ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 3 0 2013

at ____ o'clock and ____ min. ___ M
SUE BEITIA, CLERK

MAHEALANI VENTURA-OLIVER
PO Box 758
Waiakoa, HI 96790

MAHEALANI VENTURA-OLIVER
Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

United States of America

Plaintiff,

vs.

Mahealani Ventura-Oliver,

Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:11-CR-00503-JMS(01)

Notice of Motion and Motion to
Dismiss Counts 1-16, 17, 18 and 25 of
the Superseding Indictment Charged
Against Only Mahealani Ventura-
Oliver; Memorandum of Points and
Authorities; or In the Alternative, If the
Court Denies the Motion to
Immediately Certify the Question to the
9th Circuit for Review. _____

Date:
Time:
Judge: J. Michael Seabright

---

Comes now Mahealani Ventura-Oliver, defendant herein, and causes
to have filed her Notice of Motion and Motion to Dismiss Counts 1-16, 17,
18 and 25 of the Superseding Indictment Charged Against Only Mahealani
Ventura-Oliver; Memorandum of Points and Authorities; Declaration of
Mahealani Ventura-Oliver; or In the Alternative, If the Court Denies the
Motion to Immediately Certify the Question to the 9th Circuit for Review.

Dated: Honolulu, Hawaii, September ___, 2013

Mahealani Ventura-Oliver, Defendant

1

Mahealani Ventura-Oliver

Pro Se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| United States of America<br><br>Plaintiff,<br><br>vs.<br><br>Mahealani Ventura-Oliver,<br><br>Defendant | ) Case No.: 1:11-CR-00503-JMS(01)<br>)<br>) Notice of Motion and Motion to<br>) Dismiss Counts 1-16, 17, 18 and 25 of<br>) the Superseding Indictment Charged<br>) Against Only Mahealani Ventura-<br>) Oliver; Memorandum of Points and<br>) Authorities;; or In the Alternative, If the<br>) Court Denies the Motion to<br>) Immediately Certify the Question to the<br>) 9th Circuit for Review. _____<br>)<br>) Date:<br>) Time:<br>) Judge: J. Michael Seabright<br>) |

### Notice of Motion and Motion

To all parties and their attorneys of record:

Please take notice that on _____, 2013, at

_____ a.m., or as soon thereafter as the matter may be heard, in Courtroom

___ of the U.S. District Court located at 300 Ala Moana Blvd., Honolulu,

Hawaii, 96850, Defendant Mahealani Ventura-Oliver will move and hereby

moves for an order dismissing Counts 1-16, 17, 18 and 25 of the
Superseding Indictment against Mahealani Ventura-Oliver on the grounds
that the Political Question Doctrine mandates the dismissal of all counts of
the Superseding Indictment against Mahealani Ventura-Oliver.

The reasons for such motion are:

- Subsequent to the filing of the motion to dismiss presently before the Court, the Government's actions constructively amended and created a variance to the Superseding Indictment mandating dismissal of the Superseding Indictment; and

- The overwhelming emphasis by the Government on the Government's new exhibits showing the transfer of the ownership of land, the rescission of mortgages over the land, the registry of the conveyances and the Government's urging this Court to adopt the position of the mortgagee banks that such land transfers and mortgage rescissions are invalid despite the decisions of the Congress and the Executive Branch to exercise jurisdiction over this area mandating the imposition of the Baker v. Carr criteria mandating the Political Question Doctrine and the binding U.S. Supreme Court precedent cases upholding the sovereignty of the Kingdom of Hawaii, the Royal Patents and the rights of Native Hawaiians to their land, amongst other reasons.

This Motion is based upon the Notice of Motion, the Memorandum of
Points of Points and Authorities, and such documents presented at the
hearing of the Motion.

3

Dated: Honolulu, Hawaii, September _____, 2013.

_____
Mahealani Ventura-Oliver,
Pro Se


Mahealani Ventura-Oliver

Pro Se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| United States of America | ) Case No.: 1:11-CR-00503-JMS(01) |
| Plaintiff, | ) |
| | ) Memorandum of Points and Authorities |
| vs. | ) |
| | ) Date: |
| Mahealani Ventura-Oliver, | ) Time: |
| Defendant | ) Judge: J. Michael Seabright |
| | ) |
| | ) |
| | ) |
| | ) |

## Memorandum of Points and Authorities

- **Introduction**

This Motion incorporates by reference as if set forth in full the
Motion to Dismiss Counts 1-16 of the Superseding Indictment Against Only
Pilialoha K. Teves, Memorandum of Points and Authorities, Declaration of

Pilialoha K. Teves and the Reply filed in this case joined in by Mahealani
Ventura-Oliver.

The actions of the Government subsequent to the filing of the
aforementioned Motion mandate the dismissal of the Superseding
Indictment.

In its Opposition to the aforementioned Motion, the Government
conceded that it did not have sufficient evidence for the Superseding
Indictment stating at page 5 FN 1:

> "To the extent Teves is arguing that the Superseding Indictment must
> be dismissed because of insufficient evidence, she is again mistaken.
> *United States v. Calandra*, 414 U.S. 338, 344-45 (1974) (holding that
> an indictment valid on its face is not subject to challenge on the
> ground that the grand jury acted on the basis of inadequate or
> incompetent evidence)."

Such argument effectively conceded that the Government presented
inadequate, incompetent, and/or deficient evidence to the Grand Jury.

Additionally, the Government did not provide the entire statement
from *United States v. Calandra*, 414 U.S. 338 (1974) which was as follows
at 343-345:

> "**The scope of the grand jury's powers reflects its special role in
> insuring fair and effective law enforcement**. A grand jury
> proceeding is not an adversary hearing in which the guilt or
> innocence of the accused is adjudicated. Rather, it is an ex parte
> investigation to determine whether a crime has been committed and
> whether criminal proceedings should be instituted against any person.
> The grand jury's investigative power must be broad if its public
> responsibility is adequately to be discharged. Branzburg v. Hayes,
> supra, 408 U.S., at 700, 92 S.Ct., at 2665; Costello v. United States,
> supra, 350 U.S., at 364, 76 S.Ct., at 409.

> In Branzburg, the Court had occasion to reaffirm the importance of

the grand jury's role:

'(T)he investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen . . ..' 408 U.S., at 700, 92 S.Ct., at 2666.

'The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. . . . **'When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation.'** Wood v. Georgia, 370 U.S. 375, 392 (82 S.Ct. 1364, 1374, 8 L.Ed.2d 569) (1962). **A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'** United States v. Stone, 429 F.2d 138, 140 (C.A.2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. Costello v. United States, supra, 350 U.S. at 362 (76 S.Ct. 406 at 408). **It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made . . ..'** Id., at 701—702, 92 S.Ct., at 2666.

**The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence,** Costello v. United States, supra; Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination, Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). (Emphasis added.)

Conceding that the Superseding Indictment was based upon inadequate or incompetent evidence, the Government immediately began to lay the foundation to constructively amend and create an amendment or

variance to the Superseding Indictment by adding witnesses and documents which were not mentioned in the Superseding Indictment.

Subsequent to the filing of the aforementioned Motion, the Government filed: (1) the Government's Witness List (Doc. No. 198, filed 9/23/2013); (2) the Government's Exhibit List (Doc. No. 207, filed 9/27/2013) and (3) the Parties Joint Proposed Jury Instructions (Doc. No. 202, filed 9/26/2013).

- **The Government's Actions Constructively Amended and Created a Variance to the Superseding Indictment Mandating Dismissal of the Superseding Indictment.**

  - **The Criteria Set Forth in the Precedents for a Constructive Amendment or Variance Are Fulfilled.**

In *U.S. v. Adamson*, 291 F.3d 606 (9th Cir., 2002), the court stated how an indictment can be dismissed after being returned based upon constructive amendments or variances at 291F.3d at 614-615:

> **"The Fifth Amendment guarantees a criminal defendant "[the] right to stand trial only on charges made by a grand jury in its indictment."** *United States v. Garcia-Paz,* 282 F.3d 1212, 1215 (9th Cir.2002). **After an indictment has been returned and criminal proceedings are underway, the indictment's charges may not be broadened by amendment, either literal or constructive, except by the grand jury itself.** *See Stirone v. United States,* 361 U.S. 212, 215-16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Pazsint,* 703 F.2d 420, 423 (9th Cir.1983).
>
> **"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them."** *United States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984); see also *United States v. Dipentino,* 242 F.3d 1090, 1094 (9th Cir.2001) ("A

7

**constructive amendment `involves a change, whether literal or in effect, in the terms of the indictment.'")** (quoting *Jones v. Smith*, 231 F.3d 1227, 1232 (9th Cir.2000)). **A variance, on the other hand, "occurs when ... the evidence offered at trial proves facts materially different from those alleged in the indictment."** *Von Stoll*, 726 F.2d at 586 (quoting *United States v. Cusmano*, 659 F.2d 714, 718 (6th Cir.1981)).

The line between a constructive amendment and a variance is at times difficult to draw. *See, e.g.,* 3 Charles Alan Wright, Federal Practice and Procedure, Criminal § 516 (2d ed.1982) (observing that "[a] rather shadowy distinction has been drawn between amendment and variance"); *United States v. Antonakeas*, 255 F.3d 714, 722 (9th Cir.2001) (observing that "[t]he distinction between an amendment to an indictment and a variance is blurred"). **Nevertheless, the line is significant because, whereas a constructive amendment always requires reversal, "a variance requires reversal only if it prejudices a defendant's substantial rights."** *United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir.1991).

**In our efforts to draw this line, we have found constructive amendment of an indictment where (1) "there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument," or (2) "the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved."** *Von Stoll*, 726 F.2d at 586; *see also Dipentino*, 242 F.3d at 1094-95 (finding constructive amendment where indictment charged defendants with allowing scraped asbestos-containing materials to dry out on floor, instead of placing materials, while wet, into leak proof containers, but jury instruction permitted jury to convict defendants for failing to deposit asbestos containing materials as soon as possible at waste disposal site meeting appropriate federal requirements); *United States v. Carlson*, 616 F.2d 446, 447-48 (9th Cir.1980) (finding constructive amendment where indictment charged defendant with misapplying bank funds by causing loan to be made for personal use, but evidence and instructions permitted conviction for misapplying bank funds by causing loan to be made knowing that it was inadequately secured); *Howard v. Dagget*, 526 F.2d 1388 (9th Cir.1975) (**finding**

8

**constructive amendment where indictment charged defendant with inducing two named women to engage in prostitution but evidence and instructions allowed jury to convict defendant of inducing women neither named nor mentioned in indictment).**

**Although a constructive amendment usually involves a complex of facts, we have generally found a variance where the indictment and the proof involve only a single, though materially different, set of facts.** *See Von Stoll,* 726 F.2d at 586 (finding nonfatal variance where indictment charged defendant with "transporting in interstate commerce $10,000 that was taken by fraud from Ron McCallum" but proof and instructions allowed jury to convict defendant of taking $10,000 from McCallum's business partner); *United States v. Tsinhnahijinnie,* 112 F.3d 988, 990-92 (9th Cir.1997) **(finding fatal variance where indictment charged defendant with sexual abuse of child occurring on Indian reservation during summer of 1992, but proof fluctuated between placing the abuse at place and time in indictment and placing it off reservation in 1994)**; *Olson,* 925 F.2d at 1174-75 (finding nonfatal variance, in mail fraud prosecution, where indictment charged "a scheme to defraud and to obtain money" but jury instructions required proof that defendants schemed to defraud by obtaining "money or property"); *Jeffers v. United States,* 392 F.2d 749, 752-53 (9th Cir.1968) (finding fatal variance where indictment alleged that money solicited by religious group was used for non-religious purposes, but evidence failed to prove that use was non-religious, instead showing that use was merely contrary to representations made when money was collected)." (Emphasis added.)

In this case the setting forth of 40 witnesses and 36 categories of documents almost all of which were not mentioned in the Superseding Indictment created an amendment to the Superseding Indictment.

The 9th Circuit case of *U.S. v. Choy,* 309 F.3d 602 (9th Cir., 2002) held that the evidence produced at trial caused a variance in the indictment resulting in a violation of Choy's 5th Amendment right to be charged by a Grand Jury. The court stated at 309 F.3d at 607:

9

"Choy's bribery conviction was also legal error, indeed constitutional error, in another respect. **The theory on which he was convicted constituted a fatal variance from the offense alleged in the indictment, violating Choy's Fifth Amendment right to be charged by a grand jury.** _See Stirone v. United States,_ 361 U.S. 212, 217-18, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

The grand jury indicted Choy for giving "a thing of value (to wit, $5,000)" to a public official. The "thing of value" given to a public official is an element of the bribery charge. _See_ 18 U.S.C. § 201(b). Choy was convicted, however, on the theory that giving the $5,000 to a private individual indirectly conferred value — the opportunity to receive bribes in the future — on a public official. This version of the purported bribe involves a set of facts distinctly different from that set forth in the indictment, which Choy could not have anticipated. _See United States v. Garcia-Paz,_ 282 F.3d 1212, 1216-17 (9th Cir.2002) (stating that cases holding variance fatal were those where conviction was permitted on _different behavior_ from that alleged in indictment), _cert. denied,_ ___ U.S. ___, 123 S.Ct. 47, ___ L.Ed.2d ___ (2002); _Jeffers v. United States,_ 392 F.2d 749, 751-52 (9th Cir.1968) (finding a fatal variance where the indictment charged that donations from followers of a religious group were used for non-religious purposes, but the evidence showed only that the money was used in ways contrary to the representations made when collecting it); _cf. United States v. Antonakeas,_ 255 F.3d 714, 722 (9th Cir.2001) (finding that, where indictment charged the defendant with conspiracy to distribute marijuana in Hawaii, and the prosecution failed to prove the nexus with Hawaii at trial, there was only one set of facts and, thus, no constructive amendment of the indictment). **Because the indictment and the evidence presented at trial represented two distinct sets of facts, the second of which could not be anticipated by Choy, the variance amounts to an impermissible constructive amendment of the indictment.** _See id.; see also United States v. Miller,_ 471 U.S. 130, 134-40, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (where an element of the offense is not "fully and clearly set out in the indictment," _id._ at 136, 105 S.Ct. 1811, the difference between the offense charged and the offense proved at trial is a fatal variance).

\*\*\*\*\*

10

**Striking the bribery conviction for legal error in turn requires striking the conspiracy conviction.** The jury returned a general verdict of guilty on the multi-count conspiracy charge against Choy. Because one of the counts — bribery — was based on a "legally inadequate theory" and conviction on that theory constituted a fatal variance from the indictment, the conviction cannot stand. *See Griffin,* 502 U.S. at 55-56, 59, <u>112 S.Ct. 466</u>. We vacate the conspiracy conviction and remand for retrial, if the government decides to pursue the matter further. *See Barona,* 56 F.3d at 1098." (Emphasis added.)

In the present case, once all of the witnesses have testified and the exhibits entered the case will be different.

- **Dismissal Is Mandated.**

    - **The Government Witness and Exhibit Lists Mandate Dismissal.**

In the present case, the witnesses and exhibits proposed by the Government will be a constructive amendment of the Superseding Indictment and a variance of the proof required for the existing Superseding Indictment by proving a different set of facts than alleged in the present Superseding Indictment, once presented to the jury.

The present Superseding Indictment contains two very narrow conspiracy charges (Counts 1-16 against Mahealani Ventura-Oliver and Pilialoha K. Teves) and related charges (Counts 17, 18 and 25 against Mahealani Ventura-Oliver).

These charges are based upon minimal overt acts involving approximately 20 individuals other than the 4 Defendants executing approximately 30 individual documents. The Parties Joint Jury Instructions

11

are limited to the Superseding Indictment.

The Superseding Indictment only named Mahealani Ventura-Oliver in general terms in Counts 1-16. Count 1 was the only count making any specific factual allegation about her as to time and action. Such allegations did not support the general allegations in Count 1 as they alleged acts unrelated to the general conspiracy allegations of Count 1. Such particular allegations stated:

> "2. On or about February 11, 2008, MAHEALANI OLIVER signed a "Private Bond Order for Payment" for $300,000 made payable to Chase Home Loan Finance, LLC."

> "4. On or about February 11, 2008, JOHN D. OLIVER and MAHEALANI OLIVER sent a "Private Bond Order for Payment" to Chase Home Loan Finance, LLC for purported payment of their loan."

> "5. On or about February 11, 2008, MAHEALANI VENTURA-OLIVER notarized the signature of an individual whose initials are "G.A." on a "Bonded Promissory Note."

> "7. On or about August 12, 2008, MAHEALANI VENTURA-OLIVER wrote a check for $3,000 to Peter Hoy."

The documents identified in the Superseding Indictment compared to the witnesses identified by their initials show that only the following witnesses can testify as to documents set forth in the Superseding Indictment relating to Mahealani Ventura-Oliver and Pilialoha K. Teves, if at all:

Count 1 ("WK"- Wayne Kanishiro) – Receipt for $2,500- signed by Pilialoha K. Teves;

Defendants (unnamed) alleged to have caused documents to be

mailed:

Count 2 ("JA"- Jerry Agbannadag)- "Private Offset Discharging and Indemnity Bond";

Count 3 ("GA"- Guy Aina)- "Bonded Promissory Note";

Count 4 ("MV" and "CW"- Myra Villa (not on witness list) and Christopher Westen)- "Private Bond Order for

Payment ..Negotiable";

Count 5 ("CK"- Charlotte Kanaele)- "Bonded Promissory Note";

Count 6 ("MS"- Marnel Lozano nee Soares)- "Bonded Promissory Note";

Count 7 ("NL"- Noreen Lane)- "Bonded Promissory Note";

Count 10 ("MV"- Melvin Valois)- "Private Offset Discharging and Indemnity Bond"; and

Count 11 ("WK"- Wayne Kanishiro) - "Bonded Promissory Note".

In contrast, the Government's Witness List identifies 41 witnesses and the Government's Exhibit List consists of 23 pages of 38 categories of exhibits. This discrepancy as shown by the identity of the Government's witnesses and the Government's exhibits compared to the Superseding Indictment, demonstrates the Government's intention to prove a conspiracy and actions far different than those alleged in the Superseding Indictment.

The Government admits to this intention by including the following Proposed Joint Jury Instruction to conceal its activity:

> **"You have heard evidence that the defendants committed other acts not charged here**. You may consider this evidence only for its bearing, if any, on the question of the defendants intent, motive, opportunity, preparation, plan, knowledge or absence of mistake, and for no other purpose. You may not consider this evidence as evidence of guilt of the crimes for which the defendants are now on trial."

(Emphasis added.)

The Government knows that case precedent holds that putting forth evidence of different actions will constructively amend the Superseding Indictment  and result in their convicting the defendants on charges not in the Superseding Indictment.

The Government's Witness List does not list witnesses whose names support the initials listed in Count 1- "Overt Acts" paragraphs 11 (AA) and 15 (AV),  Count 6 (MS although a Marnel Lozano, nee Soares is shown), Count 8 (VM), Count 9 (DL), Count 12 (BA), Count 13 (AA), Count 14 (AV), Count 15 (JH) and Count 16 (WP) of the Superseding Indictment mandating that that Count 1 be dismissed in whole or part.

The Government's Witness List does not list witnesses whose names support the initials listed in Counts 8 (VM), 9 (DL), 12 (BA), 13 (AA), 14 (AV), 15 (JH), and 16 (WP) of the Superseding Indictment mandating that these counts be dismissed in their entirety or in the alternative that the Government be precluded from bringing any evidence to support such counts.

The names on the Government's Witness List supporting the initials or names in the remaining counts are: Count 1- "Overt Acts" paragraphs 1 (John Oliver for himself), 3 (John Oliver for himself), 4 (John Oliver for himself), 8 (Leatrice Lehua Hoy for herself; Tanya Andaya as "TA"), 9 (Leatrice Lehua Hoy for herself; Tanya Andaya as "TA"), 10 (Leatrice Lehua Hoy for herself) and 12 (John Oliver for himself); Count 2 ("JA"- Jerry Agbannadag); Count 3 ("GA"- Guy Aina); Count 4 ("MV" and "CW"- Myra Villa (not on witness list) and Christopher Westen); Count 5 ("CK"- Charlotte Kanaele); Count 6 ("MS"- Marnel Lozano nee Soares); Count 7

("NL"- Noreen Lane); Count 10 ("MV"- Melvin Valois), Count 11 ("WK"-Wayne Kanishiro), Count 18 (John Oliver for himself) and Count 25 (John Oliver for himself).

The Government's Witness List did not have witness names supporting the names or initials set forth in the following counts of the Superseding Indictment relating to Mahealani Ventura-Oliver and Pilialoha K. Teves: Counts 8 ("VM"), 9 ("DL"), 12 ("BA"), 13 ("AA"), 14 ("AV"), 15 ("JH"), 16 ("WP") and 17.

All other names identified on the Government's Witness List did not appear as names or initials in the Superseding Indictment.

The Government's Exhibit List sets forth numerous proposed exhibits containing names which do not correlate to the names of proposed witnesses on the Government's Witness List: (1) Exhibits 1, 1A, 1C, 1E-J, 1L-U; (2) Entire Exhibit 8; (3) Exhibits 18 G, H; (4) Entire Exhibits 26- 36.

Of the remaining Exhibits on the Government's Exhibit List, only those exhibits which were mentioned in the Superseding Indictment are directly relevant to prove the counts in the Superseding Indictment (See Proposed Jury Instructions).

- **The Trial Deposition of Francisca Lono Mandates Dismissal.**

On September 24, 2013, the Government took the deposition of Francisca Lono pursuant to Court Order in lieu of appearing at trial. A true and correct copy of the Transcript of the Testimony of Francisca Lono is now part of the Court Record and incorporated herein as if set forth in full.

In such testimony, Francisca Lono authenticated Exhibits 9-9j. Neither Francisca Lono nor any of the Exhibits 9-9j were mentioned in the

15

Superseding Indictment.

Francisca Lono specifically testified that only John Oliver told her about the use of the IRS forms and that it was John Oliver who sold her the CD which she used to fill out the IRS forms (RT p. 38 ln. 7- p. 39, ln. 20) (RT p. 64 ln. 17-25) and that she did not know who mailed the bond (Government Exhibit 9) (RT p. 26 ln. 21- p. 27 ln. 2) (RT p. 59 ln. 6-9) (RT p. 70 ln. 17-24).

The remaining exhibits related to the land, receipts, checks or confirmation of mail deliveries.  The trial deposition of Francisca Lono confirmed the Government's actions to constructively amend the Superseding Indictment.

- **The New Exhibits Mandate Dismissal under the *Baker v. Carr* Criteria of the      Political Question Doctrine and Supreme Court Precedent Holds that Kingdom of Hawaii Sovereignty and Royal Patents Control the Land.**

The new exhibits relating to the transfers of land to the trusts, the rescission of mortgages and disputes regarding the title to the lands controlled by Royal Patents demonstrate that the Court does not have jurisdiction to consider the Superseding Indictment under the *Baker v. Carr* criteria of the Political Question Doctrine.

The exhibits listed on the Government's Exhibit List taken in conjunction with the witnesses listed on the Government's Witness List needed to authenticate such documents and show that such documents were executed by such individuals, as occurred in the trial deposition of Francisca Lono show: (1) that land is being transferred from individual ownership to a trust; (2) that such land was the subject of a Royal Patent; (3) that previous

16

mortgages with the individual owner on such transferred land are being rescinded by the trust; (4) that the mortgagee bank is challenging the rescission or other action related to the land; (5) that the Government is advocating the position of the mortgagee bank as part of its proof of a conspiracy; and (6) that by doing such, the Government is asking the Court to enter into the exclusive area of the Congress and Executive Branch and rule on the Kingdom of Hawaii's sovereign right to its land, the land system instituted by the Kingdom of Hawaii, the Royal Patent system and the Native Hawaiian's sovereign rights to their lands, whereas the U.S. Supreme Court and other federal courts have previously held that the court does not have jurisdiction to do such under the *Baker v. Carr* criteria of the Political Question Doctrine (See *Sai v. Clinton*, 778 F.Supp.2d 1 (D.D.C. 2011), Aff'd. Per Curiam *Sai v. Obama* al., (USCA, DCA No. 11-5142 9/26/2011) and cases cited therein).

As a corollary, the testimony set forth in the Grand Jury Transcripts of Steven Carter dated May 26, 2011 and September 1, 2011, and Malia Dougan dated May 26, 2011 shows that the Grand Jury was never made aware that the Government was adopting a position of asking the court to rule on the Kingdom of Hawaii's sovereign right to its land, the land system instituted by the Kingdom of Hawaii, the Royal Patent system and the Native Hawaiian's sovereign rights to their lands, whereas the U.S. Supreme Court and other federal courts have previously held that the court does not have jurisdiction to do such under the *Baker v. Carr* criteria of the Political Question Doctrine by advocating on behalf of the mortgagee banks that the rescission of the mortgages was improper or illegal.

By withholding such information from the Grand Jury, the

Government deprived the Grand Jury of the opportunity to fully investigate and fairly determine whether an indictment should issue.

The United States Supreme Court held that the Royal Patent controls Hawaii land questions as early as 1904 in the case of *Samuel Damon v. Territory of Hawaii*, 194 U.S. 154, 24 S.Ct. 617, 48 L.Ed. 916 (1904) stating at 194 U.S. at 160-161 as follows:

> **"However, in this case it is not necessary to invoke the statutes further than to show that, by the law in force since 1846, at least, such rights as the plaintiff claims, and which, as is shown by the evidence, he and his predecessors in title have been exercising for forty years, have been recognized as private property. Such is the view of the leading case, decided in 1858 and acquiesced in, we believe, ever since.** *Haalelea* v. *Montgomery*, **2 Hawaiian R. 62, 66. In the present instance the plaintiff claims under a royal patent, admitted to have been effective as to whatever, by its true construction, it purported to convey. This patent describes the ahupuaa by metes and bounds, and then the granting clause goes on: 'There is also attached to this land a fishing right in the adjoining sea, which is bounded as follows,' again giving boundaries, and continuing: 'The islands of Mokumoa, Mokuonini, and Mokuoco are a part of Moakalua and are included in the above area.'**

> The description of what is intended to be conveyed could not be plainer. But the habendum is 'to have and to hold the above granted land,' and it is said that, as the fishery of an overlord or konohiki, unlike the rights of tenants, did not pass as an incident of land, but must be distinctly granted, the fishery was not included in the patent. *Haalelea* v. *Montgomery*, 2 Hawaiian Rep. 62, 71. Again, we must avoid being deceived by a form of words. We assume that a mere grant of the ahupuaa without mention of the fishery would not convey the fishery. But it does not follow that any particular words are necessary to convey it when the intent is clear. When the description of the land granted says that there is incident to it a definite right of fishery, it does not matter whether the statement is technically accurate or not; it is enough that the grant is its own dictionary and

18

explains that it means by 'land' in the habendum, land and fishery as well. There is no possibility of mistaking the intent of the patent. If declares that intent plainly on its face. There is no technical rule which overrides the expressed intent, like that of the common law, which requires the mention of heirs in order to convey a fee. **We are of opinion that the patent did what it was meant to do, and therefore that the plaintiff is entitled to prevail.**" (Emphasis added.)

*Samuel Damon v. Territory of Hawaii,* was followed by the United States Supreme Court case of *Joseph O. Carter, et al., v. Territory of Hawaii*, 200 U.S. 255, 26 S.Ct. 248, 50 L.Ed. 470 (1906). The Supreme Court again upheld the Royal Patents stating at 200 U.S. at 256-257 in relevant part:

> "This is a proceeding to establish the plaintiffs' rights to a several fishery of the kind described in *Damon* v. *Hawaii*, 194 U. S. 154, 48 L. ed. 916, 24 Sup. Ct. Rep. 617, and comes here under the same circumstances as that case did. The fishery in question is a sea fishery within the reef in Waialae Iki, island of Oahu, and is claimed by metes and bounds in the complaint. The plaintiffs are owners of the adjacent land under a royal patent following upon an award of the Land Commission, and the only difference between this case and the former one is that in this, the fishery is not described in the royal patent, and that, apart from the question of prescription, upon which we shall say nothing, the plaintiffs have to rely upon the statutes alone. They offered evidence at the trial that, before the action of the King in 1839, those under whom the plaintiffs claim title had enjoyed, from time immemorial, rights similar to those set out in the statutes, and also that they had been in continuous, exclusive, and notorious possession of the konohiki right for sixty years. They offered, in short, to prove that their predecessor in title was within the statutes, and therefore owned the fishery, it not being disputed that if he did, the plaintiffs own it now. The judge rejected the evidence, and entered judgment for the defendant, and, on exceptions, this judgment and that in *Damon* v. *Hawaii* were sustained at the same time, in one opinion, by the supreme court. 14 Haw. 465.

We deem it unnecessary to repeat the ground of our intimation in the former case, that the statutes there referred to created vested rights. We simply repeat that, in our opinion, such was their effect. The fact that they neither identified the specific grantees nor established the boundaries is immaterial when their purport as a grant or confirmation is decided. It is enough that they afforded the means of identification, and that presumably the boundaries can be fixed by reference to existing facts, or the application of principles which have been laid down in cases of more or less similar kind.

The omission of the plaintiffs' predecessor in title to establish his right to the fishery before the Land Commission does not prejudice their case. See *Kenoa* v. *Meek*, 6 Haw. 63. That commission was established to determine the title to lands as against the Hawaiian government. In practice it treated the fisheries as not within its jurisdiction, and it would seem to have been right in its view. See *Akeni* v. *Wong Ka Mau*, 5 Haw. 91."

Neither *Samuel Damon v. Territory of Hawaii* nor *Joseph O. Carter, et al., v. Territory of Hawaii* have been distinguished or overturned by subsequent U.S. Supreme Court cases and are presently binding precedent on this court on the issue that the Royal Patent controls the title to land in Hawaii.

- **The Hawaii Supreme Court Recognized the Sovereignty of the Kingdom of Hawaii and the Royal Patent System as Controlling**.

In the case of *Omerod v. Heirs of Kaheananui*, 172 P.3d 983 (Hawaii, 2007), the court stated at 172 P.3d at 990-992 as follows in relevant part:

**"This court has recognized that the traditional Hawaiian concept of land ownership was markedly different from Western notions of ownership embodied in the common law.** *Pub. Access Shoreline Haw. v. Hawai`i County Planning Comm'n,* 79 Hawai`i 425, 442, 903 P.2d 1246, 1263 (1995) [hereinafter, *PASH*]; *In re Boundaries of Pulehunui,* 4 Haw. 239, 240-41 (1879) (stating that, "from prehistoric times, every portion of the land constituting these Islands was

20

included in some division, larger or smaller, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood").

Under the Constitution of 1840, although all the land "belonged" to the King, it was not his personal property. *PASH,* 79 Hawai`i at 443, 903 P.2d at 1264 (quoting *Reppun v. Bd. of Water Supply,* 65 Haw. 531, 542, 656 P.2d 57, 65 (1982)). Rather, it belonged to the chiefs and the people, and the King, as the head of the chiefs and the people, managed the land. *Id.* "Thus, prior to the Mahele, all the land remained in the public domain." *Id.*

As noted previously, under the traditional land tenure, the islands were apportioned into large tracts called ahupua`as. Large ahupua`as generally contained subdivisions called `ilis. *Territory v. Tr. Est. Kanoa, Dec. et al.,* 41 Haw. 358, 361 (1956). The `ilis were managed by konohikis, the King's chiefs, who brought the `ili's revenues to the chief who owned the ahupua`a. *Harris v. Carter,* 6 Haw. 195, 206 (1877).

In 1845, the Board of Commissioners to Quiet Land Titles (Land Commission) was established to facilitate the transition from the traditional landholding scheme to a more western system, while preserving the traditional concept of joint ownership. Its initial purpose was "to investigate and settle all land claims of private individuals, whether native or foreign." *Makila Land Co., LLC v. Kapu,* 114 Hawai`i 56, 58, 156 P.3d 482, 484 (App.2006) (citing Melody Kapilialoha MacKenzie ed., *Native Hawaiian Rights Handbook* 151 (1991)). "It was the Land Commission's responsibility to ascertain or reject claims of interests in land brought before it." *PASH,* 79 Hawai`i at 445, 903 P.2d at 1266. The Principles of the Land Commission required the commissioners to "first elicit from creditable witnesses, the fact or history of each [claim]; and thus assort or reconcile those facts to the provisions of the civil code, whenever there is a principle in past legislation applicable to the point under consideration; but when no such principle exists, they may judicially declare one, in accordance with ancient usage and not at conflict with any existing law, nor at variance with the facts, and altogether equitable and liberal."

*Kapiolani Estate v. Atcherley,* 21 Haw. 441, 459 (1913) (Perry,

J., concurring and dissenting) (quoting Principles of the Land Commission, R.L., p. 1175). "The awards of the [Land C]ommission were to be deemed final and binding upon all parties unless appealed." *McBryde Sugar Co., Ltd. v. Robinson*, 54 Haw. 174, 185, 504 P.2d 1330, 1338 (1973).

After the Land Commission entered a Land Court Award (LCA), the Minister of Interior could issue a Royal Patent after the awardee paid a commutation fee. *State v. Zimring*, 58 Haw. 106, 111, 566 P.2d 725, 730 (1977). **In essence, a Royal Patent was a quitclaim of the government's interest in the pertinent land.** *Mist v. Kawelo*, 11 Haw. 587, 589 (1898). The applicable statute provided:

A Royal Patent, signed by the King, and countersigned by the Minister of the Interior, shall issue under the great seal of the kingdom to the purchaser in fee simple of any Government land or other real estate; and also to any holder of an award from the [Land Commission] for any land in which he may have commuted the Government rights.

*Pratt v. Holloway*, 17 Haw. 539, 541 (1906) (internal quotation marks and citation omitted). In order to obtain a Royal Patent, and therefore to obtain fee simple ownership of land conveyed during the Mahele, an awardee needed to present a Boundary Commission judgment describing his or her land by metes and bounds. *In re Boundaries of Paunau*, 24 Haw. 546, 556 (1918) (noting that the purpose of the Boundary Commission and its "right to certify boundaries was to enable owners of land which had been awarded ... by name only to obtain [R]oyal [P]atents defining their lands by metes and bounds[]" (citation omitted)).

"In 1847, the King together with the Privy Council determined that a land mahele, or division, was necessary for the prosperity of the Kingdom." *Zimring*, 58 Haw. at 112, 566 P.2d at 730. According to this plan, "the King [would] retain all his private lands as individual property and ... that of the remaining lands, one-third was to be set aside for the Government, one-third to the chiefs and konohiki and one-third for the tenants." *Id.* (footnotes omitted). The Great Mahele started in 1848. *Id.* "The Mahele agreements were essentially reciprocal quitclaims and did not convey title. Detailed claims

had to be presented to the Land Commission for formal
[LCAs]." *Id.*

Similarly, the Land Commission itself could not convey fee
simple title to land. *PASH,* 79 Hawaiʻi at 445, 903 P.2d at 1266
(citing J. Chinen, *The Great Mahele: Hawaii's Land Division of 1848*
(1958)). "Rather, its duty was to define each applicant's identifiable
interests in land and issue an award describing those interests. Actual
title to land could be gained only by a payment of commutation to the
Kingdom and issuance of a royal patent." *Id.*

Thus, "[t]o establish legally cognizable private title to land ...
one must show that he or a predecessor-in-interest acquired a [LCA],
a Royal Patent, a Kamehameha Deed, a Grant, a Royal Patent Grant,
or other government grant for the land in question." *Zimring,* 58 Haw.
at 114, 566 P.2d at 731 (citing <u>Thurston v. Bishop, 7 Haw. 421</u>
<u>(1888); In re Title of Pa Pelekane, 21 Haw. 175 (1912)</u>); *see also*
<u>Rose v. Yoshimura, 11 Haw. 30, 32 (1897)</u> (stating that "neither the
Mahele ... nor an application for an award gave any title, and ... until
an award was made by the [Land Commission] or by the Minister of
the Interior (after 1860), the land must be considered to still belong to
the government[]" (internal citations omitted)).

Because of the enormous amount of land involved, "[t]he
Mahele ... was ... made without survey. Tracts of land ... were
awarded to those entitled by name of the ahupuaa or ili. By such grant
was intended to be assigned whatever was included in such tract
according to its boundaries as known and used from ancient times."
*Pulehunui,* 4 Haw. at 240 (internal quotation marks omitted).

When Mahele awards were presented to the Land Commission,
many LCAs were made without survey, that is, by name only.
*Paunau,* 24 Haw. at 554. Thus, the Boundary Commission was
created "to enable those who had been awarded lands by name only to
afterward procure an authentic description of their land...." *Id.* **Both
LCAs and Boundary Commission judgments *"were judicial
determinations,* and were the only legal mode of confirming and
fixing boundaries, and, when pursued were *binding upon the
whole world." <u>Territory v. Liliuokalani,</u> 14 Haw. 88, 105 (1902)**
(Thomas Fitch, Esq., concurring) (emphases added)." (Emphasis

23

added.)

- **On Their Face, the Bonds Are Private Indebtedness and Relate to the Land.**

By its description under penalty of perjury , the bond was a private bond with a private person as its "maker" and not drawn on the U.S. Treasury, but placed as an asset with the U.S. Treasury to secure a Bonded Promissory Note;

The face of the "Bonded Promissory Note from "AA" (Alfredo B. Andaya), Count 13- not a witness, (Government Doc. No. 22925) shows a debt from Alfredo B. Andaya as "Principal Maker" payable to Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Countrywide Home Loans, "Account Private Indemnity Offset Bond no. RA 070100803 paid to the order of the above [Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Countrywide Home Loans]" "as secured by the U.S. Treasury, Henry M. Paulson, Jr.....". From the face of the Bonded Promissory Note, the United States Treasury is both the Co Payee with Countrywide Home Loans and the "surety" for the Promissory Note in the event the Bonded Promissory Note is not paid by Alfredo B. Andaya as "Principal Maker", with payment of the Promissory Note being "ledgered against the bond, Private Indemnity Offset Bond no. 070100803 [sic] in which Alfredo B. Andaya is also the "Principal Maker", in which the United States Treasury is the Co Payee with Countrywide Home Loans and the bond "[i]s secured by the U.S. Treasury, Henry M. Paulson, Jr.....". (A true and correct copy of the bond is Government Exhibit 13)

The face of the "Bonded Promissory Note from "AV" (Aaron Vista),

Count 14– not a witness, (Government Doc. No. 22809) shows a debt from Aaron Vista as "Principal Maker" payable to Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Countrywide Home Loans, "Account Private Indemnity Offset Bond no. T3 0100200801 paid to the order of the above [Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Countrywide Home Loans]" "as secured by the U.S. Treasury, Henry M. Paulson, Jr…..". From the face of the Bonded Promissory Note, the United States Treasury is both the Co Payee with Countrywide Home Loans and the "surety" for the Promissory Note in the event the Bonded Promissory Note is not paid by Aaron Vista as "Principal Maker", with payment of the Promissory Note being "ledgered against the bond, Private Indemnity Offset Bond no. T3 0100200801 in which Aaron Vista is also the "Principal Maker", in which the United States Treasury is the Co Payee with Countrywide Home Loans and the bond "[i]s secured by the U.S. Treasury, Henry M. Paulson, Jr…..". (A true and correct copy of the bond is Government Exhibit 14)

The face of the "Bonded Promissory Note from "GA" (Guy Alvin Aina) Count 2 (Government Doc. No. 22890) shows a debt from Guy Alvin Aina as "Principal Maker" payable to Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Washington Mutual, "Account Private Indemnity Offset Bond no. RA 060110801 paid to the order of the above [Henry M. Paulson, Jr., dba Secretary of the United States Treasury, Department of the Treasury and Washington Mutual]" "as secured by the U.S. Treasury, Henry M. Paulson, Jr…..". From the face of the Bonded Promissory Note, the United States Treasury is both the Co

Payee with Washington Mutual and the "surety" for the Promissory Note in the event the Bonded Promissory Note is not paid by Guy Alvin Aina as "Principal Maker", with payment of the Promissory Note being "ledgered against the bond, Private Indemnity Offset Bond no. 060110801in which Guy Alvin Aina is also the "Principal Maker", in which the United States Treasury is the Co Payee with Washington Mutual and the bond "[i]s secured by the U.S. Treasury, Henry M. Paulson, Jr.....". (A true and correct copy of the bond is Government Exhibit 3)

Guy Alvin Aina also has a Royal Patent to show ownership of the underlying land subject to the mortgage (Government Doc. No. 0054199-0054201).

The examples show that the Bonded Promissory Notes are based upon claims to land and Royal Patents which involve questions of sovereignty of the Kingdom of Hawaii and of the "Native Hawaiians" over their land.

As shown in the case of *Sai v. Clinton*, 778 F.Supp.2d 1 (D.D.C. 2011), Aff'd. Per Curiam *Sai v. Obama* al., (USCA, DCA No. 11-5142 9/26/2011), the court held that the Political Question Doctrine precluded the court from taking jurisdiction over a case in which the question of title to land derived from Royal Patents under the Kingdom of Hawaii was presented.

The "Private Offset Discharging and Indemnity Bond" (Government Doc. No. 22891-22899. A true and correct copy of the bond is Government Exhibit 3B) is shown to also be related to the Royal Patents as it is a private bond by the landowner deposited in the U.S. Treasury as an asset to indemnify account

holders therein and provide an offset as follows as shown in the example of the Notice of Acceptance and Taking for Value of Guy Alvin Aina (Government Doc. No. 0054212-54212. A true and correct copy of the notice is Government Exhibit 3E):

> "....the Private Indemnity and Offset Bond deposited as an asset with the U.S. Department of Treasury duly indemnifying account holders therein and providing offset amount up to the full value of the bond for any recharge or discharge therein by the Creditor, herein Affiant".

- **The Hawaiiloa Foundation's Goal Was to Perpetuate the Royal Patents with all Donors Being Directors.**

In contrast to John Oliver's and Leatrice Lehua Hoy's mis-characterization of participants in the Hawaiiloa Foundation's seminars and programs as "customers", the Charter and Minutes of the Hawaiiloa Foundation (Govt. Doc. Nos. 0054840 – 0054851) show:

> (1) that one of the Hawaiiloa Foundation's goals is:
>
> **"To vest, maintain and perpetuate the bonded royal patenting system that is currently in place for all successor patentees and to compile data on completed patent titles."** (Charter, Govt. Doc. No. 0054844);
>
> (2) that **"all supporters should be a Director on the Board of Directors"**;
>
> and
>
> (3) **"that all supporters of an [sic] beneficiaries of the HLF, are considered to be a director on the Board of Directors"** (collectively Resolution Dated April 1, 2008, Govt. Doc. No. 0054848). (Emphasis added) (Copies of the documents are set forth in the Declaration of Pilialoha K. Teves, incorporated herein).

Under the Charter and Resolution Dated April 1, 2008, all actions

were taken by Directors of the Board of Directors of the Hawaiiloa

Foundation and not by "conspirators " and "customers" to **vest, maintain**

**and perpetuate the bonded royal patenting system that is currently in**

**place for all successor patentees.."** (Emphasis added.);

- **The Plea Agreements of John Oliver and Leatrice Lehua Hoy and the Testimony Steven Carter and Francisca Lono Showed that John Oliver, Alone, Was Responsible for the Social Security Debt Scheme.**

Early in the case, Defendant Peter Hoy also known as "Petro Hoy"

was dismissed from the case on the grounds of being "incompetent to stand

for trial". He is not listed as a witness on the Government's Witness List.

Subsequently John Oliver and Leatrice Lehua Hoy each executed a

Memorandum of Plea Agreement. Each is scheduled to be sentenced after

the trial.

The Government's Witness List shows John Oliver as a witness.

John Oliver was charged in the Superseding Indictment with violations in

all Counts 1-25. John Oliver is the estranged husband of Mahealani

Ventura-Oliver. The decision on the extent of the marital privilege is being

held for trial. John Oliver entered into a Memorandum of Plea Agreement.

A true and correct copy of the John Oliver Memorandum of Plea

Agreement (Doc. No. 130 in this case) is incorporated herein as if set forth

in full.

At Paragraph 4 of the John Oliver Memorandum of Plea Agreement,

John Oliver pled guilty to only Counts 1 and 18 and the United States

agreed to dismiss the remaining counts at the time of sentencing which is

scheduled to occur after this trial.

The John Oliver Memorandum of Plea Agreement did not give John

Oliver any immunity for his testimony on any count in the Superseding Indictment, and in particular no immunity was given for any testimony to be given relating to Counts 2-17, and 19-25 which the United States agreed to dismiss. This agreement of dismissal for testimony demonstrated: (1) that the United States did not have any case to support Counts 2-17 and 19-25 against either John Oliver or any other defendant, in particular Mahealani Ventura-Oliver and Pilialoha K. Teves; and (2) that the United States was purchasing the testimony and cooperation of John Oliver in exchange for dismissing Counts 2-16 and 19-25 as set forth in paragraphs 20, 23 and 24, respectively, of the John Oliver Memorandum of Plea Agreement.

In pleading guilty to Count 1 in Paragraph 8 of the John Oliver Memorandum of Plea Agreement, John Oliver specifically stated that all of the activities by any named defendant and specifically mentioning Mahealani Ventura-Oliver and/or Pilialoha K. Teves, were conducted by, under the auspices and control of, or on the property of the Hawaiiloa Foundation. John Oliver did not state that any activity or act by Mahealani Ventura-Oliver and/or Pilialoha K. Teves occurred outside of the auspices and control of the Hawaiiloa Foundation or outside its property.

In pleading guilty to Count 1 in Paragraph 8 of the John Oliver Memorandum of Plea Agreement, John Oliver specifically admitted:

> "During that time [May 9, 2008-March 4, 2009] Defendant [John Oliver] knew that the documents prepared by HLF [Hawaiiloa Foundation] were not real financial instruments that could be used to pay debts."

John Oliver did not state that anyone else had such knowledge and in particular did not state that Mahealani Ventura-Oliver and/or Pilialoha K. Teves had such knowledge.

Undercover FBI Agent Steven Carter stated in the Grand Jury Testimony of Steven Carter dated May 26, 2011, at page 11, ln. 1 – ln. 5 that **only** John Oliver stated that "he had access to this program [the debt assistance program]" and that the specifics of that program were not taught at the open seminar which Steven Carter attended.

The trial testimony of Francisca Lono confirmed the statement that the specifics of the program were not taught at the open seminar (RT p. 14 ln. 20- p. 15 ln. 1); confirmed that she does not have any specific knowledge as to who mailed the bond (Exhibit 9) (RT p. 26 ln. 21- p. 27 ln. 2) (RT p. 59 ln. 6-9) (RT p. 70 ln. 17-24); confirmed that she was given a template of the documents to fill in which she did (RT p. 31 ln. 24- p. 32 ln. 2); confirmed she made her check out to the Hawaiiloa Foundation (RT p. 34 ln. 16-21); confirmed that John Oliver taught the tax program and she bought the CD from which instructed her how to fill out the forms for the program from John Oliver personally for $20.00 (RT p. 38 ln. 7- p. 39, ln. 20) (RT p. 64 ln. 17-25); confirmed she did all mailings other than the bond (RT p. 48 ln. 6- p. 49, ln. 5); confirmed that the cost of the program was called a donation "kokua" (RT p. 56 ln. 4-13); confirmed no assistance from Mahealani Ventura-Oliver or Pilialoha K. Teves in the tax program (RT p. 66 ln. 7-11); and confirmed the only time she spoke with Pilialoha K. Teves was when she went to the Hawaiiloa Foundation to sign documents (RT p. 74 ln. 17-24).

In pleading guilty to Count 18 in Paragraph 8 of the John Oliver Memorandum of Plea Agreement, John Oliver specifically admitted that he prepared all of the documents submitted to the IRS and did not state that Mahealani Ventura-Oliver prepared or submitted any document to the IRS.

30

The Government's Witness List shows Leatrice Lehua Hoy as a witness who was charged in the Superseding Indictment with violations in Counts 1-16. Leatrice Lehua Hoy entered into a Memorandum of Plea Agreement. A true and correct copy of the Leatrice Lehua Hoy Memorandum of Plea Agreement (Doc. No. 133 in this case) is incorporated herein as if set forth in full.

At Paragraph 4 of the Leatrice Lehua Hoy Memorandum of Plea Agreement, Leatrice Lehua Hoy pled guilty to only Count 1 and the United States agreed to dismiss the remaining counts at the time of sentencing which is scheduled to occur after this trial.

The Leatrice Lehua Hoy Memorandum of Plea Agreement did not give Leatrice Lehua Hoy any immunity for her testimony on any count in the Superseding Indictment, and in particular no immunity was given for any testimony to be given relating to Counts 2-16 which the United States agreed to dismiss. This agreement of dismissal for testimony demonstrated: (1) that the United States did not have any case to support Counts 2-16 against either Leatrice Lehua Hoy or any other defendant, in particular Mahealani Ventura-Oliver and Pilialoha K. Teves; and (2) that the United States was purchasing the testimony and cooperation of Leatrice Lehua Hoy in exchange for dismissing Counts 2-16 as set forth in paragraphs 20, 23 and 24, respectively, of the Leatrice Lehua Hoy Memorandum of Plea Agreement;

In pleading guilty to Count 1 in Paragraph 8 of the Leatrice Lehua Hoy Memorandum of Plea Agreement, Leatrice Lehua Hoy specifically admitted that all of the activities by any named defendant and specifically mentioning Mahealani Ventura-Oliver and/or Pilialoha K. Teves were

31

conducted by, under the auspices and control of, or on the property of the Hawaiiloa Foundation. Leatrice Lehua Hoy did not state that any activity or act by Mahealani Ventura-Oliver and/or Pilialoha K. Teves occurred outside of the auspices and control of the Hawaiiloa Foundation or outside its property.

In pleading guilty to Count 1 in Paragraph 8 of the Leatrice Lehua Hoy Memorandum of Plea Agreement, Leatrice Lehua Hoy specifically admitted that bonds and other documents were prepared from "computer templates".

In pleading guilty to Count 1 in Paragraph 8 of the Leatrice Lehua Hoy Memorandum of Plea Agreement, Leatrice Lehua Hoy specifically admitted that the source of her knowledge that the "bonds were not legitimate financial instruments" was a "**November 17, 2008, newspaper article in which the Federal Bureau of Investigation warned the public that the bonds were not legitimate financial instruments.**" Leatrice Lehua Hoy did not point to any court decision holding that the bonds were not legitimate financial instruments.

On November 17, 2008, Mahealani Ventura-Oliver executed a declaration on behalf of the Hawaiiloa Foundation stating that the Hawaiiloa Foundation "DOES NOT SELL BONDS AND DOES NOT PARTICIPATE IN MORTGAGE SCAMS", "GIVES FREE PUBLIC CLASSES", "ABIDES BY THE LAW WITH THE IRS PROMOTING UNITY WITHIN THE LAW AND BY THE LAW", amongst other things (Government Doc. No. 0054197).

## Conclusion

On the eve of a three week trial, the underlying truth of the

Government's case is apparent. The Superseding Indictment against Mahealani Ventura-Oliver and Pilialoha K. Teves must be dismissed.

The Government conceded that its case was insufficient or inadequate in the Government's Opposition to the Motion to Dismiss of Pilialoha K. Teves.

It reinforced such concession through its actions to constructively amend and create a variance to the Superseding Amendment by adding witnesses and exhibits to the trial who and which were never mentioned in the Superseding Indictment and possibly not even to the Grand Jury. It solidified such concession with the Memoranda of Plea Agreements of John Oliver and Leatrice Lehua Hoy, the Grand Jury Testimony of Steven Carter and Malia Dougan and the Trial Deposition of Francisca Lono, none of which established that either Mahealani Ventura-Oliver or Pilialoha K. Teves were guilty of any of the charges in the Superseding Indictment.

The Trial Deposition of Francisca Lono was particularly significant as Francisca Lono was: (1) never identified in the Superseding Indictment; and (2) the Government used her deposition to primarily authenticate numerous documents all of which but one were never set forth in the Superseding Indictment and confirm that Mahealani Ventura-Oliver and Pilialoha K. Teves did not participate in the conspiracies charges in the Superseding Indictment in Counts 1-16, 17, 18 and 25 and 1-16 respectively.

Based upon these actions, it may be safely determined that the Government if required to submit an offer of proof of its proposed witness testimony and exhibits to be entered will state that it will spend the entire three week trial doing the exact same thing with the other 40 witnesses and

36 sets of exhibits that it did in the Francisca Lono trial deposition with a few exceptions for testimony from custodians of records and Steven Carter, based upon the Government's Witness and Exhibit Lists.

The result will be a constructive amendment or variation to the Superseding Indictment and the imposition of the *Baker v. Carr* criteria of the Political Question Doctrine, all of which mandate dismissal of the Superseding Indictment.

Mahealani Ventura-Oliver respectfully requests that the Court eliminate the waste of judicial time and effort involved in a three week trial by requiring the Government to provide the aforementioned offer of proof and upon receiving such, dismissing the Superseding Indictment, or in the alternative certifying the question to the 9th Circuit for appeal.

Dated: Honolulu, Hawaii, September ___, 2013.

Mahealani Ventura-Oliver,
Pro Se

34

# CERTIFICATE OF SERVICE

I, RUSTAM A. BARBEE, hereby certify that a true and exact copy of the foregoing document was duly mailed and/or faxed and/or hand-delivered to the following on September 30, 2013:

LAWRENCE TONG, ESQ.
Assistant United States Attorney
PJKK Federal Building
300 Ala Moana Boulevard, Room 6-100
Honolulu, Hawaii   96850
*Attorney for Plaintiff*
*UNITED STATES OF AMERICA*

RICHARD D. GRONNA, ESQ.
841 Bishop St., Ste. 2201
Honolulu, HI 96813
*Attorney for Defendant*
*PILIALOHA TEVES*

DATED:   Honolulu, Hawaii, September 30, 2013.


_____
MAHEALANI VENTURA-OLIVER
Defendant