1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

   UNITED STATES OF AMERICA,     ) CRIMINAL NO. 11-00503JMS
4                                )
              Plaintiff,         ) Honolulu, Hawaii
5                                ) October 8, 2013
        vs.                      ) 8:36 a.m.
6                                )
   (01) MAHEALANI VENTURA-OLIVER ) FURTHER JURY TRIAL - DAY 4
7  (03) PILIALOHA K. TEVES,      )
                                 )
8              Defendants.       )
   _____)
9

10                 TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
11               UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13   For the Government:      LAWRENCE L. TONG, ESQ.
                             MICHAEL DAVID NAMMAR, ESQ.
14                           Office of the U.S. Attorney
                             PJKK Federal Building
15                           300 Ala Moana Blvd., Suite 6100
                             Honolulu, Hawaii  96850
16

17   For Defendant          RUSTAM A. BARBEE, ESQ.
     Ventura-Oliver:        Attorney at Law
18                          1188 Bishop Street, Ste. 2606
                            Honolulu, Hawaii  96813
19

20   For Defendant Teves:   RICHARD D. GRONNA, ESQ.
                            Attorney at Law
21                          841 Bishop Street, Suite 2201
                            Honolulu, Hawaii 96813
22

23   Official Court         Cynthia Fazio, CSR, RMR, CRR
     Reporter:              United States District Court
24                          P.O. Box 50131
                            Honolulu, Hawaii  96850
25  Proceedings recorded by machine shorthand, transcript produced
    with computer-aided transcription (CAT).

1                          <u>I N D E X</u>

2

3    <u>EXAMINATIONS</u>                                        <u>PAGE</u>

4    STEVEN CARTER.......................................
          DIRECT EXAMINATION BY MR. TONG....................  77
5         VOIR DIRE EXAMINATION BY MR. BARBEE..............  80
          RESUMED DIRECT EXAMINATION BY MR. TONG...........  82
6         VOIR DIRE EXAMINATION BY MR. BARBEE..............  94
          RESUMED DIRECT EXAMINATION BY MR. TONG...........  95
7
     LEATRICE HOY.......................................
8         DIRECT EXAMINATION BY MR. NAMMAR................. 102
          RESUMED DIRECT EXAMINATION BY MR. NAMMAR......... 137
9         CROSS-EXAMINATION BY MR. BARBEE.................. 185
          CROSS-EXAMINATION BY MR. GRONNA................. 209
10        REDIRECT EXAMINATION BY MR. NAMMAR............... 211
          RECROSS-EXAMINATION BY MR. BARBEE............... 214
11        RECROSS-EXAMINATION BY MR. GRONNA............... 215

12   MATTHEW JOHNSON.....................................
          DIRECT EXAMINATION BY MR. NAMMAR................. 217
13        VOIR DIRE EXAMINATION BY MR. BARBEE............. 222
          RESUMED DIRECT EXAMINATION BY MR. NAMMAR......... 223
14        CROSS-EXAMINATION BY MR. BARBEE................. 246
          CROSS-EXAMINATION BY MR. GRONNA................. 248
15        REDIRECT EXAMINATION BY MR. NAMMAR............... 253

16

17

18

19

20

21

22

23

24

25

1                           E X H I B I T S

2     GOVERNMENT'S:                                              PAGE

                                                                  82
      1-T was received in evidence........................
4     1-U was received in evidence........................  95

5     1-J was received in evidence........................ 138

6     1-L was received in evidence........................ 140

7     1-M and 1-O were received in evidence.............. 142

8     1-F was received in evidence........................ 152

9     12 was received in evidence........................ 155

10    12-A was received in evidence........................ 160

11    12-B was received in evidence........................ 161

12    5-A was received in evidence........................ 165

13    8-A was received in evidence........................ 166

14    9-A was received in evidence........................ 166

15    10-A was received in evidence........................ 167

16    11-A was received in evidence........................ 168

17    13-A was received in evidence........................ 168

18    1-K was received in evidence........................ 171

19    30-A was received in evidence........................ 177

20

21

22

23

24

25

1   TUESDAY, OCTOBER 8, 2013                              8:36 A.M.

2              (The following proceedings were held in open court out

3   of the presence of the jury:)

4              THE CLERK:  Criminal Number 11-00503, United States of

5   America versus defendant number 1, Mahealani Ventura-Oliver;

6   defendant number 3, Pilialoha K. Teves.

7              This hearing has been called for further jury trial,

8   day 4.

9              Your appearances for the record, please.

10             MR. TONG:  Good morning, Your Honor.  Larry Tong and

11  Mike Nammar for the United States.  With us are Special Agent

12  Steve Carter and Malia Dougan.

13             THE COURT:  Yes, good morning.

14             MR. BARBEE:  Good morning, Your Honor.  Rustam Barbee

15  appearing with Mahealani Ventura-Oliver.  She's present in

16  court.

17             THE COURT:  All right.

18             MR. GRONNA:  Good morning, Your Honor.  Richard

19  Gronna, along with Pilialoha Teves, and we're here this

20  morning.

21             THE COURT:  All right.  And the jury is not present.

22  You may be seated.

23             All right.  There are a number of things I want to

24  take up before we bring the jury back.

25             One is my chambers got a call yesterday from

1    Ms. Pawlowski, who is the woman I believe that I did not permit

2    to be present in -- during the deposition, has been present

3    throughout a lot of the trial, claiming that Mr. Nammar is not

4    licensed to practice law.  And so given the fact that that

5    allegation was made, I thought it appropriate to hear a

6    response to that.

7              MR. NAMMAR:  Yes, Your Honor.  I'm licensed and have

8    been since April 2006 in Oklahoma.  I'm inactive in Hawaii.

9              THE COURT:  Did you comply with local rule -- let me

10   find it -- 83.1(b)?

11             MR. NAMMAR:  I'm not sure what that local rule is,

12   Your Honor.

13             THE COURT:  Well, you have to file a certificate

14   saying that you are admitted elsewhere and in -- in good

15   standing before you can practice in this court.

16             MR. NAMMAR:  Okay.  I know at one time I was admitted

17   to practice in this court.

18             THE COURT:  And I have that certificate when you first

19   were admitted here, but as I understand, you're inactive in

20   Hawaii now and it appears you are not compliant with Rule

21   83.1(b).

22             MR. NAMMAR:  Okay.  I wasn't aware of that.  I don't

23   know if I did that as part of --

24             THE COURT:  I asked the Clerk's Office to check

25   yesterday, and they could not find it.  That said, George

1    Bartels, who handles all of this, is out of town right now and

2    not really reachable.  So whether or not we were able to do a

3    complete search or not, I can't really answer.  But a

4    preliminary search, such a certificate could not be found.

5              Do you recall submitting such a certificate?

6              MR. NAMMAR:  I know that I submitted a certificate

7    each year to the DOJ, but I think that that's something

8    different where I certified that I'm currently licensed.

9              THE COURT:  All right.  Are you certifying you have

10   been a member in good standing of the bar of Oklahoma since

11   when?

12             MR. NAMMAR:  April 12th, 2006.  I -- I printed up a

13   document, Your Honor, yesterday from the bar website if you

14   want to see it.

15             THE COURT:  All right.  And you've been continuously

16   active in that jurisdiction?

17             MR. NAMMAR:  Yes.  I only went inactive in Hawaii to

18   avoid the $500 fee per year.

19             THE COURT:  All right.  That's -- that's -- I

20   understand there may be financial concerns, but I want to make

21   sure I understand this.  So, you better get -- before you do

22   anything today, you better get to me what's required under Rule

23   83.1(b).

24             MR. NAMMAR:  Yes, Your Honor.

25             THE COURT:  Anything from the defense on that?

1              MR. BARBEE:  No, Your Honor.

2              MR. GRONNA:  No, Your Honor.

3              THE COURT:  All right.  If anyone believes there's a

4    problem going forward, you can file something.  Okay?  My

5    view -- my preliminary view is, an attorney with the Department

6    of Justice can practice law in any jurisdiction within the

7    country as long as they are an active member of a bar in one of

8    the United States or I think it's Puerto Rico, Virgin Islands,

9    Guam, the Marianas.

10             It appears that Mr. Nammar has not complied with Rule

11   83.1(b), but it is not discretionary on the Court's part to

12   grant or deny that.  As long as the affidavit is filed, the

13   admission to practice is accepted and filed.

14             And the court -- the rule says:  "Shall be eligible

15   for leave to practice before the Court provided they are an

16   active member in good standing of the bar of the highest court

17   of any state, and leave of court shall be granted upon written

18   notice accompanied by an affidavit verifying eligibility."

19             And I get these quite often from SEC attorneys and DOJ

20   component attorneys and SAUSAs and so forth.  So I don't really

21   understand how that could have fallen through the cracks,

22   Mr. Nammar.  It shouldn't have.  It's a local rule.  It's an

23   important local rule.

24             MR. NAMMAR:  Yes, Your Honor.

25             THE COURT:  But I'm not going to do anything today

1    until you get that to me, all right?

2           MR. NAMMAR:  Yes, Your Honor.

3           THE COURT:  All right.  Second matter I want to take

4    up is, it was brought to my attention Sunday morning that a

5    video was posted on YouTube where somebody had videotaped

6    events in the courtroom when the court was not in session.  And

7    a bit of time out in the hallway.  And this was -- it appeared

8    to be during the morning of the final pretrial conference.  I

9    was in my office walking down the hallway when I heard the

10   chant, and I told Ms. Greaney I'm not going to go in the

11   courtroom while that is going on, and I'll wait for it to

12   finish.  And so that was right at the time the hearing was to

13   begin.

14          And what the video captures is the chant, and then

15   people leaving the courtroom, and Ms. Ventura-Oliver providing

16   her view that the prosecution is politically motivated to

17   silence her because of her political activities regarding

18   Native Hawaiian rights, and in particular, the ownership under

19   the federal building.

20          And it appeared to me that Ms. Ventura-Oliver was

21   aware that she was being recorded.  The sort of statement she

22   made would not be made in the abstract.  It appeared to me the

23   person who filmed it knew they couldn't film it given the

24   nature of the filming, the way it appeared.  It sort of cut to

25   the floor and up.  I mean it wasn't someone holding a camcorder

1    and recording thinking it was legitimate.

2            And we have postings downstairs and we have a local

3    Rule 83.8 that clearly says this can't be done.

4            So first and foremost, I want to make sure everyone

5    here is aware that the taking of videos in the courtroom, the

6    recording of any audio in the courtroom or its environs is not

7    permitted.  I will postpone making a decision whether -- if it

8    is determined who took the video, as to whether to issue an

9    Order to Show Cause to hold that person in contempt.  I won't

10   make that decision until after the trial.  I don't want to

11   disrupt this trial any further.

12           It is my view, however, and I'll hear from counsel, to

13   revoke my order permitting the defendants to have laptops in

14   the courtroom at this point in time.  Given what appears to be,

15   from my view of this video -- and I will make this video, I had

16   it preserved because my understanding is YouTube can be taken

17   down at any time.  So I had our IT people preserve it, and I

18   will have it made part of the record should there ever be a

19   review of this.

20           Mr. Barbee, have you seen the video?

21           MR. BARBEE:  Yes, Your Honor.  I was informed at

22   2 o'clock yesterday afternoon that there had been something

23   posted, and I went back to my office and I, too, looked at it

24   yesterday afternoon.

25           Regarding the defendant's laptops, it's my belief --

```
 1   my information and belief, I don't know that the defendants
 2   even had their laptops that -- that day.
 3            THE COURT:  Well, here's my concern.  Here's my
 4   concern.  The taking of the video, and what appeared to be
 5   Ms. Ventura-Oliver's participation in that, shows a clear
 6   disrespect and refusal to comply with court rules.  And what I
 7   have done essentially by allowing them to have laptops in the
 8   courtroom, both defendants, is say, I trust you to comply with
 9   the rules.  And I no longer have that faith.
10            It's in my discretion in the first instance, as you
11   know, whether I would permit this or not.  And I did permit it.
12   I'm not saying that you and Mr. Gronna can't have laptops, and
13   I'm not saying they couldn't use your laptops, but laptops can
14   be equipped to record, video or audio.
15            Mr. Gronna, do you want to be heard on that at all?
16            MR. GRONNA:  Well, Your Honor, I have my laptop.  I do
17   not have a --
18            THE COURT:  Has Ms. Teves been bringing in a laptop or
19   not?
20            MR. GRONNA:  Well, she did, Your Honor, and
21   essentially when she brought it in the first day, we attempted
22   to load in the disk that has all the discovery, you know,
23   from --
24            THE COURT:  Didn't work.
25            MR. GRONNA:  From Page 1 to, you know, 60,000,
```

1    whatever it is.  It didn't work.  And so then I've been using

2    mine just to access the discovery pages.

3             THE COURT:  I don't know --

4             MR. GRONNA:  I don't have a camera in it.  It doesn't

5    -- can't connect into the Internet, and I have no idea.  You

6    know, I -- Mr. Barbee called me at 5 o'clock yesterday

7    afternoon to inform me that this posting had come up online,

8    and that's the first I'd heard of it and --

9             THE COURT:  Well, let me be very clear about

10   something.  I do not believe for a second that Mr. Barbee or

11   Mr. Gronna knew about this, were complicit in this in any way.

12   I want the record to be very clear on that.  I'm not suggesting

13   that in any way.

14             What I am suggesting is, based on my view of this, and

15   I watched it several times, it appears to me at least that

16   Ms. Ventura-Oliver was quite aware of what was happening.  And

17   in my discretion I permitted both defendants to have laptops.

18             Now, you're telling me Ms. Teves simply hasn't had her

19   laptop here; is that right?

20             MR. GRONNA:  We tried to hook it up on the first day

21   of trial, Your Honor, and it didn't work and it was shut down,

22   and that's -- we haven't -- she has not used her laptop since

23   then.

24             THE COURT:  Okay.  So what you have before you there

25   is your laptop?

1          MR. GRONNA:  This is mine, yes.

2          THE COURT:  Okay.  All right.

3          Do you have anything, Mr. Barbee, to state?

4          MR. BARBEE:  No, Your Honor.

5          THE COURT:  All right.  So I am revoking the order for

6   both defendants.  They will not be permitted to bring laptops

7   into the courtroom.

8          I want to confirm, Mr. Barbee -- you can confirm that

9   Ms. Ventura-Oliver -- I see her laptop sitting there -- is off

10  and will remain off until -- she may not be able to take it out

11  till the end of the day.  I don't know, and that's fine.  But

12  it's to remain off the rest of the day and will not be

13  permitted back in the courtroom.

14         MR. BARBEE:  Yes, Your Honor.

15         THE COURT:  So I'm giving a very stern warning here to

16  you, Ms. Ventura-Oliver.  I would be in my rights to revoke

17  your bail right now.  I'm not going to do that.  But if I learn

18  of any similar conduct going forward, of your flouting the

19  court rules, I won't hesitate to revoke your bail.

20         All right.  Anything else on that issue?

21         MR. TONG:  No, Your Honor.

22         THE COURT:  There's a gentleman standing up with his

23  hand in the air.  I don't know if he wants to be heard?

24         UNIDENTIFIED MALE:  Yes, may I?

25         THE COURT:  Yeah, I think you're going to need a

1    microphone, though, because --

2              UNIDENTIFIED MALE:  I can speak loud.

3              THE COURT:  Well, it may not pick up, though, for the

4    system is the problem if you do that.  So we'll bring you a

5    microphone, sir.

6              And, sir, I don't know if you're going to make any

7    comments that could implicate your Fifth Amendment rights.  I

8    want you to know what your Fifth Amendment rights are, which is

9    you don't have to speak.  Anything you do say right now could

10   be used against you.  Do you understand that?

11             UNIDENTIFIED MALE:  Yeah.  I don't know all my

12   rights --

13             THE COURT:  I'm telling you your rights.  Which is if

14   you say right now anything that could in any way implicate you

15   in the recording of this video, that could be used against you

16   later in a contempt proceeding and you could be incarcerated if

17   found guilty of that contempt.  If what you were to say were to

18   implicate you in some way.  So, you know, you want to volunteer

19   something, I don't know what you want to say.  I want to

20   know -- make sure you understand what your rights are.

21             UNIDENTIFIED MALE:  I understand what you just said.

22             THE COURT:  Do you understand your rights?

23             UNIDENTIFIED MALE:  I understand what you just said is

24   that --

25             THE COURT:  All right.  Sir, I'm not going to hear

```
 1    from you then.  Take the microphone away.  I'm not going to
 2    hear from you.  You play a game, I ask you if you understand
 3    your rights, you won't answer my question, I'm not going to
 4    hear from you.
 5              Anything else on this issue?
 6              MR. TONG:  On this issue, no, Your Honor.
 7              THE COURT:  Mr. Gronna, Mr. Barbee.
 8              MR. GRONNA:  No, Your Honor.
 9              MR. BARBEE:  No, Your Honor.
10              THE COURT:  All right.  I did receive a Motion in
11    Limine from Mr. Barbee.  Have you reviewed that, Mr. Tong, and
12    is this something we can wait to take up until some later
13    point?
14              MR. TONG:  Yes to the first.  I got it by ECF at about
15    4:30.  We can take it up at the Court's convenience.  I can
16    give a preliminary response if it would help.
17              THE COURT:  Well, we have a jury --
18              MR. TONG:  Right.
19              THE COURT:  -- that's going to be coming in relatively
20    soon.  I'm just wanting to know if we can take it up maybe
21    right after the lunch break, that sort of thing.
22              MR. TONG:  The only issue we have, Your Honor, is
23    Lehua Hoy is on the schedule for this morning.  Lehua Hoy will
24    testify that on two occasions she was given bags that turned
25    out to be bags of cash and gold coins from or through the
```

1  defendants in connection with their learning of an

2  investigation.  So, we need to know whether the Court is going

3  to allow that before she testifies.

4          THE COURT:  Do -- do you think she'll testify before

5  or after the morning break?  What's your view on that?

6          MR. TONG:  Well, that's related to another issue that

7  I want to raise.  But I think she'll get on the stand after the

8  morning break.  So I think we could probably take it up at the

9  break.

10         THE COURT:  Okay.  All right.

11         MR. TONG:  But I do have another issue that I would

12 like to raise with the Court, and I apologize.  I mean normally

13 I would just put on the agent and it would be an evidentiary

14 matter.  But the Court may recall that I think on Thursday I

15 raised my intention to have Agent Carter testify about his

16 undercover participation in the case and the fact that he made

17 five-and-a-half or six hours of recordings of the defendants

18 engaged in their seminar, and it was my intention to play

19 limited excerpts.  And I think the Court said that was fine,

20 but we wanted to know whether the defense had any objection or

21 any other parts of the recordings they wanted to play under the

22 rule of completeness.

23         We didn't hear anything by Friday at noon, which I

24 understood was the time we were supposed to hear.  Yesterday I

25 got a call from Mr. Barbee late in the afternoon saying that

1    the defendants want the entire recordings played so that the

2    proceeding is complete.  So that would take us from 30 minutes

3    of excerpts that we have up to about six hours of excerpts.

4            THE COURT:  Well, here -- yeah, go ahead.

5            MR. TONG:  And I just wanted to proffer to the Court,

6    I have the transcripts of the portions that I want to play.

7    They're very narrow in scope.  They consist largely of

8    introductions of different individuals; of Gilbert Schmitt

9    talking to Agent Carter saying, If you have a mortgage, we can

10   help get rid of it, make an appointment, come to the office.

11   That sort of thing.

12           And while I understand that they're entitled to

13   designate other portions that are necessary to be complete, I

14   think six hours is excessive.  And I wanted some guidance from

15   the Court rather than doing this in front of the jury and

16   sending them away for 15, 20 minutes.

17           THE COURT:  I mean do you have a transcript of the

18   whole six hours?  Or not?

19           MR. TONG:  It's not in a transcript form, but I've

20   given them -- they've had for a couple of years the entire

21   recording.  They have not designated any portion.  While I

22   respect my friends across the aisle, I don't think that they

23   made a discerning attempt to see what portions of the six hours

24   were necessary to make it complete.  I think they're just

25   saying we want six hours of it played.

1          THE COURT:  Well, let me tell you my general rule,

2     which is, if I were to allow the six hours, it's going to be on

3     your time, Mr. Barbee.  In other words, the jury is going to

4     know you're the one who wants them to listen to the six hours.

5     I will permit Mr. Tong to play his half hour, and then you can

6     announce you want six hours before the jury.  And you know,

7     honestly, a jury is not going to react well to that if that

8     six hours is full of irrelevant downtime.

9          MR. BARBEE:  Your Honor, just a brief --

10          THE COURT:  And I say that because it's not fair to

11     the government to say, Oh, Mr. Tong, you have to play a full

12     six hours in front of that jury.  That's not fair to Mr. Tong.

13          MR. BARBEE:  Yes, Your Honor.  I understood the Friday

14     noon deadline to have to do with the transcript of the

15     deposition of Ms. Lono.  Of course, my client did leave the

16     island Thursday, Thursday evening, and I didn't have a complete

17     chance to discuss with her this issue of the completeness of

18     the recorded tape-recordings.  She did understand from the

19     Court's comments that there is a rule of completeness, and she

20     did during a meeting with me in discussing it request that the

21     entire recording be played.  So that is our position.

22          With regard to the Court indicating to the jury that

23     the defense has requested that the entire tape be played, leave

24     that in the sound discretion of the Court.

25          THE COURT:  Well, it's not that I'm telling the jury

1    that, it's that Mr. Tong will play 30 minutes, and then he

2    would finish his examination, and then you'd get up and have

3    the jury listen to six hours.

4             MR. BARBEE:  Well, if there's a rule --

5             THE COURT:  And I don't think Ms. Ventura-Oliver

6    understands how juries react to those sort of things.  A waste

7    of their time.  If it is a waste of their time.  I'm not saying

8    that it is.  Maybe the full six hours is necessary for the rule

9    of completeness, I don't know.

10            MR. BARBEE:  I believe that is her position at this

11   point.

12            THE COURT:  Well, I'm not asking what her position is,

13   Mr. Barbee.  She's not representing herself.

14            MR. BARBEE:  Mm-hmm.

15            THE COURT:  So don't -- don't tell me it's her

16   position.  I mean you've got to be the attorney here.

17            MR. BARBEE:  Yes, Your Honor.  She -- she has made

18   that request of me, and I don't think it's an unreasonable

19   request at this time.

20            THE COURT:  So when do you plan to play that tape?

21            MR. TONG:  I was going to do it first thing in the

22   morning, Your Honor.

23            THE COURT:  This morning?

24            MR. TONG:  This morning.  And we have other witnesses

25   in town from the Mainland as well as Maui.  I have respect for

1   Mr. Barbee.  I'm sure he didn't know, but I'm just alerting the

2   Court that I didn't hear until --

3          THE COURT:  But there's nothing I can do right now,

4   because I don't know -- I can't rule on the rule of

5   completeness unless I have it all before me.  There's no way

6   for me to say, This part is necessary and this part isn't.

7          MR. TONG:  Your Honor, I can go forward or I have

8   transcripts that the Court can review that are fair and

9   accurate transcriptions of what we propose to play.  I think

10  you can see the narrowness of the scope.  It doesn't really go

11  into the program other than who's involved and the fact that --

12         THE COURT:  What I don't know, and I see one of my law

13  clerks sitting back there, I might ask her to go do some

14  research on whose burden it is to show under -- is it Rule 106?

15  Do I have that right?

16         MR. TONG:  106.

17         THE COURT:  106.  Whose burden it is to show what is

18  necessary to comply with the rule of completeness.  And I

19  suspect it's Mr. Barbee, and I have not heard anything yet on

20  that.

21         And so Ms. Passamaneck is on her way out.  If you

22  could -- if you could do a little research for me, I'd

23  appreciate that.  It's always nice to have a brain trust who

24  can do that research quickly.

25         MR. GRONNA:  And, Your Honor, if I may just briefly

1    say something.  There actually -- the total amount of tapes

2    that were provided to us, I think that the government, the FBI,

3    recorded took place over about three or four days.  And so the

4    recordings are actually presentations on separate days on --

5    and essentially it's the same thing in each one of the

6    recordings.

7           It's my -- my position with regard to Ms. Teves is

8    that I think that it's more appropriate to perhaps play one of

9    her presentations, which only might last an hour, an

10   hour-and-a-half at the most.  And if need be, in 45 minutes or

11   an hour a break could be taken.

12          But in order to give the jury a full understanding of

13   everything that was presented at these meetings, I think is

14   important.  It wasn't just a meeting about bonded promissory

15   notes and getting your debt eliminated.  There was also a lot

16   of information about land holdings and that whole thing.

17          THE COURT:  See, but I don't even know who's talking

18   on these tapes.  I have no idea --

19          MR. GRONNA:  Well, essentially it's Ms. Ventura-Oliver

20   is up there making the presentation.

21          THE COURT:  And so you want Ms. Teves?

22          MR. GRONNA:  Well, she -- as I just said, she doesn't

23   really -- because she's there at these meetings and being

24   implicated as being a participant in this, it's my feeling, and

25   I think that what Mr. Barbee is saying by the rule of

```
 1    completeness, is at least -- we're not -- I
 2    don't necessarily -- I'm not interested in the complete
 3    six hours, but I think that in order to give some a better
 4    perspective of what was actually being said at these meetings,
 5    just to provide the recording of the day that --
 6            THE COURT:  All right.  Let me just stop you, because,
 7    see, that doesn't sound like the rule of completeness to me.
 8    To have your client's recordings played to make complete what
 9    Ms. Ventura-Oliver said.
10            MR. GRONNA:  Well, they're all the same.
11            THE COURT:  Well, but -- Mr. Tong, are you going to
12    play both defendants or just Ms. Ventura-Oliver this morning?
13            MR. GRONNA:  Well, Ms. Teves never presented.
14            MR. TONG:  Ms. Teves never presented any information.
15    She's --
16            THE COURT:  Let me -- I don't know what this is.  You
17    guys are acting as if I know this and I've heard all of this.
18    I have no clue whatsoever what's on these tapes.  None.  Zero.
19            MR. TONG:  Just for future reference, Your Honor, I
20    give to the Court the transcript.
21            THE COURT:  So, you know, you're talking about the
22    rule of completeness, I'm in a total vacuum, and you're talking
23    as if I know something.  I don't.
24            MR. GRONNA:  Okay.
25            THE COURT:  I don't even know who's on these tapes is
```

1    what I'm saying.  So if it's Ms. Ventura-Oliver only, I have

2    some problems with that.

3          What I suggest we do, can you call Agent Carter for

4    whatever else you want to call him, not do this right now, and

5    I'll permit you to recall him after we have a chance to take a

6    look at this, Mr. Tong.

7          MR. TONG:  I wish I could, Your Honor, but you'll

8    recall we split his testimony into two segments.

9          THE COURT:  Well, then it'll be three segments,

10   though, is what it'll be.

11         MR. TONG:  This is really the only reason we're

12   calling him at this point in time.  I mean if the Court wants

13   us to move to another witness, I guess we could do that.  The

14   difficulty is the next two witnesses are Mr. Nammar's

15   witnesses.

16         Apparently we're printing out the form that Mr. Nammar

17   can sign, and I think it's discretionary with the Court to

18   allow it.  So we could move to the next witness if he can get

19   the form signed, and then we can take this up at the break, if

20   that would be the Court's preference.

21         THE COURT:  I'd prefer to take it up over the lunch

22   hour is what I'd prefer to do.

23         So someone's working on that, Mr. Nammar?

24         MR. NAMMAR:  Yes.  I sent Malia Dougan to print up the

25   form for me.

```
 1          THE COURT:  All right.  So if we can push that off
 2     until after lunch, let's do some research, let me look at what
 3     I can as far as the transcript, get a little educated on this,
 4     and then -- and then I'd feel a lot more comfortable having a
 5     discussion at that point.
 6          MR. BARBEE:  Your Honor, just one more thing.  With
 7     regard to the tape-recordings that Special Agent Carter made,
 8     there is a portion, significant portion of the tape, and I
 9     don't know if that's in the excerpts they intend to play where
10     there's an individual talking to him in the audience and
11     outside of the audience.  I believe it's John Oliver, if I'm
12     not mistaken.  And of course, a great portion of our defense is
13     that John Oliver was significantly involved, if not leading
14     events in this matter, including leading the defendant.  Even
15     though she may be speaking for the bulk of the time, he's
16     behind the scenes stirring up interest in this program and
17     guiding people on what to do, and that's exactly what he was
18     doing with Special Agent Carter in our opinion.  And that's a
19     portion of the tape that we definitely want played.
20          THE COURT:  Well, and that may be appropriate.  But
21     now you're starting to sort of provide me with --
22          MR. BARBEE:  Yes, Your Honor.
23          THE COURT:  -- some background, the sort of thing I
24     need to make an informed decision.  All right.
25          MR. TONG:  Your Honor, may I just suggest, I will give
```

1   to the parties -- when I got the objection, I whittled down

2   even further what I wanted to play to make it very narrow so

3   that it would be easier for the parties and the Court.

4         Your Honor has before you the transcripts of the

5   portions that I propose to play.  I know you're not going to

6   read it now.  I'm not asking you to.  I'm going to give it to

7   the defense counsel too so it's clear to everybody in the

8   courtroom that's all we propose to play.  And if they propose

9   to play other portions, they've had the tape for a long time,

10  certainly, you know, we'll make available whatever portions the

11  Court thinks is necessary for completeness.

12        THE COURT:  All right.  And the other option here is

13  to put on Agent Carter, let Mr. Tong have his examination, and

14  then you folks later on when he's recalled, for instance, you

15  could cross-examine him on this matter as well.  In other

16  words, you could get more out if it takes more time for you to

17  review all of this.  That's another option we have it seems to

18  me.

19        MR. TONG:  If they're willing to agree to that, then

20  we could proceed with Agent Carter.  If not, we'll proceed with

21  Mr. Nammar's witness as soon as the form is signed.

22        THE COURT:  All right.  Mr. Gronna, Mr. Barbee, is

23  that -- would that be agreeable to you that we put him on now.

24  I can instruct the jury if you want that there may be some

25  cross-examination about the tape, but that's -- or he's going

1    to be recalled and that will occur at a later point in time.

2              MR. BARBEE:  So the proposal, as I understand it, is

3    Special Agent Carter would do his direct, and then later on

4    after we've had a chance to look at the excerpts that we want

5    to play, we would then do our cross-examination.

6              THE COURT:  Correct.  And it can either be when he's

7    recalled or we can just call him back just for that cross

8    separately.  Your discretion really.

9              MR. BARBEE:  That's fine.

10             MR. GRONNA:  That sounds reasonable, Your Honor.

11             THE COURT:  All right.  I think that's a nice option.

12             Now, I was just handed a note that Juror Number 5

13   approached one of our jury clerks to let her know that he

14   observed events on Thursday afternoon that caused him to feel

15   threatened and intimidated.  He and another juror -- I'm just

16   reading the note I received -- were waiting for a taxi to the

17   airport when they observed the individuals being led out and

18   screaming, Shame on you, et cetera, and yelling.

19             So we did have a discussion after we recessed on

20   Thursday as to whether we should question the jury, and it

21   seems to me at this point maybe we should.

22             Hold on one second.

23                  (Pause in the proceedings.)

24             MR. BARBEE:  Your Honor, do you have a copy of the

25   note?

1          THE COURT:  Well, it's not a note.  It's a note that

2     Ms. Greaney took down talking to Cynthia.

3          MR. BARBEE:  That he observed something that made him

4     feel threatened?

5          THE COURT:  Threatened, right.  Right.  And we need to

6     get it from the horse's mouth.  This is double hearsay at this

7     point in time, so we obviously need to get it from the juror.

8          What -- what -- let's talk about how best to do this.

9     My thought is bring in the jury, ask them if any of them

10     observed a disturbance Thursday afternoon at some point as they

11     were leaving the courthouse, see who answers yes, and then do

12     individual voir dire at that point.

13          MR. GRONNA:  You know, I think that that's what we're

14     going to have to do.  I was hoping not, but I think based on

15     this note, we have no choice.

16          THE COURT:  And I will make it clear to the jury --

17     I'm going to make crystal clear that those events had nothing

18     to do with any of the parties.  And there's simply no reason to

19     feel threatened.  I mean there's nothing here such that they

20     should feel threatened based on what did happen.  I mean I

21     think they know something happened in the courtroom afterwards.

22     I'm sure they understand that.

23          MR. BARBEE:  Yes, Your Honor.  It appears that there's

24     two issues before the Court:  The information that the deputy

25     marshal gave us on Thursday, and then this new information from

1    Juror Number 5.  So it seems to be two separate issues.  I -- I

2    can state for the record that as the jurors were leaving for

3    the day, after the Court had instructed the audience members to

4    rise for the jury, that I personally observed alternate

5    juror -- let's see here, Alternate Juror Number 2, John Hearn,

6    the elderly gentleman.

7         THE COURT:  Yes, uh-huh.

8         MR. BARBEE:  He was the last juror to exit the

9    courtroom, and as he was going through the gate past the bar,

10   he looked to his right very quickly and then did a double take

11   to his right and had a kind of a grimace on his face when he

12   saw the two spectators not rising for the juror -- jury.

13        THE COURT:  Well, you know, I mean that's why I tried

14   to tell both of you to convince Ms. Ventura-Oliver to tell

15   these people to do the right thing.  But everyone is too

16   stubborn.  They want to make a point.

17        MR. BARBEE:  Yeah, I think to some degree those people

18   were out of her control.

19        THE COURT:  I don't know that I believe that,

20   Mr. Barbee, based on what I observed here.  I don't think I

21   believe that.

22        MR. BARBEE:  Okay.

23        THE COURT:  When I see her hugging them -- when you

24   tell me she has to go to the bathroom really badly, really,

25   really badly, to me that means when I take a recess she

1    beelines for the bathroom.  What does she do?  She goes out

2    into the hallway and talks to those two individuals.  She

3    doesn't go to the bathroom right away.

4              DEFENDANT VENTURA-OLIVER:  Well, they came up to me.

5              THE COURT:  Well, I don't care.  I don't care.  If you

6    had to go to the bathroom that badly to disrupt us, to me that

7    means -- we've all been in that position where you really have

8    to go.  It's nature.  It's human nature.  And what do you do if

9    you're -- you have to go so badly that you ask the Court for a

10   recess?

11             DEFENDANT VENTURA-OLIVER:  Yes.

12             THE COURT:  That means you're beelining to the

13   bathroom.  She didn't do that.

14             DEFENDANT VENTURA-OLIVER:  I didn't want to be rude to

15   them.

16             THE COURT:  Ma'am, I don't want to hear your excuses.

17   It's not being rude saying, I'll be right back, I'm going to

18   the bathroom.  That's not being rude.

19             DEFENDANT VENTURA-OLIVER:  I did say that after they

20   were talking and talking to me.  Actually several people were

21   talking to me.

22             THE COURT:  I don't believe that she could not have

23   controlled those people based on what I observed.  I think she

24   is in control of those people is my view based on what I

25   observed.

1          DEFENDANT VENTURA-OLIVER:  Mm-hmm.

2          THE COURT:  All right.  So my inclination is to bring

3     the jury in to ask who, if any, observed a disturbance, I'll

4     call it, outside the courthouse at some point after they were

5     excused Thursday afternoon.

6          MR. BARBEE:  Could you expand that to ask if they saw

7     a disturbance inside the courthouse too, because apparently --

8          THE COURT:  Inside the courtroom you mean or --

9          MR. BARBEE:  I think it would have been on this floor.

10          THE COURT:  Okay.

11          MR. BARBEE:  The deputy marshal made his statement to

12     the Court Thursday afternoon that he believes some of the

13     jurors might have seen a disturbance when he was escort -- when

14     the marshals were escorting the two individuals either to the

15     elevator on this floor or outside the building.

16          THE COURT:  All right.  So I can ask if any of them

17     observed after they were dismissed Thursday afternoon, if any

18     of them observed a disturbance either in the courthouse or

19     outside the courthouse.

20          MR. BARBEE:  Yes, Your Honor.

21          THE COURT:  And those who say yes, then we will

22     identify for the record, and then I think we should probably

23     talk to them individually at that point.

24          MR. TONG:  Your Honor, I agree completely.  I just

25     wonder whether we should call it an incident, because for those

1   who didn't see anything, "disturbance" implies a lot of things
2   that "incident" may not.  I leave it to your discretion,
3   though.
4            THE COURT:  I think "incident" is probably a little
5   better way to put it.  I see Mr. Barbee shaking his head yes.
6            Mr. Gronna, you don't object to that?
7            MR. GRONNA:  I don't object.
8            THE COURT:  All right.  Anything else before -- do you
9   have the paperwork, Mr. Nammar?
10           MR. NAMMAR:  I do, Your Honor.  May I approach?
11   (Handing document.)
12           THE COURT:  Mr. Nammar, I think what you need to do,
13   because I know you just had the form filled out, but because of
14   this lapse in time, based on your representation --
15           MR. NAMMAR:  Yes.
16           THE COURT:  -- I think you need to say:  "I am an
17   active member in good standing of the Bar of the Supreme Court,
18   State of Oklahoma, which is the highest court in that state,
19   and have been an active member in good standing since," and
20   whatever that date is.  And you can handwrite that in, but I
21   think the record probably should be clear to reflect that fact.
22           I'm going to have Ms. Greaney go ahead and get the
23   jury.  Just sign off on this.
24           All right.  So I have signed the order permitting
25   practice.

 1              MR. NAMMAR:  Thank you, Your Honor.

 2              THE COURT:  And we'll have that filed when Ms. Greaney

 3      returns.

 4                       (Pause in the proceedings.)

 5              MR. GRONNA:  I'm sorry, I can't do anything about the

 6      bells and whistles from the laptop.

 7              THE COURT:  Oh, oh.  I'm sure someone of a younger

 8      generation could figure that out, but I fully appreciate what

 9      you're saying.

10                       (Pause in the proceedings.)

11              THE COURT:  Counsel, do you think it would be best to

12      do sidebars or do you think we should take -- if we have more

13      than one positive response, take them outside and bring them in

14      one at a time?

15              MR. BARBEE:  I think sidebars would be sufficient,

16      Your Honor.

17              MR. GRONNA:  Sidebar would probably be fine, Judge.

18              THE COURT:  It would probably be a little more

19      economical to do it that way.  If we learn after a while we

20      need more time, then we can change that up, but we'll start

21      that way and see how that goes.

22                       (Pause in the proceedings.)

23              (The following proceedings were held in open court in

24      the presence of the jury:)

25              THE COURT:  All right.  Everyone may be seated.  Thank

1    you.

2            Call the case.

3            THE CLERK:  Criminal Number 11-00503, United States of

4    America versus defendant number 1, Mahealani Ventura-Oliver;

5    defendant number 3, Pilialoha K. Teves.

6            This hearing has been called for further jury trial,

7    day 4.

8            Your appearances for the record, please.

9            MR. TONG:  Good morning, Your Honor.  Ladies and

10   gentlemen.  Larry Tong and Michael Nammar for the United

11   States.  With us are Special Agent Steve Carter of the FBI and

12   Special Agent Malia Dougan of the IRS.  Good morning.

13           THE COURT:  Good morning.

14           MR. BARBEE:  Good morning, everybody.  Rustam Barbee

15   appearing with Mahealani Ventura-Oliver.

16           THE COURT:  Good morning to both of you.

17           MR. GRONNA:  And good morning, Your Honor.  Richard

18   Gronna appearing on behalf of Pilialoha Teves, and she's

19   present here.

20           THE COURT:  And good morning to both of you.  Thank

21   you.  You may be seated.

22           And good morning, ladies and gentlemen.  I hope

23   everyone enjoyed the long weekend.  We are back for

24   continuation of the trial.

25           But before we do begin the evidence, I do want to have

1   a discussion with you and I want to see a show of hands to a

2   question I have.  And then I may want to talk individually to

3   some of you if necessary.

4          And that is, I want to ask if any of you observed an

5   incident either inside the courthouse or outside the courthouse

6   after recess on Thursday afternoon.  So I forget exactly the

7   time we recessed, somewhere in the neighborhood of 4:00, 4:15,

8   somewhere in there.  After you folks left the courtroom if any

9   of you observed an incident, again, whether inside or outside

10  of the courthouse, if I could see if any of you did by a show

11  of hands.

12         Okay.  So what I'm going to do is, for each of you

13  that answered yes is take you to sidebar and have a

14  conversation with you.  Okay?  So let me see --

15         Alison, if you can get a list.

16         I'm going to have Ms. Greaney just make sure we know,

17  and then she can call you down one at a time.  Just raise your

18  hand again so she can -- one, two, three, four, five, six,

19  seven, eight of you?  No, one more.  One with food in his

20  mouth.

21         Okay.  So why don't we just start with Mr. Hearn, and

22  we'll go down the first row and then down the second row.

23         We can go to sidebar.

24                  (Sidebar on the record:)

25         THE COURT:  Wait for counsel, Mr. Hearn.

1          All right.  Mr. Hearn, what did you observe?

2          JUROR NUMBER 7:  I observed a man and a woman

3   screaming loud as we were exiting the building.  The man had

4   his hair in a knot on the top of his head, had a rod in his

5   hand.  The lady had a huge lauhala hat on.  And I couldn't

6   understand what they were screaming about, but they were being

7   escorted out of the building.

8          THE COURT:  Okay.  Hold on one second.  Has this

9   caused you any concerns at all about serving as a juror?

10          JUROR NUMBER 7:  Not at all.

11          THE COURT:  You can be fair and impartial to both

12   sides?

13          JUROR NUMBER 7:  Absolutely.

14          THE COURT:  And you won't consider that in any way.

15          JUROR NUMBER 7:  No, sir.

16          THE COURT:  And let me instruct you on something just

17   to be very clear.  That had nothing to do with any of the

18   parties in this case, whether the United States or the defense,

19   that incident had nothing to do with the parties themselves.

20   Okay.

21          JUROR NUMBER 7:  Oh, good.  That's good to hear.

22          THE COURT:  All right.  All right.  Any follow-up

23   questions?

24          MR. BARBEE:  Mr. Hearn, you heard the Judge's

25   instructions on this matter.  You won't hold that at all

1    against my client, will you?

2              JUROR NUMBER 7:  Absolutely not.

3              MR. BARBEE:  Thank you.

4              THE COURT:  Anything further?

5              MR. GRONNA:  No, thank you.

6              MR. TONG:  No, Your Honor.

7              THE COURT:  Okay.  Thank you, sir.  You may be seated.

8              Alison, just bring them on down in order.

9              THE CLERK:  Ryan.

10             MR. TONG:  He's more alert now than I am at my age.

11             THE COURT:  He's really remarkable.

12             Get close to the microphone.  All right.  So,

13   Mr. Okata, tell me -- tell me what you observed.

14             JUROR NUMBER 2:  I don't know.  We were sort of far

15   away.  We were at the corner.

16             THE COURT:  Corner of what?

17             JUROR NUMBER 2:  Of --

18             THE COURT:  Halekauwila.

19             JUROR NUMBER2:  And what's coming down, Punchbowl.

20             THE COURT:  Punchbowl.  Okay.  Yeah, mm-hmm.

21             JUROR NUMBER 2:  And they were all the way at the door

22   and few of us observed them basically yelling at the

23   courthouse.

24             THE COURT:  Yelling at the courthouse.

25             JUROR NUMBER 2:  Yeah.

1          THE COURT:  Okay.

2          JUROR NUMBER 2:  Mostly in Hawaiian.  I don't speak,

3     so I don't know what they were saying.

4          THE COURT:  All right.  Is that pretty much it?

5          JUROR NUMBER 2:  Yeah.  We were far.

6          THE COURT:  Okay.  Is there anything about the

7     incident that would cause you to question your ability to be

8     fair and impartial to both sides in this case?

9          JUROR NUMBER 2:  No.

10         THE COURT:  Okay.  And I want to instruct you so you

11    know that had nothing to do with any of the parties in this

12    case, whether the defense --

13         JUROR NUMBER 2:  It seemed like they were yelling at

14    the guards.

15         THE COURT:  -- or at the prosecution side, so --

16         JUROR NUMBER 2:  Yeah.

17         THE COURT:  -- I just want to make sure you can follow

18    that instruction.

19         JUROR NUMBER 2:  Yeah.

20         THE COURT:  And not hold this against anybody.  Is

21    that right?

22         JUROR NUMBER 2:  Yeah.

23         THE COURT:  Okay.  And just to be clear, I'm letting

24    you know it really has nothing to do with any of the parties.

25         JUROR NUMBER 2:  Makes sense.

 1          THE COURT:  Okay.  Thank you.

 2          Anything further?

 3          MR. BARBEE:  You saw -- how many people did you see

 4   yelling at the guards?

 5          JUROR NUMBER 2:  Two.

 6          MR. BARBEE:  And can you follow Judge Seabright's

 7   instructions, you are not going to hold that against anybody in

 8   this courtroom?

 9          JUROR NUMBER 2:  Yes.

10          MR. BARBEE:  Thank you.

11          THE COURT:  Thank you.  I already asked him that,

12   Mr. Barbee.

13          MR. BARBEE:  I know.  I was more concerned about who

14   he saw.

15          THE COURT:  Okay.  Hunjo -- Honjo.

16          Okay.  For the record, Ms. Honjo, correct?

17          JUROR NUMBER 4:  Yes.

18          THE COURT:  Okay.  So why don't you tell us what you

19   observed, Ms. Honjo.

20          JUROR NUMBER 4:  Just like a demonstration between two

21   people -- of two people.  That lady that was sitting in the

22   courtroom with the big hat and the guy with the funny hair.

23          THE COURT:  Okay.  And what's -- when you say

24   "demonstration," can you be more specific?

25          JUROR NUMBER 4:  They were yelling really loud.  I

```
 1   didn't really understand because I don't understand Hawaiian.
 2            THE COURT:  Okay.  So it was in Hawaiian.
 3            JUROR NUMBER 4:  The only word I heard was "make."
 4            THE COURT:  What does "make" mean?
 5            JUROR NUMBER 4:  Dead.
 6            MR. TONG:  Dead.
 7            THE COURT:  Okay.
 8            JUROR NUMBER 4:  And they were really loud, though.
 9            THE COURT:  Okay.  All right.
10            JUROR NUMBER 4:  Mm-mm.
11            THE COURT:  Would what you observed Thursday afternoon
12   impact your ability to be fair and impartial in this case in
13   any way?
14            JUROR NUMBER 4:  No, it wouldn't.
15            THE COURT:  Okay.  Let me tell you -- instruct you,
16   okay, as part of this process that what happened, what you
17   observed has nothing to do with any of the parties in this
18   case.  Whether the United States or either of the defendants or
19   any of the counsel, nothing to do with any of them whatsoever.
20   And so I do instruct you not to consider it in any way because
21   it has nothing to do with the parties in this case.
22            JUROR NUMBER 4:  Okay.
23            THE COURT:  Okay?  And you can be fair and impartial
24   to both sides?
25            JUROR NUMBER 4:  Yes.
```

1          THE COURT:  And you can follow my instructions.

2          JUROR NUMBER 4:  Of course.

3          THE COURT:  Okay.

4          Anything?  No follow-up.  Thank you, ma'am.

5          MR. GRONNA:  Thank you.

6          THE COURT:  The next juror is the one who the note --

7          MR. TONG:  Felt threatened.

8          THE COURT:  Right, the note came from, correct.

9          All right.  For the record, Mr. Knowles, correct?

10         JUROR NUMBER 5:  Yes.

11         THE COURT:  Okay.  So, Mr. Knowles, tell us what you

12    observed.

13         JUROR NUMBER 5:  As we were leaving last Thursday, I

14    was with Melanie, the other outer island person, and we were

15    just right near the exit.  A young Hawaiian man, perhaps in his

16    30s, he was in the audience and the older Hawaiian woman were

17    yelling very loudly.  The Hawaiian man was yelling in Hawaiian.

18    Very loud, very intimidating, very threatening.  Wasn't sure if

19    it was directed towards the jurors or the guards.  I couldn't

20    really tell, but, nevertheless, I did feel a bit intimidated.

21    The woman was yelling things like, "Shame, shame on you."  I

22    heard one Hawaiian word "make."  I think it means kill or

23    something.  So it was a bit intimidating.  I did report it this

24    morning to Cynthia, so --

25         THE COURT:  We knew that.  We appreciate that.

```
 1              JUROR NUMBER 5:  Sure.  Sure.

 2              THE COURT:  And you did the right thing.  So we

 3    appreciate you doing that.

 4              JUROR NUMBER 5:  Yeah.  But Melanie and I, we snuck

 5    out a side door and we just kind of hung back while the two

 6    blew off their steam or whatever.

 7              THE COURT:  All right.  So, I want you to know that

 8    the incident had nothing to do with any of the parties in this

 9    case.

10              JUROR NUMBER 5:  Okay.

11              THE COURT:  The lawyers or the parties, to be very

12    clear.  Okay?

13              JUROR NUMBER 5:  All right.

14              THE COURT:  Had nothing to do with any of them.

15              JUROR NUMBER 5:  Sure.

16              THE COURT:  But you did observe what you observed, and

17    you have described it as somewhat intimidating.

18              JUROR NUMBER 5:  Mm-hmm.

19              THE COURT:  Not knowing who it was directed at.

20              JUROR NUMBER 5:  Mm-hmm.

21              THE COURT:  So I want to make sure given this event

22    you can be fair and impartial to both sides.

23              JUROR NUMBER 5:  I believe I can, Judge, yes.

24              THE COURT:  And if I instruct you not to consider in

25    any way in your deliberations and in reaching at a fair and
```

1   just verdict in this case, you can do that?

2           JUROR NUMBER 5:  Yes, sir.

3           THE COURT:  Okay.  And you can follow my instruction,

4   I'm telling you right now that this had nothing to do with the

5   parties, you can do that?

6           JUROR NUMBER 5:  Absolutely.

7           THE COURT:  And, therefore, not hold it against

8   anybody.

9           JUROR NUMBER 5:  I believe so, yes.

10          THE COURT:  Okay.  All right.  Are you confident of

11  that?

12          JUROR NUMBER 5:  Yes.

13          THE COURT:  Okay.  Any follow-up questions?

14          MR. BARBEE:  No, Your Honor.

15          MR. TONG:  No, Your Honor.

16          MR. GRONNA:  No, Your Honor.

17          THE COURT:  Thank you, sir.

18          All right.  Mr. Nakamura.

19          This is the most awkward seating because they have

20  these drawers here and my legs have nowhere to go.

21          Mr. Nakamura, come on up.  Okay.  For the record, you

22  are Karl Nakamura.

23          JUROR NUMBER 6:  Yes.

24          THE COURT:  Okay.  So, Mr. Nakamura, why don't you

25  tell us what you saw or observed Thursday afternoon.

 1                 JUROR NUMBER 6:  We were walking, but we were far away

 2     close to the crosswalk already, and we just heard a commotion.

 3     There were two people -- I guess they were -- I don't know who

 4     they were yelling at, and I really didn't make out what they

 5     were saying.

 6                 THE COURT:  Okay.  So where were you at the time?

 7                 JUROR NUMBER 6:  Near the crosswalk of Punchbowl.

 8                 THE COURT:  Punchbowl and Halekauwila?

 9                 JUROR NUMBER 6:  Yeah.

10                 THE COURT:  Okay.  And you couldn't make out what they

11     were saying?

12                 JUROR NUMBER 6:  No.  I thought they were arguing with

13     the security or something.

14                 THE COURT:  Okay.

15                 JUROR NUMBER 6:  I don't really know.

16                 THE COURT:  Okay.  So I want to make clear to you,

17     what transpired had nothing to do with any of the parties in

18     this case.

19                 JUROR NUMBER 6:  Sure.

20                 THE COURT:  I want to make that clear to you.  That

21     is, when I say that, I mean either the defendants or any of the

22     counsel or anybody.  Okay?

23                 JUROR NUMBER 6:  Mm-hmm.

24                 THE COURT:  Nothing to do with any of the people

25     participating in this -- in this process.  But I do want to

1   make sure that you can be fair and impartial to both sides and

2   reach a verdict based solely on the evidence without any

3   consideration whatsoever of the incident that you observed on

4   Thursday.

5              JUROR NUMBER 6:  Oh, yeah.

6              THE COURT:  Okay.  You can be fair to both sides.

7              JUROR NUMBER 6:  Mm-hmm.

8              THE COURT:  You have to say "yes" or "no" for the

9   record.

10             JUROR NUMBER 6:  Yes.

11             THE COURT:  And you can follow my instruction and

12   understand this had nothing to do with the parties.

13             JUROR NUMBER 6:  Yes.

14             THE COURT:  Any follow-up questions?

15             MR. TONG:  No, Your Honor.

16             MR. GRONNA:  No, Judge.

17             THE COURT:  All right.  Thank you.

18             Okay, next?

19             Okay.

20             JUROR NUMBER 9:  Edwina.

21             THE COURT:  Edwina Mancao

22             JUROR NUMBER 9:  Mancao.

23             THE COURT:  Okay.  All right, ma'am, why don't you

24   tell us what you observed.

25             JUROR NUMBER 9:  Well, I heard her saying shame on us,

1    and the local boy was screaming in Hawaiian.

2              THE COURT:  Did you understand him?

3              JUROR NUMBER 9:  No.

4              THE COURT:  Okay.  Do you know Hawaiian?

5              JUROR NUMBER 9:  No, I don't.

6              THE COURT:  Okay.  Did you make out anything other

7    than shame on us?

8              JUROR NUMBER 9:  No.

9              THE COURT:  And where were you at the time?

10             JUROR NUMBER 9:  Outside the courtroom on the -- on

11   the sidewalk outside the courthouse.

12             THE COURT:  Outside the courthouse on the sidewalk.

13   So on the Halekauwila sidewalk?

14             JUROR NUMBER 9:  Yeah.

15             THE COURT:  And where were they at the time?

16             JUROR NUMBER 9:  Right in -- outside the door.

17             THE COURT:  Outside the door.

18             JUROR NUMBER 9:  Yeah.

19             THE COURT:  Okay.  And so what I need to make sure is

20   that there's nothing about that incident that would cause you

21   to question your ability --

22             JUROR NUMBER 9:  No.

23             THE COURT:  -- to be fair and impartial.

24             JUROR NUMBER 9:  No.

25             THE COURT:  You can be fair to both sides.

1          JUROR NUMBER 9:  Yes.

2          THE COURT:  Okay.  And I do want to instruct you, just

3    so it's very clear to everyone, I'm doing this with all the

4    jurors, okay?

5          JUROR NUMBER 9:  Okay.

6          THE COURT:  To make it clear that incident had nothing

7    to do with any of the parties.

8          JUROR NUMBER 9:  Okay.

9          THE COURT:  Meaning the defendants, counsel, or the

10   defense or the United States, it had nothing to do with anyone

11   in the courtroom here.  Okay?

12         JUROR NUMBER 9:  Okay.

13         THE COURT:  And so you cannot consider it in any way

14   in reaching a fair and just verdict --

15         JUROR NUMBER 9:  Yes.

16         THE COURT:  -- in the case, and you can do that?  You

17   can follow that instruction?

18         JUROR NUMBER 9:  Yes.

19         THE COURT:  And you can be fair to both sides.

20         JUROR NUMBER 9:  Yes.

21         THE COURT:  Okay.

22         MR. BARBEE:  Just one follow-up, Ms. Mancao.  When you

23   say the boy was yelling shame on us --

24         THE COURT:  No, the woman she said.

25         MR. BARBEE:  Oh, the woman yelling.

1          JUROR NUMBER 9:  Yeah.

2          MR. BARBEE:  And she was saying, "Shame on you" to the

3    jury members or --

4          JUROR NUMBER 9:  Well, she was looking at us.

5          MR. BARBEE:  So did you feel that her comments were

6    directed at you as the jurors?

7          JUROR NUMBER 9:  I not sure.  It's more of

8    embarrassment, I think.

9          THE COURT:  It's more what, ma'am?

10         JUROR NUMBER 9:  Embarrassment.  You know.

11         THE COURT:  Okay.  But you don't feel threatened?

12         JUROR NUMBER 9:  No.

13         THE COURT:  Okay.  Anything further, Mr. Barbee?

14         MR. BARBEE:  No, Your Honor.

15         MR. TONG:  I'm sorry, can I just ask a couple of

16   questions?  When you say it was more a matter of embarrassment,

17   you felt embarrassed?

18         JUROR NUMBER 9:  Yeah, because I'm Hawaiian, so...

19   You know, the local boy is screaming --

20         MR. TONG:  So you took it --

21         JUROR NUMBER 9:  -- the Hawaiian language.

22         MR. TONG:  You took it as a comment directed at you

23   because you're Hawaiian that you should be embarrassed?  Is

24   that how you felt about it?

25         JUROR NUMBER 9:  Yeah.  Yeah, to me I feel they should

1    keep it to themselves.

2         THE COURT:  Okay.  You're going to have to come closer

3    to the microphone.  I'm sorry.

4         JUROR NUMBER 9:  They should keep it to themselves.

5         THE COURT:  But why did you feel embarrassed?  Because

6    you have Hawaiian blood you felt embarrassed, is that what

7    you're saying?

8         JUROR NUMBER 9:  Yeah.  Because I guess I'm not

9    like -- like that.

10        THE COURT:  So you're saying you saw behavior by what

11   you believed to be Native Hawaiians?

12        JUROR NUMBER 9:  Yeah.

13        THE COURT:  That you don't approve of.

14        JUROR NUMBER 9:  Yeah.

15        THE COURT:  And, therefore, you were embarrassed.  Do

16   I have that right?

17        JUROR NUMBER 9:  Yes.

18        THE COURT:  Okay.  Okay.

19        MR. GRONNA:  May I ask, you were embarrassed for them

20   or you were just embarrassed because of the way they were

21   acting?

22        JUROR NUMBER 9:  The way they were acting.

23        THE COURT:  But again, you can -- you can totally put

24   that aside?

25        JUROR NUMBER 9:  Yes.  Yes.

```
 1                 THE COURT:  Okay.  You understand, because you've
 2      heard some testimony already about --
 3                 JUROR NUMBER 9:  Yes.
 4                 THE COURT:  -- Native Hawaiian issues and
 5      Ms. Ventura-Oliver talking about Native Hawaiian history,
 6      culture, land, right, and so forth?
 7                 JUROR NUMBER 9:  Yes.
 8                 THE COURT:  So there are some issues relating to that
 9      in this case.  Do you understand that?
10                 JUROR NUMBER 9:  Yes.
11                 THE COURT:  Okay.  So it is important that you can put
12      aside anything you heard and sort of -- that embarrassment,
13      whatever that meant --
14                 JUROR NUMBER 9:  Yeah.
15                 THE COURT:  -- not let that impact in any way your
16      ability to reach a fair and impartial verdict.
17                 JUROR NUMBER 9:  Yes.
18                 THE COURT:  You can do that?
19                 JUROR NUMBER 9:  Yes.
20                 THE COURT:  You can be fair to both sides?
21                 JUROR NUMBER 9:  Yes.
22                 THE COURT:  Okay.  Thank you.
23                 MR. BARBEE:  Thank you.
24                 MR. TONG:  Thank you.
25                 THE COURT:  Who's next?
```

1            Melvin.

2            MR. BARBEE:  Number 12.

3            THE COURT:  Number 12.

4            MR. TONG:  Estioko.

5            THE COURT:  Estioko, yes.

6            Hi.  Mr. Estioko, correct?

7            JUROR NUMBER 12:  Yes.

8            THE COURT:  Come a little bit closer.  Why don't you

9    tell us what you observed on Thursday.

10            JUROR NUMBER 12:  We left the building.

11            THE COURT:  Mm-hmm.

12            JUROR NUMBER 12:  And we were almost to the traffic

13   light at the corner of Halekauwila and Punchbowl.

14            THE COURT:  Okay.

15            JUROR NUMBER 12:  And I heard all this commotion

16   behind us, and I turned around, and it was a lady that I saw in

17   the courtroom and a gentleman I saw in the courtroom.  And I

18   heard the "F" word in English, you know.  I think it was the

19   woman, she said, F you all, and blah, blah, blah.  And then the

20   young man was shouting in Hawaiian, and by the tone of voice, I

21   don't think it was very pleasant.  And --

22            THE COURT:  Do you understand Hawaiian?

23            JUROR NUMBER 12:  No.

24            THE COURT:  Okay.

25            JUROR NUMBER 12:  Just "pau" and, you know, simple

1   words.

2          THE COURT:  Sure.  Sure.

3          JUROR NUMBER 12:  And that's it.  And then we just

4   kept walking, you know, towards the traffic light to the

5   crosswalk.

6          THE COURT:  Okay.  So I want to make clear to you one

7   thing, which is the incident you observed has nothing to do

8   with any of the parties in this case.

9          JUROR NUMBER 12:  Okay.

10          THE COURT:  Whether that be the attorneys, the

11   defendants, me, anyone else, had nothing to do with anyone --

12          JUROR NUMBER 12:  Okay.

13          THE COURT:  -- on trial here or involved in the trial

14   process.

15          JUROR NUMBER 12:  Yes.

16          THE COURT:  Okay?  But you did say you observed these

17   people in the courtroom.

18          JUROR NUMBER 12:  Yes.

19          THE COURT:  Obviously we're in the courtroom.

20          JUROR NUMBER 12:  Yes.

21          THE COURT:  You know, and there was an incident

22   involving them.

23          JUROR NUMBER 12:  You need a description?

24          THE COURT:  No, no, no.

25          JUROR NUMBER 12:  Oh, okay.

```
 1                THE COURT:  No, no.  I'm just making sure you
 2    understand --
 3                JUROR NUMBER 12:  Mm-hmm.
 4                THE COURT:  -- that that incident you saw --
 5                JUROR NUMBER 12:  Has nothing to do with the case.
 6                THE COURT:  Exactly.  Exactly.
 7                JUROR NUMBER 12:  Okay.
 8                THE COURT:  And so knowing that, I want to make sure
 9    you can be fair and impartial to both sides.
10                JUROR NUMBER 12:  Yes.
11                THE COURT:  And you can follow my instruction, and
12    that is you can deliberate in the case with your fellow jurors,
13    right?
14                JUROR NUMBER 12:  Yes.
15                THE COURT:  Without consideration of that whatsoever.
16                JUROR NUMBER 12:  Yeah.
17                THE COURT:  You can do that?
18                JUROR NUMBER 12:  Yes, sir.
19                THE COURT:  And you can be fair and impartial to both
20    sides?
21                JUROR NUMBER 12:  Yes.  But can I bring something up?
22                THE COURT:  Yes.
23                JUROR NUMBER 12:  Do you guys recycle these books?
24                THE COURT:  We shred them is what we do.
25                JUROR NUMBER 12:  Because it's not my writing, but if
```

1   you look --

2           THE CLERK:  No, no, I explained to them this morning.

3   I took the books away and --

4           JUROR NUMBER 12:  I didn't -- it's almost my writing,

5   but it isn't.

6           THE COURT:  Okay.  That's fine.  You know, what

7   happened is, somebody else probably had it and they took the

8   pages out, and that's just leftover on the cover.

9           JUROR NUMBER 12:  Okay.

10          THE COURT:  Okay?  Is what it is.

11          MR. BARBEE:  What does it say?

12          THE COURT:  It says "guilty."

13          MR. BARBEE:  Oh, my gosh.

14          JUROR NUMBER 12:  I just happened to notice, you know.

15          THE COURT:  Okay.  Let me just be real clear, okay?

16          JUROR NUMBER 12:  Okay.

17          THE COURT:  What happens with these notebooks is

18  people use them, and they don't throw the whole notebook away

19  because, you know, there's paper in there and they want to use

20  it.

21          JUROR NUMBER 12:  Well, I thought somebody was setting

22  me up or something.

23          THE COURT:  No, no, no.  I'm glad you brought this to

24  our attention.  You can look at it.  It's like it was written.

25          MR. BARBEE:  Can we give Mr. Estioko a new book?

1        THE CLERK:  Yes.

2        JUROR NUMBER 12:  Yeah, now I know.

3        MR. TONG:  He has notes in there.

4        THE COURT:  He has his notes in there.

5        MR. TONG:  Why don't we just write "not guilty" in

6    front of it with a slash and then "guilty."  He knows he can

7    make his own decision.

8        JUROR NUMBER 12:  And then one more thing I want to

9    bring up.

10        THE COURT:  Let me just -- everyone stop for a minute,

11    okay?  I want to be very clear on this.  That has nothing to do

12    with this trial, okay?  That was from some other juror or some

13    other time where somebody was writing something.

14        JUROR NUMBER 12:  I thought somebody was messing with

15    me.

16        THE COURT:  No one is messing with you.  I want to

17    make that very clear, okay?  It's too bad that that wasn't

18    noticed, but it appears as if someone had a paper on top of

19    this and wrote on it.

20        JUROR NUMBER 12:  That's what it looks like.

21        THE COURT:  You have to look at an angle to see it,

22    sort of imprinted on the cover.  So...

23        MR. GRONNA:  Oh, I see.

24        THE COURT:  So knowing that this has nothing to do

25    with anyone here, the court staff, the parties, you can ignore

 1   this and proceed?

 2            JUROR NUMBER 12:  Okay.

 3            THE COURT:  I'm asking you, is that right, you can

 4   ignore this and proceed?

 5            JUROR NUMBER 12:  Yeah.

 6            THE COURT:  You can be fair and partial to both sides?

 7            JUROR NUMBER 12:  Yes, sir.

 8            THE COURT:  What we'll do is, we're going to take this

 9   top off and give you this like this (indicating), okay?

10            JUROR NUMBER 12:  Okay.

11            THE COURT:  So you can just tear that top off.  He

12   still has notes here.  He can just fold this over -- or

13   actually he may be able to just fold it over.  Just take that

14   top off.  Just tear that top off.  Yeah.  And, see, he has

15   notes, though.  So what we're going to do is that will be your

16   cover now.

17            JUROR NUMBER 12:  Okay.

18            THE COURT:  That's your new cover.

19            JUROR NUMBER 12:  Okay.

20            THE COURT:  All right.

21            JUROR NUMBER 12:  Got one more thing I want to point

22   out.

23            THE COURT:  Yes, sir.

24            JUROR NUMBER 12:  I know you guys go through a lot of

25   personal security.  You know, the checks you guys show up on

1   the screen, you cross out the account number, right?  But right

2   below the reason why you wrote the check is the entire account

3   number with the routing, the bank routing and everything.

4          THE COURT:  Okay.  We can take a look at that.

5          JUROR NUMBER 12:  I mean just for future cases.

6          THE COURT:  You know, for you it doesn't matter if you

7   have access to that so much.

8          JUROR NUMBER 12:  Yeah.

9          THE COURT:  It becomes part the record, and then the

10  public can get access to it.

11         JUROR NUMBER 12:  But the public sees that --

12         THE COURT:  Yeah, okay.

13         JUROR NUMBER 12:  They can -- you know, the guy is a

14  shrewd crook or whatever you want to call it.

15         THE COURT:  Okay.  Okay.

16         JUROR NUMBER 12:  Okay.

17         MR. TONG:  Thank you, sir.

18         MR. BARBEE:  Your Honor, I just had a couple --

19         THE COURT:  Follow-up questions, sir.  Just wait.

20         JUROR NUMBER 12:  Yes, sir.

21         MR. BARBEE:  Now, you said the lady dropped the F bomb

22  and --

23         JUROR NUMBER 12:  I'm pretty sure it was her.  It

24  sounded like a woman's voice.

25         MR. BARBEE:  -- "F you all," did you feel that that

1   was directed at you or somebody else?

2           JUROR NUMBER 12:  I think it was directed at the

3   Court.

4           MR. BARBEE:  At the Court.

5           JUROR NUMBER 12.  Or the process or, you know, that's

6   what I think it was.

7           MR. BARBEE:  Okay.  And then this note or impression

8   on the cover of your notebook that said "guilty," did you share

9   that with any of the other jurors or just with us?

10          JUROR NUMBER 12:  No, next to me.

11          MR. BARBEE:  Okay.  Which -- Ms. Honjo?

12          JUROR NUMBER 12:  Yeah, I guess.  I can't remember

13  their names.

14          THE COURT:  No, no, no.

15          JUROR NUMBER 12:  Number 11 and first alternate, I

16  guess.

17          THE COURT:  So which one did you share it with, both

18  of those?

19          JUROR NUMBER 12:  Yes.

20          THE COURT:  The two on both sides you showed?

21          JUROR NUMBER 12:  Yes.

22          THE COURT:  Okay.  Okay.  We'll talk to them.

23          JUROR NUMBER 12:  All right.  I just told them, you

24  know, I think somebody is trying to set me up here.  It looks

25  like my writing, but it isn't.

1                    THE COURT:  No, I want to be really clear on this,

2      okay?  Because I don't want any question whatsoever.  Nobody

3      wrote anything on there.

4                    JUROR NUMBER 12:  Okay.

5                    THE COURT:  Okay?

6                    JUROR NUMBER 12:  Yes.  Should I tell them that?

7                    THE COURT:  I'll tell them that, okay?  But I want you

8      to understand that, and I want to make sure you can follow my

9      instructions to just ignore that because it clearly, whether it

10     looks like your writing or not, I understand it's not your

11     writing, you're telling me that.  Clearly it was something

12     someone else wrote during a previous trial on the cover of that

13     book.

14                    JUROR NUMBER 12:  Okay.  Yeah, I'm --

15                    THE COURT:  I don't know any other explanation.  I

16     know that none of the attorneys, any of the parties, anybody

17     would do that.  That just would not happen.

18                    JUROR NUMBER 12:  Okay.  Yeah.

19                    THE COURT:  Okay?

20                    JUROR NUMBER 12:  I'll follow your directions.

21                    THE COURT:  And certainly it was not court staff,

22     okay?  So, in other words, it's a strange event that --

23                    JUROR NUMBER 12:  Coincidence.

24                    THE COURT:  Coincidence, if you want to call it that.

25                    JUROR NUMBER 12:  Yeah.

1            THE COURT:  -- that I'm telling you to ignore because

2    it's just that, and you can do that?

3            JUROR NUMBER 12:  Yes, sir.

4            THE COURT:  We've talked about a number of things.

5    Given all of these things, I just want to make sure one final

6    time you can be fair and impartial to both sides in this case.

7            JUROR NUMBER 12:  Yes, I can.

8            THE COURT:  Okay.  Thank you, sir.

9            JUROR NUMBER 12:  Thank you.

10           THE COURT:  Anyone else?

11           THE CLERK:  One more.

12           THE COURT:  Okay.  Let's finish that up.  Who's next?

13           THE CLERK:  Contreras.

14           THE COURT:  Then we're going to have to bring in

15    Number 11 and Alternate 3.

16           Ms. Contreras?

17           ALTERNATE NUMBER 4:  Yes.

18           THE COURT:  Okay.  So tell us what you observed or

19    heard on Thursday afternoon.

20           ALTERNATE NUMBER 4:  I was almost at the stoplight.

21           THE COURT:  Stoplight.  Just to be clear now,

22    Halekauwila and Punchbowl?

23           ALTERNATE NUMBER 4:  Yeah, Punchbowl, the very first

24    one outside.

25           THE COURT:  Okay.  Okay.  Mm-hmm.

```
 1              ALTERNATE NUMBER 4:  But not quite there but close.
 2    And then I just overheard some yelling, and so I looked back
 3    and I saw some lady at the door yelling inside.  But I couldn't
 4    really understand.  I mean, maybe a few F words, but besides
 5    that...
 6              THE COURT:  Okay.  Is that all you observed then?
 7              ALTERNATE NUMBER 4:  Yeah.
 8              THE COURT:  Okay.  So you just observed the lady.  And
 9    what was she doing, just yelling?
10              ALTERNATE NUMBER 4:  She was just yelling.
11              THE COURT:  And you heard a few F words on occasion.
12              ALTERNATE NUMBER 4:  Yeah.  Yeah.
13              THE COURT:  Okay.  All right.  Anything else that you
14    observed?
15              ALTERNATE NUMBER 4:  No.
16              THE COURT:  Is there anything about that incident that
17    would impact your ability to be fair and impartial in this
18    case?
19              ALTERNATE NUMBER 4:  No.
20              THE COURT:  Okay.  And I want to tell you and instruct
21    you, that what happened has nothing to do with any of the
22    parties.
23              ALTERNATE NUMBER 4:  Okay.
24              THE COURT:  The defendants, the attorneys, whether on
25    the defense side or on the prosecution side.
```

```
 1              ALTERNATE NUMBER 4:  Okay.

 2              THE COURT:  Has nothing whatsoever to do with that.

 3              ALTERNATE NUMBER 4:  Okay.

 4              THE COURT:  Okay.  And you can follow that

 5   instruction?

 6              ALTERNATE NUMBER 4:  Yes.

 7              THE COURT:  So should you be a deliberating juror, you

 8   could be fair and impartial to both sides and not consider that

 9   incident in any way.

10              ALTERNATE NUMBER 4:  Yes.

11              THE COURT:  Okay.  Any follow-up?

12              MR. BARBEE:  No, Your Honor.

13              MR. TONG:  No, Your Honor.

14              THE COURT:  Okay.

15              Alison, Number 11 and Alternate 3.

16              MR. BARBEE:  Just when you think you've seen it all.

17              THE COURT:  Exactly.  Exactly.

18              You're Ms. Hiyakumoto?

19              JUROR NUMBER 11:  Yes.

20              THE COURT:  Ma'am, we were talking to Mr. Estioko, and

21   he had mentioned that he may have mentioned to you that there

22   was some sort of indentation on the outside of his juror

23   notebook.

24              JUROR NUMBER 11:  He showed me.

25              THE COURT:  Okay.  What did you see?
```

1              JUROR NUMBER 11:  I don't know.  I said --

2              THE COURT:  No, no, what did it say?  Do you remember

3    what it said, what he showed you?

4              JUROR NUMBER 11:  He said, This is not my handwriting.

5              THE COURT:  Okay.  But did you look at what was on

6    there?  What was written on there?

7              JUROR NUMBER 11:  "Guilty."

8              THE COURT:  "Guilty."  Okay.  So he just told us about

9    that.

10             JUROR NUMBER 11:  Yeah.

11             THE COURT:  And what I told him, and I'm going to tell

12   you and make sure you understand it, no one here did that.

13   Okay.  What happens is these notebooks get recycled.

14             JUROR NUMBER 11:  Mm-hmm.

15             THE COURT:  Okay?  And what I'm assuming happened, the

16   only explanation that makes sense is, from some other time

17   someone had written some things in there, the notes were taken

18   out and destroyed, which is what we do.  But we recycle the

19   rest of the notebook.

20             JUROR NUMBER 11:  I see.

21             THE COURT:  Okay?  And someone else must have written

22   that down in some previous case.  Okay?

23             JUROR NUMBER 11:  Okay.

24             THE COURT:  So I want to give you that explanation.

25             JUROR NUMBER 11:  Okay.

```
 1              THE COURT:  It has nothing to do whatsoever with this
 2   case.
 3              JUROR NUMBER 11:  Okay.
 4              THE COURT:  Certainly no message from anybody, okay,
 5   of any sort.
 6              JUROR NUMBER 11:  Oh, yeah.
 7              THE COURT:  Okay.  Nothing like that.  Okay?
 8              JUROR NUMBER 11:  Yeah.  Because it's not pen, it's
 9   like indentation, yeah?
10              THE COURT:  Exactly.  So you understand what I'm
11   saying?
12              JUROR NUMBER 11:  Yes.
13              THE COURT:  Okay.  So the fact that you saw that,
14   would that impact your ability to be fair and impartial in any
15   way?
16              JUROR NUMBER 11:  No.
17              THE COURT:  You can be fair to both sides?
18              JUROR NUMBER 11:  Yeah.
19              THE COURT:  And that won't impact you?
20              JUROR NUMBER 11:  No.
21              THE COURT:  And you can follow my instruction, it has
22   nothing to do with this trial.
23              JUROR NUMBER 11:  Oh, yeah.  Yes.
24              THE COURT:  Okay.  Any questions?
25              MR. BARBEE:  No, Your Honor.
```

```
1              MR. TONG:  No, Your Honor.
2              THE COURT:  All right.  Thank you.
3              JUROR NUMBER 11:  Thank you.
4              THE COURT:  Thank you, ma'am.
5              THE CLERK:  Ms. Hirakawa, Jayne.
6              THE COURT:  Hi.  Ms. Contreras, right?  No, I'm sorry.
7    Ms. Hirakawa.  Sorry.
8              ALTERNATE NUMBER 3:  Yes.
9              THE COURT:  Looking at the wrong place.
10             Did Mr. Estioka show you his -- the outside of his
11   notepad?
12             ALTERNATE NUMBER 3:  Yeah.
13             THE COURT:  Okay.  And did you observe some
14   indentation or writing on there?
15             MR. BARBEE:  (Nods head up and down.)
16             THE COURT:  And what did it say?
17             ALTERNATE NUMBER 3:  "Guilty."
18             THE COURT:  Come a little closer because it has to
19   pick up.
20             I just want -- he told us about that, and I just want
21   to explain to you what I think happened here.
22             ALTERNATE NUMBER 3:  Mm-hmm.
23             THE COURT:  First of all, none of the parties here,
24   none of the court staff, nobody wrote that in a message or
25   anything of that sort.  Absolutely not.
```

1          ALTERNATE NUMBER 3:  Yeah, uh-huh.

2          THE COURT:  Okay.  What we do is when these notepads

3    are finished being used is tear out the pages, and destroy,

4    shred the writing in it, but obviously we don't throw away the

5    whole notepad --

6          ALTERNATE NUMBER 3:  Okay.

7          THE COURT:  -- because the rest of it can be used.  So

8    my assumption, and I think this is right, my assumption is that

9    previously in some other trial some juror may have had some

10   piece of paper on top of it --

11         ALTERNATE NUMBER 3:  Yeah, yeah.

12         THE COURT:  -- and wrote that word out, and then --

13         ALTERNATE NUMBER 3:  I understand.

14         THE COURT:  -- with that indentation.  So I just

15   wanted to make sure you understood.

16         ALTERNATE NUMBER 3:  Yes.

17         THE COURT:  It has nothing to do with this trial.

18   Nobody involved in this trial had anything to do with --

19         ALTERNATE NUMBER 3:  Yes.

20         THE COURT:  -- the writing of that word on the

21   notebook.

22         ALTERNATE NUMBER 3:  Yes.  Okay.

23         THE COURT:  So with that, you can be fair and

24   impartial to both sides?

25         ALTERNATE NUMBER 3:  Yes.

```
 1              THE COURT:  And that won't influence you in any way.
 2              ALTERNATE NUMBER 3:  Correct.
 3              THE COURT:  Correct.
 4         All right.  Any follow-up?
 5              MR. BARBEE:  No, Your Honor.
 6              MR. GRONNA:  No.
 7              MR. TONG:  No, Your Honor.
 8              THE COURT:  Okay.  Thank you, ma'am.
 9              ALTERNATE NUMBER 3:  Okay.  Thank you.
10              THE COURT:  All right.  Is that everybody, Alison?
11         Yes.  Okay.
12              MR. BARBEE:  Judge, I feel obliged to make a motion
13    for mistrial at this point or at some other point.
14              THE COURT:  Do it now.
15              MR. BARBEE:  Your Honor, based upon the responses of
16    the jurors, I believe that there is a risk that, even though
17    they appear to be candid, some of the emotions involved in what
18    they witnessed I believe enure in prejudice to the defendant,
19    in particular with my client.
20              With regard to Juror Number 4, Ms. Honjo, she said
21    that it was really loud and she heard the word, the Hawaiian
22    word, "make," M-A-K-E, which is dead, translated into English.
23    And that it was, you know, kind of emotional for her.
24              Juror Number 5, Mr. Knowles, said that he was
25    intimidating and threatening in his opinion.  He also heard the
```

1    word "make" being tossed out.  He felt it may have been

2    directed at the jury.  The Court tried to rehabilitate him, and

3    even so, the Court ended by asking did he think he could be

4    fair, and he said he believed so.  So, you know, I don't know

5    that that was unequivocal.

6            With regard to Juror Number 9, Edwina Mancao, she said

7    she heard one of the persons, the boy screaming in Hawaiian,

8    but that the female shouted, Shame, shame on them, or shame on

9    us -- "Shame on you" to the jurors.  And she felt that was

10   embarrassing, that the woman was singling her out, I guess, or

11   scolding her for being part Hawaiian and participating on the

12   jury or something.  But, you know, she felt some sort of

13   embarrassment there.

14           Lastly, Juror Number 12, Melvin Estioko, he heard the

15   words "F you all," and a man shouting in Hawaiian.  And then

16   with this last thing about him having a notebook that has an

17   indentation and writing on the cover of the notebook saying

18   "guilty" is just astonishing.

19           I know the Court did its best to rehabilitate these

20   witnesses and to give them curative instructions and to

21   instruct them that they're not to consider these things, but I

22   think, nevertheless, in an abundance of caution, you know, I'd

23   move for a mistrial.

24           This extraneous contamination that occurred Thursday

25   afternoon, and then this revelation of somebody having -- one

1    of the jurors having the word "guilty" on the cover of his own

2    notebook, which he was so surprised he had to bring it to the

3    attention of the parties and the Court, kind of mandate a

4    mistrial.

5           In the alternative, I'd ask that the jurors be excused

6    and replaced.

7           MR. GRONNA:  I would join, Your Honor.  If I may just

8    briefly say it's -- especially on the problem with the notepad.

9    It's not necessarily that, you know, the juror says he can be

10   fair and impartial, but my concern is the subliminal message

11   that is directly --

12          THE COURT:  You have psychiatric studies you're

13   bringing forward here, like a beer commercial?

14          MR. GRONNA:  Yes, it is.  But, nevertheless, I think,

15   you know, you see that image and it does make an impression.

16   And that's my -- so that's my two cents.

17          MR. TONG:  Your Honor, I don't think you had to

18   rehabilitate anyone.  I think they did it for themselves.  I

19   think each and every juror was very emphatic after describing

20   factually what they saw that they didn't associate the event

21   with either side.  They understood the Court's admonition that

22   it was not caused by either side, and all of them emphatically

23   said they would not use that as part of their deliberations on

24   guilt or innocence of the defendants, and that they could be

25   fair and impartial and decide the case on the basis of the

1    evidence alone.

2           And with regard to Mr. Knowles, I would say that a

3    careful review of the transcript, if prepared, will indicate

4    that he did say "I believe so," but then in the Court's

5    follow-up questions, he was absolutely emphatic when you asked

6    him, Can you be fair and impartial?

7           THE COURT:  Why don't we bring Mr. Knowles back.

8           MR. TONG:  That's fine.

9           THE COURT:  Okay.  Why don't we do that, because I

10   actually don't recall.  I did recall him one time saying "I

11   believe so," but I think it probably is appropriate to bring

12   him back.

13          MR. TONG:  That's fine, Your Honor.

14          THE COURT:  If he -- we have alternates, so we can --

15          MR. TONG:  That's fine.

16          THE COURT:  So why don't we bring Mr. Knowles back.

17          THE CLERK:  Mr. Knowles.  Knowles.

18          THE COURT:  So your laptop is not hooked up to the

19   Internet.

20          Mr. Knowles, just in some follow-up questions, we

21   thought it wise to bring you back.

22          JUROR NUMBER 5:  Sure.

23          THE COURT:  Just to make sure, you had said you could

24   be fair, but at one point you said you believed you could be

25   fair and impartial and not consider that.  And so the concern

```
 1    is whether that your answer -- you know, you equivocated at all
 2    in your answer.  In other words, the level of certainty that
 3    you cannot -- you will put that out of your mind, you will not
 4    consider it, and you will reach a verdict based solely on the
 5    evidence you hear here, as I told you before, within the four
 6    walls of the courtroom.
 7              JUROR NUMBER 5:  Mm-hmm.
 8              THE COURT:  So are you confident you can do that?
 9              JUROR NUMBER 5:  I'm a hundred percent sure.
10              THE COURT:  You're a hundred percent sure.
11              JUROR NUMBER 5:  Yes.
12              THE COURT:  Okay.  Okay.  Because at first you said
13    you believed you could be.  Some people talk that way when they
14    mean they're a hundred percent.
15              JUROR NUMBER 5:  No.
16              THE COURT:  Other people mean, I'm not sure, right?
17              JUROR NUMBER 5:  Sure.  Okay.
18              THE COURT:  And so we just wanted to make sure where
19    you were.
20              JUROR NUMBER 5:  I'm a hundred percent confident.
21              THE COURT:  You're a hundred percent confident you can
22    be fair and impartial?
23              JUROR NUMBER 5:  Yes, I am.
24              THE COURT:  And not consider the incident you saw.
25              JUROR NUMBER 5:  No sweat, no, not at all.
```

 1              THE COURT:  No sweat.  All right.  Thank you, sir.

 2              MR. TONG:  Thank you.

 3              MR. GRONNA:  Judge --

 4              THE COURT:  No, I'm going to rule unless you have

 5     something to add.

 6              MR. GRONNA:  Oh, no, I have another matter.

 7              THE COURT:  All right.  Let me rule.  So, I'm not

 8     going to go through the whole history of this.  I think it's

 9     clear from the record that the jurors that did observe the

10     event were all called to sidebar.  I went through with them

11     what they observed.  I allowed counsel to ask questions.

12              And I agree with Mr. Tong, I didn't have to

13     rehabilitate.  I mean this wasn't like pulling teeth.  The

14     various jurors observed different levels of the disturbance

15     outside.  But it's clear that they each can be fair and

16     impartial.  It's clear they can follow my instructions not to

17     consider it, and that it was not caused or related in any way

18     to any of the parties, whether it be the defense side or the

19     prosecution side.

20              And -- and I find the jurors were candid.  I mean I'm

21     very impressed -- not always during jury selection when you

22     have a bunch trying to get off, you know, but once you get that

23     panel that's seated, I'm always impressed with how hardworking

24     they tend to be and how seriously they take their -- their

25     work, and I saw that in all of these jurors.  That they were

1   being candid and were absolutely truthful when they said they

2   would not consider it, they wouldn't hold it against anybody,

3   and they could be fair.

4           Now, as far as this indentation, Counsel, do you want

5   that made part of the record?  We can do that if you wish.

6           MR. BARBEE:  Sure, Your Honor.

7           MR. GRONNA:  I think out of an abundance of caution.

8           THE COURT:  Okay.  So if we can put that in some

9   envelope of some sort and make it part of the record.

10          MR. BARBEE:  Yes, Your Honor.

11          THE COURT:  These -- yeah.  Look, events like this

12  happen.  Not this event obviously.  This is a very strange one.

13  But sort of unexpected strange events can happen.  And that's

14  what happened here.

15          Mr. Estioka saw it.  He sort of said it looked like

16  his writing.  You know, he was concerned as to how it happened

17  and so forth, and I explained the only explanation that makes

18  sense.  Nobody is claiming that Mr. Tong or Mr. Nammar or one

19  of the agents went and wrote on the notebook, or Ms. Greaney or

20  I went and wrote on the notebook.  Nobody is claiming such a

21  thing happened.

22          THE CLERK:  For the record, the notebooks were removed

23  from the seats from Thursday until this morning, so they

24  weren't available or accessible for anybody to --

25          THE COURT:  Okay.  Right.  They're held in private.

1    Right, right.  They're held in private.  So it's not as if

2    anyone has access to any of them in any event.  That is the

3    parties, the lawyers, anybody.

4         And -- and I explained to him the only explanation

5    that makes sense, which is previously somebody had written on

6    the cover of that notebook that word.  He understood it.  The

7    other two jurors he talked to understood it.  In my view they

8    were all candid.  There's simply no inkling of a suggestion

9    that they couldn't be fair because of that.

10        As far as Mr. Gronna's Madison Avenue theory on this,

11   there's really no support whatsoever for that.

12        So I do deny the Motion for a Mistrial.

13        All right.  I'm sorry to refer to it that way, but --

14        MR. GRONNA:  I would have done it.  Thanks, Judge.

15        THE COURT:  Okay.  All right.

16        MR. GRONNA:  One -- one of the issue's come up, as you

17   know, we brought it up earlier regarding Mr. Nammar.  I only

18   want to bring this up just to preserve Mr. Barbee and I with

19   our clients.  Because of the fact that it was noted that

20   Mr. Barbee -- or Mr. Nammar had not officially signed in.  I

21   know the rules pertaining --

22        MR. TONG:  Hold on.  Hold on, Richard.  Cynthia can't

23   hear you.

24        MR. GRONNA:  Okay.  I know the rules pertaining to

25   allowing, you know, counsel that are administered or licensed

1    in other states to practice in the federal courts.  However, my

2    clients are not quite so educated in that, and they made a big

3    deal and actually had -- one of their representatives had

4    called chambers about that issue.

5         And so out of an abundance of caution, I want to just

6    raise the objection to Mr. Nammar's examination of the previous

7    witnesses, and I think that what I would do, just to let the

8    Court make a ruling on this issue as to -- I would move the

9    Court to strike those examinations of those witnesses based on

10   the fact that he was not complied with the court rule.

11        MR. BARBEE:  I would join in the motion for the

12   record.

13        MR. GRONNA:  Yeah, just for the record.

14        THE COURT:  All right.

15        MR. TONG:  Well -- do you want to speak?

16        MR. NAMMAR:  No, go ahead.

17        MR. TONG:  Your Honor, I think I asked the Court to

18   make a nunc pro tunc entry of the order in essence.  I mean I

19   don't -- I think it's a ministerial act.  Mr. Nammar has been

20   an Assistant United States Attorney in the District of Hawaii

21   for at least the last two years.  He's an attorney in good

22   standing in the state of Oklahoma.  His license here lapsed,

23   but his ability to practice law in the District as a federal

24   prosecutor is governed by the local rule, which pretty much not

25   only authorizes, but I think is a ministerial act on the court

 1   to allow him to practice so long as he works with our office

 2   upon the submission of a paper.  And I think the Court can -- I

 3   don't have any research, but I believe the Court can issue the

 4   order nunc pro tunc to the beginning of this trial.

 5          THE COURT:  So here's what I'm going to do.  I'm going

 6   to -- to the extent it wasn't clear that that order was nunc

 7   pro tunc, I will do that, number one.  Number two, I'm going to

 8   deny the motion without prejudice, because I don't -- haven't

 9   done a whole lot of research here.  Okay?

10          And what I say by that -- what I mean by that is, if

11   you want to go back and do some research and file a motion,

12   I'll reconsider it.  Okay.  And the government's going forward,

13   he's now admitted, so there's no issue there.  But only going

14   backwards, right?  So I can reconsider this issue at a later

15   point in time.

16          But my preliminary view -- and this is preliminary

17   again because the ruling without prejudice to you refiling and

18   giving some case law, okay -- is that it is ministerial.  It

19   is -- Rule 83.1 is intended to require notification to the

20   Court so the Court has in its records the assurance that the

21   person has been admitted and is an active member in good

22   standing in a bar of some court.  In this case, Oklahoma.

23          Mr. Nammar has represented that he has been in good

24   standing of the bar in Oklahoma, with the Supreme Court of

25   Oklahoma since 2000 --

1          MR. NAMMAR:  -- 6, Your Honor.

2          THE COURT:  No one is questioning that representation,

3    to be clear on that.  So what he didn't do and what he should

4    have done is filed that petition and affidavit under Rule 83.1.

5    It seems to me it is very much along the lines of something

6    that is ministerial.  I'm not happy about it.  I made that

7    clear to Mr. Nammar that, you know, these rules are important

8    and should be followed.  And, honestly, it's kind of sloppy by

9    the U.S. Attorney's Office that this fell through the cracks

10   like that.

11         But that's not the issue before me right now.  The

12   issue before me is whether or not to strike the testimony of

13   the witnesses Mr. Nammar had questioned.  And I don't think

14   there's a basis to do that.  Certainly there's no prejudice.

15         And let me just say also, again, to be clear, as I

16   read the rule, once that application is submitted, the Court

17   shall sign it.  It's not discretionary.  It's not, oh, let's

18   allow this DOJ attorney to practice here and not allow another.

19   The rule says "shall be signed by the Court."  And so although

20   there was this oversight, I don't believe it rises to the level

21   such that I would grant the motion.

22         As I say, it's without prejudice.  If you want to go

23   do some research, if your clients want to do research.

24         MR. BARBEE:  That's more like it.

25         THE COURT:  More like it.  All right.  Are we ready to

1   proceed then?  Take a bathroom break?

2            MR. TONG:  If the Court will.

3            MR. BARBEE:  Thank you.

4            MR. GRONNA:  Thank you, Judge.

5                    (End of sidebar.)

6            THE COURT:  Well, we are ready to proceed after a

7   quick bathroom break.  I've been here with the attorneys for a

8   while.  My staff has been here before you came in for quite a

9   while, so we need a bit of a break.

10           So, Ms. Greaney will just take you over to the fourth

11  floor room.  You folks can use the restroom in there if you

12  need to as well.  We'll try to keep the recess relatively

13  short.

14           (A recess was taken from 9:59 a.m. to 10:22 a.m.)

15           (The following proceedings were held in open court in

16  the presence of the jury:)

17           THE COURT:  We are back on the record with counsel,

18  the defendants, case agents, and ladies and gentlemen of the

19  jury again.

20           Good morning.  We are now prepared to resume the

21  trial.  Okay.

22           MR. TONG:  Thank you, Your Honor.  Government calls

23  Steve Carter.

24                    STEVEN CARTER,

25  called as a witness by the Government, having been first duly

```
1    sworn, was examined and testified as follows:

2              THE CLERK:  Please have a seat.

3              Please state your name for the Court, and spell your

4    first and last name.

5              THE WITNESS:  Steven Carter, S-T-E-V-E-N, C-A-R-T-E-R.

6                        DIRECT EXAMINATION

7    BY MR. TONG:

8    Q    Good morning.

9    A    Good morning.

10   Q    Where do you work?

11   A    I work with the FBI over on Maui.

12   Q    What is your position with the FBI?

13   A    I'm a special agent.

14   Q    How long have you been a special agent?

15   A    Over nine years.

16   Q    And what are your duties as an agent on the island of

17   Maui?

18   A    To investigate violations of federal law.

19   Q    Have you investigated the activities of Mahealani

20   Ventura-Oliver, Pilialoha Teves and others?

21   A    I have.

22   Q    What was your role in that investigation?

23   A    We opened up an investigation based on receiving

24   complaints of a group operating on Maui.

25   Q    Were you the case agent in that matter?
```

1   A    I was.

2   Q    What does it mean to be a case agent?

3   A    You essentially lead the investigation and collect

4   evidence.

5   Q    Were any other law enforcement agencies involved in this

6   particular matter?

7   A    There was.

8   Q    What agencies were involved?

9   A    Postal Inspection Service, as well as the IRS and Maui

10  County Police Department.

11  Q    And did there come a time during this investigation when

12  you did an undercover operation?

13  A    I did.

14  Q    Can you explain what an undercover operation is?

15  A    As an undercover employee or agent, you utilize a false

16  identity, and in this situation participated as a person of

17  interest -- interested in attending the seminars of Hawaiiloa

18  Foundation.

19  Q    And did you personally do that?

20  A    I did.

21  Q    So you pretended to be a potential client; is that

22  correct?

23  A    I did.

24  Q    And in that capacity did you attend certain meetings?

25  A    Yes.

CARTER - DIRECT

1    Q    How many meetings did you attend?

2    A    I attended two public seminars.

3    Q    Where were those seminars located?

4    A    They were held at the Cameron Center.

5    Q    And what were the dates of the meetings that you attended?

6    A    The first one was November 9th, 2008, and then

7    November 16th, 2008.

8    Q    What day of the week were those meetings?

9    A    They were both on a Sunday.

10    Q    And how long did the first meeting last?

11    A    It was approximately three hours.

12    Q    What about the second meeting?

13    A    Approximately three-and-a-half hours.

14    Q    Did you make any attempt to memorialize what was said at

15    those meetings?

16    A    I had.

17    Q    What did you do?

18    A    I utilized a video and audio recorder.

19    Q    And did the machines work?

20    A    They did.

21    Q    And have you reviewed the recordings that were produced as

22    a result of those meetings?

23    A    I have.

24    Q    And have you determined whether they fairly and accurately

25    depict the substance of the conversation that occurred on those

1    dates?

2    A    They do.

3    Q    Now, have you as part of this case made DVDs that contain

4    excerpts or portions of the recordings?

5    A    I have.

6         MR. TONG:  May I approach Agent Carter?

7         THE COURT:  You may.

8    BY MR. TONG:

9    Q    Agent Carter, I'm going to show you a DVD that's been

10   marked as Exhibit 1-T, as in tango.  Do you recognize that?

11   A    I do.

12   Q    And what is it?

13   A    It's a copy of the excerpts made from the video I had from

14   November 9th.

15   Q    And how do you recognize that DVD?

16   A    By the date and my initials.

17   Q    Okay.

18        MR. TONG:  We would ask that Exhibit 1-T be received.

19        MR. BARBEE:  Voir dire, Your Honor?

20        THE COURT:  All right.

21        MR. BARBEE:  If I may.

22              VOIR DIRE EXAMINATION

23   BY MR. BARBEE:

24   Q    Special Agent Carter, directing your attention to the

25   exhibit -- I guess it's 1-T, like Tom?

```
 1    A    Yes.
 2    Q    Okay.  And that's an excerpt of a video recording you took
 3    on November 9th, 2008?
 4    A    It is.
 5    Q    And the entire length of the -- well, that's not the --
 6    that's not the -- doesn't contain the entirety of what you
 7    videotaped that day, is it?
 8    A    That's correct.
 9    Q    And how long is that exhibit in terms of minutes?
10    A    This one in particular, I believe it's approximately
11    30 minutes.
12    Q    Okay.  And that would be 30 minutes of the total
13    three hours plus that was videotaped by yourself that day,
14    correct?
15    A    Yes.
16    Q    So fair to say that this is just an excerpt or a piece of
17    what you videotaped that day, 30 minutes of more than
18    three hours of tape?
19    A    Yes.
20    Q    And in your -- this tape you personally made in your
21    undercover capacity?
22    A    Yes.
23    Q    While posing as somebody else attending a meeting at the
24    Cameron Center?
25    A    Yes.
```

1    Q    Okay.

2              MR. BARBEE:  No further questions.

3              THE COURT:  All right.  Any objection?

4              MR. BARBEE:  No, Your Honor.

5              MR. GRONNA:  No, Your Honor.

6              THE COURT:  All right.  Subject to what we discussed

7    earlier.

8              MR. BARBEE:  Yes.

9              THE COURT:  All right.  So 1-T is admitted.

10             (Government's Exhibit 1-T was received in evidence.)

11                    RESUMED DIRECT EXAMINATION

12   BY MR. TONG:

13   Q    All right.  Agent Carter, before we play portions of

14   Exhibit 1-T, let me ask you, did you -- when did you arrive at

15   the meeting on November the 9th of 2008?

16   A    I arrived after it had begun.

17   Q    Okay.  And what happened when you arrived?

18   A    I observed people standing outside a room that appeared to

19   be filled with other -- many other people that are in

20   attendance, and with two doors open leading into that room

21   where the people were in attendance.

22   Q    What did you do at that point?

23   A    As I was approaching, someone asked if I was signed up

24   with the program.  I stated no.  And he said, That's okay, you

25   can go inside, just not to shut the doors.

1    Q    Did you go inside?

2    A    I did.

3    Q    And tell us what you observed upon entering the room.

4    A    When I entered the room, I observed approximately

5    estimated 80 people seated and standing room only.

6    Q    And how did you estimate the number of people who were

7    sitting?

8    A    I had counted the chairs and rows.

9    Q    Okay.  And was anyone speaking when you walked into the

10   room?

11   A    Yes.  Mahealani Ventura-Oliver was speaking in the front

12   of the audience.

13   Q    If you were to see Mahealani Ventura-Oliver again, would

14   you recognize her?

15   A    Yes.

16   Q    Do you see her in court today?

17   A    I do.

18   Q    Would you identify her by where she's seated and what

19   she's wearing.

20   A    Seated in the second seat behind you on the right in a

21   blue and white dress.

22        MR. TONG:  May the record reflect the identification

23   of the defendant Mahealani Ventura-Oliver.

24        THE COURT:  Yes.

25   BY MR. TONG:

1   Q    Okay.  And once you entered the room, did you stay until

2   the end of that particular proceeding?

3   A    I did.

4   Q    And let me ask you, did there come a time when the name

5   Juliette Segundo was raised?

6   A    Yes.

7   Q    In what context?

8   A    Juliette Segundo was identified as someone that had her

9   mortgage zeroed out or paid off.

10  Q    Okay.  And who made that reference?

11  A    Mahealani Ventura-Oliver.

12  Q    And does that portion of the seminar appear on the first

13  excerpt on Exhibit 1-T, which is titled "Session 2," starting

14  at 10:31?

15  A    Yes.

16  Q    Have you prepared a written transcript of that portion of

17  the recording?

18  A    I have.

19  Q    And do you have Exhibit 1-T.1 in front of you?

20  A    I do.

21  Q    And does that constitute a fair and accurate transcription

22  of what was said during the seminar as reflected in this

23  excerpt?

24  A    It does.

25          MR. TONG:  Your Honor, we would ask for permission to

1   play the excerpt and distribute 1-T1.1 to the jury for their

2   use.

3            THE COURT:  All right.  Any objection?

4            MR. BARBEE:  Your Honor, we'd only ask that the Court

5   instruct the jury on transcripts.

6            THE COURT:  Yes.  Yes.

7            MR. BARBEE:  And their limited use.

8            THE COURT:  Yes, I'll do that.

9            MR. GRONNA:  Yes, same, Your Honor.

10           THE COURT:  All right.  So ladies and gentlemen, let

11  me explain to you sort of the law surrounding what's happening

12  now.  We are going to play this -- is it audio and video?

13           MR. TONG:  Yes, it is, Your, Honor.

14           THE COURT:  -- audio and video for you and a

15  transcript that has been marked Exhibit 1-T.1 has been

16  prepared.  The evidence is the audio and video itself, not the

17  transcript.  The transcript has been prepared only to assist

18  you or as an aid so you can follow along with what is being

19  said as you observe and listen to the exhibit itself.

20           So 1-T1.1 is not evidence and will not be admitted in

21  evidence.  Okay?  And remember I told you before what that

22  means.  You won't get that in deliberation, okay?  So it is

23  only an aid.  It is not evidence.  All right?  1-T itself is

24  evidence.

25           We can pass out 1-T.1 now.

1              MR. TONG:  Your Honor, we have multiple binders.  Each

2      binder has all of the transcripts together.  Does the Court

3      want us to remove the individual transcript or just tell the

4      jury to stick with just the one in front of it?

5              THE COURT:  I think we just -- what I'm going to have

6      you do is only look at the exhibit that's marked, all right?

7      So don't go forward and look at any other of these -- of these

8      marked exhibits in the book.

9              MR. TONG:  And, Your Honor, final question, some of

10     these are a little lengthy.  May I have permission to sit down

11     during the longer ones?

12             THE COURT:  No, you may not.

13             Yes, of course.

14             MR. TONG:  After that, I -- I will not sit down, Your

15     Honor.

16                        (Pause in the proceedings.)

17             THE COURT:  For the record, Counsel, the court

18     reporter will not be transcribing this.  The evidence will be

19     the exhibit itself.

20             MR. BARBEE:  Yes, Your Honor.

21             MR. GRONNA:  That's fine, Your Honor.

22             THE COURT:  All right.  So ladies and gentlemen, open

23     up, and you're only going to be looking at 1-T.1, which is two

24     pages.  Don't look beyond that.  Okay?  Unless I tell you

25     otherwise.  Just open up to the very first page.  Very first

```
 1   page.  And on the bottom right it should say "1-T.1."  Okay.
 2                 (Government's Exhibit 1-T played.)
 3   BY MR. TONG:
 4   Q    Quick question, Agent Carter.  There was a male voice that
 5   just spoke.
 6   A    Yes.
 7   Q    Did you see the person who was speaking?
 8   A    I did.
 9   Q    And who was it?
10   A    That was John Oliver.
11   Q    And preceding that there was a woman's voice.  Did you see
12   who was speaking?
13   A    Yes.
14   Q    Who was that?
15   A    Individual that I understand her name was Lei.
16   Q    Okay.  What about the person who spoke after that, at the
17   head of the -- standing at the lectern (indicating)?
18   A    Mahealani Ventura-Oliver.
19   Q    Thank you.
20              MR. TONG:  May we continue, please?
21                 (Government's Exhibit 1-T played.)
22              THE COURT:  All right.  So, ladies and gentlemen, just
23   close the booklet for now.  And if you heard anything different
24   from what you believe you saw in the transcript, remember the
25   transcript is not evidence.  What controls is the audio that
```

1    you've heard.  All right?

2           Mr. Tong.

3           MR. TONG:  Thank you, Your Honor.

4    BY MR. TONG:

5    Q    Now, Agent Carter, did there come a time later during that

6    same session that Ms. Ventura-Oliver spoke about how many

7    people had gone through the process?

8    A    Yes.

9    Q    And does that portion of the presentation appear on the

10   second excerpt on the DVD with the file title of "Session 5,

11   1207," et cetera?

12   A    Yes.

13   Q    And have you prepared a written transcript of that

14   excerpt?

15   A    I have.

16   Q    And if you could take a look at Exhibit 1-T.4, do you see

17   that in front of you?

18   A    I do.

19   Q    Does that document fairly and accurately reflect the

20   substance of the words that were said on that particular

21   excerpt of recording?

22   A    It does.

23          MR. TONG:  We would ask for permission to play that

24   excerpt and distribute 1-T.4, Your Honor.

25          MR. BARBEE:  No objection to the excerpt.

1          MR. GRONNA:  No objection, Your Honor.

2          THE COURT:  All right.  So you can open up to 1-T.4,

3    ladies and gentlemen.  It's just the next page, a single page.

4              (Government's Exhibit 1-T played.)

5    BY MR. TONG:

6    Q    All right.  Agent Carter, the excerpt immediately before

7    that referenced an Uncle Gil; is that correct?

8    A    That's correct.

9    Q    Did there come a time when you spoke to someone by that

10   name on November 9 of 2008?

11   A    Yes.

12   Q    Tell us the circumstances of that encounter.

13   A    After the seminar appeared to be complete, I walked up to

14   an individual I knew as Uncle Gilly or Gilbert Schmitt, and

15   spoke to him about the possibility of going through the process

16   or obtaining help because I had a mortgage.

17   Q    And tell us very generally the substance of your

18   discussion.

19   A    Mr. Schmitt advised that if I was in foreclosure they

20   could assist me with my mortgage and/or another loan I had.

21   Q    Was that discussion recorded?

22   A    It was.

23   Q    And is that the next excerpt entitled "File Session 8,

24   All"?

25   A    Yes.

1   Q    And did you prepare a written transcript of your

2   discussion with Gilbert Schmitt?

3   A    I did.

4   Q    Turning your attention to Exhibit 1-T.6, is that a

5   transcript of the excerpt that we propose to play?

6   A    It is.

7   Q    And does that fairly and accurately reflect the words that

8   were spoken between you and Mr. Schmitt?

9   A    It does.

10       MR. TONG:  We would ask for permission to play the

11  next excerpt and to use Exhibit 1-T.6.

12       MR. BARBEE:  No objection to the excerpt.

13       MR. GRONNA:  No objection, Your Honor.

14       THE COURT:  All right.  So, ladies and gentlemen, you

15  may open your notebooks to 1-T.6.  It's, I believe, about four

16  pages.

17           (Government's Exhibit 1-T played.)

18  BY MR. TONG:

19  Q    Agent Carter, the individual that was speaking with you,

20  is that the person you identified as Gilbert Schmitt?

21  A    It is.

22  Q    And did you continue your discussion with Mr. Schmitt on

23  that day?

24  A    It did continue, yes.

25  Q    I'm sorry?

1   A    Yes, we did.

2   Q    It sounded like that last recording sort of ended

3   abruptly.

4   A    It did.

5   Q    Can you explain what's going on?

6   A    Our devices create automatic cuts in the recording, and

7   then it continues on.  It's a natural progression.  It doesn't

8   create a break, it just separates the time frames.

9   Q    And did the recording continue on to the next excerpt that

10  appears on Exhibit 1-T?

11  A    It did -- it does.

12  Q    Is the next excerpt a file title entitled "Session 9,

13  All"?

14  A    It is.

15  Q    Did you prepare a transcript of the discussion that

16  appears on "Session 9, All"?

17  A    I did.

18  Q    And is that transcript Exhibit 1-T.7?

19  A    It is.

20  Q    Does Exhibit 1-T.7 fairly and accurately reflect the words

21  that were spoken between you and Mr. Schmitt?

22  A    It does.

23        MR. TONG:  We would ask for permission to play the

24  next excerpt, and ask the jury to use Exhibit 1-T.7.

25        MR. BARBEE:  No objection.

1          MR. GRONNA:  No objection.

2          THE COURT:  All right.  You may look in your notebooks

3    for 1-T.7.

4               (Government's Exhibit 1-T played.)

5    BY MR. TONG:

6    Q    Agent Carter, a couple of follow-up questions on that

7    transcript.  Or excerpt, rather.  There was a discussion of

8    something being a normal line in 2010.  Do you remember that?

9    A    Yes.

10   Q    What did that refer to?

11   A    I understood that I wouldn't be able to get scheduled if I

12   was under the normal line until 2010.

13   Q    And what is a "normal line"?

14   A    If you weren't in the critical phase of the mortgage

15   process.

16   Q    Okay.

17   A    Foreclosure.

18   Q    And there also was a reference to some website; is that

19   correct?

20   A    Yes.

21   Q    Did you ever in your investigation access that website?

22   A    I had.

23   Q    Was it up and operational?

24   A    It was.

25   Q    Okay.  And that recording we just heard was the first of

1  the two sessions that you attended, correct?

2  A    Yes.

3  Q    You testified earlier that you attended a second session?

4  A    I did.

5  Q    Was that date November the 16th of 2008?

6  A    Yes, it was.

7  Q    Just so we're clear, how long after the first session was

8  that?

9  A    One week.

10 Q    Okay.  Both Sundays?

11 A    Yes, both Sundays.

12 Q    And -- and did you also record the proceedings that you

13 observed on November the 16th of 2008?

14 A    I did, both audio and visual.

15 Q    Thank you.  And the same manner as the first time?

16 A    Yes.

17      MR. TONG:  May I approach, Your Honor?

18      THE COURT:  You may.

19 BY MR. TONG:

20 Q    Agent Carter, let me show you what's been marked as

21 Exhibit 1-U for identification, and ask if you recognize this?

22 A    I do.

23 Q    What is it?

24 A    It's a copy of a disk of the excerpts of the complete

25 recording for that day.

1    Q    And have you listened to those excerpts?

2    A    I have.

3    Q    And do they fairly and accurately reflect the substance of

4    the conversation and presentation on that day?

5    A    It does.

6         MR. TONG:  We would ask that Exhibit 1-U be received

7    in evidence.

8         MR. BARBEE:  Brief voir dire, Your Honor.

9         THE COURT:  Yes.

10                       VOIR DIRE EXAMINATION

11   BY MR. BARBEE:

12   Q    Special Agent Carter, this U series, the 1-U series of

13   excerpts are excerpts from a three-and-a-half hour recording?

14   A    That's accurate, yes.

15   Q    Approximate three-and-a-half hours?

16   A    Yes.

17   Q    So these are just pretty much minutes -- excerpts of --

18   minutes of excerpts from the three-and-a-half hours?

19   A    Yeah, it's less than 15 minutes of the total excerpts.

20   Q    And during the other time other than the 15 minutes, there

21   was activity going on that you were taping?

22   A    There was.

23   Q    Okay.

24        MR. BARBEE:  No objection.

25        THE COURT:  All right.

1          MR. GRONNA:  No objection.

2          THE COURT:  1-U is admitted.

3     (Government's Exhibit 1-U was received in evidence.)

4                    RESUMED DIRECT EXAMINATION

5     BY MR. TONG:

6     Q     Agent Carter, on November the 16th of 2008, who did most

7     of the speaking?

8     A     Mahealani Ventura-Oliver.

9     Q     And did there come a time when the defendant Mahealani

10    Ventura-Oliver introduced others who were involved in the

11    group?

12    A     There was, yes.

13    Q     And does that portion of the presentation appear at the

14    file that is titled "Session 4, Starting at 1501"?

15    A     Yes.

16    Q     And have you prepared a written transcript of that excerpt

17    of the recording?

18    A     I have.

19    Q     Directing your attention to Government's Exhibit 1-U.3, do

20    you recognize that?

21    A     I do.

22    Q     Is that a transcript of the portion of the recording that

23    is on the DVD?

24    A     It is.

25    Q     Does it fairly and accurately reflect the words that were

 1   spoken?

 2   A     It does.

 3   Q     As well as the speakers?

 4   A     Yes.

 5         MR. TONG:  We would ask for permission to play the

 6   next excerpt, and to have the jury use Exhibit 1-U.3.

 7         THE COURT:  Mr. Barbee?

 8         MR. BARBEE:  No objection.

 9         MR. GRONNA:  No objection.

10         THE COURT:  All right.  So, again, the same

11   instruction applies, this is not evidence, the transcript.  The

12   same as before.  And you can open your books to 1-U.3.

13         (Government's Exhibit 1-U played.)

14   BY MR. TONG:

15   Q     Agent Carter, during that excerpt the defendant Mahealani

16   Ventura-Oliver introduced someone named Pilialoha; is that

17   correct?

18   A     Yes.

19   Q     And did you see the individual who was introduced at that

20   time?

21   A     I did.

22   Q     And do you see that person in court today?

23   A     I do.

24   Q     Could you identify that person by where he or she is

25   sitting and what they're wearing.

 1   A     Far right side, Pilialoha Teves in like a purple shirt.

 2         MR. TONG:  May the record reflect the identification

 3   of the defendant Pilialoha Teves.

 4         THE COURT:  Yes.

 5   BY MR. TONG:

 6   Q     Agent Carter, during that session of November 16, 2008,

 7   was there further discussion concerning IRS taxes?

 8   A     There was.

 9   Q     And does that discussion appear in an excerpt which is

10   titled "Session 9, at 1154"?

11   A     It does.

12   Q     And did you prepare a transcript of that particular

13   recording?

14   A     I did.

15   Q     Is that transcript, does it appear as Exhibit 1-U.5?

16   A     It does.

17   Q     Does Exhibit 1-U.5 fairly and accurately reflect the words

18   that were spoken?

19   A     It does.

20         MR. TONG:  We would ask for permission to play that

21   excerpt, and to have the jury use Exhibit 1-U.5.

22         MR. BARBEE:  No objection.

23         MR. GRONNA:  No objection.

24         THE COURT:  All right, you may.  1-U.5.

25              (Government's Exhibit 1-U played.)

1   BY MR. TONG:

2   Q    Agent Carter, on that same date was there further

3   discussion about the subject of mortgages and debts?

4   A    There was.

5   Q    And does that discussion appear in the excerpt which is

6   entitled "Session 9, 1330"?

7   A    Yes.

8   Q    Have you prepared a transcript of that particular

9   recording?

10  A    I did.

11  Q    Directing your attention to Exhibit 1-U.6, do you

12  recognize that as a transcript which you prepared?

13  A    Yes.

14  Q    Does that fairly and accurately reflect the words and

15  speakers on that date?

16  A    Yes.

17       MR. TONG:  We would ask for permission to proceed with

18  the next excerpt and to use Exhibit 1-U.6.

19       THE COURT:  All right.

20       MR. BARBEE:  No objection.

21       MR. GRONNA:  No objection.

22       THE COURT:  All right.  You may open the notebook to

23  1-U.6.

24       And you may play it.

25            (Government's Exhibit 1-U played.)

1    BY MR. TONG:

2    Q    Agent Carter, does that conclude the particular excerpts

3    that are on the two DVDs that we have?

4    A    It does.

5    Q    I think the date of the last excerpt was November 16 of

6    2008; is that correct?

7    A    That's correct.

8    Q    Did anything happen in your investigation the following

9    day?

10   A    Yeah, the following day it was decided that we put out a

11   news or public announcement regarding the activity of a group

12   that was purportedly selling bonds or making promises to pay

13   off mortgages.

14   Q    And when you say "we," who are you referring to?

15   A    The FBI.

16   Q    Was that announcement made?

17   A    It was.

18   Q    Pretty much in the words you just used?

19   A    Yes.  And they were charging people for those services.

20   Q    So it was like a warning to the public?

21   A    Yes.

22   Q    And did it appear in the paper?

23   A    Yes.

24   Q    What day did it appear in the paper?

25   A    November 17, 2008.

1    Q    Thank you.  And just so we're clear, in the public

2    announcement, was the name Ko Hawaii Pae Aina mentioned?

3    A    No.

4    Q    Was the name Registry mentioned?

5    A    No.

6    Q    Was the name Hawaiiloa Foundation mentioned?

7    A    No.

8    Q    Were the names of Mahealani Ventura-Oliver or Pilialoha

9    Teves mentioned?

10   A    No, it was not.

11   Q    Thank you.

12         MR. TONG:  May I have one moment, Your Honor?

13         THE COURT:  You may.

14         MR. TONG:  I have nothing further.

15         THE COURT:  All right.  Let me see the attorneys at

16   sidebar for a moment.

17               (Sidebar on the record:)

18         THE COURT:  So because we have this agreement that you

19   may follow up your cross-examination later, you want me to

20   instruct the jury on that point right now in any way?

21         MR. BARBEE:  Sure.

22         THE COURT:  I mean it's up to you guys.  When I say

23   "you guys," the defense really.  If you want me to make some

24   comment that he may be recalled later for cross-examination

25   regarding the tapes, obviously he may be recalled.

1          MR. BARBEE:  That's fine.

2          MR. GRONNA:  That's fine.

3          THE COURT:  You want to leave it at that?

4          MR. TONG:  That's fine, Your Honor.

5          THE COURT:  Okay.  So do you have any other then or

6     are you just going to waive at this point in time?

7          MR. GRONNA:  I'll just defer until later.

8          THE COURT:  So what I am going to say is I had a

9     sidebar, and it's been decided that you are not going to

10    cross-examine now, but you may recall him later with my

11    permission.

12         MR. GRONNA:  Right, regarding his testimony.

13         MR. BARBEE:  Yes.

14         THE COURT:  Regarding his testimony.  Okay.

15         MR. TONG:  Thank you, Your Honor.

16                   (End of sidebar.)

17         THE COURT:  All right.  Ladies and gentlemen, I just

18    had sort of a procedural issue I discussed with the counsel,

19    and at this point in time defense counsel are not going to

20    question Agent Carter, but they may recall him later to

21    cross-examine him regarding his testimony.  Okay?

22         So, just understand he's not necessarily released from

23    the testimony, he may be recalled later.  But at this point in

24    time there will be no cross-examination.  All right?

25         So with that, you may step down, sir, subject to

 1   recall.

 2            THE WITNESS:  Thank you.

 3                                    (Witness excused)

 4            THE COURT:  All right.  Can we collect up those

 5   notebooks then.  If you can pass your notebooks down, ladies

 6   and gentlemen, and Ms. Greaney will collect those.

 7            MR. NAMMAR:  United States calls Lehua Hoy.

 8            THE COURT:  All right.  So, Counsel, are we going to

 9   get into the issue we talked about this morning?  Because we'll

10   have to have a break before we do that, and so --

11            MR. NAMMAR:  I don't think we will by the break.

12            THE COURT:  By the -- okay.  So if --

13            MR. NAMMAR:  I'll ask for sidebar.

14            THE COURT:  If you get to that, ask for a sidebar or

15   pass over it and then we will come back to it.

16            MR. NAMMAR:  Yes, Your Honor.

17            THE COURT:  All right.

18                         LEATRICE HOY,

19   called as a witness by the Government, having been first duly

20   sworn, was examined and testified as follows:

21            THE CLERK:  Please have a seat.

22            Please state your name for the Court, and spell your

23   first and last name.

24            THE WITNESS:  Leatrice Hoy.  L-E-A-T-R-I-C-E, H-O-Y.

25                      DIRECT EXAMINATION

HOY - DIRECT

1    BY MR. NAMMAR:

2    Q    Ms. Hoy, do you sometimes go by Lehua?

3    A    Yes, I do.

4    Q    Okay.  And where are you from?

5    A    I live on Maui.

6    Q    And where were you born and raised?

7    A    Laie, Oahu.

8    Q    How far did you go in school?

9    A    I graduated high school.

10   Q    And where did you graduate high school from?

11   A    Kahuku High.

12   Q    Did you attend any college?

13   A    Very little.  Maybe a semester at BYU Hawaii campus.

14   Q    Okay.  Are you married?

15   A    Yes, I am.

16   Q    To who?

17   A    Peter Hoy.

18   Q    Petro Hoy?

19   A    Yes.

20   Q    And when did you all get married?

21   A    1997.

22   Q    Where did you get married?

23   A    In Florida.

24   Q    And were you living in Florida at the time?

25   A    Yes.

HOY - DIRECT

1    Q    At some point did you move back to Maui?

2    A    Yes, we did.

3    Q    When?

4    A    In 1997.

5    Q    In 2011, were you charged with some federal offenses?

6    A    Yes.

7    Q    What offenses?

8    A    Conspiracy and mail fraud.

9    Q    And did you enter a plea of guilty in that case?

10   A    I did.

11   Q    And did you have a plea agreement when you entered your

12   plea?

13   A    Yes.

14   Q    And pursuant to that plea agreement, did you agree to

15   cooperate with the government?

16   A    Yes, I did.

17   Q    Have you been sentenced yet in that case?

18   A    No.

19   Q    When is your sentencing hearing?

20   A    November 18th.

21   Q    I want to take you back to 2008, first part of 2008.  Were

22   you working at that time?

23   A    Yes.

24   Q    Where were you working?

25   A    I worked at an MD's office.

HOY - DIRECT

1    Q    An MD's office?

2    A    Yes.

3    Q    And in the first part of 2008, did you and your husband

4    own real estate?

5    A    Yes.

6    Q    Where?

7    A    In Kula on Maui.

8    Q    And did you have a mortgage?

9    A    Yes.

10   Q    On that property?

11   A    Yes.

12   Q    And what was the approximate amount of the mortgage?

13   A    Approximately $450,000.

14   Q    And what were your approximate monthly payments on that

15   mortgage?

16   A    About 2,200.

17   Q    And in the first part of 2008, were you current on those

18   mortgage payments?

19   A    Yes.

20   Q    Now, I want to direct your attention to February 2008.

21   Did you come to hear about a group called The Registry?

22   A    Yes.

23   Q    And how did you hear about that group?

24   A    I had heard it from Mahealani Oliver.

25   Q    And before we get to how you heard about it, do you see

HOY - DIRECT

106

1    Ms. Oliver in the court today?

2    A    Yes, behind you.

3    Q    Okay.  Can you point her out and describe an article of

4    clothing that she's wearing?

5          THE COURT:  Why don't you move.  I think you're --

6    she's trying to look behind you.

7          MR. NAMMAR:  Yes.  I'm sorry, Your Honor.

8          THE WITNESS:  I believe it's an aqua and white dress.

9    BY MR. NAMMAR:

10   Q    Where is she seated?

11   A    At that table right there (indicated).

12         MR. NAMMAR:  Your Honor, may the record reflect that

13   the witness identified defendant Ventura-Oliver?

14         THE COURT:  Yes.

15   BY MR. NAMMAR:

16   Q    Okay.  So how did you hear about the program?

17   A    Um --

18   Q    I'm sorry, how did you hear about the group called The

19   Registry?

20   A    I knew that Mahealani Oliver had started a Royal

21   Repository Registry.  From her I heard about it.

22   Q    Okay.  And how did you first hear about it from her?

23   A    Well, we had met years prior and she did talk about

24   starting The Registry, and she eventually did.

25   Q    Okay.  And did there come a time in February 2008 when you

HOY - DIRECT

1    had a meeting with Ventura-Oliver about The Registry?

2    A    About The Registry?

3    Q    Did there come a time -- let me rephrase the question.

4         Did there come a time in February 2008 when you had a

5    meeting with Ventura-Oliver?

6    A    Yes.

7    Q    Okay.  What was that meeting about?

8    A    It was regarding mortgages.

9    Q    Okay.  And where was the meeting?

10   A    At our home.

11   Q    And who was present at the meeting?

12   A    Myself, my husband, Mahealani Oliver and John Oliver.

13   Q    Okay.  Tell us what happened during that meeting.

14   A    We were told about the mortgage program that they had done

15   with their home.  And asked if we would be interested in

16   participating.

17   Q    And what were you told about the mortgage process or plan?

18   A    That a -- a bond was created to pay for the balance of the

19   mortgage.

20   Q    And was this a planned meeting?

21   A    No.

22   Q    Okay.  How did it happen?

23   A    The Olivers turned up at our home unannounced.

24   Q    And they started telling you about this mortgage program?

25   A    Yes.

1    Q    Did they say during this meeting whether it worked?

2    A    They said that they had done it on their home a year

3    before, and they were still living in their home.

4    Q    And did they say anything in that meeting about Hawaii or

5    Hawaiian rights?

6    A    Yes.

7    Q    What was said about that?

8    A    That because I am a part Hawaiian, that I had rights to

9    the lands to which the properties are built on which gave me a

10   unique opportunity.

11   Q    And during that meeting was Ventura-Oliver convincing?

12   A    Yes.

13   Q    Can you tell us why?

14   A    Well, for me it was because of the fact that I was a

15   Hawaiian.  I do believe, you know, that we are fortunate to be

16   living here on our own lands.  And Mahealani Oliver is a very

17   well-read person, and I completely and totally believed in

18   everything she said.

19   Q    Did the subject of a fee come up during that meeting?

20   A    Yes.

21   Q    And who talked about the fee?

22   A    Mahealani Oliver.

23   Q    And what was said about the fee?

24   A    The fee was asked for the papers that would be generated.

25   Q    For the program?

HOY - DIRECT

1   A   Yes.

2   Q   And how much was the fee?

3   A   1500 was to start.

4   Q   And was there a total amount discussed?

5   A   No.

6   Q   Okay.  1500 was to start.  Did you pay that fee?

7   A   Yes, we did.

8   Q   When did you pay the fee?

9   A   That very day.

10  Q   And what happened after you paid the $1500 fee?

11  A   We were given -- given a date to go into the offices to

12  sign the papers.

13  Q   Okay.  I want to turn your attention now to March 2008.

14  What, if anything, happened then?

15  A   We did go into the offices and we did sign.

16  Q   And who is "we"?

17  A   My husband and I.

18  Q   And which offices are you talking about?

19  A   It was known as the Royal Repository and Registry.

20  Q   Okay.  And where are those offices?

21  A   In Wailuku on Hoohana Street.

22  Q   And you said you did sign.  What did you sign?

23  A   We signed a trust.

24  Q   Uh-huh.

25  A   And a bond.

 1   Q    Okay.  And who presented you with those documents?

 2   A    Mahealani Oliver.

 3   Q    Were they explained to you in detail when you signed them?

 4   A    Not in detail.  We were told what the pages that we were

 5   signing.

 6   Q    You said --

 7   A    Where to put our signature.

 8   Q    Sorry, you said you signed a bond.  What did you think the

 9   bond would do?

10   A    Well, I thought the bond was to pay for the mortgage.

11   Q    Okay.  And why did you think that?

12   A    That's what I was told.

13   Q    Okay.  How about the trust, what do you think the purpose

14   of the trust was?

15   A    The trust was to be like what I would describe as a

16   treasure chest that you would place items that you owned into

17   it.  For example, the property would become owned by the trust.

18   Q    And who told you about that?

19   A    Ms. Oliver.

20   Q    Okay.  What happened to these documents, specifically what

21   happened to the bond after you signed it?

22   A    They were sent to the mortgage company.

23   Q    Okay.  Who sent them?

24   A    The office, The Registry.

25   Q    Was anything mentioned about certified mail?

HOY - DIRECT

111

1  A    Yes.

2  Q    What was said about that?

3  A    The package will be sent certified with a return receipt,

4  which is the green card from the post office.  And that we were

5  to wait till the green card was returned to us.

6  Q    And was the green card described as important?

7  A    Yes, that was proof that the bond was sent and received.

8  Q    And who told you that?

9  A    Ms. Oliver.

10  Q    After you signed this paperwork did you continue to make

11  payments on your mortgage?

12  A    No, we stopped.

13  Q    Why did you do that?

14  A    We were told that was -- that was it.  We didn't need to

15  make anymore.

16  Q    And who told you that?

17  A    Ms. Oliver.

18  Q    Did these documents that you signed in March of 2008 work

19  for you?

20  A    No.

21  Q    Okay.  What happened?

22  A    We received a letter from the mortgage company stating

23  that they were not recognizing the bond.

24  Q    And did you discuss that response with anyone?

25  A    Yes.

HOY - DIRECT

1   Q    Who?

2   A    Ms. Oliver.

3   Q    And what did she say when you brought that up with her?

4   A    That they were expecting something like that to come back.

5   And that we would just write on them that -- words to the

6   effect of, I will not recontract, I do not enter into --

7   re-enter into a contract with you, and did not recognize what

8   they had written.

9   Q    And did you follow those instructions?

10  A    Yes.

11  Q    What ultimately happened with your house?

12  A    I'm sorry?

13  Q    What ultimately happened with your house?

14  A    We -- we eventually lost it because we could not make the

15  payments.

16  Q    So you were foreclosed on?

17  A    We never received a foreclosure notice, but we did keep

18  receiving the payment notices from the mortgage company.

19  Q    Did you ever attend any meetings that The Registry put on?

20  A    Yes.

21  Q    How often?

22  A    Every Sunday.

23  Q    And for how long?

24  A    Months.

25  Q    How many people were at these meetings on average?

HOY - DIRECT

113

```
 1   A    Maybe a couple of hundred.

 2   Q    And who spoke at the meetings?

 3   A    Ms. Oliver.

 4   Q    Did anyone else speak at the meetings?

 5   A    Yes.

 6   Q    Who?

 7   A    My husband.

 8   Q    Anyone else besides your husband?

 9   A    No.

10   Q    Okay.  What did Ms. Oliver speak about during the

11   meetings?

12   A    A lot of it was on the history of Hawaii, the royalty of

13   Hawaii and how the Hawaiians have a unique connection to this

14   land.

15   Q    And what else did she speak about?

16   A    Well, on one Sunday a month the mortgage process was

17   discussed.

18   Q    So, was that an open or closed meeting when the mortgage

19   process was discussed?

20   A    That was a closed meeting.

21   Q    And can you tell the jury what a "closed meeting" means?

22   A    It's where only the people who were going through the

23   process could go into.

24   Q    And when Ventura-Oliver spoke about the mortgage process

25   at the closed meeting, what did she -- what did she talk about?
```

1   A    It was basically the papers that we had signed, going over

2   the papers that we had, the trust.  And if there were any new

3   documents that needed to be filled in, those were introduced at

4   those meetings.

5   Q   Were references ever made to how the mortgages would be

6   paid off at those closed meetings?

7   A    Yes, on how the bonds are sent out to the mortgage, the

8   different mortgage companies.

9   Q   And did it say how they would work, the theory behind

10  them?

11  A    My understanding was the bond was generated using each

12  individual's credit.

13  Q   And go on.  Anything -- any other explanation?

14  A    Well, from the day we get -- this is the way I understood

15  it:  From the day we get a Social Security number, it starts

16  generating a credit, and it comes to a point where there's

17  enough credit there to generate this bond that would eventually

18  pay for the mortgage.

19  Q   And where did you gather that understanding from?

20  A    From the meetings.

21  Q   And from who specifically at the meetings?

22  A    Ms. Oliver.

23  Q   Were there any documents that were ever shown during these

24  meetings?

25  A    Yes.

HOY - DIRECT

1  Q    What kind of documents?

2  A    The trusts, for one.  And of course, the new documents

3  that would be filled in would be circulated.

4  Q    At the meetings was proof ever circulated that the program

5  worked?

6  A    Not that I know of.

7  Q    Do you remember a credit report being passed around?

8  A    Yes, but I don't know whose it was.

9  Q    Okay.  Do you remember what was on that credit report?

10 A    I believe like a zero balance.

11 Q    And what was the significance of the zero balance?

12 A    Showing that the mortgage had been paid.

13 Q    Did the phrase "papa molaki" ever come up in any of those

14 meetings?

15 A    Yes.

16 Q    And who used that phrase?

17 A    Ms. Oliver.

18 Q    And do you know what that phrase means?

19 A    Yes, I believe it's mortgage.

20 Q    How about the phrase "kulana," was that ever brought up at

21 any of the meetings?

22 A    I'm sorry?

23 Q    Kulana?

24 A    Kuleana?

25 Q    Oh, sorry, kuleana.

1   A    Yes.

2   Q    Was that ever brought up at any of the meetings?

3   A    Yes.

4   Q    And do you know what that means?

5   A    Not really.

6   Q    Okay.  Who else spoke at the meetings besides

7   Ventura-Oliver?  You said your husband also spoke?

8   A    Yes.

9   Q    And what did your husband speak about?

10  A    International current events.

11  Q    And why did he speak at the meetings?

12  A    He was asked.

13  Q    By who?

14  A    By Ms. Oliver.

15  Q    And what did you think his purpose was?

16  A    Well --

17       MR. GRONNA:  Well, I'm going to object to speculation,

18  Your Honor.

19       THE COURT:  Sustained.

20  BY MR. NAMMAR:

21  Q    Did he make -- when he spoke do you believe he made the

22  program more credible?

23  A    I believe he made Ms. Oliver look credible.

24  Q    And why do you think that?

25  A    Well, I believe that he was used like a mascot.

1    Q    Did John Oliver speak at any of these meetings?

2    A    No.

3    Q    Okay.  Was there anyone present at the meetings that

4    worked for the program but did not speak?

5    A    Yes.

6    Q    Who would that be?

7    A    Pilialoha Teves, Yolanda Cristomo, myself.  Melina -- I

8    don't know her last name.  Gilbert Schmitt.  And I think that's

9    it.

10   Q    And what were these individuals doing at the meetings?

11   A    Well, we all sat and --

12   Q    Okay.  And if you saw Pilialoha Teves again, could you

13   recognize her?

14   A    Yes.

15   Q    Do you see her in the courtroom?

16   A    Yes, over there (indicating).

17        THE COURT:  You have to speak into the microphone.

18        THE WITNESS:  I'm sorry.  At the end of the table on

19   the right.

20   BY MR. NAMMAR:

21   Q    And can you describe an article of clothing she's wearing?

22   A    I need to get 'em.

23   Q    Yes.

24   A    I believe it's, sorry, a purple-colored top.

25        MR. NAMMAR:  Okay.  May the record reflect that the

```
 1   witness has identified the Defendant Teves?

 2            THE COURT:  Yes.

 3   BY MR. NAMMAR:

 4   Q    At some point did you begin to work for the program?

 5   A    Yes, I did.

 6   Q    And how were you hired?

 7   A    Ms. Oliver approached me and asked if I would like to work

 8   in the office.

 9   Q    And was pay discussed at that time?

10   A    Yes.

11   Q    And what was said about pay?

12   A    Well, I mentioned that I needed to work, I needed to earn.

13   I thought maybe that Ms. Oliver thought that I would come in

14   and volunteer, and at that time I couldn't do that, I needed to

15   earn a wage.  And I mentioned that to her, and Ms. Oliver

16   offered to pay me.

17   Q    And what was your wage?

18   A    $3,000 a month.

19   Q    How long did you work for Hawaiiloa Foundation?

20   A    From July 2008 till April 2009.

21   Q    And what were your job duties there?

22   A    Office type work.  Filing, registering, basic work in an

23   office.

24   Q    And did they change over time?

25   A    Yes.
```

HOY - DIRECT

1    Q    How so?

2    A    I was given a duty to begin filling in the trust, the

3    info -- the person -- personal information into the trust

4    documents.

5    Q    And how do you go about filling in information into the

6    documents?

7    A    There was a template on the computer.

8    Q    And can you tell the jury what a "template" is.

9    A    An outline.

10   Q    Okay.  And what do you do when you're filling in the

11   template?

12   A    Putting people's personal information, their names,

13   addresses.

14   Q    Who else worked with you at Hawaiiloa Foundation?

15         THE COURT:  You mean in the office?

16   BY MR. NAMMAR:

17   Q    I'm sorry, in the office.

18   A    Pilialoha Teves, of course.  Yolanda Cristomo.  Melina.

19   Gilbert Schmitt.  John Oliver.  Kainoa Mahoe.  Can't think of

20   anyone else.

21   Q    And can you go over just briefly their roles, what they

22   did.

23   A    Well, Gilbert Schmitt was -- he answered telephones, he

24   made the appointments, he did mailings.  And he took the

25   documents to the Bureau of Conveyance to be registered or

HOY - DIRECT

120

1    filed.

2    Q    Okay.

3    A    Pilialoha did the trusts.

4    Q    And what do you mean by "did the trusts"?

5    A    I'm sorry.  She entered the informations on the trust, the

6    same as I did.

7    Q    On the template?

8    A    On the template, yes.

9    Q    Uh-huh.

10   A    John Oliver, I'm not sure what his role was.  Yolanda

11   Cristomo did help with entering information on the trust

12   template.  And Melina did that as well.

13   Q    Did Ventura-Oliver work at the office?

14   A    Yes.

15   Q    What was her role?

16   A    We called her "boss."

17   Q    Okay.

18   A    She oversaw everything.

19   Q    And you said you weren't sure what John did.  Did you ever

20   come to learn that John worked with taxes?

21   A    Yes.

22   Q    Okay.  Tell us about that.

23   A    I don't know much about it, just that he was the one to

24   ask about tax information.

25   Q    You said that Ventura-Oliver was your boss.

 1   A     Yes.

 2   Q     Who would you report to if Ventura-Oliver wasn't there?

 3   A     Ms. Teves.

 4   Q     Okay.  And can you tell us just briefly how the office was

 5   set up.

 6   A     The location that had the two offices, they were two

 7   buildings, and the one side we called the boys' side, is where

 8   the boys were.  And one side was the girls' side, which is

 9   where we were.

10   Q     And where was it located, the office?

11   A     I said the wrong -- it's Hookahi Street in Wailuku.

12   Sorry, I --

13   Q     That's okay.  And you said boys' side, girls' side.

14   A     Yes.

15   Q     Who was on the boys' side?

16   A     John Oliver, Gilbert Schmitt, Kainoa Mahoe.

17   Q     Okay.  And on the girls' side?

18   A     It was myself, Pilialoha Teves, Ms. Oliver, Yolanda,

19   Melina and Julana.  Sorry, forgot Julana.

20   Q     Okay.  And what sort of work happened on the girls' side?

21   A     Where the trusts and the bonds were created.

22   Q     Okay.  When you worked there, did Ventura-Oliver ever talk

23   about using bonds for her mortgage?

24   A     Yes.

25   Q     What did she say?

HOY - DIRECT

122

 1   A    That she had used it on her own personal house.

 2   Q    And did she say whether or not it worked?

 3   A    I assumed it did because they were still --

 4        THE COURT:  No, don't assume.  Did she say anything?

 5        THE WITNESS:  Sorry.

 6   BY MR. NAMMAR:

 7   Q    And how about Defendant Teves did she?

 8        THE COURT:  Well, I'm not sure there's an answer right

 9   now.  She started saying "I assume," and I cut her off because

10   I don't want speculation if that's what she was testifying

11   about.

12        MR. NAMMAR:  Right.

13        THE COURT:  So you had a conversation with her about

14   that.

15        THE WITNESS:  About the bond being used on her home,

16   yes.

17        THE COURT:  Okay.

18        THE WITNESS:  I did know that, yes.

19        THE COURT:  Do you have any follow-up to that?

20   BY MR. NAMMAR:

21   Q    And yes or no, did she say to you whether or not it worked

22   specifically?

23   A    Those specific words, no.

24   Q    Okay.  How about the Defendant Teves, did you ever talk to

25   her about using the bonds to pay off the mortgages?

HOY - DIRECT

1  A    Yes, she did.

2  Q    What did she say about using bonds?

3  A    That she had sent them for her mortgages on the home that

4  she had.

5  Q    And did she say whether or not it was working for her?

6  A    No.

7  Q    Okay.

8        THE COURT:  No, it didn't work or, no, she didn't say

9  anything?

10        THE WITNESS:  We never discussed.

11        THE COURT:  You never discussed it.  All right.

12        Mr. Nammar, I'm thinking of breaking now because we

13  have some business to take care of, and I want to make sure

14  court staff and you folks have enough time for lunch.  So I'm

15  thinking we'll go ahead break now till 1:15.  I have some

16  business I need to do with the lawyers for about 15 or

17  20 minutes, so -- obviously I need to give my court staff

18  and -- them and myself to eat.

19        So we'll take a little longer lunch break than usual,

20  but we'll pick up at 1:15, okay?

21        And I remind you not to talk about the case or

22  anything about it with each other or others, all right?  And

23  just leave your notepads closed and on the chairs.

24        (At 11:46 a.m, the jury was excused and the following

25  proceedings were held:)

1          THE COURT:  All right, ma'am, you may step down.

2          Counsel, I want to take about a five-minute restroom

3     break, and then we'll come back, okay?

4          (A recess was taken from 11:47 a.m. to 11:56 a.m.)

5          (The following proceedings were held in open court out

6     of the presence of the jury:)

7          THE COURT:  We're back on the record with everybody

8     but the jury.

9          All right.  So let's take up this issue regarding

10    Mr. Barbee's Motion in Limine then.

11         So can I get a proffer of what evidence is going to be

12    introduced, and then I can hear what -- what the response is

13    and hear further from Mr. Barbee, of course.

14         MR. TONG:  Your Honor, I haven't studied his motion,

15    so I think I can cover what he has in here.  But I think the

16    proffer would be that we will introduce in evidence the fact

17    that in November of 2008, at about the time the FBI issued a

18    press release that appeared in the paper advising the public to

19    beware of a group that was selling bonds in payment of their

20    mortgage, that John Oliver and Mahealani Ventura-Oliver turned

21    over bags to Lehua and Petro Hoy which contained large amounts

22    of cash and that that cash was then returned to the Olivers

23    shortly thereafter.

24         And that in April of 2009, as the FBI, IRS and other

25    agencies began their execution of search warrants, bags of cash

1    as well as bags of gold and silver coins were turned over by

2    the Olivers -- or through the Olivers, they arranged it, to

3    Petro and Lehua Hoy, who eventually turned them over to Agents

4    Dougan and Carter.  And those are the coins and cash that are

5    part of the forfeiture allegation of the superseding

6    indictment.  I believe there was something like $40,000 in

7    cash, and there also was two 27-pound bags of coins, plus a

8    group of collectable coins.

9         In addition to that, during the execution of the

10   search warrant, there was an additional amount of cash, about

11   40-something thousand dollars of cash that was found in a safe

12   in the Olivers' residence which was searched.

13        The other items that I think are at issue in this

14   motion, if I understand it correctly, is that they are

15   objecting to evidence that the Hawaiiloa funds were used to

16   purchase two trucks and also to pay Pilialoha Teves.  Those two

17   trucks are subject to the forfeiture allegation as are monies

18   taken from Pilialoha Teves' account.

19        And our proffer would be that the way in which the

20   money was collected and forwarded is consistent with criminal

21   activity.  That the turning over of those items to the Hoys in

22   the manner which I stated essentially show consciousness of

23   guilt.  John Oliver is expected to testify that the money and

24   the coins were turned over because he knew that the authorities

25   were coming and he didn't want it to be seized, and that he

1    knew that this money was derived from the operation of the

2    activities which are the subject of the investigation and

3    prosecution.

4            The fact that --

5            THE COURT:  Well, is he going to testify that

6    Ms. Ventura-Oliver was involved in that decision as well?  I

7    mean --

8            MR. TONG:  Yes, he will.

9            THE COURT:  Okay.

10           MR. TONG:  I mean I don't think he's going to say, She

11   said this, but it was a joint decision.

12           THE COURT:  A joint decision, okay.

13           MR. TONG:  Husband and wife.  And in addition to that,

14   we think that the probative value includes the fact that they

15   maintained such large cash reserves is indicative of knowledge

16   and intent of criminal activity.  That a normal business entity

17   does not conduct business that way.  They normally use their

18   operating account as the repository for the funds as well as

19   the payment of business expenses.  And here, they -- they put

20   essentially their proceeds into a form that was largely

21   untraceable and not easily subject to seizure, or we also would

22   argue that it wasn't available to people who were aggrieved

23   customers who wanted to get their money back.

24           So we think that it's relevant for those purposes.

25   And the trucks are relevant for yet another purpose, which are

1    that we will show that as to both of the trucks at issue, they

2    used either cash drawn from these accounts or they made check

3    payments drawn on the Hawaiiloa Foundation accounts during the

4    time period of the conspiracy where they were promoting to

5    others the fact that bonds could be used as a legitimate form

6    of payment of all your debts.

7            So this shows knowledge and intent that the bonds were

8    not legitimate and could not be used for that purpose because

9    when it came to buy assets, they used regular money or cash or

10   checks, just as normal people would.  So we think that goes to

11   knowledge and intent as well.

12           The other item I would argue, and then I just mention

13   it, is that I thought we had discussed this generally at the

14   pretrial conference where I had asked the Court whether --

15   actually it was more directed at the defense.  I had said, I

16   assume everybody wants us to present all our evidence upfront

17   in our case in chief, and they said, Yes, that's what we want.

18   And we have structured our case accordingly.  We do have some

19   witnesses in town now who are going to talk about the gold and

20   the like, and they flew from California for that purpose.  So

21   there is not only probative value that is not outweighed by

22   prejudicial impact, but there's a disruption of the

23   government's case.

24           Final comment, Your Honor.

25           THE COURT:  Well, let me be clear, though.  I mean is

```
 1    it your view that some of this evidence is -- is admissible
 2    really just for the forfeiture or is it your view that
 3    regardless, even if there was no forfeiture allegation, this
 4    evidence is admissible?  And you would be seeking to admit it
 5    regardless of whether there was forfeiture.
 6              MR. TONG:  The latter.
 7              THE COURT:  Okay.
 8              MR. TONG:  I say it's relevant.  But the forfeiture, I
 9    mean I don't even think their argument it's not admissible for
10    forfeiture purposes.
11              THE COURT:  Right.
12              MR. TONG:  And the final comment I would make, Your
13    Honor, this is not quite -- and I apologize I'm disjointed.  I
14    got the motion at 4:00 p.m. yesterday.  But the final comment I
15    make is the prejudicial value they complain about is very, very
16    minimal, if there is any at all.  This is not a case where
17    we're dealing with drug dealers or engaged in some illicit
18    hidden secret activity, and then agents would come upon a cash
19    hoard.  Because then they would have basically unexplained
20    wealth that the jury could use as a means of inferring other
21    criminal activity, like other drug deals that were not charged
22    in the particular case.
23              Here, as the last tape showed and as Ms. Hoy's
24    evidence demonstrates, their activities were open and
25    notorious.  They were doing weekly seminars at the Cameron
```

1    Center.  They were publicizing their activities to people who

2    came.  They were running a website basically saying, We can

3    help you with your debt.  There's been ample evidence that they

4    collected payments in the form of cash.  So even if the jury

5    hears that there was cash, it's readily explainable.  It's all

6    consistent with the activities about which they've already

7    heard.

8              THE COURT:  All right.  Mr. Barbee.

9              MR. BARBEE:  Yes, Your Honor.  Our position is, number

10   one, it's not relevant.  The money-laundering count in the

11   indictment talks about payment of a credit card debt of my

12   client and her then-husband John Oliver, a little more than

13   $10,000.  So with the money-laundering count, they've got

14   evidence separate and distinct from what we're talking about

15   here.  And what they've noticed in the indictment as a specific

16   payment of money to pay off a credit card has nothing to do

17   with this cash, the motor vehicles or the coins or the precious

18   metals.

19             In reality, what the government is trying to do is to

20   inflame the jury and ask them to render a verdict based upon an

21   emotional basis that the defendants here, and in particular, my

22   client, is a bad person for amassing such amount of cash,

23   80-some thousand dollars according to the government.  And

24   using that cash that is obtained from participants who are in

25   -- who are financially distressed and in hard circumstances in

1    order to purchase these luxury items such as silver coins,

2    gold.

3             THE COURT:  Why are those luxury items?  I mean it's

4    just a different form of -- of wealth.  I mean I don't know if

5    it's a luxury item.  A luxury item is a Jaguar.  A gold coin I

6    don't --

7             MR. BARBEE:  Tahitian pearls in the case of Ms. Teves.

8    And a gold bracelet.  Which apparently the government has not

9    recovered but has referred to because they have a receipt for

10   this gold bracelet purportedly purchased by my client with the

11   homeowner funds.

12            So, you know, we believe it is highly inflammatory.

13   The case law says that the Court should be very careful that

14   the jury not have the temptation to render a verdict of guilt

15   based upon emotional reasons.  And this evidence is all aimed

16   at inflaming the jury to get their emotions hot.

17            In addition, with regard to the evidence being

18   relevant to the forfeiture count, that -- that may be true.

19   But I'm concerned about any spillover to the criminal side.

20            THE COURT:  Well, I'm going to be clear.  I'm going to

21   rule based on the relevance, the 401 and 403 analysis as to the

22   guilt, not -- not the forfeiture.

23            MR. BARBEE:  Correct.  And if it does get to that

24   point, which it may or may not, then, you know, it's a total

25   different issue.

1          But our understanding is that this particular witness

2   is going to testify that a third party brought certain parcels

3   over to her and her husband's house containing these items, the

4   coins, the cash and whatnot, and told her that he was

5   instructed by John Oliver to deliver these items to the Hoys'

6   residence.

7          And in every single instance the reference was to John

8   Oliver.  This is not a situation where I think this witness is

9   going to say John and Mahealani Oliver dropped it at their

10   doorstep.  It was a third party who dropped it, and his words,

11   according to this witness, were that John Oliver had instructed

12   him to drop these items off.  Not Mahealani Oliver but John

13   Oliver.

14          THE COURT:  But the proffer I got from Mr. Tong --

15          MR. BARBEE:  Is a little different.

16          THE COURT:  -- is different as to what Mr. John Oliver

17   will testify to when he gets on the stand.  As to the

18   decision-making, it doesn't really matter who told this courier

19   to deliver it.  The question is who decided to have it

20   delivered in the first instance.

21          MR. BARBEE:  Well, even if it turns out that John

22   Oliver after this witness testifies does try to tie it up by

23   pointing his finger at his wife here -- ex-wife, and saying

24   that she was involved in his decision to move or -- move these

25   items, it's still prejudicial in my mind.

1           At a minimum the Court should give a cautionary

2    instruction to them that they are only to consider this

3    evidence for something other than what Mr. Tong has indicated

4    is consciousness of guilt or that the collection of cash is

5    consistent with criminal actions or the collection of coins is

6    consistent with criminal actions.  By stating that in his

7    argument, he's more or less candidly admitting that he wants to

8    inflame the jury on the basis of this evidence.

9           THE COURT:  All right.  Thank you.

10           MR. GRONNA:  And I would join in this motion, Your

11    Honor.  And I think even more so for Ms. Teves because, you

12    know, she would be more or less sucked in by the fact that she

13    is, you know, co-defendant sitting at the table here.  And it

14    may be that the jury might be looking at her as having

15    something to do with all this money being shifted around, and

16    as the government says, in order to try to conceal it or hide

17    it from, you know, impending search warrants.  And I think that

18    even she would actually even be more prejudiced by this type of

19    evidence coming in.

20           THE COURT:  All right.

21           MR. GRONNA:  I -- I would join in the motion.

22           THE COURT:  All right.  Well, as I understand the

23    proffer, there will be evidence that John Oliver and Defendant

24    Ventura-Oliver jointly made a decision to turn over these bags

25    containing cash and coins, gold, silver coins to the Hoys, and

1      that it was shortly after this press release.  And we have a

2      search warrant showing cash in the Olivers' residence and

3      evidence of the trucks being purchased as well, and that

4      Ms. Teves was paid.  I don't think there's really probably much

5      dispute over that.

6              Now, Rule 401 says, "Evidence is relevant if it has

7      any tendency to make a fact more or less probable than it would

8      be without the evidence."

9              Now, I think I've sat in this trial long enough to

10     understand what the defense is, and the defense isn't that

11     these events didn't take place.  The defense isn't that there

12     wasn't a program that, you know, the defense is going to be

13     admitting.  If not through its case, I think implicitly that

14     these meetings took place at the Cameron Center,

15     Ms. Ventura-Oliver was involved, all of this did happen.  It

16     seems to me what the defense is there's a lack of intent

17     that -- that both Ms. Ventura-Oliver and Ms. Teves believed in

18     the program.  Believed it was appropriate.  We're not trying to

19     defraud anybody, if you will.  Had no intent to defraud.

20             That appears to me to be what the defense is.  Now, if

21     I'm mistaken about that, tell me now because it seems to me

22     that's where you folks are going.  That's pretty accurate,

23     correct?

24             MR. GRONNA:  Yes, Your Honor.

25             THE COURT:  Mr. Barbee?

1      MR. BARBEE:  That was my thoughts about the defense,

2  yes.

3      THE COURT:  Okay.  All right.  And, look, it doesn't

4  take a rocket scientist to understand that given -- given the

5  evidence that's been introduced already and -- and what has

6  come forward.

7      And so when you look at Rule 401, it talks about

8  tendency to make a fact more or less probable.  And the fact

9  here we're really talking about is the intent, the government

10  has to prove the intent.  And this evidence that Mr. Tong has

11  laid out does, in my view, have a tendency to make a fact, that

12  is to prove the intent, more probable than it would be without

13  the evidence.  For the reasons stated by Mr. Tong.

14      Whether you look at it as consciousness of guilt or

15  probably more appropriately as evidence of intent that they

16  were taking money and not doing with it what most people do

17  with income that they consider to be legitimate, which is you

18  deposit it somewhere.  You don't hold it in cash -- very, very

19  few people do something like that -- and/or gold, silver coins.

20      So it is somewhat out of the ordinary.  And is for

21  that reason, I believe, relevant.  The evidence of the trucks,

22  I think for the reasons, again, Mr. Tong gave is absolutely

23  correct.  Again, it shows intent particularly where there's

24  evidence that the defendant said, you know, you can amass these

25  debts and then pay them off and so forth, but they're using the

1   normal process to buy -- to buy these trucks.

2          Now, as I turn to Rule 403, which, of course, requires

3   that I weigh the evidence to determine if the evidence -- if

4   its probative value is substantially outweighed by danger of

5   unfair prejudice, confusing the issues, misleading the jury.

6   Those are the key ones I think here for this case.  I don't

7   see, as Mr. Barbee says, that this is inflammatory, that it

8   is -- has any potential to leave -- lead the jury to make an

9   emotional decision.  The evidence really isn't in dispute that

10  they raised money.  There's no dispute that some people pay

11  cash and some people paid with check.  We've had that evidence

12  already.  There's simply no question about that, and I don't

13  believe the defendants -- I'm not hearing any challenge to any

14  of that.

15         Again, the challenge is to the intent, why they took

16  the money and what they were intending to do in return for

17  receiving that money.  And so the fact they had the money I

18  don't believe is so unusual in this case; and, therefore, I

19  don't believe that there is a concern under Rule 403.  That is,

20  there is no -- the Court would not exclude the evidence because

21  its probative value is substantially outweighed by the danger

22  of unfair prejudice in the case.

23         Now, I would certainly consider a cautionary

24  instruction or a limiting instruction of some sort.

25         Mr. Barbee, why don't you and Mr. Tong talk during the

```
 1    break and see if you can arrive -- Mr. Gronna, you as well --
 2    but arrive at some instruction, and I will be happy to consider
 3    that at the appropriate time.
 4            All right.  Anything else before we break for lunch?
 5            MR. BARBEE:  No, Your Honor.
 6            THE COURT:  All right.  I am going to look over
 7    Rule 106, and we can talk later this afternoon about some of
 8    the standards I found on Rule 106.
 9            I do want to make one thing clear, too.  On the order
10    I signed regarding Mr. Nammar, I gave that to Ms. Greaney, but
11    she hasn't filed it, so...
12            THE CLERK:  It's been filed.
13            THE COURT:  It's been filed?  Okay.
14            It's probably time-stamped after the time in which he
15    did the examination.  So I want to make it clear I signed it
16    and approved it, regardless of when it was actually filed,
17    before he began any participation in today's proceedings.
18            I also can't speak for any other judge, so I want to
19    make clear too it's nunc pro tunc as far as I'm concerned in
20    this case.  If anyone else wants to make a challenge to
21    anything, they're free to do so.  But for this case I'm -- I'm
22    obviously allowing him going forward to participate as counsel
23    for the United States Attorney's Office and have denied the
24    Motion to Strike the previous testimony that was made.
25            All right.  Anything else then?
```

```
 1              MR. TONG:  Not at this time, Your Honor.  Thank you.

 2              THE COURT:  Mr. Barbee?

 3              MR. BARBEE:  No, Your Honor.

 4              MR. GRONNA:  No, Your Honor.

 5              THE COURT:  All right.  Have a pleasant lunch.

 6         (A recess was taken from 12:15 p.m. to 1:29 p.m.)

 7              (The following proceedings were held in open court in

 8    the presence of the jury:)

 9              THE COURT:  All right.  We're back on -- back in

10    session with the defendants, counsel, case agents, and ladies

11    and gentlemen of the jury.

12              I hope you had a nice lunch.  We are ready to begin

13    our afternoon session.

14              Ms. Hoy, I remind you you still are under oath.

15              THE WITNESS:  Yes.

16              THE COURT:  All right.

17                     RESUMED DIRECT EXAMINATION

18    BY MR. NAMMAR

19    Q    Afternoon, Ms. Hoy.

20    A    Hi.

21    Q    Can you take a look at that -- in that binder in front of

22    you to Exhibit 1-J.

23    A    Yes.

24    Q    And do you recognize 1-J?

25    A    Yes, I do.
```

HOY - RESUMED DIRECT

138

1   Q    What is 1-J?

2   A    It is my first month's pay --

3   Q    Okay.

4   A    -- working.

5        MR. NAMMAR:  Your Honor, I move to admit 1-J.

6        MR. BARBEE:  No objection.

7        MR. GRONNA:  No objection.

8        THE COURT:  1-J is admitted.

9    (Government's Exhibit 1-J was received in evidence.)

10       MR. NAMMAR:  May I publish it?

11       THE COURT:  You may.

12       So that was your salary, is that what you're saying?

13       THE WITNESS:  Yes.

14       THE COURT:  Okay.

15  BY MR. NAMMAR:

16  Q    All right.  1-J is up on the screen, Ms. Hoy.  The jury

17  can see it.  And the amount appears in the right-hand corner as

18  $3,000.

19  A    Yes.

20  Q    And what period of time was this for?

21  A    It was for the month of July.

22  Q    Okay.  It's dated August 12th, 2008.  Is that around the

23  time you received this check?

24  A    Yes.

25  Q    And who did you receive it from?

1    A    Ms. Oliver.

2         THE COURT:  Get a little closer or speak up, one of

3    the two.

4         THE WITNESS:  Sorry.

5         THE COURT:  Thank you.

6         THE WITNESS:  From Ms. Oliver.

7    BY MR. NAMMAR:

8    Q    It's made out to a Petro Hoy.  Who is that?

9    A    My husband.

10   Q    And do you know why it was made out to Petro Hoy?

11   A    No, I don't.

12   Q    Okay.  Because it was your paycheck, right?

13   A    Yes.

14   Q    Okay.  And in the memo line, can you read what that says?

15   A    "Mea kokua."

16   Q    And do you know what that means?

17   A    For the help.

18   Q    Okay.  Did you always receive your check like this made

19   out to Petro Hoy?

20   A    No.

21   Q    How did you usually receive your paycheck?

22   A    After that first one it was written to Lehua Hoy.

23   Q    Okay.  And were you always paid by check?

24   A    Not always.

25   Q    Were you ever paid in cash?

HOY - RESUMED DIRECT

1    A    Yes.

2    Q    How often?

3    A    It wasn't until after the last check that was written.

4    Q    Okay.  So, go ahead.

5    A    I don't remember what month it changed.  Sorry.

6    Q    But at some point it changed from check to cash?

7    A    Yes.

8    Q    Okay.  Did you ever receive a bond as a paycheck?

9    A    No.

10   Q    Okay.  Can you take a look now at 1-L.  That's in the same

11   binder.

12        Do you recognize this photo?

13   A    Yes, I do.

14   Q    What's shown here?

15   A    It's the Cameron Center in Kahului, Maui.

16   Q    And does it accurately depict the Cameron Center as you

17   remember it back in 2008?

18   A    Yes.

19        MR. NAMMAR:  Your Honor, I'd move for the admission of

20   1-L.

21        MR. BARBEE:  No objection.

22        MR. GRONNA:  No objection.

23        THE COURT:  All right.  1-L is admitted.

24   (Government's Exhibit 1-L was received in evidence.)

25        MR. NAMMAR:  And may I publish it?

HOY - RESUMED DIRECT

141

1          THE COURT:  Yes.

2    BY MR. NAMMAR:

3    Q    Okay.  1-L is up on the screen.  The jury can see it.

4          Can you tell the jury what we're looking at here?

5          THE COURT:  Can you turn the lights down a little bit.

6    It's a little bit hard to see the top part.  That's better.

7          THE WITNESS:  In the background is the entrance into

8    the room that was used at the Cameron Center.

9    BY MR. NAMMAR:

10   Q    Okay.  And remind us, what happened at the Cameron Center?

11   A    The meetings were held.

12   Q    And you talked about open meetings and closed meetings.

13   Were they all held there?

14   A    Yes.

15   Q    Okay.  Can you take a look now at 1-M and 1-O.  Both of

16   those, 1-M and 1-O.

17   A    Yes.

18   Q    Do you recognize these two photos?

19   A    Yes, I do.

20   Q    And what's shown in 1-M and in 1-O?

21         THE COURT:  Are you saying M as in Mary, or N as in

22   Nancy?

23         MR. NAMMAR:  Sorry, M as in Mary.

24         THE COURT:  All right.  Thank you.

25         MR. NAMMAR:  And 1-O as in Oscar.

HOY - RESUMED DIRECT

142

 1          THE COURT:  All right.

 2          THE WITNESS:  Yes, these are where the offices were in

 3   Wailuku.

 4          MR. NAMMAR:  I move for the admission for 1-M, as in

 5   Mary, and 1-O, as in Oscar.

 6          MR. BARBEE:  No objection.

 7          MR. GRONNA:  No objection.

 8          THE COURT:  1-M and 1-O are admitted.

 9   (Government's Exhibits 1-M and 1-O were received in evidence.)

10          MR. NAMMAR:  And may we publish 1-M?

11          THE COURT:  Yes.

12   BY MR. NAMMAR:

13   Q    1-M is on the screen.  Ms. Hoy, can you tell the jury what

14   we're looking at here?

15   A    This is the building that had the boys' side office.

16   Q    Okay.  And where is the boys' side office in this photo?

17   A    It's on the top floor.

18   Q    Okay.  And for the record, I'm pointing to the left-hand

19   side.  Was it over here?

20   A    The other -- the other side.  You can't see the window --

21   Q    To the right of this sign that says Saigon Palace?

22   A    Sorry, to the left.

23   Q    Okay.

24   A    You can't really see the window.

25   Q    Okay.  And that was the boys' side?

```
 1   A    Yes.

 2              MR. NAMMAR:  May we publish 1-O at this time?

 3              THE COURT:  Yes.

 4   BY MR. NAMMAR:

 5   Q    Can you tell the jury what's shown here?

 6   A    This was the side that the girls' office, it was on the

 7   top floor.

 8   Q    Okay.  And it looks sort of dark, but where was the

 9   entrance to the girls' side?

10   A    To the right of that Nextel sign.

11   Q    So over in this part to the right of the Nextel sign?

12   A    Yes.

13   Q    Okay.  And you -- you told us a little bit about what

14   happened on the girls' side.  Were there any meetings on the

15   girls' side or any classes?

16   A    No.

17   Q    Okay.  Now, you told us about how in the first part of

18   2008 you paid a fee to Ventura-Oliver and then you signed a

19   bunch of documents, right?

20   A    Yes.

21   Q    You came into the office.  When you were working at

22   Hawaiiloa Foundation, did a number of other individuals go

23   through a similar process?

24   A    Yes.

25   Q    Okay.  Can you describe that process to the jury?
```

HOY - RESUMED DIRECT

1   A    Yes.  A family would call in for an appointment, and on
2   that appointment date they would come in and meet with someone
3   that worked in the office.  And at that initial meeting
4   personal information was taken from them to be used in their
5   documents that would be generated for them.  And then they
6   would be given a signing date to come back and sign the
7   documents that were prepared.
8   Q    And you mentioned an initial meeting and some information
9   was given.  What sort of information was given at the initial
10  meeting?
11  A    The initial meeting, the names, of course, the location of
12  the property, the mortgage company, the mortgage amount.
13  Q    And then you mentioned a signing date.  What happened
14  between the initial meeting and the signing date?
15  A    We would prepare the documents.
16  Q    And how would those be prepared?
17  A    We used the computers -- using templates in the computer.
18  Q    Okay.  Did you draft a number of those documents yourself?
19  A    Yes, I did.
20  Q    And were some of those documents called "bonds"?
21  A    Yes.
22  Q    Who taught you how to complete -- how to draft those
23  documents?
24  A    Ms. Oliver.
25  Q    And were you allowed to prepare those bonds initially?

HOY - RESUMED DIRECT

145

1    A    No.

2    Q    When did that change?

3    A    Later on.  I'm going to say possibly the beginning -- the

4    ending of 2008.

5    Q    Was there anyone that didn't want you to prepare the

6    bonds?

7    A    Well, when I first received a template of the bond, I was

8    asked to hang on and wait by Pilialoha before starting to do

9    them.

10   Q    And who first gave you the template?

11   A    Ms. Oliver.

12   Q    And how did she give it to you?

13   A    On a thumb drive.

14   Q    Okay.  And you said you were asked to hold on and wait.

15   Did you hold on and wait for some time?

16   A    Probably a couple of weeks.

17   Q    Okay.  Was there a standard fee that you noticed for the

18   people that were coming in?

19   A    Yes.

20   Q    And -- and how much normally was the fee?

21   A    $1500.

22   Q    Okay.  Did it change if someone was in a certain

23   situation?

24   A    Yes.  If they were in like a crisis situation, which was

25   the foreclosure notice was already being received by the -- the

HOY - RESUMED DIRECT

146

1  families, then the fee was higher.

2  Q    Okay.  And was that fee per mortgage --

3  A    Yes.

4  Q    -- per property?

5  A    Sorry.

6  Q    Okay.  So what would happen if someone had more than one

7  property?

8  A    It would be multiple.

9  Q    Okay.  So, for an example, if it was a $2,000 fee and

10  there were two properties, what would the fee be?

11  A    It would be double.  Four.  4,000.

12  Q    Okay.  How was the fee paid usually?

13  A    Usually by check.

14  Q    Okay.  Was there a point in time when checks were no

15  longer accepted?

16  A    Yes.

17  Q    Tell us about that.

18  A    I believe -- I believe there was a problem with some of

19  the checks that the people were giving, the personal checks.

20  For example, they were returned.  So they weren't being met,

21  the checks weren't being able to be cashed.

22  Q    And so what happened?

23  A    So it became policy to ask for cash.

24  Q    And who implemented that policy?

25  A    Ms. Oliver.

HOY - RESUMED DIRECT

147

1   Q    You talked about a signing date.  What happens on the

2   signing date?

3   A    The family would come in and would sit with someone, and

4   they would go through the documents page by page and ask to

5   sign them.  And the signatures --

6   Q    And --

7   A    I'm sorry.

8   Q    Go ahead.

9   A    And the signatures were needed.

10  Q    Okay.  What would happen after the documents were signed?

11  A    If the family did not pay at the initial meeting, they

12  would pay their fee at that signing day, and the documents were

13  held for recording at the Bureau of Conveyance.

14  Q    Okay.  And were some of the documents mailed out?

15  A    The bonds were mailed out, yes.

16  Q    And who would they be mailed out by?

17  A    Usually Gilbert Schmitt.

18  Q    Can you take a look now at 1-F, as in Frank.

19  A    Okay.

20  Q    Do you see 1-F?

21  A    Yes, I do.

22  Q    What is it?

23  A    I call it the intake sheet.  It's where we collected the

24  information from the families.

25              MR. NAMMAR:  Your Honor, I move to admit 1-F at this

HOY - RESUMED DIRECT

148

1    time.

2              MR. BARBEE:  If I could just have a sec, Your Honor?

3              THE COURT:  Yes.

4                   (Pause in the proceedings.)

5              MR. BARBEE:  Your Honor, I do object.  I believe it's

6    not relevant to the charges in the indictment.  It bears the

7    name of somebody unrelated to the case.

8              THE COURT:  Do you want to lay a foundation, more of a

9    foundation?

10             MR. NAMMAR:  I can.

11   BY MR. NAMMAR:

12   Q    Do you see your handwriting anywhere on this?

13   A    I do.

14   Q    Okay.  And in the bottom left, do you see a name that

15   appears?

16   A    Yes.

17   Q    What name is that?

18   A    Do you want me to say the name of the people?

19   Q    Yes.

20   A    Victor P. Mannoia and Lorelei R. Mannoia.

21             MR. NAMMAR:  Your Honor, I reoffer Exhibit 1-F at this

22   time.

23             MR. BARBEE:  If I could have a sec, Your Honor?

24             MR. NAMMAR:  In relation to Count 8.

25             THE COURT:  Count 8?

 1             MR. NAMMAR:  Yes.

 2                     (Pause in the proceedings.)

 3             THE COURT:  All right.

 4             MR. BARBEE:  Your Honor, I continue the objection.  I

 5     don't have those individuals listed on my witness list.

 6             MR. NAMMAR:  Your Honor, I think she's since changed

 7     her name to Torino.

 8             MR. BARBEE:  Oh, okay, that helps a lot.

 9             MR. NAMMAR:  Okay.  Sorry.

10             MR. BARBEE:  That helps substantially.  No objection,

11     Your Honor.

12             MR. GRONNA:  I'll maintain the objection, Your Honor.

13             THE COURT:  On what grounds?

14             MR. GRONNA:  On the grounds that this is -- it's

15     coming in for being an intake sheet in general rather than an

16     intake sheet for a particular individual.  And that individual

17     had testified previously and was not provided this document.

18     So I think it goes beyond the stated purpose for which it's

19     being --

20             THE COURT:  Well, what -- what individual testified

21     already?

22             MR. GRONNA:  I believe the individual that's listed

23     here, I don't know if they testified or not.

24             THE COURT:  No.  Not yet.

25             MR. GRONNA:  All right.  Then that's the reason why is

1   because this is particular information about that individual.

2             THE COURT:  Okay.  So first -- first you object

3   because they already testified, and now you're objecting

4   because they haven't testified yet?

5             MR. GRONNA:  Well, the basis for the objection, Your

6   Honor, is it has -- it contains more information than just an

7   intake sheet.  And it has information that an individual gave,

8   and so it goes beyond what the stated reason for the admission

9   is at this point.

10            MR. NAMMAR:  Your Honor, it's relevant to Count 8.

11  It's also relevant to the overall process.

12            THE COURT:  Well, you haven't laid a foundation for

13  the overall process.  I mean I don't really know what's on here

14  or what it reflects.

15            MR. NAMMAR:  Okay.  I can do that.

16            THE COURT:  Don't go into specifics as to what it

17  says --

18            MR. NAMMAR:  Sure.

19            THE COURT:  -- but you can ask her what this in

20  general in the various columns mean and what it's reflecting.

21  And who took this information down.

22  BY MR. NAMMAR:

23  Q    Ms. Hoy, what -- what is 1-F again?

24  A    It's what I call the intake sheet.

25  Q    And what is -- go ahead.

HOY - RESUMED DIRECT

1    A    I'm sorry.  At the initial meeting.

2    Q    And when is one of these completed?

3    A    At the initial meeting when the family comes in.

4    Q    And what sort of information is put on the intake sheet?

5    A    Names, addresses, telephone numbers, the tax map key

6    numbers to the property.  The mortgage companies.  The size of

7    the property.

8    Q    And then what is done with this sheet?

9    A    The information from this sheet is put into the -- onto

10   the bonds and into the trust.

11   Q    And do you see your handwriting anywhere on this sheet?

12   A    Yes, I do.

13   Q    Where?

14   A    The square footage.

15   Q    Okay.

16   A    And the -- the amount of dollars.

17   Q    And what would you do with the amount of dollars figure?

18   A    That would reflect the amount to be put on the bond.

19   Q    And the name Mannoia, do you recognize that as someone

20   who's been through the program?

21   A    Yes.

22        MR. NAMMAR:  Your Honor, I reoffer 1-F.

23        MR. BARBEE:  No objection.

24        MR. GRONNA:  No objection.

25        THE COURT:  1-F is admitted.

```
 1          (Government's Exhibit 1-F was received in evidence.)

 2              MR. NAMMAR:  Can we publish 1-F?

 3              THE COURT:  Yes.

 4   BY MR. NAMMAR:

 5   Q    Okay.  Looking at 1-F --

 6              MR. NAMMAR:  If you could zoom in just on the top

 7   half.

 8   BY MR. NAMMAR:

 9   Q    At the top left it says "BLT Consult Info Sheet."  Do you

10   see that?

11   A    Yes, I do.

12   Q    What does BLT stand for?

13   A    Bond, lien and trust.

14   Q    And what did you understand that to mean?

15   A    The documents that were being prepared for the family.

16   Q    Okay.  And at the top it says "kanaka and non-kanaka."  Do

17   you see that?

18   A    Yes.

19   Q    Do you know what that means?

20   A    Yes.  It -- if they were a kanaka family, the trust

21   documents had a different language in them.

22   Q    Okay.  And what does the word "kanaka" mean?

23   A    The Hawaiian person, if they have any Hawaiian --

24   Q    Blood?

25   A    -- blood.
```

1   Q    Okay.  And if you weren't kanaka, could you participate in

2   the program?

3   A    Yes.

4   Q    Where does this document go after it's completed?

5   A    Into a file.

6   Q    Okay.  And then is it retrieved at some point later?

7   A    Yes.

8   Q    What's done with it?

9   A    The information -- on the day that the documents are being

10  prepared, this document is brought out to take -- transfer the

11  information.

12  Q    And where is that information transferred to?

13  A    To the trust, the bond, those documents.

14  Q    Okay.  Can you now take a look at, I think it's going to

15  be in a different binder, Exhibit 12.  Do you see Exhibit 12?

16  A    Yes.

17  Q    Do you recognize it?

18  A    Yes, I do.

19  Q    What is it?

20  A    It's one of the bonds that --

21       THE COURT:  We can't hear you when you turn your head

22  to look at the document and you don't speak into the mike.

23       THE WITNESS:  Sorry.  It's the bond that was

24  prepared --

25  BY MR. NAMMAR:

HOY - RESUMED DIRECT

154

1   Q    Okay.

2   A    -- for that family.

3   Q    Which family?

4   A    This one in particular was the Andayas.

5   Q    And do you remember meeting with the Andayas?

6   A    Yes.

7   Q    Okay.  And how are you able to recognize this particular

8   bond?

9   A    My signature and notary stamp is on there.

10        MR. NAMMAR:  Your Honor, I'd move for admission of

11   Exhibit 12.

12        THE COURT:  Are you moving?

13        MR. NAMMAR:  Yes.

14        THE COURT:  It's a one-page document.

15        All right.  Mr. Barbee, any objection?

16        MR. BARBEE:  Could I have just a second, Your Honor?

17        THE COURT:  Yes.  Sure.

18             (Pause in the proceedings.)

19        MR. BARBEE:  I think one of the Andayas has already

20   testified, Your Honor.  So I don't know what the proffer would

21   be on this exhibit.

22        MR. NAMMAR:  Your Honor, the proffer is there would be

23   two Andaya families that will testify.

24        THE COURT:  So this is a separate Andaya?

25        MR. NAMMAR:  Yes, Your Honor.

HOY - RESUMED DIRECT

155

1        THE COURT:  All right.

2        MR. BARBEE:  No objection.

3        MR. GRONNA:  No objection.

4        THE COURT:  12 is admitted.

5        (Government's Exhibit 12 was received in evidence.)

6        MR. NAMMAR:  May 12 be published?

7        THE COURT:  Yes.

8   BY MR. NAMMAR:

9   Q    Is that your signature on the bottom left-hand corner

10  right there?

11  A    Yes.

12  Q    Okay.  And when was it signed?  When did you sign?

13  A    The 8th of October --

14  Q    Okay.

15  A    -- 2008.

16  Q    And would you sign -- was it your normal practice to sign

17  a document like this when you presented it to the participant?

18  A    Yes.

19  Q    And is this the participant's signature right here,

20  Brandon Andaya?

21  A    Yes.

22  Q    Okay.  At the bottom there, there is a satisfaction

23  tendered, certified return receipt number.  Do you see that?

24  A    Yes.

25  Q    Number starts in 7007, ends in 1426?

HOY - RESUMED DIRECT

156

1   A     Yes.

2   Q     What's the significance, if any, of that number?

3   A     That number was correlated with the certified and return

4   receipt that was sent with this particular document.

5   Q     Okay.  So who puts that number in there?

6   A     The person preparing the document.

7   Q     Okay.  And where do they get the number from?

8   A     The certified receipts at the post office.

9   Q     And are those commonly called green cards?

10  A     Yes.

11  Q     Okay.  So they take the number from that and put it in the

12  bond?

13  A     Yes.

14  Q     Okay.

15        MR. NAMMAR:  Can you zoom out a little bit.  And zoom

16  in on the top half.

17  BY MR. NAMMAR:

18  Q     On the right-hand side there it lists the amount of

19  $152,158.  Do you see that?

20  A     Yes.

21  Q     What is the significance of that number?

22  A     The amount of the loan.

23  Q     Okay.  And where -- where would you get that number from?

24  A     The intake sheet.

25  Q     Okay.  And amount of what particular loan?  Mortgage?

HOY - RESUMED DIRECT

1  A    Yes.

2  Q    Okay.  Also lists a loan account number there below that.

3  What's the significance of that number?

4  A    That corresponds with the amount that's the -- to identify

5  the actual loan.

6  Q    Okay.  So that's the loan.  And where would you get that

7  number from?

8  A    That number would come off the intake sheet.

9  Q    And looking at this document now, you've talked a little

10  bit about a template.  Can you explain that in more detail now,

11  now that you have this document up?

12  A    Yes.

13  Q    Okay.

14  A    With this document in particular would be in the computer

15  with blank spaces.  For example, where the names would go of

16  the family and the mortgage company and the amount were left

17  blank.  And to use -- you are ready to do the -- to fill the

18  document, that's where you would put the numbers that

19  correspond with whatever was needed.

20  Q    And do you remember whether you filled out this particular

21  bond?

22  A    No, I don't remember.

23  Q    Okay.  Do you remember whether the -- what the Andayas did

24  when you presented them with this particular bond?

25  A    They read it.

HOY - RESUMED DIRECT

158

1  Q    And was that something that would normally happen when you

2  presented participants with bonds?

3  A    No.

4  Q    What normally happened?

5  A    Everyone would just sign.

6  Q    And what happened after the Andayas signed this particular

7  bond?

8  A    Well, the process was the bond would be sent out to the

9  mortgage company, and the trust -- the trust would be taken to

10  be registered at the Bureau of Conveyance.

11  Q    And who would do the mailing?

12  A    Gilbert Schmitt.

13  Q    Okay.  And in your normal practice would you explain to

14  the participants what would be happening to the bond after they

15  signed it?

16  A    Yes.

17  Q    And do you see Brandon Andaya here in the bottom right

18  here?

19  A    Yes.

20  Q    And it looks like it has an 0980 number.  What's that

21  number?

22  A    I'm sorry, I don't know.

23  Q    Part of that looks blacked out.  Do you see that?

24  A    Yes.

25  Q    And then there's an 0980.  Do you know what the

 1   significance of that number is?

 2   A    It looks like it's an account number.

 3   Q    Okay.  Would you ever put people's Social Security numbers

 4   in these documents?

 5   A    Yes.

 6   Q    And would you put those on the bonds?

 7   A    I'm sorry, I don't remember.

 8   Q    Would you put -- you don't remember?

 9   A    No.

10   Q    Okay.  Can you take a look now at 12-A for me.

11   A    Yes.

12   Q    Do you recognize 12-A?

13   A    Yes, I do.

14   Q    What is it?

15   A    The top portion is the registered slip from the post

16   office.  And the bottom is the certified slip --

17   Q    And do you --

18   A    -- from the post office.

19   Q    Do you recognize the handwriting on both of these?

20   A    Yes.

21   Q    Whose handwriting is it?

22   A    It's mine.

23        MR. NAMMAR:  Your Honor, I'd move for the admission of

24   12-A.

25        MR. BARBEE:  No objection.

HOY - RESUMED DIRECT

160

1                   MR. GRONNA:  No objection.

2                   THE COURT:  12-A is admitted.

3             (Government's Exhibit 12-A was received in evidence.)

4                   MR. NAMMAR:  May we publish 12-A?

5                   THE COURT:  Yes.

6                   MR. NAMMAR:  Can you zoom in on the -- actually the

7    bottom one.

8    BY MR. NAMMAR:

9    Q    Can you tell the jury what -- what this item is?

10   A    That's the receipt from the certified mail --

11   Q    Okay.

12   A    -- slip.

13   Q    And do you see that little stamp right there?

14   A    Yes.

15   Q    Do you know when that stamp gets placed on there?

16   A    At the time of mailing.

17   Q    Okay.  And then what's done with this receipt at the

18   time -- after -- after the stamp is placed on there?

19   A    It's put into the file, the family's file.

20   Q    And so then it's retained there by Hawaiiloa Foundation?

21   A    Yes.

22   Q    The number on the left-hand side, 7007 starts with, ends

23   in 1426, do you recognize that number?

24   A    Yes.

25   Q    What number -- or what document, if any, does it relate

HOY - RESUMED DIRECT

161

1  to?

2  A    That was on the bottom part of the bond.

3  Q    So the bond we just looked at, Exhibit 12?

4  A    Yes.

5  Q    Okay.  And was that the system that was normally in place

6  to track the mailing of the bonds?

7  A    Yes.

8  Q    Okay.  Can you take a look now at 12-B?

9  A    Yes.

10  Q    Do you recognize 12-B?

11  A    Yes, I do.

12  Q    What is it?

13  A    It's the return receipt.

14  Q    Is this commonly called a green card?

15  A    Yes, it is.

16  Q    And how are you able to recognize 12-B?

17  A    That's my handwriting.

18        MR. NAMMAR:  Your Honor, I'd move for the admission of

19  12-B.

20        THE COURT:  No objection.

21        MR. GRONNA:  No objection.

22        THE COURT:  12-B is admitted.

23  (Government's Exhibit 12-B was received in evidence.)

24        MR. NAMMAR:  May I publish 12-B?

25        THE COURT:  Yes.

HOY - RESUMED DIRECT

162

1          MR. NAMMAR:  Okay.  12-B is on the screen.  Can you

2     zoom in on the top half.

3     BY MR. NAMMAR:

4     Q    Can you tell the jury what we're looking at here?

5     A    This is the side that it -- of who the package was sent

6     to, addressed to, with the corresponding tracking number.

7     Q    And the 7007 number ending in 1426, what number does that

8     relate to?

9     A    That relates to the certified and also on to the bond.

10    Q    And the bond being Exhibit 12 that we just looked at?

11    A    Yes.

12    Q    Okay.  So this article is addressed to 12th District

13    Federal Reserve Bank?

14    A    Yes.

15    Q    Is that where the bond was sent?

16    A    Yes.

17    Q    Okay.  And then what happens after this bond is received

18    by the bank?  What happens after this item -- excuse me, I'll

19    rephrase the question.

20          What happens after this item is received by the bank?

21          THE COURT:  Well, are you asking what the bank does

22    or --

23          MR. NAMMAR:  If she knows.

24          THE COURT:  But if she knows what the Federal Reserve

25    does, is that your question?

HOY - RESUMED DIRECT

163

1           MR. NAMMAR:  If she knows what happens to this card.

2           THE COURT:  To the card?

3           MR. NAMMAR:  Yeah.  Excuse me.

4           THE COURT:  Okay.  Thank you.

5           MR. NAMMAR:  Thank you.

6    BY MR. NAMMAR:

7    Q    What happens to this card?

8    A    The card is sent to the family, is returned to the family.

9    Q    Okay.

10          MR. NAMMAR:  Can you zoom out?  And can you zoom in on

11   the bottom half.

12   BY MR. NAMMAR:

13   Q    And what's shown here in the handwriting?

14   A    The Andayas' address.

15   Q    Okay.  And this is where the card gets returned to?

16   A    Yes.

17   Q    And whose handwriting is that?

18   A    It is mine.

19   Q    And when would you have written that address on there?

20   A    At the time that the bond was being made.

21   Q    Okay.  And it lists an amount there at the bottom

22   left-hand corner.  Do you see that?

23   A    Yes.

24   Q    What does that refer to?

25   A    Corresponds to the amount of the -- the loan.

HOY - RESUMED DIRECT

1    Q    And is that your normal practice to put the amount on the

2    green card?

3    A    Yes.

4    Q    Who instructed you to do that?

5    A    Ms. Oliver.

6    Q    I want to show you now a couple more documents that will

7    be discussed in more detail at a later time.

8    A    Okay.

9    Q    Can you look -- it'll be a different binder, Exhibit 5-A.

10            THE COURT:  Feel free to pass the candy down.

11   BY MR. NAMMAR:

12   Q    Do you recognize 5-A?

13   A    Yes.

14   Q    And what is 5-A?

15   A    It's the certified receipt slip.

16   Q    And how are you able to recognize 5-A?

17   A    My handwriting on there.

18            MR. NAMMAR:  Your Honor, I'd move for the admission of

19   5-A?

20            MR. BARBEE:  No objection.

21            MR. GRONNA:  No objection.

22            THE COURT:  You're going to connect it up later, I

23   take it?

24            MR. NAMMAR:  Yes.

25            THE COURT:  5-A is admitted subject to connecting up.

```
 1          (Government's Exhibit 5-A was received in evidence.)

 2    BY MR. NAMMAR:

 3    Q    And can you examine 8-A?

 4          THE COURT:  Oh, 5-A already deals with a witness who's

 5    already testified; is that right?  Okay.  So 5-A is admitted.

 6    It's been connected up.  It's just -- okay.

 7          What exhibit now?

 8          MR. NAMMAR:  8-A.

 9          THE COURT:  8-A?

10          MR. NAMMAR:  Yes.

11          THE WITNESS:  I don't have that one.

12          Sorry, 8-A?

13    BY MR. NAMMAR:

14    Q    Yes.

15    A    Okay.

16    Q    Do you recognize 8-A?

17    A    Yes, I do.

18    Q    What is 8-A?

19    A    That is the registered receipt and the certified mail

20    receipt.

21    Q    And how are you able to recognize 8-A?

22    A    That's my handwriting.

23          MR. NAMMAR:  Move for the admission of 8-A.

24          MR. BARBEE:  Number 35 again on your witness list?

25          MR. NAMMAR:  Yes.  Torino.
```

```
 1              MR. BARBEE:  No objection.

 2              MR. GRONNA:  No objection.

 3              THE COURT:  All right.  This exhibit, subject to

 4    connecting up, will be admitted.

 5         (Government's Exhibit 8-A was received in evidence.)

 6              MR. NAMMAR:  Thank you.

 7    BY MR. NAMMAR:

 8    Q    Can you now examine 9-A.

 9    A    Okay.

10    Q    Do you recognize 9-A?

11    A    I do.

12    Q    What is it?

13    A    It's a registered mail receipt and a certified mail

14    receipt.

15    Q    And how are you able to recognize it?

16    A    My handwriting.

17              MR. NAMMAR:  Move for the admission of 9-A.

18              MR. BARBEE:  No objection.

19              MR. GRONNA:  No objection.

20              THE COURT:  Admitted subject to connecting up.

21         (Government's Exhibit 9-A was received in evidence.)

22    BY MR. NAMMAR:

23    Q    And now can you take a look at 10-A.

24    A    Okay.

25    Q    Do you recognize 10-A?
```

HOY - RESUMED DIRECT

1   A    Yes.

2   Q    What is it?

3   A    It's a registered mail receipt and a certified mail

4   receipt.

5   Q    And how are you able to recognize 10-A?

6   A    It's my handwriting.

7         MR. NAMMAR:  Move for the admission of 10-A.

8         MR. GRONNA:  No objection.

9         MR. BARBEE:  No objection.

10        THE COURT:  10-A admitted subject to connecting up.

11   (Government's Exhibit 10-A was received in evidence.)

12        MR. NAMMAR:  Thank you.

13  BY MR. NAMMAR:

14   Q    Can you take a look at 11-A now.

15   A    I'm sorry, 11-A?

16   Q    Yes.

17   A    Okay.

18   Q    Do you recognize 11-A?

19   A    Yes.

20   Q    What is it?

21   A    It's a copy of the green card, the return receipt.

22   Q    And how are you able to recognize 11-A?

23   A    It's my handwriting.

24        MR. NAMMAR:  I move for the admission of 11-A.

25        MR. BARBEE:  No objection.

HOY - RESUMED DIRECT

1           MR. GRONNA:  No objection.

2           THE COURT:  All right.  Again, subject to connecting

3      up.

4           (Government's Exhibit 11-A was received in evidence.)

5      BY MR. NAMMAR:

6      Q    And can you now look at 13-A.

7      A    Okay.

8      Q    Do you recognize 13-A?

9      A    Yes.

10     Q    And what is it?

11     A    It's a registered receipt and a certified mail receipt.

12     Q    And how are you able to recognize it?

13     A    My handwriting is on the registered receipt.

14          MR. NAMMAR:  Your Honor, I move for the admission of

15     13-A.

16          MR. BARBEE:  No objection.

17          MR. GRONNA:  No objection.

18          THE COURT:  13-A is admitted.

19          (Government's Exhibit 13-A was received in evidence.)

20          MR. NAMMAR:  Thank you.

21     BY MR. NAMMAR:

22     Q    You said that you worked for the program for -- from about

23     July of 2008, right?

24     A    Yes.

25     Q    To April 2009?

HOY - RESUMED DIRECT

169

1  A   Yes.

2  Q   How many people would you estimate went through the

3  program while you were there?

4  A   I would say maybe a couple of hundred.

5  Q   And when you were working there, would participants ever

6  contact you to say that the bonds weren't working?

7  A   Yes.

8  Q   And what would you do when that happened?

9  A   We would ask Ms. Oliver what to do.

10  Q   And what would Ms. Oliver's response be?

11  A   There were more documents to fill.

12  Q   Did you ever speak with Ms. Teves about any of these

13  complaints about the bonds not working?

14  A   Not that I remember, no.

15  Q   And you've mentioned that you attended a number of those

16  HLF, Hawaiiloa Foundation meetings, right?

17  A   Yes.

18  Q   Did the subject of foreclosure notices ever come up in any

19  of those meetings?

20  A   Not that I remember.

21  Q   Did the subject of eviction ever come up in any of those

22  meetings?

23  A   Yes.

24  Q   Tell us about that.

25  A   There were people that were being evicted from their homes

HOY - RESUMED DIRECT

170

```
 1   due to nonpayment of the -- of their mortgages.
 2   Q    And was any advice given to those people who were facing
 3   eviction?
 4   A    To stay in there and occupy the property.
 5   Q    Who gave that advice?
 6   A    Ms. Oliver.
 7   Q    I want to turn your attention now to the middle of
 8   November 2008.  Do you remember a particular meeting occurring
 9   at that time period?
10   A    Yes.
11   Q    Tell us about that meeting.
12   A    There was an article in the newspaper regarding an
13   organization that was selling bonds and paying off mortgages
14   with these bonds.  And so we were called into a meeting and
15   told that, you know, it was not Hawaiiloa Foundation, and that
16   there would be an article put out on -- in -- on every island
17   in -- in the newspaper on every island.
18   Q    Who called the meeting?
19   A    Ms. Oliver.
20   Q    And when you were told about the article that would be put
21   out in the newspaper, who was talking about that?
22   A    Ms. Oliver.
23   Q    Okay.  Can you take a look now at 1-K.
24   A    Yes.
25   Q    Do you recognize 1-K?
```

1    A    I do.

2    Q    What is it?

3    A    It is the notice that was put into the different

4    newspapers on the different islands.

5    Q    This is in response to the article that you were just

6    speaking about?

7    A    Yes.

8    Q    And how are you able to recognize 1-K?

9    A    I notarized this page.

10   Q    Okay.  And whose signature appears above the notary?

11   A    Ms. Oliver.

12         MR. NAMMAR:  Move for the admission of 1-K.

13         MR. GRONNA:  No objection.

14         MR. BARBEE:  1-K?

15         MR. NAMMAR:  Yes.

16         THE COURT:  K as in kilo?

17         MR. BARBEE:  No objection.

18         THE COURT:  K is admitted.

19      (Government's Exhibit 1-K was received in evidence.)

20         MR. NAMMAR:  May we publish it?

21         THE COURT:  Yes.

22   BY MR. NAMMAR:

23   Q    Okay.  1-K is up on the screen.  Do you know who drafted

24   this document?

25   A    Ms. Oliver.

HOY - RESUMED DIRECT

172

1  Q   Okay.  And can you zoom -- or is that -- real quick, is

2  that your notary on the bottom left?

3  A   Yes.

4  Q   Okay.  And it's dated November 17th, 2008.  Is that the

5  date you remember notarizing it?

6  A   Yes.

7       MR. NAMMAR:  Okay, can you zoom in on the top half?

8  BY MR. NAMMAR:

9  Q   And just below this, is it signed by Ventura-Oliver?

10 A   Yes.

11 Q   Okay.  It's entitled "Declaration of Non-Responsibility,

12 Truth and Verified Facts."  Do you see that?

13 A   Yes.

14 Q   Okay.  And in the body of this --

15      MR. NAMMAR:  I believe you can zoom in on the top half

16 of the body.

17      THE COURT:  Maybe we should darken it a little bit.

18 It does seem a little hard to see.  Darken the lights that is.

19 That's better.  Thank you.

20 BY MR. NAMMAR:

21 Q   Okay.  Starting on the third line -- says that:  "The

22 Hawaiiloa Foundation is not affiliated with the "Hawaiian

23 Nation."  Do you see that?

24 A   Yes.

25 Q   And then it says:  "And does not sell bonds."  Do you see

1   that?

2   A     Yes, I do.

3   Q     Did I read that right?

4   A     Yes.

5   Q     Okay.  How long were you working at the Hawaiiloa

6   Foundation?

7   A     From July 2008 till April 2009.

8   Q     And during that time did the Hawaiiloa Foundation sell

9   bonds?

10   A     Yes.

11   Q     Okay.  And at this point when this came out, where did

12   it -- where was it placed?

13   A     In different newspapers on the different islands.

14   Q     And why was it placed on different islands?

15   A     Because there were people in the program on different

16   islands.

17   Q     And how do you know that it was placed in newspapers on

18   different islands?

19   A     I was the one that looked up the different paper -- the

20   information for the different papers.

21   Q     Okay.  And did you end up placing these articles in the

22   different papers?

23   A     Yes, they were.

24   Q     Okay.  At this point when this -- when this article was

25   put out, what were you thinking about the program?

HOY - RESUMED DIRECT

174

1   A    Serious doubts.

2   Q    Despite this, did you continue to work at Hawaiiloa

3   Foundation?

4   A    I did.

5   Q    Okay.  Now, I want you to examine Exhibit 30-A.  It's in a

6   different binder.

7   A    Thank you.  Okay.

8   Q    Do you recognize 30-A?

9   A    Yes, I do.

10  Q    What's shown in this photo?

11  A    I'm sorry?

12  Q    What's shown in this photo?

13  A    Two black bags -- sorry, two black bags and two bags of

14  coins and some trays of coins.

15  Q    And how are you able to recognize what's in this photo?

16  A    We at one time had this in our possession.

17           MR. NAMMAR:  Your Honor, I'd move for the admission of

18  30-A.

19           MR. BARBEE:  Your Honor, these 30 series exhibits are

20  what we had a discussion about, I think right before lunch.

21  And perhaps this would be a good time to approach the sidebar.

22           THE COURT:  All right.

23           MR. BARBEE:  Okay.

24                 (Sidebar on the record:)

25           THE COURT:  Bigger book than he does.

1          MR. BARBEE:  That's my book too.  I have all different

2    sizes.

3          MR. GRONNA:  They should have one size fit all.

4          THE COURT:  Yes?

5          MR. BARBEE:  Your Honor, Mr. Nammar is going into the

6    series of the parcels that had the coins and the cash, and I

7    thought about it over the lunch hour and met with my client and

8    Mr. Gronna, and my client and I would like the Court to give a

9    cautionary instruction.  The Court's already ruled that it's

10   admissible for intent.

11         THE COURT:  Right.

12         MR. BARBEE:  And we met with Mr. Long -- Mr. Tong for

13   a minute, and we do have the joint proposed 18, which is kind

14   of sort of almost there.  I kind of modified it a little bit.

15         THE COURT:  Let me take a look, and then we can have a

16   discussion.

17         MR. BARBEE:  I think that's what the witness is going

18   to say.

19         THE COURT:  (Perusing document.)

20         MR. BARBEE:  That John Oliver had it delivered to her

21   house.

22         MR. NAMMAR:  I think she's going to say that --

23         MR. TONG:  Let Judge Seabright read the instruction

24   first.

25         MR. NAMMAR:  Okay.

1          MR. TONG:  The issue is to be whether we reference

2    John Oliver, I think.

3          THE COURT:  So what it reads right now is:  You have

4    heard evidence John Oliver -- the proposed instruction:  "You

5    have heard evidence that John Oliver may have had cash and

6    coins delivered to Lehua Hoy's residence.  You may consider

7    this evidence only for the bearing, if any, on the question of

8    defendant's intent, motive, plan, knowledge, or absence and

9    mistake, and no other purpose.  You may not consider the

10   evidence as evidence of guilt of the crimes for which the

11   defendants are now on trial."

12         And that's a modified 4.3 Ninth Circuit instruction.

13         MR. BARBEE:  I would suggest that if the witness does

14   say that my client in addition to John Oliver was responsible

15   for the delivery that we would just add her name, John and/or

16   Mahealani.

17         MR. TONG:  I have a suggestion, Your Honor.  I know

18   it's Mr. Nammar's witness.  Why not just give the instruction

19   with no references to who delivered it.  Just say, You have

20   heard evidence that certain items were delivered to Lehua Hoy.

21   You may consider that evidence only.

22         MR. BARBEE:  Okay, that's fine.

23         MR. GRONNA:  But my concern, Your Honor, is the

24   spillover effect it has on Ms. Teves because it has no -- there

25   is no evidence to indicate that she had anything to do with

```
 1    delivering bags of money or coins or anything else.  So --
 2              THE COURT:  Right.
 3              MR. NAMMAR:  -- I don't want to have the spillover
 4    come into Ms. Teves or have the jury consider her to have some
 5    participation.
 6              THE COURT:  Let's do this:  Why don't we hear the
 7    evidence, and then let's get back together --
 8              MR. GRONNA:  All right.
 9              THE COURT:  -- and decide on the exact language of the
10    instruction.
11              MR. BARBEE:  Yes, Judge.
12              THE COURT:  Instead of doing it upfront, let's hear
13    the evidence and then we'll get back together.  Okay?
14                        (End of sidebar.)
15              MR. NAMMAR:  Your Honor, I move for admission of 30-A.
16              MR. BARBEE:  Just the objection previously made.
17              MR. GRONNA:  Join.
18              THE COURT:  All right.  30-A is admitted.
19         (Government's Exhibit 30-A was received in evidence.)
20              MR. NAMMAR:  May we publish it?
21              THE COURT:  Yes.
22    BY MR. NAMMAR:
23    Q    When did you come -- at some point did you come in
24    possession of the items that are depicted in 30-A?
25    A    Yes.
```

HOY - RESUMED DIRECT

1   Q    And what specifically did you come into possession of?

2   What items?

3   A    The two bags of coins there with the trays of coins and a

4   cash box.

5   Q    Okay.  And when did that happen?

6   A    April of 2009.

7   Q    And was there a time before that when you came into

8   possession of these items as well?

9   A    Yes.

10   Q    Okay.  When was the first time you came into possession of

11   these items?

12   A    November 2008.

13   Q    Tell us about the first time.

14   A    I arrived at work, and the Olivers were there and asked if

15   I would hold some items for them, and I said yes.

16   Q    And who asked you?

17   A    I don't know which one of the Olivers.

18   Q    Okay.  But they asked you to hold some items and you said

19   yes?

20   A    Yes.

21   Q    And then what happened?

22   A    I took them home and I put them in a closet and left them

23   there.

24   Q    And did you ever look at the contents of those items to

25   see what they were?

HOY - RESUMED DIRECT

1   A    No.

2   Q    Okay.  And then how long did you hold onto them for?

3   A    I don't know.  I'd have to maybe guess.  About maybe a

4   month or two.

5   Q    Okay.  And then what happened to these items?

6   A    John Oliver told me that he was having a friend to come up

7   and pick them up.

8   Q    Okay.

9   A    And he did.

10  Q    Okay.  And did you -- who is the friend?

11  A    His name is Lloyd Ishikawa.

12  Q    And did you give the items to Lloyd?

13  A    I did.

14  Q    And the whole time they were in your closet?

15  A    Yes.

16  Q    And you didn't know what they were?

17  A    No.

18  Q    Okay.  Now, at a later point did you come back into

19  possession of these items?

20  A    Yes.

21  Q    Okay.  When was that?

22  A    That was April 2009.

23  Q    Okay.  Tell us how that happened.

24  A    Lloyd Ishikawa again brought these items up to our home

25  and just put them in the -- the entry and left.

HOY - RESUMED DIRECT

180

1  Q    Okay.  And when you say "entry," what do you mean?

2  A    I'm sorry, to our home.

3  Q    Okay.  And then what did you do with the items?

4  A    They were left there together and they were put away until

5  we could contact the FBI.

6  Q    Okay.  At some point did you look at the contents of these

7  items?

8  A    Yes, we did.

9  Q    And what was in the items?

10  A    The items were, there was a cash box with some cash in it.

11  These two bags -- the white-colored bag, I believe one of them

12  had dimes.  And I don't remember what the other one had in

13  them.  And then the trays have coins in little pouch pockets.

14  Q    Okay.  And you said at some point you gave them over to

15  the FBI.  Who did you give them to?

16  A    Agents Carter and Dougan.

17  Q    Okay.  Before you gave them to the FBI, was anyone asking

18  for them back?

19  A    Yes.

20  Q    Tell us about that.

21  A    That night that they were -- the items were dropped off, a

22  man came to our door and said that, Johnny O. sent me to pick

23  up the bags.  And my husband said, I don't know who you are.

24  Please leave.  And he did leave.

25        And then that night John Oliver called my phone.  I

HOY - RESUMED DIRECT

```
 1    didn't answer, but he left a message saying that they were in

 2    the neighborhood and on their way home, that they would stop

 3    by.  But they never did.  And someone else came to the house

 4    that night and knocked on the door and called my name, and I

 5    didn't answer the door.

 6    Q    Why didn't you answer the door?

 7    A    I was frightened.

 8    Q    Then what happened?

 9    A    The next day I received a text first thing in the morning

10    from Ms. Oliver saying that we needed to meet, we should meet

11    for breakfast.  I was constantly being called or texted to meet

12    to hand over the -- the items.

13    Q    And the items, we're talking about the coins?

14    A    Yes.

15    Q    Okay.  Did you end up meeting with them?

16    A    I did.  The next day.

17    Q    Tell us about that.

18    A    Well, I went to meet them at -- the Olivers at --

19         THE COURT:  You said "them," who are you referring to?

20         THE WITNESS:  I'm sorry.  I went to meet the Olivers

21    at the IHOP restaurant in Kahului.  And I asked a friend to

22    come along with me because I was afraid to go on my own.  So he

23    agreed, and we went down together.  And they asked -- sorry,

24    the Olivers asked for the items, the bags and the coins.

25    BY MR. NAMMAR:
```

HOY - RESUMED DIRECT

182

1   Q    And what did you say when they asked for the items?

2   A    We told them that we would go home and discuss it with my

3   husband.  My husband did not come down with me on that day.

4   Q    And what was the Olivers' response?

5   A    They just asked me for it.  They just kept asking me for

6   it.

7   Q    And did you give it to them?

8   A    No.

9   Q    And then what happened with the items?

10  A    Well, eventually when we were able to contact the FBI, we

11  turned them over.

12  Q    And why did you turn them over to the FBI?

13  A    I felt that they were proceeds from the mortgage scheme.

14  Q    I want to turn your attention to early April 2009.  What

15  happened at Hawaiiloa Foundation then?

16  A    The FBI came into the offices and seized computers, files.

17  Q    And then was there a meeting following this?

18  A    Yes, there was.

19  Q    Tell us about that.

20  A    Well, we were called together and we met at a park, and we

21  were told to be strong, you know, stand together.  You know, we

22  would get through this, and what's happening is because

23  Mahealani is being targeted for her work in the land issues

24  regarding Hawaiians.

25  Q    And who was saying all of this?

1   A     Ms. Oliver.

2   Q     And at this point in time were you still working at

3   Hawaiiloa Foundation?

4   A     Yes.

5   Q     And what happened after this meeting?

6   A     I'm sorry.  Can you --

7   Q     Sure.

8   A     -- ask me --

9   Q     For how long after this particular meeting did you

10  continue to work at Hawaiiloa Foundation?

11  A     About three weeks.  I think.  Approximately.

12            MR. NAMMAR:  May I have a moment?

13            THE COURT:  Yes.

14                 (Pause in the proceedings.)

15  BY MR. NAMMAR:

16  Q     Why did you quit?

17  A     Well, it was just wrong being in there.  It was -- you

18  know, I finally knew that this was just wrong.

19            MR. NAMMAR:  I'll pass the witness.

20            THE COURT:  All right.  You want to have a sidebar

21  again, Mr. Barbee?

22            MR. BARBEE:  Yes, Your Honor.

23                 (Sidebar on the record:)

24            THE COURT:  All right.  So where are we on the

25  instruction then?

1          MR. BARBEE:  I would accept Mr. Tong's suggestion that

2    we just say:  You have heard evidence that -- having a hard

3    time to read -- evidence that --

4          THE COURT:  Ms. Hoy received cash and coins.

5          MR. BARBEE:  Yeah.  And we would just not name the

6    person or persons because she's got one, two -- she's named

7    like three people at least already.

8          MR. GRONNA:  How do we respond to spillover to

9    Ms. Teves?

10          THE COURT:  What spillover?  The evidence is the

11    evidence.  The jury has heard it.

12          MR. GRONNA:  I understand, but she has nothing to do

13    with bringing in the cash, and I don't want to have -- I think

14    it would be unfair to her to infer that she had something to do

15    with bringing in or acquiring the cash when there's no

16    evidence.

17          THE COURT:  Okay.  Why don't we say -- why not say

18    this:  You may consider this evidence only for its bearing as

19    to Ms. Ventura-Oliver, if any.

20          MR. BARBEE:  That's fine with us.

21          MR. GRONNA:  Yes.

22          THE COURT:  Okay?

23          MR. GRONNA:  Good.  Thank you.

24          MR. TONG:  That's fine, Your Honor.

25                         (End of sidebar.)

HOY - CROSS (Barbee)

185

 1        THE COURT:  All right.  Ladies and gentlemen, before

 2   cross-examination is given, I will give you an instruction at

 3   this point in time limiting your use of the testimony regarding

 4   the cash and coins that you just heard about.

 5        So you have heard evidence that Ms. Hoy had

 6   received -- I believe she testified two different occasions,

 7   these cash and coins.  You may consider this evidence only for

 8   its bearing as to Ms. Ventura-Oliver, if any, on the question

 9   of her intent, motive, plan, knowledge or absence of mistake

10   and for no other purpose.  You may not consider this evidence

11   as evidence of guilt of the crimes for which the defendants are

12   now on trial.

13        All right.  Mr. Barbee, your cross then.

14        MR. BARBEE:  Yes, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. BARBEE:

17   Q    Good afternoon, Mrs. Hoy.

18   A    Hi.

19   Q    You've entered into a plea agreement in this case?

20   A    Yes, I have.

21   Q    And your agreement is between yourself, your lawyer and

22   the government attorneys here, correct?

23   A    Yes.

24   Q    And the agreement is, is that in exchange for your

25   cooperation with the government that you may receive a reduced

HOY - CROSS (Barbee)

1    sentence for your testimony here today; is that correct?

2    A    Yes.

3    Q    So, in other words, you made a deal with the government to

4    try to get a lower sentence.

5    A    Yes.

6    Q    And you want a lower sentence, don't you?

7    A    Yes.

8    Q    You don't want to spend years and years in prison, do you?

9    A    No.

10   Q    The decision to give you a lower sentence does not rest in

11   your hands, does it?

12   A    No.

13   Q    And it doesn't rest in your lawyer's hands, does it?

14   A    No.

15   Q    It rests in the hands of the government attorneys and

16   whether or not they are satisfied that you have given

17   substantial assistance to the government; isn't that true?

18   A    Yes.

19   Q    Okay.  So it's in your interest in order to get a lower

20   sentence to try as best as you can to substantially assist them

21   in the prosecution of this case, correct?

22   A    Yes.

23   Q    Okay.  Now, the ultimate decision to give you a sentence,

24   of course, is going to rest with Judge Seabright?

25   A    Yes.

HOY - CROSS (Barbee)

1 Q    But in order to even have a chance at that lower sentence,

2 you have to satisfy the government attorneys, correct?

3           THE COURT:  All right.  Let's have sidebar for one

4 moment.

5                    (Sidebar on the record:)

6           THE COURT:  I understand the issue is what she thinks

7 and how she sees this, but I assume there's no mandatory

8 minimum here.

9           MR. BARBEE:  No.

10           THE COURT:  And so it is a little different

11 post-Booker.  I mean I just want to make clear on that.  I mean

12 even if the government doesn't file a motion, I can consider

13 the cooperation now.

14           MR. BARBEE:  Of course, Your Honor.

15           THE COURT:  And so I just want you to be careful --

16           MR. BARBEE:  I've kind of exhausted it.

17           THE COURT:  Okay.  I mean -- and I don't want to stop

18 you from asking questions.  I just think you asked a question

19 without thinking through the sort of post-Booker world now,

20 because the reality is, even if for some reason they don't file

21 a motion, I can still consider her cooperation.

22           MR. BARBEE:  And we like that.

23           THE COURT:  Okay.  It's not to say the government's

24 motion isn't important, but the question you were asking was as

25 if the sentence can't be reduced but for the government's

HOY - CROSS (Barbee)

188

1    motion.

2              MR. BARBEE:  Right.

3              THE COURT:  And that at least legally is not correct

4    anymore under a consideration of 3553.

5              MR. BARBEE:  Yes, Your Honor.

6              THE COURT:  Does everyone agree with that?

7              MR. TONG:  Absolutely.

8              THE COURT:  Right.  So I just want to make sure

9    legally we're on the same page.  From there you can ask your

10   questions.

11             MR. TONG:  No, legally the questions misstated the

12   plea agreement, but we didn't object.

13             THE COURT:  All right.  I just -- I think a lot of

14   times we're all stuck in a mindset pre-Booker.

15             MR. BARBEE:  Correct.

16             THE COURT:  That question was in that frame.

17                        (End of sidebar.)

18             THE COURT:  All right, Mr. Barbee.

19             MR. BARBEE:  Thank you.

20   BY MR. BARBEE:

21   Q    So what happened in this case is that you were at some

22   point indicted by the grand jury for committing conspiracy --

23   excuse me, conspiracy to commit mail fraud?

24   A    Yes.

25   Q    And you were charged with that crime, correct?

HOY - CROSS (Barbee)

189

1    A    Yes.

2    Q    And your husband was indicted too, correct?

3    A    Yes.

4    Q    And his name is Petro Hoy?

5    A    Yes.

6    Q    What is his legal name?

7    A    Peter Hoy.

8    Q    Is it Petrovich Hoy?  Has he gone by the name Petrovich?

9    A    He has gone by that name, yes.

10   Q    I'm --

11   A    I'm sorry, yes.

12            THE COURT:  You have to speak up or get closer to the

13   microphone.

14            THE WITNESS:  I'm sorry.  He has gone by that name,

15   yes.

16   BY MR. BARBEE:

17   Q    So he's gone by the names Peter Hoy, correct?

18   A    Yes.

19   Q    Petrovich Hoy?

20   A    Yes.

21   Q    And Petro Hoy?

22   A    Yes.

23   Q    Dr. Hoy?

24   A    Yes.

25   Q    Ambassador Hoy?

HOY - CROSS (Barbee)

190

1   A    Yes.

2   Q    He's not an ambassador, is he?

3   A    No.

4   Q    And you've been married to him since 1997?

5   A    Yes.

6   Q    And has he always portrayed himself as an ambassador?

7   A    No.

8   Q    And what country did he say he was an ambassador to?

9   A    He did not name a country.

10  Q    Do you recall him ever claiming to be an ambassador from

11  Sweden?

12  A    No.

13  Q    Okay.  And you were present, you said, at many of the

14  meetings at the Cameron Center in Wailuku in 2008, 2009?

15  A    Yes.

16  Q    And you didn't hear him refer to himself as an ambassador

17  from Sweden?

18  A    Not from Sweden, no.

19  Q    Okay.  And what kind of doctor was he supposed to be when

20  he referred to himself as a doctor?

21  A    Psychiatry.

22  Q    Psychiatry?  Was he in fact a psychiatrist?

23  A    I do believe he is.

24  Q    Have you seen any evidence such as a certificate of

25  graduation or diploma as a medical doctor in psychiatry for

HOY - CROSS (Barbee)

191

1   your husband?

2   A    No.

3   Q    Did he treat any patients?

4   A    No, not here.

5   Q    Was he a hypnotist in California for several years?

6   A    Yes.

7   Q    And that's different than a psychiatrist, isn't it?

8   A    Yes.

9   Q    Anyway, when you and your husband were indicted, you came

10   to Honolulu with your attorneys and pled not guilty; is that

11   correct?

12   A    Yes.

13   Q    And then in the interim between today and when you pled

14   not guilty is when you made the deal with the government,

15   correct?

16   A    Yes.

17   Q    During your presence and attendance at the meetings at the

18   Cameron Center in Wailuku in 2008 and 2009, isn't it true that

19   your husband represented to people that they had these type of

20   bonded promissory notes where he was from?

21   A    I don't know that.

22   Q    Do you recall him saying that to the crowd, that they had

23   these type of instruments and they used them and they worked

24   where he was from?

25   A    No.

HOY - CROSS (Barbee)

192

 1  Q    Where was he from?

 2  A    Where was he from?

 3  Q    Where is your husband from?  What country is he from?

 4  A    He holds a passport from the UK.

 5  Q    Isn't it a fact he was born and raised in Lancaster,

 6  United Kingdom in England?

 7  A    Yes.

 8  Q    He's not from Sweden.

 9       MR. NAMMAR:  Objection.  Relevance.

10       THE COURT:  Well, she said he holds a UK passport, and

11  she didn't know -- she never heard about Sweden, she said.

12       MR. BARBEE:  Okay.

13  BY MR. BARBEE:

14  Q    He doesn't hold a Swedish passport in addition to a UK

15  passport?

16  A    No.

17  Q    Have you ever traveled with him to Sweden?

18  A    No.

19  Q    Have you ever attended diplomatic functions with him at

20  embassies anywhere in the world?

21  A    No.

22  Q    So, in fact, he's not an ambassador.  That was just a

23  bunch of shibai, right?

24       MR. NAMMAR:  Objection.  Asked and answered.

25       THE COURT:  Sustained.  She answered the question.

HOY - CROSS (Barbee)

193

 1  BY MR. BARBEE:

 2  Q    Who is Audrey Hoy?

 3  A    My husband's daughter.

 4  Q    Were you in the presence of Audrey Hoy, your husband's

 5  daughter, and your husband in the Cayman Islands?  Do you

 6  recall being with them in the Cayman Islands?

 7          MR. NAMMAR:  Objection.  Relevance.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  It was just Audrey and I that went.

10  BY MR. BARBEE:

11  Q    Well, do you recall being in the Cayman Islands with

12  Audrey?

13  A    Yes.

14  Q    And do you recall opening up a Cayman island bank account

15  at that time?

16  A    No, not at that time, no.

17  Q    Do you have a Cayman island bank account?

18  A    No, we don't.

19  Q    And not at that time have you -- since have you opened and

20  then subsequently closed a Cayman island bank account?

21  A    Years and years ago.

22  Q    And what funds did you deposit into that Cayman island

23  bank account?

24  A    American dollars.

25  Q    For what purpose?

HOY - CROSS (Barbee)

194

1  A   Good interest rates.

2  Q   And where were the American dollars that you deposited

3  into the Cayman island bank account from, or should I ask who

4  were they from?

5  A   We worked.  We were earners.

6  Q   Were they not in fact from -- were they not in fact

7  embezzled funds from a victim in the Cayman Islands?

8  A   No.

9  Q   Do you recall a person named Lyndy in the Cayman Islands

10  that you and your husband helped?

11  A   Yes.

12  Q   And do you recall basically embezzling land or funds from

13  her and then using that funds to open the account in the Cayman

14  Islands?

15        MR. NAMMAR:  Objection.  Improper impeachment,

16  relevance, 403.

17        THE COURT:  Overruled.

18        THE WITNESS:  We did not embezzle any money from

19  anyone.

20  BY MR. BARBEE:

21  Q   Did you obtain -- did you and your husband, Petrovich Hoy,

22  obtain funds from Lyndy in the Cayman Islands?

23  A   Yes, we did.

24  Q   Did you obtain land from her in the Cayman Islands?

25  A   Yes.

HOY - CROSS (Barbee)

1   Q    And did you obtain this land from her under false

2   pretenses?

3   A    No.

4   Q    She just gave it to you?

5   A    She -- yes.

6   Q    Out of the goodness of her heart she gave you land?

7   A    Yes.

8   Q    And how about the money, wasn't the money in fact for a

9   real estate transaction where your husband was to sell her land

10   for her?

11   A    No.

12   Q    And rent it out before he sold it?

13   A    No.

14   Q    Who is Lynne Souza?

15   A    My sister?

16   Q    I'm asking you, who is Lynne Souza?

17   A    She is not Souza anymore.

18   Q    What is she now?

19   A    Leong.

20   Q    Leong.  Do you have a sister Lynne, named Lynne?

21   A    Yes.

22   Q    Do you get along with her?

23   A    I do.

24   Q    So would it surprise you to find out that she had negative

25   things to say about you to the FBI?

HOY - CROSS (Barbee)

196

1  A    I would be surprised.

2  Q    Would it surprise you that she described you as a scam

3  artist and your husband as a hacker?

4         MR. NAMMAR:  Objection.  Relevance.

5         THE COURT:  Sustained.

6         MR. NAMMAR:  Move to strike.

7         THE COURT:  Sustained.  Strike the last question by

8  Mr. Barbee.

9  BY MR. BARBEE:

10  Q    In 2009, did you and your husband have a safe located in

11  your residence in Maui?

12  A    Yes.

13  Q    And did you have another safe in your shed adjacent to

14  your residence?

15  A    No.

16  Q    Did you have two safes in your house?

17  A    No.

18  Q    Just one safe?

19  A    Yes.

20  Q    Now, you testified on direct testimony that there came a

21  time where Hawaiiloa Foundation, where you were working at,

22  that participants or customers would bring in cash to pay to

23  the foundation; is that correct?

24  A    Yes.

25  Q    And you handled this cash, did you not?

HOY - CROSS (Barbee)

197

 1   A   Yes.

 2   Q   And part of your job was to keep track of the cash and to

 3   make daily deposits into a bank account, correct?

 4   A   Yes.

 5   Q   And that's what you did initially, correct?

 6   A   Yes.

 7   Q   At some point you stopped depositing that cash, correct?

 8   A   It was only deposits of checks that I did.

 9   Q   Okay.  So your testimony is that you did not deposit the

10   cash.

11   A   Not cash.

12   Q   And did you take that cash on occasion home with you where

13   you lived with your husband Petrovich?

14   A   No.

15   Q   In 2009, when you met with Special Agent Carter, one of

16   the items you turned over to him was a substantial amount of

17   cash, correct?

18   A   Yes.

19   Q   Over $40,000 in U.S. cash, correct?

20   A   Yes.

21   Q   That in fact was cash that you had taken from the

22   Hawaiiloa Foundation, is it not?

23   A   No.

24   Q   Who's Gerry Michaud?

25   A   A friend of the Olivers.

HOY - CROSS (Barbee)

198

```
1   Q    And did he have an office or share spaces in the boys'
2   office area with John Oliver?
3   A    Yes.
4   Q    And was it your understanding that he provided legal
5   advice to the Olivers and to participants?
6   A    He held classes, but I don't know if he offered them legal
7   advice.
8   Q    And the subject matter of his classes had to do with legal
9   issues, correct?
10  A    Yes.
11  Q    Did he hold himself out as an attorney?
12  A    Not that I know of.
13  Q    Did there come a time where John Oliver invited somebody
14  from the Mainland to come down and do training for the -- some
15  of the personnel at Hawaiiloa Foundation?
16  A    Yes.
17  Q    And would that person be the -- Winston Shrout or one of
18  his representatives?
19  A    Yes.
20  Q    And what is your understanding as to the area of expertise
21  of Mr. Winston Shrout?
22  A    I believe that he was the one that the Olivers got the
23  information on how to do the bonds.
24  Q    Okay.  So prior to Mr. Shrout and his organization coming
25  down to Maui, Mahealani Ventura-Oliver was primarily giving
```

HOY - CROSS (Barbee)

1   history lectures at the Cameron Center; isn't that correct?

2   A    Yes.

3   Q    After Shrout's people came down at the invitation of John

4   Oliver is when this bond stuff started coming up, correct,

5   at -- at the Cameron Center?

6   A    The bonds were already in use.

7   Q    Okay.  So Winston Shrout's people and his expertise was to

8   train the Hawaiiloa Foundation people on his bonds?

9   A    I don't know that.  I was not included in that meeting.

10  Q    Mm-hmm.  Is it your understanding, however, that either

11  Mr. Shrout or his representative came on at least two occasions

12  to Maui?

13  A    Yes.

14  Q    And after they left, were the bond forms changed from what

15  they were before?

16  A    I don't remember when.

17  Q    Now, it's your understanding that -- is it not, that John

18  Oliver was the person to discuss and assist people and to offer

19  to assist people with tax issues, correct?

20  A    Yes.

21  Q    Are you familiar with the 1099 forms that were filed on

22  behalf of people?

23  A    Yes.

24  Q    And it's John Oliver that was the person that provided

25  direction on these forms, correct?

HOY - CROSS (Barbee)

200

 1   A    Yes.

 2   Q    And he's the one that came up with the idea of these tax

 3   account -- using tax forms to zero out debts; is that not true?

 4   A    Yes.

 5   Q    You've witnessed yourself conflict between Mr. John Oliver

 6   and Mahealani Oliver, correct?

 7   A    I'm sorry, I missed the beginning part.

 8   Q    You've witnessed the conflicts in their relationship?

 9   A    Yes, I did.

10   Q    He could be very demanding, could he not?

11   A    Yes.

12   Q    And he would yell at her from time to time, would he not?

13   A    Yes.

14   Q    Did he get physical with her while you were there in the

15   office?

16   A    No.

17   Q    But he would just scream and yell at her, right?

18   A    Yes.

19   Q    He would berate her.  Correct?

20   A    Yes.

21   Q    He would tell her that she needed to do things his way,

22   correct?

23   A    I never heard those words exactly.

24   Q    Were there times when Mr. Oliver would bring his wife

25   Mahealani to your home with your husband Petrovich for training

1   on how to do these presentations having to do with bonds and

2   taxes?

3   A    No.

4           THE COURT:  Mr. Barbee, is this a good time for a

5   break?

6           MR. BARBEE:  Yes, Your Honor.

7           THE COURT:  All right.  So we'll go ahead and take our

8   afternoon recess, ladies and gentlemen.  I remind you not to

9   talk to each other and others about the case.  Leave your

10  notebooks, close them up, and leave them on your chairs.  Take

11  about a 15-minute recess and start up for the afternoon.

12          (At 2:47 p.m., the jury was excused and the following

13  proceedings were held:)

14          THE COURT:  All right.  You may step down, ma'am.

15          THE WITNESS:  Thank you.

16          (A recess was taken from 2:48 a.m. to 3:11 p.m.)

17          (The following proceedings were held in open court in

18  the presence of the jury:)

19          THE COURT:  We're back with defendants, defense

20  counsel, Mr. Tong, Mr. Nammar, the case agents.

21          And, ma'am, I do remind you you are still under oath.

22          And, of course, the jury is present for the record as

23  well.

24          All right.

25  BY MR. BARBEE:

HOY - CROSS (Barbee)

1   Q    Mrs. Hoy, I think kind of where we left off we were

2   talking about this training.

3        Do you recall last year, a July of 2012 meeting with

4   Special Agent Carter, Special Agent Dougan, Assistant United

5   States Attorney Michael Nammar and Assistant United States

6   Attorney Larry Tong, and do you recall telling them that you

7   believe that Ventura-Oliver had learned about the bonds and the

8   mortgage process from attending meetings held by Winston

9   Shrout's group?

10  A    Yes.

11  Q    Okay.  And is that true?

12  A    Yes.

13  Q    Okay.  Do you recall that in 2009 Ventura-Oliver picked up

14  somebody from Winston Shrout's organization who was there to

15  train people regarding the mortgage process?  2009.

16  A    I know that someone did come, yes.  What was discussed, I

17  don't know.  I was not in on that meeting.

18  Q    Okay.  Do you recall telling special agents and the U.S.

19  Attorneys -- Assistant United States Attorneys that that person

20  came in to conduct training about the mortgage process in HLF

21  office room 206?

22  A    Yes.

23  Q    Okay.  And is that true?

24  A    Yes.

25  Q    Do you recall also saying that a second representative

HOY - CROSS (Barbee)

203

1  from the Winston Shrout organization came down to do training

2  for Gerry Michaud and others, including John Oliver, regarding

3  taxes?

4  A    There was a person, yes, that did come in regards to

5  taxes.  I don't know from what organization they came, though.

6  Q    Okay.  Do you recall telling Special Agents Carter,

7  Dougan, Assistant United States Attorneys Michael Nammar and

8  Larry Tong that HLF brought in a female from the Shrout's

9  organization to teach them about taxes?

10  A    Yes.

11  Q    Okay.  Does that refresh your memory?

12  A    Yes.

13  Q    Okay.  So on at least two occasions representatives from

14  the Shrout's organization came to do training; one came to do

15  training on the mortgage and the bonds, and one came down to do

16  training on the taxes.

17  A    Yes.

18  Q    Now, with regard to your turning over of these items to

19  the FBI and the IRS, do you recall trying to bargain with

20  the -- you and your husband trying to bargain with the FBI for

21  amnesty, immunity, protection, new identities?

22  A    No.

23  Q    Do you recall trying to bargain with the FBI for amnesty

24  from charges?

25  A    We did ask if we could be, yes.

HOY - CROSS (Barbee)

204

1  Q    And that your names not be printed in the media?

2  A    Yes.

3  Q    And did you come -- become aware in May, I guess early May

4  of 2009, that a police report had been filed against you for

5  theft of the items that you subsequently delivered to Special

6  Agent Carter?

7  A    I did hear a rumor.  I never did see a report, though.

8  Q    Okay.  So you heard a rumor that there had been a police

9  report alleging that you had stolen that $48,000?

10 A    Yes.

11 Q    But the police didn't come and talk to you about it?

12 A    No.

13 Q    The Maui Police Department?

14 A    No.

15 Q    Because you had, like, the day -- the very day before had

16 turned over that money to the FBI?

17 A    I don't know.

18 Q    Late April 2009?

19 A    Yes, April 2009.

20 Q    Okay.  And you recall meeting with -- I guess it would be

21 your first meeting with Special Agent Carter on or about

22 April 30th, 2009, this is the time where you and your husband

23 told him the story about somebody dropping the cash off at your

24 house?

25 A    Yes.

HOY - CROSS (Barbee)

1    Q    Okay.  And at that time your husband -- you were present

2    with your husband when he was talking to the agents?

3    A    Yes.

4    Q    And you were both there together?

5    A    Yes.

6    Q    And Special Agent Carter had identified himself with his

7    credentials as a Federal Bureau of Investigation special agent?

8    A    Yes.

9    Q    And your husband in your presence informed the special

10   agent that he had a doctorate --

11              MR. NAMMAR:  Objection.  Hearsay.

12              THE COURT:  Sustained.

13   BY MR. BARBEE:

14   Q    You indicated in testimony just a few minutes ago that

15   your husband had a passport from the UK but that you had not

16   known him to have traveled to Sweden, correct?

17   A    Yes.

18   Q    And you had never heard him say he was an ambassador from

19   Sweden, correct?

20   A    No.

21   Q    Do you recall telling -- being in the presence when your

22   husband told --

23              MR. NAMMAR:  Objection.  Hearsay.

24   BY MR. BARBEE:

25   Q    -- Special Agent Carter --

1          MR. NAMMAR:  Calls for hearsay.

2          THE COURT:  Well, I think he's just impeaching now.

3          Is that right, Mr. Barbee?

4          MR. BARBEE:  Yes, Your Honor.

5          THE COURT:  I'll allow it.

6    BY MR. BARBEE:

7    Q    Do you recall when you met with Special Agent Carter on

8    April 30th, 2009, your husband told Special Agent Carter that

9    he had a doctorate in pediatrics and psychiatric studies from

10   Stockholm University?

11         MR. NAMMAR:  Objection.  Improper impeachment.

12         THE COURT:  All right.  Let's go to sidebar.

13              (Sidebar on the record:)

14         THE COURT:  So what's so special about Sweden?

15         MR. BARBEE:  She's saying -- she's denying that her

16   husband ever represented that he, you know, had any connection

17   with Sweden, and here he is at an interview, the very first

18   interview with a special agent, telling the FBI agent he

19   graduated from med school in Sweden.

20         MR. NAMMAR:  I think he's trying to impeach Mr. Hoy.

21   That's the way I took it.

22         THE COURT:  Well, I think he's impeaching her

23   testimony that she never -- that's what he's trying to do.

24         MR. TONG:  But in fairness, Your Honor -- I'm just an

25   observer here, I've been listening to Mr. Barbee's questions.

```
 1   He asked Mrs. Hoy whether Petro Hoy was from Sweden, not
 2   whether he went to school in Sweden.  He's now trying to
 3   impeach that statement by saying, Didn't he say he attended
 4   school in Sweden?  I think that's a nuance that he's trying to
 5   twist.
 6            THE COURT:  That's a good point.  So lay a
 7   foundation --
 8            MR. BARBEE:  Yes, Your Honor.
 9            THE COURT:  -- need to then.  Okay?
10            MR. BARBEE:  Yes, Your Honor.
11                      (End of sidebar.)
12            THE COURT:  So rephrase, Mr. Barbee.
13            MR. BARBEE:  Thank you.
14   BY MR. BARBEE:
15   Q    You've been married to your husband since 1997?
16   A    Yes.
17   Q    And you were with your husband for years before you guys
18   got married, correct?
19   A    Yes.
20   Q    And have you ever known him to have any connection with
21   the country of Sweden?
22   A    No.
23   Q    On April 30th, 2009, isn't it true that you were present
24   when your husband told Special Agent Carter that he had a
25   doctorate in pediatrics and psychiatry from the University of
```

HOY - CROSS (Barbee)

1    Stockholm?

2              MR. NAMMAR:  Same objection, Your Honor.

3              THE COURT:  Overruled.

4              Do you recall that?

5              THE WITNESS:  No, I don't.  I'm sorry.

6    BY MR. BARBEE:

7    Q    Is there something that could refresh your recollection as

8    to what your husband said in your presence and the presence of

9    Special Agent Carter in April of 2009?

10             THE COURT:  Well, but she said she doesn't remember

11   it, so refreshing her recollection is not relevant at this

12   point in time for impeachment.

13   BY MR. BARBEE:

14   Q    Is your memory about the events of April 2009 better today

15   as you're here testifying in court or would they have been

16   better in 2009?

17   A    I'm sorry.  I'm sorry, can you ask that again?

18   Q    Do you remember -- is there anything that could possibly

19   refresh your recollection and your memory as to what your

20   husband told Special Agent Carter in April of 2009?

21             MR. NAMMAR:  Same objection.

22             THE COURT:  Sustained.

23   BY MR. BARBEE:

24   Q    In any event, your husband does not have a doctorate in

25   pediatrics from the Stockholm University, does he?

 1  A    Not that I know of.

 2  Q    He doesn't have a doctorate in psychiatry from Stockholm

 3  University, does he?

 4  A    Not that --

 5           MR. NAMMAR:  Objection.  Asked and answered.

 6           THE COURT:  Overruled.

 7  BY MR. BARBEE:

 8  Q    Pediatrics, psychiatry?

 9  A    No, not that I know of.

10  Q    Your husband is not a special ambassador to the United

11  Nations, is he?

12  A    No.

13  Q    Okay.

14           MR. BARBEE:  No further questions.

15           THE COURT:  All right.  Mr. Gronna?

16                    CROSS-EXAMINATION

17  BY MR. GRONNA:

18  Q    Good afternoon, Ms. Hoy.

19  A    Hi.

20  Q    I just had a couple of questions.

21           With regard to the people that worked in the Hawaiiloa

22  Foundation offices, you worked there for a while, right?

23  A    Yes.

24  Q    I think you testified you had a job working there.

25  A    Yes.

HOY - CROSS (Gronna)

210

1   Q    And you were getting paid?

2   A    Yes.

3   Q    And the people in that office were similar to you, right?

4   A    Yes.

5   Q    They were there working and they were also getting paid,

6   right?

7   A    Yes.

8   Q    Getting paid a salary, right?

9   A    Yes.

10  Q    And to your knowledge, one of those persons getting paid a

11  salary was Ms. Teves, right?

12  A    Yes.

13  Q    Now, the -- you said that you had been filling out -- when

14  you got there your job was to fill out templates for the -- for

15  irrevocable trusts; is that right?

16  A    Yes.

17  Q    And those were trusts that were on a template on a

18  computer, right?

19  A    Yes.

20  Q    And you don't know who prepared those trusts, do you?

21          THE COURT:  You mean the template itself?

22          MR. GRONNA:  The templates, yes.

23          THE WITNESS:  No.

24  BY MR. GRONNA:

25  Q    They had already been prepared?

1   A    Yes.

2   Q    And to your knowledge, Ms. Teves was not the author of

3   those trusts, was she?

4   A    No.

5        MR. GRONNA:  I don't have any other questions.  Thank

6   you.

7        THE COURT:  All right.  Mr. Nammar.

8        MR. NAMMAR:  Thank you, Your Honor.

9                    <u>REDIRECT EXAMINATION</u>

10  BY MR. NAMMAR:

11  Q    You were asked a little bit about your plea agreement on

12  cross-examination, right?

13  A    Yes.

14  Q    Okay.

15  A    I'm sorry.  Yes.

16  Q    You have a plea agreement?

17  A    Yes.

18  Q    Okay.  And what's your understanding about what that

19  agreement says about whether or not you are to testify?

20  A    Yes, I am to testify to -- to the truth, and I hope that

21  it will be in my favor.

22  Q    And regarding your testimony, did I ever tell you how to

23  testify?

24  A    No.

25  Q    And you were asked about a lighter sentence.  What's your

HOY - REDIRECT

212

 1    understanding about who ultimately sentence -- sentences you?

 2    A    The judge.

 3    Q    Okay.  And am I going to sentence you?

 4    A    No.

 5    Q    And were any promises made to you about a reduction in

 6    your sentence from the government?

 7    A    No.

 8    Q    You were asked about some cash that you gave over to

 9    Special Agent Carter.

10    A    Yes.

11    Q    I think it was around $40,000.

12    A    Yes.

13    Q    Where did you get that cash from?

14    A    That was the cash that was dropped off at our home by

15    Lloyd Ishikawa.

16    Q    And why did you turn it over to the FBI?

17    A    The same reason as the -- the coins, we believed them to

18    be part of the gains from the mortgage scheme.

19    Q    You were asked a little bit about when money came in the

20    office.

21    A    Yes.

22    Q    When participants brought in cash, what would you do with

23    it?

24    A    Well, I would give a receipt to the families that brought

25    in the cash, and if Ms. Oliver was in the office at that time,

HOY - REDIRECT

213

 1    I would hand it to her.  If she wasn't, I would hand it to

 2    Ms. Teves.  And if she wasn't available, it would be put into a

 3    pouch in a drawer.

 4    Q    And where was that pouch located or where was that drawer

 5    located?

 6    A    In the office, in Ms. Teves' office, which eventually

 7    became Ms. Teves' office.

 8    Q    And you were asked a little bit about some arguments

 9    between Ms. Ventura-Oliver and John Oliver, right?

10    A    Yes.

11    Q    Who made the decisions regarding the bond process that

12    you've described?

13    A    Ms. -- Ms. Oliver.

14    Q    Who set the prices?

15    A    Ms. Oliver.

16    Q    Who collected the fees?

17    A    Ms. Oliver.

18    Q    Did you ever question Ventura-Oliver about the bond

19    process?

20    A    No.

21    Q    Why not?

22    A    I had a hundred percent faith in -- in Ms. Oliver.

23    Q    What's her personality like?

24    A    I find her to be a very serious person.  Knowledgeable.

25    Q    And you were asked a little bit about the templates and

HOY - CROSS (Barbee)

214

1   the creation of some of these bonds and trusts, and you were

2   asked a little bit about someone who came to give lectures,

3   Winston Shrout?

4   A    Yes.

5   Q    Do you know who put the Hawaiian language in the documents

6   that were drafted?

7   A    Ms. Oliver.

8   Q    Okay.  And do you know whether the program worked for

9   anyone?

10  A    No, I don't.

11  Q    No, you don't know whether it worked for anyone?

12  A    Correct, I don't know if it worked for anyone.

13  Q    Have you ever heard of it working for anyone?

14  A    No, I haven't.

15           MR. NAMMAR:  No further questions.

16                    RECROSS-EXAMINATION

17  BY MR. BARBEE:

18  Q    Just a few more questions.  Regarding these arguments

19  between John Oliver and his wife Mahealani, you've already

20  testified you heard him yelling at her, directing her what to

21  do; yet, you just testified that you felt that Mahealani

22  Ventura-Oliver was in charge of this bond process.

23           Did it appear to you that at least on the girls' side

24  of the office that she was in charge of the bond process?

25  A    Yes.

1  Q    And you don't know what, if anything, her husband had

2  directed her to do earlier that morning or the past evening.

3  A    No, I would not.

4  Q    With regard to setting the prices, you don't know what, if

5  anything, John Oliver had directed her to do regarding setting

6  prices, do you?

7  A    No, I don't.

8  Q    And you don't know what -- what John Oliver had directed

9  her to do, if anything, regarding fees?

10 A    No, I don't.

11 Q    And John Oliver did, however, have open authority and

12 reign over the tax side, correct?

13 A    Yes.

14 Q    That part was open, correct?

15 A    Yes.

16        MR. BARBEE:  Okay.

17        THE COURT:  Mr. Gronna, I assume you have nothing --

18 oh, you do.

19        MR. GRONNA:  I do, yes.  I have just a couple

20 follow-up questions.  I'm sorry.

21        THE COURT:  All right.  Sure.  No, no.

22                    RECROSS-EXAMINATION

23 BY MR. GRONNA:

24 Q    You know, when you got involved with this, you know, when

25 you came in to start working with the Hawaiiloa Foundation, you

 1   learned about the bond process, right?

 2   A    Yes.

 3   Q    And you believed in it, right?

 4   A    Yes.

 5   Q    And when you got in the office everybody believed in it,

 6   right?

 7   A    Yes.

 8   Q    I mean nobody ever told you -- Ms. Teves certainly never

 9   got up to you and said, Hey, you know, this doesn't work.  I

10   know it doesn't work.  She never said that, did she?

11   A    No.

12   Q    She believed in it, right?

13   A    Yes.

14   Q    I mean she was in there working like you believing that

15   this stuff was going to work, didn't she?

16            MR. NAMMAR:  Objection.  Calls for speculation.

17            THE COURT:  Sustained.

18   BY MR. GRONNA:

19   Q    Well, she never indicated to you to the contrary, right?

20   A    No.

21            THE COURT:  Let's question within the scope of --

22            MR. GRONNA:  I'm finished.

23            THE COURT:  -- the redirect.  All right.  Thank you.

24            MR. GRONNA:  Thank you, Your Honor.

25            MR. NAMMAR:  Nothing further, Your Honor.

1       THE COURT:  All right.  You may step down, ma'am.

2       THE WITNESS:  Thank you.

3                               (Witness excused)

4       THE COURT:  All right.  Next witness?

5       MR. NAMMAR:  The United States calls Matthew Johnson.

6       THE COURT:  Matthew Johnson?

7       MR. NAMMAR:  Yes.

8                    MATTHEW JOHNSON,

9  called as a witness by the Government, having been first duly

10 sworn, was examined and testified as follows:

11      THE CLERK:  Please have a seat.

12      Please state your name for the Court, and spell your

13 first and last name.

14      THE WITNESS:  Matthew Johnson, M-A-T-T-H-E-W,

15 J-O-H-N-S-O-N.

16                   DIRECT EXAMINATION

17 BY MR. NAMMAR:

18 Q    Afternoon, Mr. Johnson.

19 A    Good afternoon.

20 Q    How are you employed?

21 A    I am with the Office of the Comptroller of the Currency,

22 or OCC.  It's a Bureau of the U.S. Treasury Department.

23 Q    And what is your title there?

24 A    I'm a commissioned national bank examiner and a problem

25 bank specialist.

JOHNSON - DIRECT

1    Q    What does the OCC do?

2    A    The OCC is responsible for regulating, chartering,

3    examining, supervising all national banks in the United States

4    as well as their branches overseas.  And it's also, now that

5    we've incorporated the Office of Thrift Supervision, we now

6    have responsibility for savings and loans that have national

7    charters as well.

8    Q    Have I asked you to give opinions about whether certain

9    financial instruments are authentic?

10   A    Yes.

11   Q    And have you formed opinions about those instruments?

12   A    I have.

13   Q    And before we get to those opinions, what specifically in

14   your background qualifies you to give such opinions?

15   A    The six years -- I have just recently moved to Dallas,

16   Texas, about seven months ago.  My position in Washington D.C.,

17   I was the fraud expert for the OCC and I reviewed many

18   fictitious financial instruments in my role there, which is my

19   primary responsibility, as well as a couple years while I was

20   in San Francisco.

21   Q    And you mentioned that you worked as an external fraud

22   specialist.  What are your duties in that position?

23   A    My duties in that position was to assist law enforcement

24   or assist the general public or assist entities when they come

25   across financial instruments that appear to be real or purport

JOHNSON - DIRECT

1    to be real, and make a determination as to whether they are or

2    not.

3    Q    And can you tell the jury what a financial instrument is?

4    A    A financial instrument can be something as basic as your

5    check in your checkbook is a financial instrument.  It can also

6    be a loan from a bank.  So there's many different names and

7    forms of financial instruments.

8    Q    How long have you worked total time at the OCC?

9    A    Next week will be 27 years.

10   Q    Okay.  And what kind of other positions have you held

11   at -- at the OCC?

12   A    When I started my career in Longview, Texas, I was an

13   associate national bank -- I'm sorry, an assistant national

14   bank examiner.  And then I became an associate national bank

15   examiner.  And my role there was just to learn how to be an

16   examiner, to learn what it takes to be a financial institution,

17   how to look at them, how to evaluate them.

18          And then I became a commissioned national bank

19   examiner, with the title NBE, stands for national bank

20   examiner.  And then I was responsible for conducting

21   examinations, having training teams under my purview, examining

22   banks, looking at financial instruments, financial documents,

23   financial books and records of banks.

24          And then I became a fraud specialist, and then an

25   external fraud specialist, and now I'm a problem bank

JOHNSON - DIRECT

220

1   specialist.

2   Q    And what does a problem bank specialist do?

3   A    A problem bank specialist, unfortunately, has to deal with

4   the problem banks.  We make a determination as to whether or

5   not they are operating in a safe and sound manner.  And if they

6   are not, then there are certain remedial action that we can

7   take against them, whether the institution itself or insiders

8   of the institution.

9   Q    And during your career with the OCC, have you dealt with

10  financial instruments issued by the United States Treasury?

11  A    I have.

12  Q    And have you offered numerous opinions about the

13  authenticity of such financial instruments?

14  A    I have.

15  Q    Tell me a little bit about your education.

16  A    I have a bachelor's degree from LeTourneau, and that's

17  spelled L-E-T-O-U-R-N-E-A-U, University, which is out of

18  Longview, Texas.  And I have an emphasis in accounting and

19  finance and economics with a minor in psychology.

20          I also have a couple of certifications.

21  Q    Tell us about those.

22  A    I have a certification, it's called a Fraud Specialist

23  certification.  And that is administered from the Association

24  of Fraud Examiners, which is out of Austin, Texas.  And you go

25  through a vetted process just like a CPA or an attorney or a

JOHNSON - DIRECT

1    commissioned national bank examiner would do.  You have to

2    study, you have to sit for the test and be evaluated, and you

3    have to pass.

4            I also have a certified Anti-Money Laundering

5    Specialist certification, and, again, that's a vetted process.

6    And that's done out of Miami, Florida.  And it's from the

7    Association of Certified Anti-Money Laundering Specialists.

8    Q    And do you lecture on any subjects?

9    A    My students probably think I lecture, but I -- I'm an

10   instructor for a couple of cadres of instructors in my agency

11   as well as a cadre from the Department of Justice.  The cadres

12   at the OCC are anti-money launderist -- anti-money laundering

13   terrorist financing course that I teach.  And then I also teach

14   what's called a Bank Supervision School, which evaluates

15   individuals who are going to sit for the commissioning test and

16   make sure they have the skill sets to be able to do that.

17           And then for the Department of Justice, I work with

18   the Asset Forfeiture and Money Laundering Section to educate

19   the prosecutors as well as agents on financial investigations

20   and what you do as far as looking at documents from financial

21   institutions.

22   Q    Have you previously been qualified to give expert

23   testimony in judicial proceedings?

24   A    I have.

25   Q    And in what field were you qualified as an expert?

1    A    I've been qualified as an expert in fictitious financial

2    instruments, high-yield investment schemes.  That's like the

3    Bernie Madoff type schemes.  And also just on some bank fraud

4    issues.

5    Q    And were most of those times that you were qualified, was

6    that in federal court?

7    A    Yes.

8    Q    Okay.

9         MR. NAMMAR:  Your Honor, at this time the government

10   offers Mr. Johnson as an expert in the field of fictitious

11   financial instruments.

12        MR. BARBEE:  Your Honor, just a quick voir dire?

13        THE COURT:  Yes.

14                   VOIR DIRE EXAMINATION

15   BY MR. BARBEE:

16   Q    Okay.  Mr. Johnson, good afternoon.

17   A    Good afternoon.

18   Q    How many times have you been qualified to testify in

19   federal court as an expert in fictitious financial documents?

20   A    I've testified in federal court over 50 times.  The times

21   that I've been offered as an expert, probably 25 to 30 times.

22   Q    In the specific area of fictitious financial documents I'm

23   asking about.

24   A    Correct.

25   Q    Okay.

1          MR. BARBEE:  No further questions.

2          THE COURT:  All right.  Any objection?

3          MR. BARBEE:  No, Your Honor.

4          MR. GRONNA:  No.

5          THE COURT:  All right.  So the Court will permit the

6    witness to testify in the area of fictitious financial

7    instruments.

8                  RESUMED DIRECT EXAMINATION

9    BY MR. NAMMAR:

10   Q    Can you tell the jury what a fictitious financial

11   instrument is.

12   A    A fictitious financial instrument is an instrument that

13   purports to be based upon something that is genuine.  Or I

14   should say -- let me rephrase that.

15          It purports to be something that's based on something

16   that is not genuine as opposed to something that is, like,

17   considered counterfeit.

18          Counterfeit would be something that is based upon

19   something that is real, that is genuine.  For example, like a

20   counterfeit $20 bill or counterfeit $100 bill.  That's an

21   actual instrument that is something that's real, something

22   that's genuine, and then you have something that's counterfeit

23   to make it look like that.

24          A fictitious financial instrument is one where it's

25   not based upon anything that is -- that is legal or genuine.

JOHNSON - RESUMED DIRECT

224

1    Q    How do you determine whether a financial instrument is
2    fake or fictitious?
3    A    There are certain things I look at when I'm asked to
4    review them.  So there could be certain language on the
5    document.  It could be the way the document is presented.
6    Could be even based upon even the paper and the ink that is
7    used.  And there are certain hallmarks that I will notice that
8    I can certainly attest that they're not genuine.
9    Q    And what are some of those hallmarks?
10   A    A lot of times when documents will use, for example -- a
11   Social Security number, for example.  If I see a Social
12   Security number on an instrument that purports to be a
13   financial instrument, then to me that's a red flag because
14   financial documents or financial instruments now, genuine ones,
15   are not going to use Social Security numbers.  They also will
16   use certain names and certain phrases that, while they may make
17   sense in a real environment or in a real document, on that
18   document when they are put together they don't make any sense.
19   Q    And during the course of your career, how many fictitious
20   final -- financial instruments have you come across?
21   A    I've probably looked at a thousand or more.
22   Q    Okay.
23        MR. NAMMAR:  Your Honor, may we publish Exhibit 13,
24   which has already been admitted into evidence?
25        THE COURT:  Yes.

1          You want the witness to look in the book or just on

2    the overhead?

3          MR. NAMMAR:  I think it might be helpful for the book

4    just in case.  Thank you.

5    BY MR. NAMMAR:

6    Q    Have you formed an opinion about the authenticity of

7    Exhibit 13?

8    A    I have.

9    Q    And what conclusion have you drawn?

10   A    That it is a fictitious financial instrument and it has no

11   financial value.

12   Q    And what do you base that on?

13   A    Well, as I previously testified, some of the things that I

14   look at on here, like if you look at the top part where it says

15   "To the order of," and it says, "to Henry Paulson," who --

16   Henry Paulson at 2008 was the Secretary of the Treasury.  So

17   he's a real person and he actually held that title there.

18   There -- to my knowledge, there are no documents, financial

19   documents that are made payable to the Secretary of the

20   Treasury.

21          There are other things that I look at, for example,

22   just the title of the document itself.  So, for example, in the

23   upper right -- left-hand corner of this document, it says

24   "Bonded Promissory Note."  Well, "bonded promissory note" has

25   no meaning in the financial world.  Now, the word "bonded "does

JOHNSON - RESUMED DIRECT

226

1    and "promissory note" do, but again, as I mentioned earlier,

2    when you put them together they -- they have no meaning.

3    There -- there's no value there.

4    Q    Tell us a little bit about some of the words in the title.

5    Title "Bonded Promissory Note."  I mean by itself what does

6    "promissory note" mean?

7    A    Well, generally speaking, a promissory note is, like, if

8    you go to a bank and you sign a promissory note because you're

9    going to buy a car.  So it's an agreement between you and the

10   financial institution that they have a lien on your car and you

11   are obligated to pay the money back for that car.

12   Q    How about the word "bond" or "bonded"?

13   A    Bond is -- a bond is something that can be issued from a

14   government or from a corporation will issue bonds.  What that

15   will do is if -- let's say the U.S. Government issues a bond.

16   They're issuing that to an investor.  Someone is going to buy

17   that bond.  And so the question is, Well, what does then the

18   U.S. Government do with that money?  Well, they use that money

19   to -- to pay bills, to highways, for infrastructure, for many

20   things that they could be doing that for.

21        And corporations do the same thing.  So like if a

22   Fortune 500 company issues a bond, which you have an investor

23   buy that bond, they're using that for maybe research and

24   development.  Maybe to build a new plant.  So they're using

25   that money for something for their business.

1  Q   And the title, looking at the title, those words strung

2  together, "bonded promissory note," does that mean anything?

3  A   No.

4  Q   Okay.  You mentioned already a little bit, Henry Paulson

5  who's -- to the order of Henry Paulson, that he was the

6  Secretary of Treasury, I think you told us that.

7        What is the Department of Treasury?

8  A   The Department of Treasury, it's -- it's a very large

9  government agency that is responsible for paying our bills.  It

10  also -- obviously the Internal Revenue Service is part of the

11  Department of Treasury, so they're responsible for revenue

12  collection and tax issues.

13        And the Department of Treasury has many different

14  bureaus underneath them.  My agency is one of them.  And so the

15  Treasury itself has many different facets to why it exists, but

16  generally or overwhelmingly, it is for the payment of -- of

17  debt.

18  Q   And how did Mr. Paulson, if you know, get his job?  How

19  did he get his job?

20  A   How did he get his job?

21  Q   Yes.

22  A   He was appointed by the President of the United States.

23  Q   Okay.  And what does he do as the Secretary of the

24  Treasury?

25  A   Well, he --

1  Q    Or what did he do?  Excuse me.

2  A    Well, the Secretary of the Treasury, or in this case

3  Mr. Paulson, would oversee just the agency itself.  He'd also

4  serve on the President's cabinet.  And so to advise the

5  President on matters that have to do with revenue coming in and

6  revenue going out or payments of revenue going out.  Like I

7  said, there's many different facets of Treasury that he's

8  responsible for.

9  Q    And looking back to this document here at the top, can you

10  tell what's trying to be paid off here?

11  A    Well, it appears -- it says, if you look at the -- right

12  under the "in the amount of," and it says "for," and it says

13  "beneficiary bank, Bank of America, Countrywide Home Loans, to

14  apply to loan Account Number 168602149149."  So it appears it's

15  trying to pay off or pay on that loan.

16  Q    And does this document say anywhere how it will be paid

17  off?  The debt?

18  A    Well, the document itself is directing Mr. Paulson to do

19  something.

20  Q    Uh-huh.

21  A    So it's trying to get money out of alleged accounts at

22  Treasury in order to pay on this Countrywide loan at Bank of

23  America.

24  Q    Can private debts be paid by the United States Treasury

25  with a bond like --

1    A    Ask the question again.

2    Q    Can private debts, like a mortgage, can a private debt be

3    paid from the United States Treasury with a bond?

4    A    Well, the U.S. Department of Treasury is not going to pay

5    someone's mortgage.

6    Q    Okay.

7    A    If that was your question.

8    Q    Yeah, do they pay private debts?  Does the U.S. Treasury

9    pay private debts?

10   A    For -- no.  They -- they are responsible for paying the

11   debts of the U.S. Government.

12   Q    Okay.  Can individuals have accounts with the United

13   States Treasury?

14   A    Yes.

15   Q    Tell us about that.

16   A    Well, there are accounts at the U.S. Treasury and they're

17   called Treasury Direct accounts or Legacy Treasury Direct

18   accounts.  And basically how it works is this:  Anybody here in

19   the courtroom, we could all go on the computer and go to

20   treasurydirect.gov and we could open an account at the Treasury

21   Department.

22         Now, there are some specific things, however, that

23   these accounts can and cannot do.  What they can do is that

24   they could hold investments that you make.  For example, if you

25   wanted to buy a government obligation, meaning a bond, a T -- a

1    treasury bill, treasury bond, a treasury note or even a savings

2    bond, you would buy it and that account would hold those things

3    for you.  So it's like a -- almost like a brokerage account, it

4    just sits there in that account.

5            Now, you cannot write a check on that account.  You

6    cannot get a money order on that account.  If you wanted to use

7    the money that's represented in that account by those bonds,

8    treasury notes, things, bonds, whatever, then you have to sell

9    them and then transfer that money to another bank or financial

10   institution to your account, and then you can write a check off

11   of that or do whatever you want with it.

12   Q    And looking back to this, this document which is called a

13   Bonded Promissory Note, I think you've gone through some of the

14   characteristics that conclude -- that help you conclude that

15   this document isn't genuine.

16           Are there any others that jump out at you from this

17   document?

18   A    Well, this is a -- what Exhibit Number 13 is, it's

19   obviously a copy of a -- of an original.

20   Q    Yes.

21   A    That lot of times when I see the originals -- I've seen

22   hundreds and hundreds of them -- just the border in and of

23   itself, it will -- it'll jump out at you as if it's something

24   that's genuine, something that's real, because it's got a nice

25   pretty border, and it's got nice ink, and it's on nice paper.

1          But in and of itself, I -- I've actually never seen a

2     bond that would look like that.  There are certain

3     characteristics that some bonds have, but when you're trying to

4     make something that's not real look real, then you're going to

5     try to put terminology, the right paper, the right ink on it to

6     make someone believe that it is real.

7     Q    And this appears to be a copy, a black and white copy, but

8     what can you tell us about some of the colors that you've seen

9     on fictitious financial instruments?

10          MR. BARBEE:  Your Honor, I'm going to object, Your

11     Honor.  It's not related to this exhibit.

12          THE COURT:  Sustained.

13     BY MR. NAMMAR:

14     Q    Looking back to this particular bond, are there certain

15     characteristics that make it appear to be real?

16     A    Well, again, just as I mentioned, some things I look at

17     that jump out at me that are real, like Mr. Paulson's name,

18     using Mr. Paulson's name on a document such as this would

19     indicate to me that it is -- it is not real.  But just having

20     Mr. Paulson's name on there, someone who doesn't understand

21     what these types of documents are may conclude that it is

22     something that is genuine.

23          Additionally, it -- at the very bottom right-hand

24     quadrant, it has the "by the Federal Reserve Bank of San

25     Francisco, 101 Market Street, San Francisco."  Well, the

1    Federal Reserve Bank of San Francisco is a real Federal Reserve

2    Bank.  It is at that address on Market Street in San Francisco.

3    So using terminology, using people's names that are real will

4    cause someone to conclude, if they're not aware, that this

5    could be something of value when in fact it is not.

6    Q    And this document appears to be notarized.  What, if

7    anything, is the significance of the fact that it appears to be

8    notarized?

9    A    A lot of times when individuals have received documents

10   that are notarized, it gives an air of legitimacy.  However,

11   just because something has a notary seal on it doesn't make it

12   legitimate.

13   Q    And it also references there at the bottom "Satisfaction

14   tendered, certified return receipt," and then there's a number.

15   Have you seen language similar to this on bonds before?

16   A    On fictitious financial instruments, yes.

17   Q    Okay.  And what's the significance, if any, of that sort

18   of language?

19   A    There's -- there's no significance.  Again, it's just

20   there to make it appear as though it's genuine.

21   Q    Okay.  Can you take a look now at Exhibit 4.

22            MR. NAMMAR:  And may we publish it to the jury?

23            THE COURT:  It's been admitted?

24            MR. NAMMAR:  Yes.

25            THE COURT:  Four?  Yes.

JOHNSON - RESUMED DIRECT

1          MR. NAMMAR:  I think, Alison, it might be a different

2    binder.

3    BY MR. NAMMAR:

4    Q    Have you examined Exhibit 4?

5    A    I have.

6    Q    And what conclusions have you drawn regarding Exhibit 4?

7    A    That it is, again, a fictitious financial instrument that

8    has no -- no monetary value.

9    Q    And what do you base that on?

10   A    Well, just like I talked about in -- in the last document,

11   it's the way -- it's causing -- is trying to cause the U.S.

12   Government to do something or the government to do something

13   when in fact they cannot.

14          MR. NAMMAR:  Zooming in at the top there, if you

15   could.

16   BY MR. NAMMAR:

17   Q    This document is entitled "Private Bond Order for

18   Payment - Negotiable."  What, if any, significance does that

19   have to you?

20   A    None.  There -- there are no legitimate documents that are

21   entitled "Private Bond Order for Payment - Negotiable."

22   Q    How about some of the words in the title by themselves, do

23   they mean anything?

24   A    Yes.  Yes, individually they all mean something, just like

25   in the last document.

JOHNSON - RESUMED DIRECT

234

1  Q    What does "negotiable" mean?

2  A    Negotiable is something that is negotiated between two or

3  more people or entities, and you agree upon a term, an interest

4  rate, and all the other covenants that might be in a document.

5  Q    And are there certain characteristics in this particular

6  bond that lead you to conclude that it's not genuine besides

7  the title?

8  A    Well, for me the one thing -- well, two things that jumped

9  out at me.  One is, again, there's a use of Social Security

10 numbers.  And this document itself, while not -- they're kind

11 of redacted, but they have like the last four digits of a

12 Social Security number on it, is one thing that again jumps out

13 at me.  It's in that second paragraph, second to the last line.

14 Very -- very beginning.  And the --

15 Q    And is it right -- right here (indicating)?

16 A    Yes.

17 Q    Okay.

18 A    And it's used again later on down that paragraph.

19       But the one thing that also jumps out at me on this

20 document itself is in that same paragraph, about two-thirds of

21 the way down, it's like three lines up from the bottom of that

22 paragraph, it starts by "foreign," and it says "House Joint

23 Resolution 192 of June 5 -- by June 1933."

24       House Joint Resolution is a legitimate resolution.  It

25 was a resolution that was -- that was passed in 1933 that

JOHNSON - RESUMED DIRECT

1   started the process of the U.S. going off the gold standard.

2   And basically what that means is that no longer could anybody

3   require someone to pay their debts in gold.  We have currency

4   in the United States.  You can use currency.  No one can

5   require you to use gold.

6          So in all the documents I've looked at, there is

7   always -- there's always been some sort of reference to House

8   Joint Resolution 192 or HJR 192.  And that is a theory called

9   the Redemption Theory.  And the Redemption Theory is a theory

10  that is promoted that says in 1933 the United States went

11  bankrupt.  And because of that bankruptcy, the U.S. Government

12  took all of our Social Security numbers for those of us that

13  were born then, which nobody in this room was, I don't think,

14  in 1933, and in perpetuity took Social Security numbers and

15  birth certificates, and said we have to somehow support the

16  U.S. Government's debt because the U.S. Government is bankrupt,

17  so we're going to take your Social Security numbers and birth

18  certificates to support that debt, and in exchange for that we

19  are going to set up secret accounts at the U.S. Treasury

20  Department you can access to pay off your debts.

21         Well, in 1933, we did not go bankrupt, and there were

22  no secret accounts set up, so there is no money at the Treasury

23  for all of us to access to pay our debts.

24         So when I see that in these documents I immediately

25  know that there's something wrong with them.  And if you go to

JOHNSON - RESUMED DIRECT

236

1   the second page, that same HJR 192 is also mentioned on the

2   second page as well.

3   Q    And are there any secret accounts at the U.S. Treasury by

4   which someone can pay off their debts?

5   A    No.

6   Q    Okay.  And where on the second page does it reference HJR?

7   Is it right there (indicating)?

8   A    Correct, it starts on that -- it starts "a beneficiary in

9   common," on the second paragraph.

10  Q    And right below that it references the Organic Act of

11  1900.

12  A    Right.

13  Q    What, if anything, is the significance of that reference?

14  A    I don't believe there's any significance to it.  My

15  understanding is the Organic Act of 1900 is something that's

16  indigenous to Hawaii.  And the United States passed a federal

17  law called the Organic Act in 1900, and basically what it said

18  is that Hawaii can set up a government.

19  Q    And when you see the House Joint Resolution right below

20  the Organic Act of 1900, what, if anything, does that tell you?

21  A    Nothing.  It means -- it doesn't mean anything.

22        MR. NAMMAR:  Now, if we can go back to the first page.

23  And zoom in on the second full paragraph.

24  BY MR. NAMMAR:

25  Q    It references down there at the bottom "UCC."  Have you

JOHNSON - RESUMED DIRECT

1    ever seen a reference to the UCC in any fictitious financial
2    instruments?
3    A    I have.
4    Q    And what is the UCC?
5    A    The UCC stands for Uniform Commercial Code.  And all 50
6    states in the United States are now -- have a UCC.  And
7    basically a UCC-1 allows an entity to claim a lien position on
8    personal property.  So if you went to a store and bought a
9    washer and a dryer, and you got a loan for it, that store would
10   most likely -- they can file a UCC-1 telling the whole world
11   that they have a lien interest until you pay off your washer
12   and dryer.  Once you pay off that washer and dryer, then they
13   file what's called a UCC-3.
14   Q    And do UCC references give a document like this an air of
15   legitimacy?
16   A    No.
17   Q    Why not?
18   A    Because the Uniform Commercial Code, or UCC, has nothing
19   to do with the legitimacy of a fictitious financial instrument.
20   Q    Okay.
21             MR. NAMMAR:  Now, I want to zoom in on first full
22   paragraph.
23   BY MR. NAMMAR:
24   Q    And it says there that:  "The Comptroller of the Currency,
25   the Hawaiian Treasury, Russ Saito, is directed to issue money

1    on account via this bond, bond order to Countrywide Home Loans

2    for satisfaction of loan number," and it lists a loan number.

3         Do you see that?

4    A    I do.

5    Q    Okay.  What is trying to be paid off here?

6    A    It appears as though there are two loan -- or a loan and

7    an account number that are trying to be paid off.  And the

8    loans are at Countrywide Home Loans.

9    Q    And does that first sentence say how the bond or purported

10   bond is going to pay off that loan?

11   A    Well, this Hawaiian Treasury, Russ Saito, is directed to

12   issue money to pay it off.

13   Q    And you've already told us about the United States

14   Treasury, but can the State of Hawaii Treasury -- can private

15   debts, like a mortgage, be paid from the Treasury of the State

16   of Hawaii with a bond?

17   A    Not to my knowledge.

18   Q    Okay.  Can you take a look now at Exhibit 14-C.  I think

19   it's in the last binder that you looked at.

20        THE COURT:  You may publish.  You want to publish

21   that?

22        MR. NAMMAR:  Yes, Your Honor.  Thank you.

23   BY MR. NAMMAR:

24   Q    Have you examined 14-C?

25   A    I have.

1   Q    And have you formed an opinion regarding the authenticity

2   of this document?

3   A    I have.

4   Q    What conclusions have you drawn?

5   A    That it's a fictitious financial instrument and it has no

6   financial value.

7   Q    And -- and what do you base that on?

8   A    Well, as -- as with the previous two exhibits, it's the

9   same thing.  It references certain things that do not exist or

10  it causes -- tries to cause the Treasury to do something which

11  the individuals are not authorized to cause the Treasury to do

12  anything.

13  Q    And in looking at the title of this bond, it's entitled

14  "Private Offset, Discharging and Indemnity Bond."  That's a

15  different name than the other ones we've looked at, right?

16  A    Correct.

17  Q    But yet you've come to the same conclusions for all three?

18  A    That's correct.  In my review of fictitious financial

19  instruments I've concluded that it doesn't matter what you

20  title it.  It -- it could be called a Volkswagen for all I

21  care.  But it doesn't make it real.  The title is -- they're

22  just words on a piece of paper.

23  Q    And looking at the title right here, does that have any

24  significance to you?

25  A    No.

JOHNSON - RESUMED DIRECT

240

1   Q    Okay.  And looking at this particular bond, are there any

2   characteristics in the document that lead you to conclude that

3   it's fake?

4   A    Well, again, like the first one, it has Mr. Henry Paulson

5   on there.  So the maker of the bond is trying to cause

6   Mr. Paulson to do something, which he or she has no authority

7   to do.

8   Q    Right.  And how about the amount?  This time it's for

9   300 million.  Does that tell you anything?

10  A    Well, that's -- it's a big number.  Lot of times a lot of

11  the documents that I see they have extraordinary numbers.  I

12  have seen it all the way up to -- to a trillion dollars, and I

13  had to count the zeros to make sure it was that.

14         But you see very, very large dollar amounts that is

15  a -- it's a red flag on any document when you see those kind of

16  large dollar amounts.  Then you have to get behind what's in

17  the document to determine whether or not it's real.

18  Q    It also looks like it references some Social Security

19  numbers right here (indicating)?

20  A    Yes.

21  Q    And again, what's the significance of that?

22  A    That documents such as these are not going to have an

23  individual's Social Security number on it.

24  Q    At the top right it lists an issue date.  Do -- do real

25  bonds have issue dates?

1    A    Yes.

2    Q    Okay.  Do real bonds have -- there's an expiration date

3    below that.  Do they have expiration dates?

4    A    Some do if they're fixed, yes.

5    Q    Is there anything in this particular bond that would make

6    it appear to be authentic?

7    A    Well, again, just the way they use words that are real

8    words in financial terminology in the financial world, and in

9    this case too, if this were the original, probably the border

10   and the paper, that kind of stuff, would -- would give me that

11   indication as well.

12         It uses Mr. Paulson's name.  I don't think you can

13   underestimate the power of words in documents.  When you use

14   words that are real that we all understand what those words

15   are, our first inclination is to say, Oh, well, there must be

16   some legitimacy here.  But in fact in instruments such as these

17   there is no legitimacy.

18   Q    And you mentioned a border.  This bond has a border on it,

19   it is in black and white, but do real bonds have borders?

20   A    Some do, I'm sure.

21         MR. NAMMAR:  Okay.  Can we go now to the last page of

22   this document, Your Honor?

23         THE COURT:  Yes.

24   BY MR. NAMMAR:

25   Q    And it's Bates 22818.

JOHNSON - RESUMED DIRECT

242

1             MR. NAMMAR:  And can you zoom in on the bottom.

2    BY MR. NAMMAR:

3    Q    Looks like here that these are fingerprints.  Do you see

4    that in the middle of the page?

5    A    I do.

6    Q    And what, if anything, is the significance of

7    fingerprints?

8    A    Well, there's no significance to the fingerprints.  Again,

9    I think it's an -- it's an attempt to try to make something

10   appear legitimate.

11   Q    Okay.  And at the bottom there, it says:  "I certify under

12   penalty of perjury that this document is true and correct, and

13   a complete copy of the original."

14             Do you see that?

15   A    I do.

16   Q    Have you seen language similar to that before?

17   A    I have.

18   Q    And what, if anything, is the significance of that

19   language?

20   A    None.

21   Q    Can you give me some real life examples of when bonds like

22   the ones we looked at today have been used.

23   A    Sure.

24   Q    And have worked.

25   A    A few come to mind.  There have certainly been bonds such

JOHNSON - RESUMED DIRECT

243

1   as these that have been sent to the Internal Revenue Service to

2   pay off someone's tax liability.  And the Internal Revenue

3   Service will take that.  The individual who initially got it

4   may not have an understanding of what these things are or what

5   they are not.  And they send it for processing, and it

6   eventually gets kicked back because it's not genuine.

7          I have certainly seen instruments such as these used

8   at an NFL franchise to gain access to -- I believe they're

9   called "luxury sky boxes."  And they were able to use those for

10  a couple football games anyway until the franchise found out

11  that these are not real.

12         I have certainly seen documents that have been used to

13  pay child support, to pay court costs, where, again, the person

14  who initially takes them may not have an understanding of what

15  they are.  And so they will send it for processing, and by the

16  time it's discovered that it's not genuine, then it gets sent

17  back.  And then, unfortunately, a lot of times entities are

18  left holding the bag.

19  Q    Are you aware of any alerts being issued for fictitious

20  financial instruments similar to the ones we've been looking at

21  today?

22  A    I am.  My agency has issued at least two alerts to notify

23  the financial community, and, in turn, notify the general

24  public, that these types of schemes are being -- are attempted

25  to be perpetrated upon the American financial system or even on

1    the U.S. Government.

2          We -- I have certainly fielded many, many phone calls

3    and emails where people ask me whether or not they're genuine

4    or real, and I will refer them to the alerts as well as talk to

5    them on the phone about it, and let them know that there is

6    information out there in the public domain.

7          My agency, the OCC, has information on it.  I know the

8    Securities and Exchange Commission, or SEC, does.  The FBI

9    does.  IRS certainly does.  And there are other government --

10   federal government agencies, as well as some state and locals,

11   have determined that it's important for the public to be aware

12   that these documents exist, but they are not real.  And if --

13   and like -- I believe in the alerts that my agency has on

14   there, it actually gives a phone number and the name of a

15   person and say, If you come across these, please contact.

16   Q    And how are these alerts circulated?  Where do they go?

17   A    We send them out to all the financial institutions.  It's

18   probably electronic by now.  And then we also put them on our

19   website.  And so it's publicly published.

20         MR. NAMMAR:  Your Honor, can we put back up

21   Exhibit 4 -- or, excuse me, Exhibit 13 on the screen?

22         THE COURT:  All right.

23         MR. NAMMAR:  And can you zoom in on the first

24   paragraph.

25   BY MR. NAMMAR:

JOHNSON - RESUMED DIRECT

245

1   Q    You see the first sentence there?  I don't know if you can

2   see it up on the screen, Mr. Johnson.

3   A    I got it.

4   Q    Okay.  And then the -- are you there?

5   A    I am.

6   Q    And in the first sentence, it says:  "Payee shall, upon

7   receipt of the instrument, charge Countrywide Home Loans via

8   pass-through account."

9          Have you ever heard of such a thing as a "pass-through

10  account"?

11  A    I have.

12  Q    Okay.  What is that?

13  A    A pass-through account is typically used -- and we don't

14  like them, by the way -- is typically used in relationships

15  from domestic banks and foreign banks.  And what happens is, if

16  the foreign bank has an account at the domestic bank, but they

17  want to pay a third party, they will set up what's called a

18  pass-through account, and it's just exactly what it looks like.

19  It passes through the account.

20         And the problem with those that we discovered in -- in

21  our world is that a lot of times there's no transparency in

22  those accounts.  But they do exist.

23  Q    And who is the payee here, looking at this document?

24  A    Henry Paulson.

25  Q    Okay.  Does Henry Paulson use pass-through accounts to pay

1    off private debts like a home mortgage?

2    A    No.

3    Q    Okay.

4          MR. NAMMAR:  I'll pass the witness, Your Honor.

5          THE COURT:  All right.

6          Mr. Barbee, how much do you have, do you think?

7          MR. BARBEE:  Maybe five minutes or less.

8          THE COURT:  All right.  Let's try to finish up then.

9                      CROSS-EXAMINATION

10   BY MR. BARBEE:

11   Q    Good afternoon again, Mr. Johnson.

12   A    Good afternoon.

13   Q    Now, you talked about these fictitious documents that you

14   examined, and you've opined, at least for the exhibits that

15   were shown to you here in court, that they were fictitious.

16   A    Correct.

17   Q    Okay.  You indicated that the fictitious documents

18   frequently use items of legitimacy such as the border and the

19   name of the Secretary of Treasury, correct?

20   A    Correct.

21   Q    And persons that are holding them, you've told us,

22   sometimes don't know that these things are real or not.

23   A    The persons that initially get them -- let me make sure

24   we're clear.  What I was testifying to was that the people or

25   entities that are receiving them for payment a lot of times do

JOHNSON - CROSS (Barbee)

247

1    not know that they're not real.

2    Q    And isn't it true sometimes that the persons that are

3    holding them before they're sent somewhere will oftentimes not

4    know if they're real or not?

5            MR. NAMMAR:  Objection.  Calls for speculation.

6            THE COURT:  Sustained.

7    BY MR. BARBEE:

8    Q    Are you familiar with straw man?

9    A    I am.

10   Q    What is straw man?

11   A    A straw man is a concept that uses a -- another persona to

12   represent the person that is using them.

13   Q    Are you familiar with the term "straw man" as it relates

14   to what you've described to the jury having to do with persons'

15   Social Security numbers and the House Resolution of 1933?

16   A    I'm familiar with the term "straw man" as it relates to

17   the Redemption Theory.

18   Q    Yes.  And what is that?

19   A    An individual purportedly sets up a straw man in order to

20   conduct their business.  But in reality, that individual is

21   doing it.

22   Q    And in conjunction with the concept -- legal concept of

23   corporation, how does the straw man theory work?

24   A    My understanding is that the straw man acts kind of like

25   the corporation of the individual who set up the straw man.

JOHNSON - CROSS (Gronna)

1 Q    Okay.  Have you heard the term "sovereign" used in

2 relation to these type of fictitious documents?

3 A    I've heard the phrase "sovereign citizen" used with

4 respect to these documents, yes.

5 Q    And what does that mean?  What does that concept entail?

6 A    A sovereign citizen is described as someone who doesn't

7 believe in the authority of the U.S. Government, the court

8 system, the IRS system, the laws of the U.S.

9 Q    And in conjunction with that concept of sovereign, have

10 you or, to your knowledge, your agency, the Comptroller of

11 Currency, gained any familiarity with a person named Winston

12 Shrout?

13 A    The name is vaguely familiar.

14         MR. BARBEE:  No further questions.

15         THE COURT:  All right.  Mr. Gronna?

16         MR. GRONNA:  Yes, just very briefly, Judge.  Thank

17 you.

18                    CROSS-EXAMINATION

19 BY MR. GRONNA:

20 Q    Less than five minutes.

21         Good afternoon.

22 A    Good afternoon.

23 Q    You had mentioned some of these -- on the Mainland you're

24 familiar, you said you've seen like hundreds of these documents

25 before; is that right?

JOHNSON - CROSS (Gronna)

249

1    A    Thousands, yes.

2    Q    Thousands.  Okay.  So this -- this is not a new thing that

3    you've seen, right?

4    A    That's correct.

5    Q    In other words, the documents, these three exhibits you've

6    just seen, the bonded promissory notes and something, that is

7    actually something that's been passed over on the Mainland,

8    isn't it?

9    A    It is -- if I'm understanding your question correctly, it

10   is certainly a scheme that has -- has been found in other parts

11   of the Mainland, yes.

12   Q    Okay.  And there are individuals that promote this scheme,

13   right?

14   A    There are.

15   Q    And these individuals, they call themselves the

16   "sovereigntists," don't they?

17   A    That is one word they call themselves, yes.

18   Q    And what are the other words they call themselves?

19   A    Well, some of them call themselves President of the United

20   States.  Some are called Supreme Court Justice of the United

21   States.

22   Q    Uh-huh.  Other names that they go by?

23   A    I'm sure there are.  I'm sure I don't know all of them.

24   Q    Okay.  But those are just the ones that come to your mind,

25   right?

JOHNSON - CROSS (Gronna)

1    A    Yes.

2    Q    And this sovereignty, this is like a movement, isn't it?

3    A    I don't know if I would call it a movement.

4    Q    Well, you've seen like -- you've seen documents sort of

5    flux, don't you, given different economic times, don't you?

6    A    Rephrase the question.

7    Q    Let me rephrase the question

8         THE COURT:  And I'm afraid if you don't, he won't, and

9    the jury won't understand the answer.

10        MR. GRONNA:  Let me rephrase the question.

11   BY MR. GRONNA:

12   Q    The sovereigntists -- well, let me ask you this:  You had

13   mentioned you vaguely remember the name Winston Shrout, right?

14   A    Correct.

15   Q    Okay.  But the name has come across, you know, your radar

16   at some point in time in doing these cases, correct?

17   A    I believe so.

18   Q    And Mr. Shrout is known for doing what they call a 1099,

19   the 1099 forms, right?  You're familiar with that, aren't you?

20   A    Yeah, the 1099-OID?

21   Q    Yes.

22   A    Yes.

23   Q    And he's sort of the author of that, isn't he?

24   A    I wouldn't know that he's the author of it.

25   Q    But he promotes it, doesn't he?

1   A    If -- if you're saying he does, then yes.

2          THE COURT:  No, no, no.  Do you know yourself?

3          THE WITNESS:  I -- like I said, I know the name.  If

4   he's a promoter of 1099-OID, I don't remember.

5   BY MR. GRONNA:

6   Q    All right.  And what about the bonded promissory notes?

7   A    I believe that is more familiar to me with respect to

8   Mr. Shrout.

9   Q    Okay.  So he's known for that then, isn't he?

10  A    I --

11  Q    You know him for doing that, right?

12  A    Yes.

13  Q    Okay.  Thank you.

14         And Mr. Shrout has been doing this for how many years

15  now?

16  A    I don't know.

17  Q    When did you first learn about Mr. Shrout?  Was it before

18  2008?

19  A    I -- I don't know what date.

20  Q    Okay.  Well, how long have you been doing this for now?

21  A    I've been doing this for seven or eight years.

22  Q    Seven or eight years.  So that would actually take you

23  back to before 2008, right?

24  A    Correct.

25  Q    Okay.  And so would it be safe to say then, Mr. Shrout and

JOHNSON - CROSS (Gronna)

252

1   his activities is something that you became aware of prior to

2   2008?

3            MR. NAMMAR:  I would object as beyond the scope.

4            THE COURT:  Sustained.

5            MR. GRONNA:  All right.

6   BY MR. GRONNA:

7   Q    Now -- but at some point in time Mr. Shrout is known as

8   one of these sovereigntists, isn't he?

9            MR. NAMMAR:  Same objection.

10           THE COURT:  Sustained.

11           MR. GRONNA:  All right.

12  BY MR. GRONNA:

13  Q    Now, you had mentioned the -- the 1933 -- 1933, apparently

14  these people believed that our country had gone bankrupt; isn't

15  that right?

16  A    Correct, I did mention that.

17  Q    And in the course of -- and this -- this theory has

18  actually been promulgated prior to 2008, wouldn't it?

19  A    Yes.

20  Q    And isn't it safe to say in the course of your doing this,

21  you know, of learning how this works that -- would you say that

22  there was a larger influx of, say, bonded promissory notes

23  being sent to Mr. Paulson around 2008, just around the time

24  that the markets crashed?

25           MR. NAMMAR:  Beyond the scope.

JOHNSON - REDIRECT

253

1        THE COURT:  Sustained.

2   BY MR. GRONNA:

3   Q    Now, with regard to the -- these people that do this,

4   would you say that -- have you actually dealt with these

5   individuals before?  Have you talked to them?

6   A    No.

7   Q    You never talked with them at all about their belief

8   system and why they do it?

9   A    No.

10       MR. GRONNA:  No other questions.

11       THE COURT:  All right.  Anything, Mr. Nammar?

12       MR. NAMMAR:  One second, Your Honor.

13            (Pause in the proceedings.)

14            REDIRECT EXAMINATION

15   BY MR. NAMMAR:

16   Q    Mr. Barbee talked about how you didn't see every single

17   document in this case; is that right?

18   A    Correct.  He mentioned the three documents that we already

19   looked at.

20   Q    Okay.  And you've just given an opinion about three

21   documents, right?  Now, would your opinion -- or you just

22   testified about three documents, right?

23   A    Correct.

24   Q    Okay.  Would your opinion be the same if you were shown a

25   number of other documents with similar titles and similar

 1   characteristics?

 2   A     Yes.

 3             MR. NAMMAR:  Okay.  No further questions.

 4             THE COURT:  All right.

 5             MR. BARBEE:  No questions, Your Honor.

 6             THE COURT:  Mr. Gronna.

 7             MR. GRONNA:  (Gesturing.)

 8             THE COURT:  All right.  Sir, you may step down.  Thank

 9   you.

10                                    (Witness excused)

11             THE COURT:  All right.  Ladies and gentlemen,

12   obviously we're at the end of the day.  I do want to inform you

13   tomorrow morning I have some other business, so there's good

14   and bad news.  The bad news, we're going to get started a

15   little late.  The good news is you get to sleep in a little

16   bit.

17             So if you can be in the jury lounge at 10:15.  We'll

18   try to get started as close to that as possible tomorrow

19   morning, okay?  We won't take a morning recess.  So we're going

20   to get started and just go through.  Provided no one has a

21   bathroom emergency, we'll do that.

22             I want to remind you not to speak about the case with

23   each other or others.  Fold up your notepads, leave them on the

24   chairs.  And have a pleasant evening to each and every one of

25   you.

1          (At 4:23 p.m., the jury was excused, and the following

2     proceedings were held:)

3          THE COURT:  All right.  The jury has departed.

4          I did do some preliminary research on Rule 106, and,

5     first of all, it's not clear 106 applies to recordings, but

6     Rule 611 sort of supplants Rule 106 in this context.  So the

7     same framework applies regardless of whether it's Rule 611 or

8     Rule 106.  But it does appear to be your burden to come forward

9     with specifics as to what you want to play.

10         So, you're going to have to do that to some degree,

11    come forward with something.  We have some time to work through

12    that, it seems to me, because the case isn't near finished yet.

13    I am happy to go through a little more of this case law with

14    you tomorrow morning.  I've scheduled a 4:15 hearing in another

15    case, and I want to get started on that now.  So I don't want

16    to have a prolonged discussion on this right now.

17         But I do believe, Mr. Barbee, Mr. Gronna, it's your

18    burden to come forward and say, Here's what it is I think the

19    jury needs to hear.  Because after all, it makes sense because

20    the rule of completeness is about making sure the jury isn't

21    misled in any way.

22         Now, let me say this:  If in fact your concern is the

23    government played -- and I would understand this concern -- the

24    government played 30 minutes.  In fact, Ms. Ventura-Oliver

25    spoke for six-and-a-half hours.  And other than that

1    30 minutes, it was mainly about Hawaiian history, Hawaiian

2    culture, Hawaiian land title; that the other things that she

3    talked about, it seems to me if that's true, you're going to

4    get that out on cross-examination anyways.  It seems to me.

5         In other words, I don't think that Agent Carter would

6    deny that if that is the case, and if that's what your concern

7    really is.  So I'm not sure if we need to hear everything if in

8    fact what you need to get out is -- is possible to get out just

9    on -- on cross-examination.

10        I'm not saying I wouldn't allow more.  I'm just saying

11   if that's the limit of your concern, I think there's a way to

12   address it.  If your concern is broader than that, more

13   specific than that, and there are certain things that were said

14   that you think were out of context and need to be played to put

15   it in context, or misleading in any way and you need to play

16   something else, then obviously we'll take that up.

17        All right?

18        MR. BARBEE:  Yes.

19        THE COURT:  Okay.  Anything further then?

20        MR. TONG:  Your Honor, I would just ask that if they

21   do want other portions of the DVDs played that they identify

22   with reference to the time on the DVD what they want.  That way

23   we can look at it, and if the Court orders it, we can make

24   copies.

25        THE COURT:  Well, and I need to know what it is so I

1    can get a proffer as to what that is too, and you need to know

2    that so you can listen to it and respond.

3            MR. TONG:  Exactly, Your Honor.

4            THE COURT:  Right.  Right.  So why don't you two --

5    why don't you all talk about timing among yourselves to work

6    out timing issues as to when the defense could come back to me

7    with their specifics and give me time to rule on this, and then

8    give the government time to get the -- does that make sense?

9            MR. TONG:  No, no, it makes sense, but you're looking

10   at me, and I think really the issue is when they can be ready.

11   Because I think it will take us at least a day if they specify

12   portions.  This is not an easy task.  We spent the entire

13   weekend just selecting the excerpts.

14           THE COURT:  Okay.

15           MR. TONG:  It has to do with the way that the

16   recordings were made.  So we need lead time before our case

17   ends.  So I think the Court should probably give them a

18   deadline.  I don't really care if it's the end of this week or

19   whatever, because I think we're going into next week.

20           THE COURT:  Why don't you -- what I'm saying is,

21   though, I think -- why don't you folks talk among yourselves,

22   see if you can agree on something, and we'll talk about this

23   again tomorrow morning.

24           MR. TONG:  Okay.

25           THE COURT:  And then you can tell me what you agree

1  on, okay?  Because it's your schedules and your time right now.

2  If you can work it out to where you think there's enough time

3  within your case and then for you to get the recordings

4  together, Mr. Tong, then that's fine with me.  But I need time

5  also to listen to whatever is required to rule.

6      MR. TONG:  I completely understand, Your Honor.

7      THE COURT:  Okay.  All right.  Thank you.  We're in

8  recess for the evening.

9      (The proceedings concluded at 4:27 p.m.,

10  October 8, 2013.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing pages numbered 1 through 258

6    is a true, complete and correct transcript of the proceedings

7    had in connection with the above-entitled matter.

8

          DATED at Honolulu, Hawaii, January 6, 2014.

9

10

11                    _____*/s/ Cynthia Fazio*_____
                      CYNTHIA FAZIO, CSR, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25