1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,      ) CRIMINAL NO. 11-00503JMS
4                                   )
                 Plaintiff,         ) Honolulu, Hawaii
5                                   ) October 16, 2013
            vs.                     ) 8:57 a.m.
6                                   )
     (01) MAHEALANI VENTURA-OLIVER ) FURTHER JURY TRIAL - DAY 9
7    (03) PILIALOHA K. TEVES,       )
                                    )
8                Defendants.        )
     _____ )
9

10                       TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:        LAWRENCE L. TONG, ESQ.
                                MICHAEL DAVID NAMMAR, ESQ.
14                              Office of the U.S. Attorney
                                PJKK Federal Building
15                              300 Ala Moana Blvd., Suite 6100
                                Honolulu, Hawaii  96850
16

17   For Defendant             RUSTAM A. BARBEE, ESQ.
     Ventura-Oliver:           Attorney at Law
18                             1188 Bishop Street, Ste. 2606
                               Honolulu, Hawaii  96813
19

20   For Defendant Teves:      RICHARD D. GRONNA, ESQ.
                               Attorney at Law
21                             841 Bishop Street, Suite 2201
                               Honolulu, Hawaii 96813
22

23   Official Court            Cynthia Fazio, CSR, RMR, CRR
     Reporter:                 United States District Court
24                             P.O. Box 50131
                               Honolulu, Hawaii  96850
25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1 <u>I N D E X</u>

2

3 <u>EXAMINATIONS</u>                                              <u>PAGE</u>

4 STEVEN CARTER..........................................
     CROSS-EXAMINATION BY MR. BARBEE....................  25
5    CROSS-EXAMINATION BY MR. GRONNA....................  32
     REDIRECT EXAMINATION BY MR. TONG..................  33
6    RECROSS-EXAMINATION BY MR. GRONNA.................  36

7 JOHN OLIVER............................................
     DIRECT EXAMINATION BY MR. TONG....................  38
8    VOIR DIRE EXAMINATION BY MR. BARBEE............... 103
     RESUMED DIRECT EXAMINATION BY MR. TONG............ 104
9    VOIR DIRE EXAMINATION BY MR. BARBEE............... 130
     RESUMED DIRECT EXAMINATION BY MR. TONG............ 130
10   VOIR DIRE EXAMINATION BY MR. GRONNA............... 138
     RESUMED DIRECT EXAMINATION BY MR. TONG............ 140
11   CROSS-EXAMINATION BY MR. BARBEE................... 152
     CROSS-EXAMINATION BY MR. GRONNA................... 191

12

13

14                        E X H I B I T S

15 GOVERNMENT'S:                                            <u>PAGE</u>

   1-W was received in evidence........................  28
16 1 was received in evidence..........................  50
   18-A was received in evidence....................... 104
17 30-B was received in evidence....................... 119
   30-C was received in evidence....................... 120
18 1-Q was received in evidence........................ 130
   1-R was received in evidence........................ 132
19 1-N was received in evidence........................ 133
   1-P was received in evidence........................ 140
20 32-A was received in evidence....................... 149

21

22

23

24

25

```
 1   WEDNESDAY, OCTOBER 16, 2013                        8:57 A.M.
 2              (The following proceedings were held in open court out
 3   of the presence of the jury:)
 4              THE COURT:  All right.  So we are on the record, jury
 5   is not present, with counsel, defendants and case agents.
 6              I'd asked to meet a little bit early to go over a
 7   couple matters, but let's start with you, Mr. Barbee, and
 8   whether you heard from Mr. Dyer and where the matter stands
 9   with him.
10              MR. BARBEE:  Yes, Your Honor.  I did receive a text
11   from Mr. Dyer yesterday evening approximately 9:00 p.m. Hawaii
12   time, which would be maybe midnight his time, saying that he
13   had not been paid the retainer fee and that he was not flying
14   to Hawaii today.
15              THE COURT:  All right.  So, Ms. Ventura-Oliver, that's
16   sort of that for now.  If he gets paid and he wants to come,
17   he's welcome, but at this point in time...
18              DEFENDANT VENTURA-OLIVER:  I understand.  As far as I
19   know, there's money being wired today.
20              THE COURT:  Okay.  All right.  And if that -- if that
21   happens and he can get here, great, but lawyers don't work for
22   free and for the most part, unless they're court-appointed, of
23   course, from your perspective.
24              MR. BARBEE:  And we trust that the federal government
25   will be paying us eventually.
```

 1          THE COURT:  We all feel that way, that eventually
 2   we'll get our paychecks.
 3          All right.  So I don't think there's anything else at
 4   this point in time to take up regarding that matter.  I did
 5   want to have -- I definitely want to have a discussion with the
 6   jury today about timing.  It looks like the government, if it
 7   will not wrap up today, will be very close to wrapping up today
 8   is my understanding.
 9          Mr. Gronna, you had indicated -- obviously you don't
10   have to make any decision as to your own client at this point.
11   I'm not --
12          MR. GRONNA:  Yes.
13          THE COURT:  -- suggesting in any way you do.  You had
14   indicated you did not believe there would be any witnesses, and
15   no final decision had been made as to Ms. Teves.
16          MR. GRONNA:  I don't plan on having any witnesses.  I
17   think the witnesses that would be called would be incorporated
18   through those witnesses that, to the extent that
19   Ms. Ventura-Oliver may have some, they would essentially be
20   incorporated into -- into Ms. Teves.
21          THE COURT:  All right.
22          MR. GRONNA:  And I'm still discussing with her her
23   rights to testify or not testify.
24          THE COURT:  Okay.  All right.  So, Mr. Barbee, let me
25   turn to you then.  How long do you see your case at this point?

 1          MR. BARBEE:  At this point I have filed or, again,

 2    given copies to counsel a supplemental witness list, numbers 30

 3    through 36, and I believe that they would be all fairly quick

 4    witnesses, perhaps four hours for all of them.  And then yet to

 5    be decided is whether or not the defendant elects to testify.

 6    I've advised her numerous times of her constitutional right to

 7    testify and not to testify, and she wants to wait making a

 8    final decision until after the government rests its case.

 9          THE COURT:  That's fine.  And I want to make it clear,

10    I'm not -- I understand that that's a decision that you have up

11    until the very end to make, and I'm not putting any pressure on

12    you or your clients to make that decision now.  I want you to

13    be able to consult with them up until the very last minute to

14    make a decision on that.

15          MR. BARBEE:  Mm-hmm.

16          THE COURT:  And that's appropriate, and I'm not

17    suggesting otherwise.  But putting aside then the possibility

18    of your client testifying, you think you'll need about

19    four hours' worth of time?

20          MR. BARBEE:  Yes.  And even if she does testify, I

21    think we would be complete with all witnesses most likely in

22    one day.

23          THE COURT:  Okay.  So your case would be one day max

24    is the way you see it now.

25          MR. BARBEE:  That's the way I see it.

```
 1            THE COURT:  Okay.  So I think what I need to tell the
 2    jury is, that it's likely we'll go into next week.  But it's a
 3    little unclear right now whether or not we would -- because it
 4    seems unlikely to me we would finish by Friday in time to
 5    instruct and close.  Right?
 6            So, because if we could instruct and close on Friday,
 7    I'd have them come in on Monday to deliberate.  But I think
 8    what I'll tell them is it looks like the trial could go into
 9    Tuesday, maybe Wednesday on the outside, and then see if anyone
10    has any issues with that.  And if so, we'll have to take that
11    up.  But we do have three alternates, so we should be in pretty
12    good shape, hopefully.
13            Is that agreeable --
14            MR. BARBEE:  Yes.
15            THE COURT:  -- as far as process?
16            MR. BARBEE:  Yes, Your Honor.
17            MR. GRONNA:  Yes.
18            MR. TONG:  Yes, Your Honor.
19            THE COURT:  All right.
20            MR. TONG:  I think -- I think we may spill into
21    tomorrow.  So, we'll take the morning.
22            THE COURT:  Okay.
23            MR. TONG:  I wouldn't want them to get their hopes up
24    or --
25            THE COURT:  Yes.
```

1          MR. TONG:  -- absolutely sure we'd be done on Friday.

2          THE COURT:  All right.  All right.  So I will tell

3    them we will spill in, it looks like at least a few days next

4    week.

5          THE CLERK:  And to make sure they know, no court on

6    Monday.

7          THE COURT:  No what?

8          THE CLERK:  Monday, no trial on Monday.

9          THE COURT:  Yeah, right, no court on Monday.  All

10   right.

11         Now, Mr. Tong, did you have anything to raise before

12   the jury comes in?  Mr. Nammar?

13         MR. NAMMAR:  Yes, two quick issues.  They both relate

14   to John Oliver.  One of them is that we've been informed by

15   Mr. Barbee that he plans to bring up a conviction that

16   Mr. Oliver has, and we learned that yesterday.  It's an abuse

17   of a family/household conviction.  It's a misdemeanor.  It's

18   not admissible in our minds under 609 because it's not a felony

19   and it also doesn't involve an act of dishonesty or false

20   statement.

21         THE COURT:  So give me the -- do you have the statute,

22   by any chance?

23         MR. NAMMAR:  I do, Your Honor.

24         THE COURT:  And I can just take a look at that.  That

25   won't happen before this morning's break, right, so I can look

1   at it later, right?

2            MR. NAMMAR:  Yes.  It's 709-906.

3            THE COURT:  906.  And it's a misdemeanor, is that what

4   you're saying?

5            MR. NAMMAR:  Subsection (5) tells you that it's a

6   misdemeanor.  The actual violation is Subsection (4)(b).

7            THE COURT:  (4)(b).

8            MR. NAMMAR:  And what that is, is -- my understanding

9   of reading the statute and looking at the PSR, is if an officer

10   comes to someone's house and they have reasonable suspicion,

11   they can say within, you know, 24 hours, you can't come near

12   this particular person, and he violated that 24-hour rule.

13            THE COURT:  And when was this?

14            MR. NAMMAR:  October of 2004.

15            MR. BARBEE:  I believe the offense date is October

16   '04.  Conviction date is somewhere in '05, I think February

17   '05.

18            MR. NAMMAR:  That's right.

19            THE COURT:  All right.  So what I prefer to do is --

20   Mr. Barbee, you won't need this right away, correct?

21            MR. BARBEE:  No.

22            THE COURT:  All right.  What I prefer to do is look at

23   the statute during a break, and then we can have some further

24   discussion at a minimum sidebar, but don't get into it without

25   at least a sidebar, Mr. Barbee.

1            MR. BARBEE:  Yes, Your Honor.  And I'll let Mr. Nammar

2    finish, but there is one more area of impeachment I wanted to

3    discuss with the Court very quickly.

4            THE COURT:  All right.

5            MR. NAMMAR:  And I have a copy of the statute, Your

6    Honor, that I don't need.

7            THE COURT:  Oh, okay.  You can give that to

8    Ms. Greaney.  That'll be useful.

9            MR. NAMMAR:  (Handing document.)

10           THE COURT:  And do you agree that's what he was

11   convicted of, the 709-906(4)(b)?

12           MR. NAMMAR:  I do.

13           THE COURT:  No, no, I'm talking to Mr. Barbee.  I'm

14   sorry.  Thank you for that, Mr. Nammar.

15           MR. BARBEE:  Yes, Your Honor.  I have it right here.

16   Just looking over --

17           MR. TONG:  I agree with Mr. Nammar, too.

18           MR. BARBEE:  I had it right here.  Let me see if I can

19   grab it real quick.

20           What I've got, Judge, is I've got the judgment of

21   conviction and probation form.  It doesn't have the statutory

22   section.  However, the bail order reads HRS 709-906 without a

23   sub.

24           THE COURT:  So where did you get your sub from?

25           MR. NAMMAR:  I got the draft PSR that I have looked at

1    says the violation is a 24-hour warning citation.  So, I looked

2    at the statute and that's where I got the sub.

3            THE COURT:  I see.  All right.  Okay.  Well, I will

4    take a look at that.

5            So, why don't we go forward to whatever the other

6    issue regarding impeachment.

7            MR. BARBEE:  Yes, Your Honor.

8            Is that it?

9            MR. NAMMAR:  Yeah.

10           MR. BARBEE:  Okay.  The other area of impeachment also

11   came up in the presentence report, Mr. Oliver's presentence

12   report.  And in the report it has a result of the psychological

13   assessment by Dr. Turnbull on Page 27 and a self-reporting

14   substance abuse issue reported to the Probation Office in

15   preparation of this presentence report.  The probation officer,

16   I guess, is --

17           MR. TONG:  Ellie.

18           MR. BARBEE:  Okay.  Ellie Asasaki apparently.  And he

19   reports that he had an alcohol abuse issue and stopped drinking

20   in 2004, which would have been the evening before his arrest

21   for the abuse case that we have a conviction for.

22           Secondly, he has reported to Dr. Turnbull that he

23   previously used cocaine, hallucinogens and marijuana, which

24   impacted his life.  And that he ceased using cocaine in

25   approximately 2005.

1          So just to inquire the Court that if that is a

2    permissible area of impeachment, I would propose to ask him if

3    he used illegal drugs in 2005 and prior, and if he denies it,

4    then impeach him with it, with his statements.  If he admits

5    it, just leave it alone.

6          THE COURT:  All right.

7          MR. NAMMAR:  Your Honor, it -- there's no conviction

8    for that, so it's not 609.  It's not 608(b) because it doesn't

9    deal with truthfulness.  And as far as, you know, if he were to

10   say something in direct testimony where we asked him a

11   question, if he were to reference, you know, I've never done

12   any drugs, then I would agree under 607, impeachment by

13   contradiction, he could bring it up.  But as far as just

14   bringing it up out of thin air, I think it's 403, Your Honor,

15   and it's very prejudicial to the witness to bring up past drug

16   use.

17         THE COURT:  Well, I mean the problem -- I assume you

18   join in the --

19         MR. GRONNA:  Yes.

20         THE COURT:  -- in Mr. Barbee's request --

21         MR. GRONNA:  Yes, I do.  Thank you.

22         THE COURT:  -- for the record.  Okay.

23         The problem I have with this is, as I understand the

24   evidence, and I'll wait and hear to see if the scope of the

25   time period in which he testifies, and then -- so I'm going

1   to -- I'm going to sort of deny you without prejudice,

2   Mr. Barbee, the right to do this.  Meaning you can raise it at

3   sidebar again.

4         If there is testimony where he is recalling events

5   that occurred during that time period he was using cocaine,

6   fair enough it seems to me.  I think there's plenty of case law

7   that says you can -- you can -- as to memory, ability to

8   recall, you can ask the witness about alcohol use, drug use,

9   anything that might impair their ability to recall events from

10  that time period.

11        But I don't know of any relevance if all he talks

12  about is sort of 2008 forward, for instance, of getting into

13  that 2005 time period.  But I'll hear you at sidebar.  I'd like

14  to wait and hear the evidence and put all of this in context.

15        MR. BARBEE:  Yes, Your Honor.

16        THE COURT:  Okay?  So that's sort of my preliminary

17  view on that.

18        All right.  Anything else then before we bring in the

19  jury?

20        MR. GRONNA:  Yeah, we do -- I do have one very quick

21  manner.  Ms. Teves' submissions to her foreclosure, I went back

22  and I renumbered those in sequence to when she got letters from

23  CPB, her response, then the letters from the lawyers, her

24  response, and then the filing of the Notice of Pendency of

25  Action, and then her pleadings that she filed in the circuit

1    court of the Third Circuit in relation to that up until -- I

2    think the last filing was in February of 2009.

3            And so I've provided that to Mr. Nammar.  We'll have

4    the actual Bates stamps on those -- on those submissions.  I've

5    actually -- unfortunately, I don't have anything other than

6    just the Post-Its, but I have essentially renumbered those

7    exhibits.  So, we -- we have those put together, and we should

8    have -- well, they are basically at this point --

9            THE COURT:  Do you want to do an oral stipulation

10    before the jury regarding that?  A written stipulation?  How do

11    you want to handle it?

12            MR. GRONNA:  An oral stipulation is fine, Your Honor.

13    I mean that's -- if the government is good with that, we'll

14    stipulate that these are the documents and --

15            MR. NAMMAR:  That's fine, Your Honor.

16            THE COURT:  Okay.

17            MR. NAMMAR:  We're going to have them marked, our

18    office, so they'll be marked according to Mr. Gronna's request.

19            THE COURT:  Okay.  So when will you have that done?

20            MR. NAMMAR:  I think after lunch.

21            THE COURT:  After lunch.  All right.  So after lunch

22    you want to look at what the government's done --

23            MR. GRONNA:  Yes.

24            THE COURT:  -- make sure it all looks good, and then

25    I'll let you folks put the stipulation on the record, and you

1   can move for admission, Mr. Gronna --

2          MR. GRONNA:  Yes.

3          THE COURT:  -- at that point, okay?

4          MR. GRONNA:  Yes.  There may be some documents I may

5   be asking Mr. Oliver about pertaining to some of the filings

6   that Ms. Teves made.

7          THE COURT:  Well, you can still do that, and we can

8   make it -- if he testifies before its admission for some

9   reason, you can certainly use that.

10         MR. GRONNA:  Perfect.  Good.

11         THE COURT:  All right.

12         MR. GRONNA:  Thanks.

13         MR. NAMMAR:  And I know you probably want to bring the

14  jury in, but regarding the marital privilege -- I mean we can

15  talk about it at the break.  I looked at some of the cases you

16  talked about yesterday.  I can talk about it now or if Your

17  Honor wants to bring the jury in.

18         THE COURT:  Well, I -- I think, again, it's so

19  contextual.  You know, it's so contextual as to whether or not

20  a statement is in furtherance or not.

21         MR. NAMMAR:  Well, I guess I don't under- -- I read

22  through the cases, I read through *Montgomery* and *Marashi*, which

23  I think is the other one, and -- and what I understand them to

24  say is that the marital communication privilege does not apply

25  when statements are made in furtherance, like Your Honor was

1    saying.  But I don't read that as saying that's an element.  I

2    don't read it as saying it has to be in furtherance.  And

3    because when I think you --

4           THE COURT:  Well, I -- I'm so finding that's an

5    element.

6           MR. NAMMAR:  Okay.

7           THE COURT:  So get beyond that.  It's an element.

8           MR. NAMMAR:  Okay.

9           THE COURT:  In my courtroom it's an element.

10          MR. NAMMAR:  And if Your Honor finds that it's an

11   element, then that's Your Honor's ruling.

12          THE COURT:  Right.  I think that's pretty clear.  To

13   me.  It's required.  If it's not in furtherance in some way --

14   they didn't have to use that language in *Marashi*.  I mean I

15   think Mr. Tong picked up on that.  They talked about -- if I

16   can find the language -- about what other circuits have ruled,

17   and they say every other circuit has looked at this, has talked

18   about it not applying to communications -- quote:  Having to do

19   with present or future crimes in which both spouses are

20   participants.

21          MR. NAMMAR:  And --

22          THE COURT:  And then they say, quote, after further

23   discussion:  Thus, we join our sister circuits in holding -- so

24   this is a holding by the Ninth Circuit -- that the marital

25   communications privilege does not apply to statements made in

1    furtherance of joint criminal activity.

2         They came up with that "in furtherance."  They didn't

3    cite that language when they were sort of discussing what other

4    circuits held.

5         So, it seems to me -- you know, they say we join, and

6    I understand that.  But they either read that furtherance --

7    "in furtherance" element into the other cases, other circuit

8    cases, or they have adopted that within the Ninth Circuit

9    framework.

10        MR. NAMMAR:  And when you look at, in particular one

11   of the cases they cite, which is *Parker* from the Fourth

12   Circuit, what it says is:  "When you have joint -- the joint

13   participation exception applies when statements are made in the

14   course of successfully formulating and commencing a joint

15   criminal activity."

16        And I think that's -- when we're talking about

17   discussions between husband and wife about whether they should

18   continue what they're doing, there may be an argument that's

19   not in furtherance, but it's clearly formulating their scheme

20   and continuing their scheme.

21        THE COURT:  No, I think it is in furtherance if -- if,

22   hypothetically, one spouse says, You know, I'm not sure that we

23   should continue to engage in this criminal activity.  Not this

24   case, some other criminal activity someone is engaged in, a

25   husband and wife have been engaged in.  And I'm not sure we

1   should continue with this.  It's starting to bother me.  I'm

2   thinking maybe we'll get caught.

3          And that's all that's said at that point in time.  I

4   don't necessarily see that in furtherance.

5          But if the response to that is, You know, you're

6   right.  We really need to be more careful going forward about

7   covering our tracks.  Then it becomes in furtherance, it seems

8   to me, at that point in time.  "In furtherance" can be how not

9   to get caught.  "In furtherance" can be how to cover your

10  tracks.  "In furtherance" can be we can't do this to 800

11  people, we can only do it to 200 people.  That's still in

12  furtherance.  It may cut back on the criminal activity, but it

13  seems to me that's still in furtherance of that joint activity,

14  discussing the parameters of it and how you go forward with it.

15         So I agree with you, Mr. Nammar, to that degree.  So

16  it's all very contextual, it seems to me, in the end as to

17  whether it is in furtherance or not.

18         MR. NAMMAR:  I understand.

19         THE COURT:  I don't know that I can rule any more than

20  that without hearing testimony.

21         MR. NAMMAR:  Right.  Right.

22         MR. TONG:  Your Honor, we accept your ruling.  I just

23  want to raise one point.

24         THE COURT:  Thank you.

25         MR. TONG:  Graciously accept it.

1          THE COURT:  Yes, thank you.

2          MR. TONG:  With regard to Count 17, which is the money

3    laundering, I think you already know basically they took the

4    funds from the Hawaiiloa Foundation account, and after the bond

5    didn't work to pay off the credit card, they used a check.

6          THE COURT:  So that is the Hawaiiloa Foundation check

7    for 17,000 and change.

8          MR. TONG:  Yes.  Yes.  10,000.

9          THE COURT:  Or 10,000 and change.

10         MR. TONG:  Yes.  I just want to make clear that it's

11   my position any discussions between the two of them concerning

12   the usage of that check would be in furtherance because they

13   basically used that check as a means of committing the

14   violation that is alleged in Count 17.  So I just want to raise

15   that with the Court.  I will be asking about that.

16         THE COURT:  Okay.  All right.

17         MR. TONG:  Thank you.

18         THE COURT:  All right.  So can we bring the jury in?

19         THE CLERK:  Yes, Your Honor.

20         THE COURT:  All right.  Your first witness is going to

21   be Agent Carter?

22         MR. TONG:  We've agreed Mr. Barbee will cross-examine

23   Agent Carter and introduce the excerpts that he wants to play.

24         THE COURT:  Okay.  So I will tell the jury then -- you

25   can go -- I will tell the jury that, If you may recall, there

 1   was no cross-examination of Agent Carter when he first

 2   testified, and that you reserved that for later and you're

 3   going to do your cross-examination, and then we're going to go

 4   back into a recall --

 5           MR. BARBEE:  Right, Your Honor.  And then I guess

 6   the -- play the excerpts, hand them the transcripts, and then

 7   admit them, admit the real evidence, the recordings as -- by

 8   stipulated -- stipulation.

 9           THE COURT:  All right.  And I'll remind the jury the

10   transcripts are not evidence.

11           MR. BARBEE:  Okay.  One of the clips does not have a

12   transcript.  It's the very last one, so...

13           THE COURT:  All right.  Well, you can explain that to

14   the jury.  Okay.

15           MR. BARBEE:  Okay.

16           THE COURT:  About -- this is about half an hour total?

17           MR. TONG:  Maybe 45 minutes, Your Honor.

18               (Pause in the proceedings.)

19           MR. TONG:  Oh, and, Judge, just so we're clear, we

20   decided not to call Ms. Dougan as a witness.  So she will

21   remain in the courtroom during Agent Carter's testimony.

22           THE COURT:  All right.  And that really moots out --

23           MR. TONG:  Yes, it does.

24           THE COURT:  -- the entire issue that we discussed

25   earlier about dual case agents and designation seems to me.

 1          MR. TONG:  And we accept your ruling on that.

 2                    (Pause in the proceedings.)

 3          THE COURT:  Mr. Barbee, looking at 709-906, the

 4   Sub (5) says:  "Abuse of a Family or Household Member and

 5   refusal to comply with the lawful order of a police officer

 6   under Subsection (4) are misdemeanors."

 7          So there's two different ways it can be a misdemeanor.

 8   As I understand, the government is saying it's the second part,

 9   "the refusal to comply with the lawful order"; is that right,

10   Mr. Nammar?

11          MR. NAMMAR:  Yes, Your Honor.

12          MR. BARBEE:  There's what I understand from looking at

13   the complaint is that it's alleged that he -- there was a TRO

14   issued against him by his wife Mahealani Ventura-Oliver.  That

15   the police were called to respond to a complaint of abuse.

16   That they served him with a 24 notice -- a 24-hour notice to

17   vacate the premises and not return.  The cooling-off period

18   that the State of Hawaii statutes provide.  And that he refused

19   to obey the officers.

20          THE COURT:  All right.

21          MR. BARBEE:  So it would be --

22          THE COURT:  For purposes of me determining this, what

23   I don't know, and I have to look at the law, is whether, you

24   know, it sort of gets into the categorical, the modified

25   categorical approach whether you can separate a statute.  But

```
 1    it seems like there's consensus that the conviction was for the
 2    refusal to comply with the lawful order of a police officer
 3    under Subsection (4).
 4              MR. BARBEE:  That's our understanding.
 5              MR. NAMMAR:  Yes, Your Honor.
 6              THE COURT:  And so stipulated.
 7              MR. NAMMAR:  So stipulated.
 8              MR. BARBEE:  Yes, Your Honor.
 9              THE COURT:  All right.  For purposes of when I go back
10    and look at this.
11              MR. BARBEE:  Yes, Your Honor.
12              THE COURT:  All right.  Thank you.
13                   (Pause in the proceedings.)
14              (The following proceedings were held in open court in
15    the presence of the jury:)
16              THE CLERK:  Criminal Number 11-00503, United States of
17    America versus defendant number 1, Mahealani Ventura-Oliver;
18    defendant number 3, Pilialoha K. Teves.
19              This hearing has been called for further jury trial,
20    day 9.
21              Your appearances for the record, please.
22              MR. TONG:  Good morning, Your Honor.  Good morning,
23    ladies and gentlemen.  Larry Tong and Michael Nammar for the
24    United States.  With us are Special Agent Malia Dougan of the
25    IRS and Special Agent Steve Carter of the FBI.
```

    1            THE COURT:  Good morning.

    2            MR. BARBEE:  Good morning, everyone.  Rustam Barbee

    3    appearing with Mahealani Ventura-Oliver, present in court.

    4            THE COURT:  Good morning.

    5            MR. GRONNA:  And good morning, Your Honor.  Richard

    6    Gronna appearing on behalf of Pilialoha Teves, and we're here

    7    this morning.

    8            THE COURT:  All right.  Yes, good morning.

    9            And good morning, ladies and gentlemen.  Hope everyone

   10    really had a pleasant evening.

   11            Before we get started -- you may be seated.  Thank

   12    you.

   13            Before we get started, I did sort of want to tell you

   14    where we stand time-wise and what the schedule looks like.

   15            Trials as they get near the end get a little bit hard

   16    to predict as far as timing for various reasons.  But it looks

   17    unlikely that we'll finish this week.  So we're likely to go

   18    into next week.  Now, Monday is the day we're off, and so we

   19    come back Tuesday, Wednesday, next week will be sort of the

   20    schedule.

   21            If anyone here has a real hardship with that, because

   22    I know that goes a little beyond what I told you the planned

   23    time was, let me know.  And you don't have to answer right now.

   24    If you need to make a phone call or something during the lunch

   25    hour, you can get your phone and do that, and we can have a

1   discussion a little bit later.  But, you know, if someone, for

2   instance, has a paid vacation, I want to know that.  Those sort

3   of things, okay?

4          So, that's where things stand.  It looks like we'll go

5   into next week.  Monday, we would not have court because that's

6   the day I do a lot of other things and I'm tied up all day

7   doing other hearings in different cases.  And then we'd come

8   back Tuesday and Wednesday.  And of course, I can't control how

9   long your deliberations are, neither can any one of you.

10  That -- that's a group dynamic as far as how long your

11  deliberations take, which of course can go on.

12         So it could be, you know, throughout the week next

13  week.  All right?  With Monday, of course, being a day we will

14  not be in court.  All right?  And we'll have a little further

15  discussion then, and anyone can let me know later if you have

16  any real hardships, okay?

17         All right.  So, as I understand, Agent Carter is going

18  to be taking the stand next.  So there are two things I want to

19  explain to you.

20         One is I gave the government permission to call Agent

21  Carter twice; first to play the tapes and then to come back and

22  provide some other testimony.  So he is going to do that.

23         But also, if you recall, when he testified the first

24  time, I allowed Mr. Barbee and Mr. Gronna to reserve their

25  cross-examination of him until he was called back.  And so what

```
 1    we're going to do is, we're going to start with that
 2    cross-examination.  Do you remember before the tape was played
 3    and you got a transcript when Agent Carter was on the stand
 4    before.  And as I understand it, some more excerpts from those
 5    meetings are going to be played for you.  You'll get a
 6    transcript, as I understand, for most but not all.
 7              Is that right, Mr. Barbee?
 8              MR. BARBEE:  All but the last one.  I think there's a
 9    total of four.
10              THE COURT:  Okay.
11              MR. BARBEE:  First three should have transcripts, the
12    very last does not have a transcript.
13              THE COURT:  Okay.  So you'll have transcripts for
14    three of the four portions that are going to be played.  I
15    remind you when you have these transcripts, the transcripts are
16    not evidence.  The evidence is the recording itself.  If you
17    notice any differences between what's on the transcript and
18    what you hear, what you hear controls.  The transcript is not
19    controlling.  It is not evidence.  Okay?
20              MR. BARBEE:  Excuse me, Your Honor.  There's actually
21    five, so the first four have transcripts, the last one doesn't.
22              THE COURT:  All right.  Thank you.
23              Then when that is concluded, then the government will
24    essentially be calling him back on the stand, although stay on
25    the stand, and ask some more questions, and then defense will
```

1   be entitled to cross him again.

2         Do I have that right?

3         MR. TONG:  We're going to have one other witness, and

4   then he'll come back on the latter part of his testimony.

5         THE COURT:  Okay.  So this right now would just be --

6         MR. TONG:  Is just the cross-examination, yes.

7         THE COURT:  Okay.  Very well.  Thank you.

8         So, Agent Carter, you can come back up.

9         All right.  Because this is just a continuation of

10  your cross-examination, I will not have you take the oath

11  again, but I do remind you you are still under oath from your

12  direct examination.

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  All right.

15                    STEVEN CARTER,

16  called as a witness by the Government, having been previously

17  sworn, was examined and testified as follows:

18        THE COURT:  All right, Mr. Barbee.

19        MR. BARBEE:  Thank you, Judge.

20                    CROSS-EXAMINATION

21  BY MR. BARBEE:

22  Q    Good morning, Special Agent Carter.

23  A    Good morning.

24  Q    Directing your direction to your testimony, I guess it was

25  last week, you testified that in an undercover capacity you

1    attended two of the Cameron Center seminars or meetings.

2    A    Yes, I did.

3    Q    First on November 9th, 2008, and then November 16, 2008,

4    correct?

5    A    That's correct.

6    Q    And during your direct testimony, portions of the

7    recordings that you made undercover were played for the jury,

8    correct?

9    A    They were.

10    Q    Okay.  In fact, on November 9th, the total recording time

11    was approximately three hours?

12    A    Approximately.

13    Q    And on November 16th, the total recording time was about

14    three-and-a-half hours?

15    A    That's correct.

16    Q    Okay.  So what was played for the jury last week was just

17    excerpts of those two meetings totalling six-and-a-half hours.

18    A    Yes.

19    Q    Okay.  Referring you to November 16th, 2008, do you recall

20    activating the recording device upon your arrival at the

21    Cameron Center?

22    A    Yes, I did.

23    Q    And at that time you went in to sign in on some sort of a

24    sign-in sheet; is that correct?

25    A    On the 16th, yes.

1   Q    And then you entered the Cameron Center hall and a person

2   approached you and started talking to you, correct?

3   A    Yes.

4   Q    And that person was later identified or, I guess, you've

5   identified that person who was talking to you as John Oliver,

6   correct?

7   A    Yes, I did.

8   Q    Okay.

9        MR. BARBEE:  At this point, Your Honor, we would ask

10   permission to publish by stipulation Exhibit 1-U.1.

11        THE COURT:  Wait, 1-U.1.  Is that right?

12        MR. BARBEE:  And by stipulation.

13        THE COURT:  All right.  So that is the --

14        MR. TONG:  Well, Your Honor, I think what we would

15   agree to is the playing of the recording itself as the

16   evidence, and the use of 1-U.1 to help the jury follow the

17   recording.

18        MR. BARBEE:  Does the recording already have a number?

19        MR. TONG:  The recording is entitled "File Session 3

20   all for November 16, 2008."

21        THE COURT:  Okay.  So we need to admit whatever

22   recording.

23        MR. TONG:  Yes.  I think if asked, Agent Carter would

24   testify that upon the request of the defense, he loaded onto a

25   DVD various recordings requested by the defense.  They have

1    been marked as Exhibit 1-W.  And by stipulation of the parties,

2    we would agree to the admission of 1-W and the use of the

3    transcripts to help the jury.

4            THE COURT:  All right.

5            MR. BARBEE:  I stand corrected, Your Honor.  We would

6    stipulate to the admission of DVD disk 1-W.

7            THE COURT:  1-W.  All right.  And --

8            MR. BARBEE:  I believe it contains all five of the

9    sessions, all five of the excerpts.

10           THE COURT:  All right.  Mr. Gronna, I assume you're

11   onboard with that?

12           MR. GRONNA:  Yes, Your Honor.

13           THE COURT:  All right.  So 1-W is admitted by

14   stipulation.

15           And then I will permit, Mr. Barbee, you to provide

16   Ms. Greaney to provide the transcripts so they can follow

17   along.  And, Mr. Barbee, you can just tell them which

18   particular transcript to open to at what time.

19        (Government's Exhibit 1-W was received in evidence.)

20           THE COURT:  So the first one would be 1-U.1,

21   Mr. Barbee?

22           MR. BARBEE:  Correct.  Of Exhibit 1-W, the first

23   transcript pertains to 1-U.1.

24           THE COURT:  All right.

25           MR. BARBEE:  Which should be the first page of the

 1    transcripts.

 2               THE COURT:  All right.  Is everyone there?

 3               Yes, I'm seeing heads shake up and down.  All right.

 4               So are we prepared to play that then?

 5               MR. BARBEE:  Yes, Your Honor.  Could we publish it?

 6               THE COURT:  Yes.

 7               Agent Dougan, if you could queue that up.

 8                    (Government's Exhibit 1-W played.)

 9               THE COURT:  All right.

10    BY MR. BARBEE:

11    Q    And then, Agent Carter, after this period of time on

12    November 16th, 2008, Mr. Oliver continued to discuss issues

13    with you, did he not?

14    A    Yes, it was one conversation.

15    Q    Okay.

16               MR. BARBEE:  I would ask that we queue and publish

17    U1-2.  Hopefully, that's the next page on your transcript.

18               THE COURT:  Yes.  All right.  So you can turn to

19    1-U.2.  And queue up Session 4, it looks like.

20                    (Government's Exhibit 1-W played.)

21    BY MR. BARBEE:

22    Q    Special Agent Carter, these last two excerpts occurred

23    before the meeting on November 16th, 2008?

24    A    Before the general meeting started?

25    Q    Yes.

1   A    Yes.

2   Q    And you subsequently record -- continued to record after

3   the general meeting, did you not?

4   A    I did.

5   Q    And I direct your attention to a time that you left the

6   hall and, I believe, went outside the Cameron Center and sat on

7   a bench or on a chair.  Do you recall that?

8   A    Yes, after the seminar was completed?

9   Q    Yes.

10   A    Yes.

11   Q    And at that time you were able to record -- continue

12   recording with John Oliver and other individuals who

13   participated in the -- in the conversation.

14   A    Yes, I was sitting -- seated near him, John.

15   Q    Okay.  I would direct -- I would direct your attention to

16   1-U.7.

17          MR. BARBEE:  And ask if that could be published to the

18   jury, Your Honor.

19          THE COURT:  Yes.  So you can open up to the next

20   Page 1-U.7.

21          MR. BARBEE:  Yeah, so 1-U.7, the third excerpt.

22          THE COURT:  All right.  You can play that.

23          (Government's Exhibit 1-W played.)

24   BY MR. BARBEE:

25   Q    After the time period which has just been played on that

1    excerpt, you continued to sit outside and listen and

2    participate in discussion with John Oliver and others, correct?

3    A    Yes.  It was all part of the same time frame.

4    Q    And included in the discussions was a person you later

5    identified as a Gerry Michaud?

6    A    Yes.

7            MR. BARBEE:  I'd ask to publish 1-U.8.

8            THE COURT:  All right.  You may open to that page.

9                (Government's Exhibit 1-W played.)

10   BY MR. BARBEE:

11   Q    So, Special Agent Carter, on that last excerpt, John

12   Oliver refers to promissory notes and the Secretary of Treasury

13   Henry Paulson?

14   A    Yes.

15   Q    And he refers to UCC filings?

16   A    He did.

17   Q    And he refers to the OID 1099 forms?

18   A    Yeah, the 1099-OIDs.  Yes.

19   Q    And he said it took him a long time to -- to learn all

20   these things.

21   A    That's what he said.

22   Q    Okay.  Now, this last clip, I believe, is from the

23   previous week, November 9th, when you attended a session at the

24   Cameron Center; is that correct?

25   A    Yes.

1    Q    And this -- on this clip you have recorded Mahealani

2    Ventura-Oliver speaking to the general crowd; is that right?

3    A    Yes.

4    Q    Okay.

5         MR. BARBEE:  I'd ask to queue and publish 1-U.7.

6         MR. TONG:  No transcript.

7         MR. BARBEE:  Oh.  This is the one we don't have the

8    transcript for, but if we could publish it on the screen.

9         THE COURT:  All right.

10        MR. BARBEE:  I apologize we don't have a transcript,

11   so just try to listen to it.

12             (Government's Exhibit 1-W played.)

13   BY MR. BARBEE:

14   Q    So, Special Agent Carter, on this excerpt there's a

15   portion where Mahealani Ventura-Oliver is asking questions of

16   somebody off to the side, and you hear a male voice answering

17   and giving her the information, and that person was John

18   Oliver, wasn't it?

19   A    Yes, it is.

20        MR. BARBEE:  Okay.  No further questions, Your Honor.

21        THE COURT:  All right.

22        MR. GRONNA:  Just very briefly, Your Honor.

23        THE COURT:  Yes.

24                      CROSS-EXAMINATION

25   BY MR. GRONNA:

1    Q    Good morning, Agent Carter.

2    A    Good morning.

3    Q    You spent two day -- two separate sessions going to the

4    presentations at the Cameron Center, correct?

5    A    Yes.

6    Q    November 9th and November 16th.

7    A    That's correct.

8    Q    2008.  And in the course of all the time you spent there,

9    I think there was that small clip that you spoke briefly with

10   Ms. Teves; is that right?

11   A    Yes.

12   Q    And in the entire time that you were there, that was the

13   only time that you had any -- any interaction with her; isn't

14   that right?

15   A    Me personally, yes.

16   Q    Yes.  And in the course of the entire six hours you were

17   there, she never made any presentation at those meetings, did

18   she?

19   A    Not that I'm aware of, no.

20        MR. GRONNA:  No other questions.

21        THE COURT:  All right.

22        MR. TONG:  Very briefly, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. TONG:

25   Q    Agent Carter, just so we're clear, the first four excerpts

1    we had transcripts for, those occurred on November 16th of

2    2008; is that correct?

3    A    That's correct.

4    Q    And the last excerpt of the defendant Mahealani

5    Ventura-Oliver, what date was that?

6    A    November 9th.

7    Q    So that was the week before?

8    A    The week -- the Sunday before, yes.

9    Q    And out of curiosity, what, if anything, did John Oliver

10   say to you when you initiated contact with him on November the

11   16th?

12   A    When he approached me --

13   Q    Yes.

14   A    -- the first time?

15   Q    Yes.

16   A    He asked if I was FBI or law enforcement.

17   Q    And how did you respond?

18   A    That I was not.

19   Q    You were actually Steve Koch, I guess.

20   A    I didn't tell him what my name was at that time, but I...

21   Q    Okay.  And the first several clips appear to be taken

22   outside of the meeting room; is that correct?

23   A    Which one, sir?

24   Q    The ones that we played first where it appeared that you

25   were sitting on a bench looking at the Cameron Center.

 1   A    Played those second.

 2   Q    Okay.  Do you recall the videos showing you and John

 3   Oliver --

 4   A    Yes.

 5   Q    -- outside?

 6   A    Yes.

 7   Q    Were there some outside?

 8   A    Yes, there were two clips that were -- we were sitting

 9   outside on the bench.

10   Q    Okay.  And what was happening inside, do you know?

11   A    At that time, no.

12   Q    Were there other people there?

13   A    Yes.

14   Q    So this occurred after the general presentation?

15   A    It was.  It was after the seminar ended, people were

16   departing the main room where the seminar was.  There was some

17   food and beverages in there, but people were exiting.

18   Q    So people were just kind of talking about what they had

19   been experiencing; is that correct?

20   A    Yes.

21   Q    And Mr. Gronna just asked you whether that was the only

22   contact you had with Pilialoha Teves on that day; is that

23   correct?

24   A    Yes.

25   Q    Why did you go up and talk to Pilialoha Teves?

 1    A    I was directed by John Oliver to go talk to Pilialoha and

 2    Mahealani regarding my mortgage situate -- situation.

 3                MR. TONG:  Thank you.  I have nothing further.

 4                THE COURT:  All right.  Anything else?

 5                MR. BARBEE:  No recross.

 6                MR. GRONNA:  Yes, just one question.

 7                         RECROSS-EXAMINATION

 8    BY MR. GRONNA:

 9    Q    In the tape I think John Oliver directed you to contact

10    Ms. Oliver and Ms. Teves to make an appointment, right?

11    A    Yes.

12    Q    And not to discuss -- and you were not going to be

13    discussing your mortgage situation with them, just to make an

14    appointment, right?

15    A    I was to mention that I was in a crisis regarding my

16    mortgage, to make an appointment or get a consultation.

17    Q    Yeah, and that's all the conversation was.  She gave you a

18    number?

19    A    Yes.

20    Q    And you were to call the number to make an appointment,

21    right?

22    A    That's correct.

23    Q    Okay.  And you never met with her after that, right?

24    A    I did not.

25                MR. GRONNA:  Thank you.

     1          THE COURT:  All right.  You may step down, sir.

     2                                   (Witness excused)

     3          THE COURT:  All right.  I think we'll go ahead and

     4   take a break now before the next witness testifies.  So we'll

     5   hopefully keep this 15 minutes if we can, and be back for the

     6   next portion of the morning session.  Just leave your

     7   notepads -- yes, I'm sorry, just leave the binders on the

     8   chair, and Ms. Greaney will collect those up.  Okay.  You can

     9   just leave them on the chair, along with your notepads, and

    10   remember my admonition not to speak about the case with each

    11   other or others.  Okay?

    12          (At 10:29 a.m., the jury was excused, and the

    13   following proceedings were held:)

    14          THE COURT:  All right.  Anyone need to see me?

    15          MR. BARBEE:  No.

    16          THE COURT:  All right.  The jury has departed.

    17          MR. TONG:  I just wanted to make sure -- the next

    18   witness is in custody, so would the Court be able to call down

    19   and ask the marshals to bring him up?

    20          THE COURT:  Yes.

    21          MR. TONG:  At the appropriate time.  Thank you.

    22          THE COURT:  Thank you.

    23          Alison, have him up here before we reconvene.

    24          THE CLERK:  Yes, Your Honor.

    25          (A recess was taken from 10:30 a.m. to 10:56 a.m.)

```
 1            (The following proceedings were held in open court in
 2     the presence of the jury:)
 3            THE COURT:  All right.  We are on the record with
 4     defendants, counsel, case agents, and ladies and gentlemen of
 5     the jury.
 6            All right, next witness?
 7            MR. TONG:  Government calls John Oliver.
 8            THE COURT:  All right.
 9                        JOHN OLIVER,
10     called as a witness by the Government, having been first duly
11     sworn, was examined and testified as follows:
12            THE CLERK:  Please state your name for the Court, and
13     spell your first and last name.
14            THE WITNESS:  John Oliver.  J-O-H-N, O-L-I-V-E-R.
15                      DIRECT EXAMINATION
16     BY MR. TONG:
17     Q    Good morning, sir.
18     A    Morning.
19     Q    Would you tell the jury where you're from originally?
20     A    I'm originally from San Diego, California.
21     Q    And how far did you go in school?
22     A    Graduated high school and a couple years of trade school.
23     Q    What did you study in trade school?
24     A    I -- I'm in the masons' union.
25     Q    As in --
```

```
 1    A    Tile.

 2    Q    -- tile work?

 3    A    Tile and stone.

 4    Q    And when did you first come to Hawaii?

 5    A    January 1st, 1990.

 6    Q    What island did you come to?

 7    A    Maui.

 8    Q    Why did you come to Maui?

 9    A    A change of pace, good weather --

10         THE COURT:  All right.  That microphone is too close.

11    So I want you to be about six inches.  You can pull it forward

12    or sit back.

13         THE WITNESS:  Okay.

14         THE COURT:  But about six inches and talk -- talk

15    directly towards the mike.

16         THE WITNESS:  Basically to surf.

17    BY MR. TONG:

18    Q    Okay.  Did you do any kind of work for money when you

19    arrived in Maui?

20    A    Yeah, I got right into the masons' union here.

21    Q    And I think you said you were doing some tile work?

22    A    Yeah, it was tile.

23    Q    And did there come a time when you actually had your own

24    tile company?

25    A    Yeah.
```

1   Q    What was the name of that company?

2   A    Kaimana Tile Company.

3   Q    How long did you stay on the island of Maui?

4   A    I never left.  I've stayed there since.

5   Q    Do you know someone named Mahealani Ventura-Oliver?

6   A    Yeah.

7   Q    And if you were to see her again, would you recognize her?

8   A    Yes.

9   Q    Is she in court today?

10  A    Yes.

11  Q    Would you point her out by where she's seated and what

12  she's wearing.

13  A    Right over there in the turquoise dress.

14       MR. TONG:  We would ask that the record reflect the

15  identification of the defendant Mahealani Ventura-Oliver.

16       THE COURT:  Yes.

17  BY MR. TONG:

18  Q    When did you first meet Mahea Ventura-Oliver?

19  A    Oh, I believe it was around 1991, I think.  December.

20  Q    How did the two of you meet?

21  A    I was walking down Kihei Road and hitchhiking home, and

22  she picked me up.  And we started --

23  Q    And did you strike up a conversation?

24  A    Yeah.

25  Q    Did you learn what her occupation was at that time?

OLIVER - DIRECT

41

```
 1   A      Yeah.

 2   Q      What was it?

 3   A      She was a waitress at that time.

 4   Q      And what -- go on.

 5   A      And she hula danced, too.  She was a hula dancer.

 6   Q      Okay.  And what came of your relationship with Mahea

 7   Ventura-Oliver?

 8   A      We fell in love and ended up moving in together,

 9   eventually got married.

10   Q      Do you recall when you got married?

11   A      I believe it was around '95.

12   Q      What is the present status of your relationship with Mahea

13   Ventura-Oliver?

14   A      We're separated right now, and the divorce is pending.

15   Q      Have any papers been filed?

16   A      Yes.

17   Q      Who filed the papers?

18   A      She did.

19   Q      And during your time with the defendant Mahea

20   Ventura-Oliver, did you learn about her educational background?

21   A      Yeah.

22   Q      What does that consist of?

23   A      As far as I know, graduated high school.

24   Q      Okay.

25   A      Yeah.
```

1    Q    What kind of jobs has she had during the time you have

2    been together?

3    A    Hula dancing, and -- and then she worked at the Grand

4    Wailea for a while, and then she started doing paralegal work,

5    she went to paralegal school.

6    Q    And what did she do at the Grand Wailea?

7    A    She worked at the business center.

8    Q    You say that she went to paralegal school; is that

9    correct?

10   A    Yeah.

11   Q    Did she ever work as a paralegal?

12   A    Yeah, she did.

13   Q    And where was that?

14   A    Legal Aid Society.

15   Q    Do you recall her ever working for a title company?

16   A    Oh, yes.  That's right.  And a title company.  Yeah.

17   Q    Which title company was that?

18   A    Old Republic.

19   Q    Have you known Mahea Ventura-Oliver to have an interest in

20   land titles?

21   A    Yes.

22   Q    When did that interest begin?

23   A    Probably -- I'd say probably around '98, '99.

24   Q    And can you tell the jury what she did in connection with

25   land titles?

1    A    She would gather up genealogy and -- and look to see if

2    the titles had issues or, you know, to connect genealogy to

3    land titles, to the Kingdom, you know, the patented lands.

4    Q    Okay.  Let's try to break that down a little.  Genealogy

5    is the tracing of what?

6    A    Of the -- the blood lines, yeah.

7    Q    Okay.  And you said she would trace genealogy to

8    particular land titles; is that correct?

9    A    Yeah.

10   Q    So, in other words, match up families historically against

11   land holdings?

12   A    Well, I don't know if I want to say land holdings, but

13   to -- to see if they were connected to the -- to certain lands

14   to see which families came from where.

15   Q    Okay.  And in that context, did you hear of something

16   called Ko Hawaii Pae Aina?

17   A    Yes.

18   Q    What did that mean?

19   A    That was written on every -- every land title and that was

20   the name of the Kingdom.

21   Q    Kingdom of Hawaii?

22   A    Yeah.

23   Q    And are you familiar with something called the Hawaiiloa

24   Foundation?

25   A    Yeah.

1   Q   What was that?

2   A   That was the -- like a trust, I think, or, yeah, a trust

3   or a foundation that was set up.

4   Q   What about something called The Registry?

5   A   The Registry, yeah, that was to -- yeah.

6   Q   What did The Registry do?

7   A   To try to put people -- register land patents, land

8   titles, yeah.

9   Q   And what was the original purpose of Hawaiiloa Foundation

10  as you understood it?

11  A   The purpose was to put -- put people -- connect them to

12  their lands, to help with them to connect them to their land

13  titles.

14  Q   Now, before Hawaiiloa Foundation was formed -- well, let

15  me ask that.  Do you recall when Hawaiiloa Foundation was

16  formed?

17  A   I -- no.  I couldn't honestly give you a --

18  Q   Were you --

19  A   -- a date.

20  Q   -- working at the time Hawaiiloa Foundation was formed?

21  A   Yes.

22  Q   And what were you doing at the time?

23  A   I was a title contractor, so...

24  Q   And did you hear about something called the "patriot

25  movement"?

  1   A     Yeah.

  2   Q     How did you hear about that movement?

  3   A     Just browsing online.  Yeah, started reading.

  4   Q     And tell us generally what the movement was about.

  5   A     It's basically a lot of history and trying to match the

  6   history with laws and -- and a lot of legal jargon, legal stuff

  7   basically.

  8   Q     And does the name Sam Kennedy have any meaning to you?

  9   A     Yeah.

 10   Q     Was he one of the promoters of the patriot movement?

 11   A     Yeah.

 12   Q     And did you go online and study this movement?

 13   A     Yeah.

 14   Q     Can you tell us whether the patriot movement promoted the

 15   use of bonds to pay off debts?

 16   A     Yes.

 17   Q     Can you give us a brief explanation of what you read about

 18   the movement in relation to the use of bonds.

 19   A     Yeah, they were using promissory notes and they were using

 20   them to -- to discharge debt basically.  That's what they

 21   were -- the sites was about.  His site.

 22   Q     And did the online information say anything about

 23   Ko Hawaii Pae Aina as it related to the patriot movement?

 24   A     No.

 25   Q     Did the patriot movement materials say anything specific

1    to the Kingdom or state of Hawaii?

2    A    No.

3    Q    Did you become interested in the patriot movement

4    materials?

5    A    Yes.

6    Q    Did there come a time when you tried to use a bond to pay

7    off your own mortgage?

8    A    Yes.

9    Q    And before we get into that, tell us where were you living

10   at the time.

11   A    I was living at -- at a house in Waiehu, Maui.  Our house.

12   Q    Was the address 584 Haiki Place?

13   A    Yes.

14   Q    And who owned that residence?

15   A    We did.

16   Q    "We" is?

17   A    Mahealani and I.

18   Q    Did you have a mortgage on that residence?

19   A    Yes.

20   Q    Who was the mortgage with?

21   A    Chase.

22   Q    Chase Bank?

23   A    Chase Bank.

24   Q    All right.  And did there come a time when you tried to

25   use various documents to pay off that mortgage?

 1   A    Yes.

 2   Q    Could you please take a look at Exhibit 1-V, which I

 3   believe is in evidence.

 4          THE COURT:  V as in Victor?

 5          MR. TONG:  Yes, Your Honor.  And may we --

 6          THE COURT:  It is -- it is in evidence.  You may

 7   publish.

 8   BY MR. TONG:

 9   Q    Do you have Exhibit 1-V in front of you, Mr. Oliver?

10   A    Yes.

11   Q    And this appears to be a letter dated November 22, 2006,

12   and addressed to you; is that correct?

13   A    Yes.

14          MR. TONG:  Steve, the first -- up through the first

15   paragraph.

16   BY MR. TONG:

17   Q    And, Mr. Oliver, you just testified that Chase was the

18   bank that held the mortgage on your property; is that correct?

19   A    Yes.

20   Q    And this appears to be dated -- I'm not -- I'm sorry,

21   addressed to you and your then-wife; is that correct?

22   A    Yes.

23   Q    There's a loan number here; is that correct?

24   A    Yes.

25   Q    What number was that?

1   A    1960053490.

2   Q    Okay.  I think I asked a bad question.

3   A    Oh.

4   Q    I guess what I really meant is, was that your loan with

5   Chase?

6   A    Yeah, that -- that's it.

7   Q    Okay.  And the first sentence says:  "Dear Mr. and

8   Mrs. Oliver:  Chase received a document entitled Notice of

9   International Commercial Claim in Admiralty Administrative

10  Remedy."  Do you see that sentence?

11  A    Yes.

12  Q    Did you send a claim having that title to Chase Bank prior

13  to this letter?

14  A    Yes.

15  Q    And where did you get the wording or theory behind that

16  particular claim?

17  A    From the -- the Kennedy information, the Sam -- the

18  website.

19  Q    And at the time that you sent that particular document,

20  what did you intend to do?

21  A    Well, I was hoping it would discharge our debt.

22  Q    Okay.  And did it discharge your debt?

23  A    No.

24  Q    All right.  It appears that the first paragraph of this

25  letter said:  "Please be advised that the document is invalid."

1   Do you see that reference?

2   A    Yes.

3        MR. TONG:  And if we may, Agent Carter, may we go to

4   the second paragraph, please.

5   BY MR. TONG:

6   Q    Mr. Oliver, the second paragraph is now on the screen, and

7   it, to paraphrase, advised you that Chase expected you would

8   comply with the terms of your mortgage; is that correct?

9   A    Yes.

10  Q    You remember receiving this letter?

11  A    Yes.

12  Q    And would you take a look at the third paragraph now.

13       Third paragraph essentially advises you that certain

14  borrowers have fallen victim to unlawful scams using similar

15  documents to the one you sent; is that correct?

16  A    Yes.

17  Q    And where the dot is, it says:  "These efforts are invalid

18  and do not eliminate debt, and may be illegal."  Is that

19  correct?

20  A    Yes.

21  Q    And you read that particular letter in or about November

22  of 2006; is that correct?

23  A    Yes.

24  Q    And after reading that letter, did you or your wife

25  consult an attorney or law enforcement officers concerning your

1    attempt to pay the mortgage with that claim?

2    A    No.

3    Q    Did you do anything after receiving this letter?

4    A    If I can recall right, I might have sent something else

5    back to them.

6    Q    Okay.  Let's take a look at Exhibit 1, which I believe is

7    not in evidence, but see if you recognize that.

8    A    Exhibit 1?

9    Q    One.

10   A    Very beginning?  There it is.  Yeah.

11   Q    Do you have Exhibit 1 in front of you?

12   A    Yes.

13   Q    And that's a letter also addressed to you and your wife;

14   is that correct?

15   A    Yes.

16   Q    And do you recognize that letter?

17   A    Yeah.

18         MR. TONG:  We would ask -- we would ask that Exhibit 1

19   be received.

20         MR. BARBEE:  No objection.

21         MR. GRONNA:  No objection.

22         THE COURT:  One is admitted.

23      (Government's Exhibit 1 was received in evidence.)

24         MR. TONG:  All right.  May we show the letter, Your

25   Honor?

1          THE COURT:  Yes.

2          MR. TONG:  All right.  Let's see the first paragraph

3     again, Agent Carter.

4     BY MR. TONG:

5     Q    Mr. Oliver, again, the last letter was December of 2006;

6     is that correct?

7     A    Yes.

8     Q    And this is the next month, correct?

9     A    Yup.

10    Q    And you just testified that you think you responded to the

11    December letter with something else, right?

12    A    Mm-hmm.

13    Q    This letter references a Notice of International

14    Commercial Claim, et cetera, correct?

15    A    Yes.

16    Q    And again, the body of the letter advised you that Chase

17    would not accept that; is that correct?

18    A    Yes.

19          MR. TONG:  And if we could see the third paragraph,

20    please, Agent Carter.

21    BY MR. TONG:

22    Q    It appears to contain language very similar to the

23    language in the letter we just looked at, Exhibit 1-V; is that

24    correct?

25    A    Yes.

1   Q    And after receiving this letter in January of 2007, did

2   you or your wife make any attempts to consult with attorneys or

3   law enforcement officers concerning your attempt to eliminate

4   debt in this fashion?

5   A    No.

6   Q    What did you do next?

7   A    You know what, I probably -- there was probably another

8   letter or something we sent.

9   Q    Okay.

10  A    Yeah.

11          THE COURT:  Do you know or are you just guessing at

12  this point?

13          THE WITNESS:  Well, I --

14          THE COURT:  We don't want you to guess.

15          THE WITNESS:  I honestly can't recall right now,

16  but --

17          THE COURT:  Okay.

18          THE WITNESS:  I know there was a lot of paperwork.

19          THE COURT:  If you can't recall, then you say you

20  can't recall.

21          THE WITNESS:  Okay.  I can't recall.

22          THE COURT:  -- you're speculating may have happened.

23          THE WITNESS:  Yeah.

24  BY MR. TONG:

25  Q    Okay.  But you are familiar with your mindset as of the

1   time of this letter, which is January 2007, correct?

2   A     Yeah, I cannot forget these.

3   Q     And did you continue to study the patriot movement with

4   regard to its usage on mortgages in January of 2007?

5   A     Yes.

6   Q     And you say there's probably another document.  Is that

7   because you know that you continued to use documents of that

8   sort?

9   A     Yes.

10   Q     Now, let me show you a document that is marked as

11   Exhibit 1-A.

12          MR. TONG:  And I believe that's in evidence, Your

13   Honor.

14          THE COURT:  It is, yes.

15          MR. TONG:  May we display it, please?

16          THE COURT:  Yes.

17          MR. TONG:  If we can -- perfect.

18   BY MR. TONG:

19   Q     Mr. Oliver, Exhibit 1-A is a letter addressed to Chase

20   Home Finance and the "regarding" line references your loan; is

21   that correct?

22   A     Yes.

23   Q     And up above it there's a designation "KHK"; is that

24   correct?

25   A     Yes.

1    Q    And Maui Ko Hawaii Pae Aina, correct?

2    A    Yes.

3    Q    What was the KHK?

4    A    I can't recall.

5    Q    Is this a letter that you participated in sending, though?

6    A    Yes, I had to have.  Yes.

7    Q    And why do you say you had to have?

8    A    Because it was coming from my house, I know.

9    Q    Okay.  And this letter appears to have been received on

10   February the 15th by the bank; is that correct?

11   A    Yes.

12   Q    And that would have been a little after the preceding

13   notice that said the admiralty claim was no good; is that

14   correct?

15   A    Yes.

16   Q    And it says:  Please see the enclosed bond order for

17   payoff of a loan.  Correct?

18   A    Yes.

19   Q    And it directs them to apply the bond order to pay off the

20   loan and return any credit to the Hawaiian Treasury; is that

21   correct?

22   A    Yes.

23   Q    At the time of that letter, were you involved in any

24   studies concerning the so-called Hawaiian Treasury?

25   A    I was familiar with some of it, yes.

1    Q    And how were you familiar with the so-called Hawaiian

2    Treasury?

3    A    From doing some research at the Bureau of Conveyance

4    and -- and some historical research.

5    Q    And if we could look at the second full paragraph, please.

6          It says:  "This bond is paid through the Hawaiian

7    Treasury in care of the comptroller, Russ Saito"; is that

8    correct?

9    A    Yes.

10   Q    By the way, who prepared this letter?

11   A    Mahealani.

12   Q    Okay.  And where did the information used -- or who

13   decided to use the Hawaiian Treasury and the phrase "Russ

14   Saito" in reference to this bond?

15   A    We both had discussed it.

16   Q    All right.  And just so we're clear, you said that you

17   looked at the Sam Kennedy online materials, right?

18   A    Yes, yes.

19   Q    Did those materials tell you to use the reference to the

20   Hawaiian Treasury and Russ Saito, the comptroller of the State

21   of Hawaii?

22   A    No.

23   Q    They were more general; is that correct?

24   A    Yeah.

25         MR. TONG:  Now, if we could look at the third full

1    paragraph, please.

2    BY MR. TONG:

3    Q    I'm not going to read all of this, but the bottom part of

4    the paragraph talks about breaches concerning the Royal Patent;

5    is that correct?

6    A    Yes.

7    Q    Where did that language come from?

8    A    That would -- would have come from us, Mahealani.

9    Q    And you?

10   A    Yes, and me.

11   Q    And who was the person who did the most study on the Royal

12   Patents?  Was it you or Mahealani Ventura-Oliver?

13   A    That would have been Mahealani.

14   Q    And the very bottom of the letter --

15            MR. TONG:  If we could look at the hand certification.

16   BY MR. TONG:

17   Q    -- references -- I think I'm reading certified mail; is

18   that correct?

19   A    Yes.

20   Q    Whose handwriting is that?

21   A    That's Mahealani's.

22   Q    And what was the significance of the reference to

23   certified mail?

24   A    That would prove that basically it got served to where it

25   needed to go.  It referenced the service.

OLIVER - DIRECT

57

```
 1   Q    And why was the fact of service important to you?

 2   A    That we had a record of it being received --

 3   Q    Why --

 4   A    -- by their office.

 5   Q    Why would that matter?

 6   A    Just for proof for future reference.

 7   Q    Okay.  Did it -- did it have anything to do with the

 8   so-called payment of the mortgage, the effectiveness of the

 9   bond?

10   A    No.  No.  It was simply to prove that it got received by

11   them.

12   Q    And where did you get your understanding of that?

13   A    That was from the patriot site, I couldn't remember which

14   one.

15   Q    How was the lender under the patriot theory supposed to

16   get paid?

17   A    From the -- from the State, whoever was holding the

18   treasury.

19   Q    Okay.

20   A    Yeah.

21   Q    In other words, as indicated in this letter --

22   A    Yeah.

23   Q    -- they were supposed to get paid out of the State of

24   Hawaii Treasury?

25   A    Well, from the Kingdom Treasury.
```

1   Q    Okay.  Fair enough.

2   A    Yeah.

3   Q    Thank you for the correction.

4        Now, the letter that we have on the screen starts with

5   the phrase:  "Please see the enclosed bond order."

6        Do you see that in front of you, Mr. Oliver?

7   A    Yes.

8        MR. TONG:  Let's go to the next document, which is

9   Exhibit 1-B, as in boy.

10  BY MR. TONG:

11  Q    Do you have that document in front of you?

12  A    Yes.

13       MR. TONG:  Your Honor, I believe that's in evidence.

14  May I display it?

15       THE COURT:  It is in evidence and you may.

16       MR. TONG:  If we could, let's look at everything --

17  well, let's look at the bottom first.

18  BY MR. TONG:

19  Q    Mr. Oliver, this appears to be a document entitled

20  "Private Bond Order," correct?

21  A    Yes.

22  Q    And at the bottom there are two signatures; is that

23  correct?

24  A    Yes.

25  Q    Whose signatures are those?

1    A    Mine and Mahealani's.

2            MR. TONG:  All right.  And now if we could go to the

3    top of the document.  Through the first two paragraphs, let's

4    say.

5    BY MR. TONG:

6    Q    The title is "Private Bond Order For Payment."  And it

7    references the loan you and the defendant Mahealani Oliver had

8    with Chase Home Finance; is that correct?

9    A    Yes.

10   Q    And the date of the document appears to be February 9,

11   2008, correct?

12   A    Correct.

13   Q    Which is the same date as the letter you just testified

14   about, correct?

15   A    Yes.

16   Q    So this was the bond that was contained with the letter;

17   is that right?

18   A    Yes.

19   Q    And again, there's a reference to "Comptroller of the

20   Currency" and directing him to issue money on that account,

21   correct?

22   A    Yes.

23   Q    Who prepared this particular bond?

24   A    That would have been me.

25   Q    Okay.  And as you look at it, there are various references

1    to Royal Patents and the like; is that correct?

2    A    Yes.

3    Q    And where would you have gotten that information?

4    A    That was all from Mahealani.  Yeah.

5    Q    Now, the lower right-hand corner --

6         MR. TONG:  If we could go there please, Agent Carter.

7    BY MR. TONG:

8    Q    -- has a stamp it looks like; is that correct?

9    A    Yes.

10   Q    And where did the wording of that particular stamp come

11   from?

12   A    That was from Mahealani.

13   Q    So I'm gathering that the two of you collaborated on the

14   wording that would go into a paper of this sort; is that

15   correct?

16   A    Yeah.

17   Q    Tell us a little bit about how that collaboration took

18   place.

19   A    Well, we both would discuss, you know, the bonds and how

20   we think we can make it work.

21   Q    Okay.  And did those discussions pretty much continue

22   throughout the time you used these bonds?

23   A    Yeah.

24   Q    All right.  Now, if I can direct you to the second page of

25   that same document, which is Exhibit 1-B.  It's Bates 4281.

 1          MR. TONG:  May we show it -- oh.

 2     BY MR. TONG:

 3     Q    It appears that you and your wife signed this in front of

 4     someone; is that correct?

 5     A    Yes.

 6          MR. TONG:  And if we could see the bottom third of the

 7     document, please, Agent Carter.

 8          THE WITNESS:  I don't have this one in my file.

 9     BY MR. TONG:

10     Q    It's --

11     A    You said 1-B?

12     Q    No, this is 1-B, the second page.

13     A    Oh, sorry.  Okay.

14     Q    Do you have that in front of you --

15     A    Yeah.

16     Q    -- Mr. Oliver?

17     A    Yes.

18     Q    All right.  And it appears that it was notarized by

19     someone; is that correct?

20     A    Yes.

21     Q    Who notarized this document?

22     A    Pilialoha.

23     Q    And does Pilialoha have a last name?

24     A    Teves.

25     Q    And did you know Pilialoha Teves at the time?

1    A    Yes.

2    Q    If you were to see Pilialoha Teves again, would you

3    recognize her?

4    A    Yes.

5    Q    Do you see her in court today?

6    A    Yes.

7    Q    Can you identify her by where she's seated and what she's

8    wearing.

9    A    She's in the farthest right and I think black, I think,

10   yeah.

11         MR. TONG:  May the record reflect the identification

12   of the defendant Pilialoha Teves.

13         THE COURT:  Yes.

14   BY MR. TONG:

15   Q    Mr. Oliver, this is dated February 11, 2008; is that

16   correct?

17   A    Yes.

18   Q    Why did you have Pilialoha Teves notarize this paper?

19   A    Because she was right there.  She was close to us.

20   Q    And where were you when you signed this document?

21   A    This was probably at our office.  At our office.

22   Q    Which office would that be?

23   A    At this time, I guess it was the old office.  I can't

24   remember the --

25   Q    Okay.  Would this be the Hawaiiloa Foundation office?

1   A    Yeah.  Yeah.

2   Q    So Hawaiiloa Foundation was operating at the time you

3   signed this document?

4   A    Yeah.

5   Q    And Pilialoha Teves was there?

6   A    Yes.

7   Q    Why was she there?

8   A    She was helping out.

9   Q    Okay.

10  A    She was help.

11  Q    She was part of the foundation at that point in time?

12  A    Yes.

13          THE COURT:  Could we have a sidebar for one moment,

14  please?

15                  (Sidebar on the record:)

16          THE COURT:  Two things.  One, I'm concerned with the

17  amount of times he's saying "I guess" and "I think."  I don't

18  know if that's the way he speaks or if he really doesn't have a

19  memory of these things.  And so I might start interrupting if

20  he says that.

21          And, secondly, you're leading a lot, Mr. Tong.  And

22  there hasn't been objections to it, I understand, but I think

23  I'd like to see non-leading questions --

24          MR. TONG:  Okay.

25          THE COURT:  -- going forward.

1              (End of sidebar.)

2          MR. TONG:  I think the witness wants some reading

3   glasses.

4          THE COURT:  Oh, okay.

5          THE WITNESS:  Yeah, I didn't bring my glasses.

6          THE COURT:  I understand the need for those.

7          THE WITNESS:  Thank you.

8          THE COURT:  Does that help?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Okay.

11   BY MR. TONG:

12   Q    Do you recall any discussions with Pilialoha Teves

13   concerning any attempts by you and Mahealani Ventura-Oliver to

14   use a bond to pay off your mortgage?

15   A    I -- I know she was in the office.  So it was discussed

16   around her.

17   Q    So that's a "yes"?

18   A    At the time.  At that time, yes.

19   Q    And tell us in substance of the discussions that occurred.

20   A    Well, we would --

21          MR. GRONNA:  Well, Your Honor, I'm going to have to

22   object.  I mean he's going to -- we're -- can I approach?

23          THE COURT:  What is --

24          MR. GRONNA:  Well, he's moving to speculate.  He says

25   she's in the office and he has no personal knowledge.  And she

 1    may have -- may not have heard what their discussions were.

 2              THE COURT:  I thought he was just going to testify as

 3    to the discussions he had with Ms. Teves.  That's what I heard.

 4    Is that right?

 5              THE WITNESS:  Well, not directly.  She was in the

 6    office with us in the same vicinity.

 7              THE COURT:  And did you have a discussion with her?

 8              THE WITNESS:  With Mahealani at the time.  But she was

 9    right there.

10              MR. TONG:  Okay.  Well, can I explore it a little

11    more, Your Honor?

12              THE COURT:  Yes.

13    BY MR. TONG:

14    Q    All right.  So you had a discussion with Mahealani

15    Ventura-Oliver concerning the bonds, correct?

16    A    Yeah.

17    Q    And where were the two of you located?

18    A    In the office, in the main room.

19    Q    Would this be the Hawaiiloa Foundation office?

20    A    Yes, yes.

21    Q    And where was Pilialoha Teves at the time?

22    A    She was at her desk in the same room.

23    Q    How far apart were the three of you?

24    A    We were close.  I would say within 10 feet.

25    Q    Were you close enough so that everybody could hear what

 1   everyone was saying?

 2   A    Yes.

 3        MR. GRONNA:  Well, I object.  That's speculation, Your

 4   Honor.

 5        THE COURT:  Sustained.

 6   BY MR. TONG:

 7   Q    Could you hear what Mahealani Ventura-Oliver was saying at

 8   the time?

 9   A    Yes.

10   Q    Could you hear what Pilialoha Teves said at the time?

11   A    Yes.

12   Q    So, tell us about the discussion that you and Mahealani

13   Ventura-Oliver had in Pilialoha's -- Pilialoha Teves' presence.

14   A    Well, we would be discussed on how to -- how the process

15   was going to work.  How we were going to do it.

16   Q    And tell us what that discussion was.

17   A    It was -- initially there was a discussion on how much

18   could be charged for the use of the bonds.

19   Q    Okay.

20   A    And -- it's a long time ago.

21   Q    I understand.

22   A    So, I can't remember word for word.  But we discussed how

23   the bonds were going to discharge debt for people, how the

24   foundation was going to make money to sustain itself.

25   Q    Was there also a discussion of how much would be charged

1    for the bonds?

2    A    Yes.

3    Q    What amount was agreed upon?

4    A    I think the discussion was between 1,000 and 1500.

5         MR. BARBEE:  Your Honor, I'm going to object, move to

6    strike as to what the witness thinks he either knows or doesn't

7    know.  He shouldn't speculate.

8         THE WITNESS:  Okay.

9         THE COURT:  Sustained.

10        So, Mr. Oliver, you've said several times "I guess,"

11   "I think."  You're in a court of law.

12        THE WITNESS:  Yeah.

13        THE COURT:  If you have a memory, you have a memory,

14   testify to it.  If you don't have a memory, you have to say "I

15   don't remember."

16        THE WITNESS:  Okay.

17        THE COURT:  Okay.  There's nothing wrong with saying

18   you don't remember if you don't remember.

19        THE WITNESS:  Okay.

20        THE COURT:  What I don't want you to do is speculate.

21        THE WITNESS:  Okay.

22        THE COURT:  Okay?

23        MR. BARBEE:  Move to strike, Your Honor.

24        THE COURT:  Motion granted.  The jury will disregard

25   the comment regarding the amount.

```
 1              You can follow up, Mr. Tong.

 2    BY MR. TONG:

 3    Q    We're talking about the discussion between the three of

 4    you concerning the amount to be charged.

 5    A    Yes.

 6    Q    Do you have --

 7              MR. GRONNA:  I think that misstates his testimony,

 8    Judge.  I think the discussion was between him and Ms. Oliver.

 9    That Ms. Teves is 10 feet away.

10    BY MR. TONG:

11    Q    Was Ms. Teves part of the discussion?

12    A    Yes.

13    Q    So she wasn't a potted plant.

14              MR. GRONNA:  Well, it's leading.

15              MR. TONG:  I'll withdraw that.

16    BY MR. TONG:

17    Q    So, this is a discussion between the three of you; is that

18    correct?

19    A    No.

20    Q    Okay.  Who was involved in the discussion?

21    A    Mahealani and I.

22    Q    Okay.

23    A    Yeah.

24    Q    And what was -- and Ms. Teves was present?

25    A    Yes.
```

1   Q    And what was discussed?

2   A    On how much to charge for the process.

3   Q    Do you have a memory of what amount was agreed upon?

4   A    The final agreement was $1500.

5   Q    Now, we were actually test -- talking earlier about the

6   attempt by you and Mahealani Ventura-Oliver to pay your

7   mortgage with the bond, correct?

8   A    Yes.

9   Q    And I believe we went through documents received from

10  Chase; is that correct?

11  A    Yes.

12  Q    Did Chase ever accept your use of bonds as payment of the

13  mortgage?

14  A    No.

15  Q    And directing your attention to Exhibit 1-C, let me ask if

16  you recognize that document.

17          MR. TONG:  We would ask to display 1-C, Your Honor.  I

18  believe --

19          THE COURT:  It's admitted, you may.

20          MR. TONG:  Thank you.

21          THE WITNESS:  Okay.

22  BY MR. TONG:

23  Q    Do you have Exhibit 1-C in front of you, sir?

24  A    Yes.

25  Q    And do you recognize that document?

```
 1   A    Yes.

 2   Q    What is it?

 3   A    Saying, we're behind on the payment and we're in default.

 4   Q    Okay.  And in fact, the first paragraph --

 5        MR. TONG:  If we can zoom in.  Just the first

 6   paragraph.

 7   BY MR. TONG:

 8   Q    -- says:  "You are in default"; is that correct?

 9   A    Yes.

10   Q    And the rest of the letter asks you to pay, correct?

11   A    Yes.

12   Q    Did you discuss the fact that you had received this letter

13   with Mahealani Ventura-Oliver in the presence of Pilialoha

14   Teves?

15   A    No.

16   Q    Okay.  Did you ever tell Ms. Teves that Chase had not

17   accepted your bond in payment of its mortgage?

18        MR. GRONNA:  Well, that's leading, Your Honor.

19        THE COURT:  Sustained.

20   BY MR. TONG:

21   Q    Did you ever discuss with Pilialoha Teves whether your

22   attempt to use a bond to pay your mortgage succeeded?

23        MR. GRONNA:  Objection.  It's leading.

24        THE COURT:  Overruled.

25        THE WITNESS:  I can't recall.
```

1    BY MR. TONG:

2    Q    Okay.  Do you recall Pilialoha Teves attempting to buy a

3    house?

4    A    Yes.

5    Q    And was there any discussion about what, if anything, she

6    should do in connection with that house?

7    A    Yes.

8    Q    What was the discussion?

9    A    I know she mentioned that she was going to buy a house

10   and -- and do the process.  It was short.

11   Q    She mentioned that to you?

12   A    Yes.

13   Q    Did you respond to her statement?

14   A    Yes, I acknowledged.  Yeah.

15   Q    Did you tell her anything else?

16   A    No.

17   Q    All right.  You and your wife had a credit card with First

18   Hawaiian Bank; is that correct?

19   A    Yes.

20   Q    And did there come a time when you tried to pay off that

21   credit card debt with a bond?

22   A    Yes.

23   Q    And if you would, would you turn to Exhibit 17-B, as in

24   boy.

25             MR. TONG:  Your Honor, we'd ask to display it.  I

 1   believe it's in evidence.

 2              THE COURT:  You may.

 3              17-D or B?

 4              MR. TONG:  17-B, as in boy.

 5              THE COURT:  B, as in boy.

 6   BY MR. TONG:

 7   Q    Do you have that in front of you, Mr. Oliver?

 8   A    Yes.

 9   Q    This is a document entitled "Bonded Promissory Note"; is

10   that correct?

11   A    Yes.

12   Q    And is there a date on the document?

13   A    Let's see.  Yup.  4/19/2008.

14   Q    So April 19th of 2008, correct?

15   A    Yes.

16   Q    And it references "for credit to," a particular account,

17   correct?

18   A    Yes.

19   Q    What was that account number for?

20   A    It was a credit card.

21   Q    And who held that credit card?

22   A    I don't know if that was joint, I can't remember.  I know

23   it was my name.

24   Q    And it was directed to First Hawaiian Bank; is that

25   correct?

1   A   Yes.

2   Q   And in essence, this is a bond similar to the one

3   previously used; is that correct?

4   A   Yes.

5   Q   And that appears to be signed by you; is that correct?

6   A   Yes.

7   Q   Now, let met ask you to look at page -- excuse me, 17-D,

8   as in David.  The second page, which is Page 299.

9   A   Yes.

10   Q   Do you have that document in front of you?

11   A   Yes.

12        MR. TONG:  May we show it, Your Honor?  I believe

13   that's in evidence also.

14        THE COURT:  Yes, yes.

15   BY MR. TONG:

16   Q   That's a document entitled "Affidavit of Proof of

17   Payment"; is that correct?

18   A   Yes.

19   Q   And the bottom part of it has some signatures, does it

20   not?

21   A   Yes.

22   Q   Whose signature appears as the person making the

23   affidavit?

24   A   That's me.

25   Q   It appears there's a notary seal, correct?

 1   A    Yes.

 2   Q    Who notarized this document?

 3   A    Mahealani.

 4   Q    And the date of the document?

 5   A    That is May 1st, 2008.

 6   Q    All right.  What was this document intended to do?

 7   A    That was going to try to discharge the debt.

 8   Q    The credit card debt?

 9   A    Yeah.

10        MR. TONG:  Now, if I could look at the text, please.

11   Through -- just the text itself, 1 through 8.

12   BY MR. TONG:

13   Q    Paragraph 2 references a "Bonded Promissory Note"; is that

14   correct?

15   A    Yes.

16   Q    Is that the note you previously testified about?

17   A    Yes.

18   Q    And Paragraph 6 has some language there, do you see that

19   language?

20   A    Yes.

21   Q    Where did the language about the Hawaiian Treasury and the

22   territory of Hawaii come from?

23   A    The language, I probably wrote it.

24   Q    Okay.

25   A    But it's from language that I had learned.

1   Q    Okay.  And where had you --

2   A    From Mahealani.

3   Q    All right.  And if you can move over two more pages on

4   that document to Page 301.

5           MR. TONG:  If we could see that document, please?

6           THE WITNESS:  Yes.

7   BY MR. TONG:

8   Q    This is dated April 19, 2008, correct?

9   A    Yes.

10  Q    And it's notarized by whom?

11  A    Pilialoha.

12  Q    Why did you have this document notarized by Pilialoha

13  Teves?

14  A    She was available at the time at the office.

15  Q    Now, did you have any discussions with Pilialoha Teves

16  concerning your attempt to use a bond to pay off your credit

17  card?

18          MR. GRONNA:  Objection as to foundation.

19          THE COURT:  He's asking a foundational question,

20  whether there was a conversation.

21          THE WITNESS:  Yes.

22  BY MR. TONG:

23  Q    Tell us the substance of that discussion.

24          MR. GRONNA:  Well, again, Your Honor, foundation as to

25  time when it happened.

1          MR. TONG:  All right.

2          THE COURT:  Sustained.

3     BY MR. TONG:

4     Q    Mr. Oliver, you wrote this document notarized on April 19,

5     2008, correct?

6     A    Yes.

7     Q    And it's notarized by Pilialoha Teves, correct?

8     A    Yes.

9     Q    And it had to do with the payment of the credit card,

10    correct?

11    A    Yes.

12    Q    At or about the time when she notarized this document, did

13    you have a discussion with Pilialoha Teves concerning the

14    contents of this document?

15    A    Yes.

16    Q    What was the substance of that discussion?

17    A    That I needed to send this to the -- to the bank.  Yeah.

18    This additional paper.

19    Q    Okay.  And did you tell her why you needed to send it to

20    the bank?

21    A    I can't recall.

22    Q    Did the bank accept your bonded promissory note?

23    A    No.

24    Q    And directing your attention to Exhibit 17-C.

25          MR. TONG:  May we show 17-C, Your Honor?

```
 1              THE COURT:  Yes.
 2   BY MR. TONG:
 3   Q    This appears to be a letter dated May 2, 2008; is that
 4   correct, Mr. Oliver?
 5   A    Yes.
 6   Q    And it references receipt of your bonded promissory note,
 7   correct?
 8   A    Yes.
 9   Q    And did the bank accept that money or that note as payment
10   of your credit card debt?
11   A    No.
12   Q    And in fact, it said none of the enclosures have any legal
13   effect; is that correct?
14   A    Yes.
15   Q    And do not represent any payment, correct?
16   A    Yup.
17   Q    What did you do after receiving this letter, which is
18   Exhibit 17-C?
19   A    I don't -- I might have sent another note.
20              THE COURT:  Do you know, sir?  Don't guess.
21              THE WITNESS:  No, I did, I did.  I sent another note
22   at some point.
23   BY MR. TONG:
24   Q    All right.  And in fact, would you look at Exhibit 17-E,
25   please.
```

1          Do you have 17-E in front of you?

2    A    Yes.

3          MR. TONG:  May we show 17-E, Your Honor?

4          THE COURT:  You may.

5    BY MR. TONG:

6    Q    And this appears to be a letter dated May 21, a couple

7    weeks after the earlier letter, correct?

8    A    Yes.

9    Q    And did you receive this letter from First Hawaiian Bank?

10   A    Yes.

11   Q    And directing your attention to the second paragraph where

12   it references that the enclosures do not represent any payment

13   and are hereby rejected, you remember being told that by the

14   bank; is that correct?

15   A    Yes.

16   Q    And you said you might have sent other documents.  The

17   first sentence says:  "We received three mailings from you,"

18   correct?

19   A    Yes.

20   Q    Are those the documents that you believe were sent to the

21   bank?

22   A    Yes.

23   Q    Now, do you recall discussions with Pilialoha Teves and

24   Mahealani Ventura-Oliver concerning whether your use of the

25   bond was successful in paying off your credit card?

1   A   Say that again, please?

2   Q   Do you recall talking about the use of the bond to pay off

3   your credit card with Mahea Ventura-Oliver and Pilialoha Teves?

4   A   Yes, we had discussed it, in the office.

5   Q   Tell us the substance of your discussions.

6   A   It was a brief conversation on discharging the debt and --

7   and using the bonds.  Yeah.  And that -- and that it looks like

8   it'll work, according to the -- to the sites, the websites.

9   Q   And what about when the bank told you it wouldn't work?

10   A   I don't recall speaking about that in front of Pili.

11   Q   In front of Pilialoha?

12   A   Yeah, yeah.

13   Q   Okay.  Now, we're in about May of 2008; is that correct?

14   A   Yes.

15   Q   Were you still working at the time?

16   A   Yes.

17   Q   And where were you working?

18   A   I was still doing tile work.

19   Q   When did you stop working?  Or did you?

20   A   I -- I kind of always worked a little bit, but I basically

21   stopped working around the time -- shortly after the office

22   opened.

23   Q   Okay.

24   A   Yeah.

25   Q   And by "the office," what are you referring to?

1   A      The foundation office, Hawaiiloa Foundation.

2   Q      Where did the foundation office -- where did it first

3   open?

4   A      The first office was in, I believe it was 300 Hookahi

5   Street.

6   Q      And how big a room or how many suites did you have?

7   A      It was -- it was two suites.  It was small.  It was a

8   small unit.  Yeah.

9   Q      And did the foundation keep its offices at that location

10  the entire time?

11  A      No, we moved.

12  Q      And where did you move to?

13  A      We moved next door basically, two doors down.  Two or

14  three doors down on the same street.  And the address is -- I

15  can't recall.

16  Q      Why did you move?

17  A      We needed more space.

18  Q      Okay.  And why did you need more space?

19  A      Because it was growing.

20  Q      "It" being what?

21  A      The -- the process, the office, the -- the process.

22  Q      And by "process," what do you mean?

23  A      The -- the mortgage process was affected, and it started

24  drawing a lot of people, so we needed another office.

25  Q      Was Hawaiiloa Foundation holding seminars at the time?

 1   A     Yeah.

 2           THE COURT:  At what time?

 3   BY MR. TONG:

 4   Q     Do you recall about the time when the -- you moved to the

 5   offices, the second offices?

 6   A     Yeah.

 7   Q     All right.  And when was that?

 8   A     You know what, I can remember in my head, but I just

 9   couldn't remember the dates.

10   Q     Okay.

11   A     Yeah.

12   Q     All right.  Well, let me direct your attention to the

13   summer of 2008, which is the time that you received those

14   letters we just showed you.  Okay?

15   A     Mm-hmm.

16   Q     And what was Hawaiiloa Foundation doing at that time?

17   A     We were doing the -- the mortgage process, it was just

18   starting.

19   Q     And when you were just starting the mortgage process,

20   where did you -- or did you put on presentations?

21   A     Yeah, that process started around the same time.

22   Q     Okay.  And where did the presentations take place?

23   A     They were at -- mostly at the Cameron Center.

24   Q     Okay.  Let me ask you to look at a document which may help

25   with the time.  It's marked as Exhibit 1-X.

OLIVER - DIRECT

82

1              Do you have Exhibit 1-X in front of you, Mr. Oliver?

2   A    Yes.

3   Q    And let's go page by page.  Do you recognize the first

4   page of Exhibit 1-X?

5   A    Yes.

6   Q    And what is it?

7   A    That's a receipt.

8   Q    I'm sorry?

9   A    Yeah, this is a -- a receipt.

10             MR. TONG:  Your Honor, may I look at what he has?

11             THE WITNESS:  Or a contract.

12             THE COURT:  Do you know what it is, Mr. Oliver?

13             THE WITNESS:  Let me read it.  Give me a second here.

14   BY MR. TONG:

15   Q    You know what, Mr. Oliver, take your -- take a moment.

16   There's three pages to Exhibit 1-X, and I would like you to

17   review all three pages, and then look up when you're done, if

18   you would, please.

19   A    Okay.  (Perusing document.)  Okay.

20   Q    Have you reviewed Exhibit 1-X?

21   A    Yes.

22   Q    All right.  Let's take a look at the third page first.  Do

23   you recognize the third page of Exhibit 1-X?

24   A    Yes.

25   Q    And is that a resolution of the Hawaiiloa Foundation?

 1            MR. BARBEE:  Your Honor, I'm going to object to

 2    leading of the witness by Mr. Tong.

 3            THE COURT:  Sustained.

 4    BY MR. TONG:

 5    Q    Do -- do signatures appear on the third page of

 6    Exhibit 1-X?

 7    A    Yes.

 8    Q    Do you recognize the signatures that appear there?

 9    A    Yes.

10    Q    And whose signatures appear there?

11    A    There's Mahealani.

12    Q    And is it notarized?

13    A    Yes.

14    Q    Whose signature appears as the notary?

15    A    Pilialoha.

16    Q    And do you have a recollection -- well, let me -- let me

17    withdraw that.

18            What about the first two pages of Exhibits 1-X, do you

19    recognize those?

20            THE COURT:  Have you ever seen --

21            THE WITNESS:  No.

22            THE COURT:  Have you ever seen them before?

23            THE WITNESS:  Yes.  It's -- I signed it, so, yes, I

24    have seen it.

25            THE COURT:  Do you recall it, though?

 1                THE WITNESS:  No, I don't recall.

 2                THE COURT:  Okay.

 3    BY MR. TONG:

 4    Q    All right.  Well, then I'll move on.

 5                Do you recall Hawaiiloa Foundation having a bank

 6    account?

 7    A    Yes.

 8    Q    And who controlled the bank account?

 9    A    Mahealani.

10    Q    And by the way, what were the -- did -- did Hawaiiloa

11    Foundation give titles to people who were part of the group?

12    In other words, was anyone ever designated to be the

13    chairperson of Hawaiiloa Foundation?

14    A    You know what, I can't recall.

15    Q    You can't recall?

16    A    No.

17    Q    Let me ask you to look at the third page of Exhibit 1-W,

18    and see if that refreshes your memory -- 1-X.

19    A    Yes.

20    Q    Having reviewed the third page, does that refresh your

21    memory as to whether anyone was given titles within the

22    Hawaiiloa Foundation?

23    A    Yes.

24    Q    Did you have a title?

25    A    I was -- I listed as vice chair.

1          THE COURT:  No, no, no, he's not asking you what

2   you're listed as.

3          THE WITNESS:  Oh.

4          THE COURT:  Put that document down now.

5          THE WITNESS:  Okay.  Yeah.

6          THE COURT:  The question is whether that refreshes

7   your recollection.

8          THE WITNESS:  Yeah.

9          THE COURT:  He's not asking you to -- from this

10  document what it says, but what your memory is.

11         THE WITNESS:  Okay.

12         THE COURT:  Okay?

13  BY MR. TONG:

14  Q    Having reviewed that document, do you now have a memory of

15  the titles of people with Hawaiiloa Foundation?

16  A    Yes.

17  Q    Did Mahealani Ventura-Oliver have a title?

18  A    Yes.

19  Q    What was her title?

20  A    She was the chairperson.

21  Q    And did you have a title within Hawaiiloa Foundation?

22  A    Vice chair.

23  Q    And who assigned those titles?

24  A    Mahealani.

25  Q    Okay.  Now, are you familiar with the operations of

1    Hawaiiloa Foundation from the time when the bank account was

2    established?

3    A    Yes.

4    Q    And did Hawaiiloa Foundation have any activities other

5    than the mortgage activities?

6         THE COURT:  Just time frame, Mr. Tong.

7    BY MR. TONG:

8    Q    Do you recall --

9         THE COURT:  It may be never, I don't know.

10   BY MR. TONG:

11   Q    Do you recall when the bank account was started?

12   A    That would have been in -- in the beginning, the very

13   beginning.  Yeah.

14   Q    Can you give us a month?

15   A    No.

16   Q    Okay.  I'm going to ask you again to look at Exhibit 1-X,

17   at the bottom of the first -- the third page and the first

18   page, and see if that helps you remember when the bank account

19   was established.

20        THE COURT:  The first page, Mr. Tong?

21        MR. TONG:  Right under the signature on the lower

22   right-hand corner, right above the word "date."

23        THE COURT:  Oh, I see.

24   BY MR. TONG:

25   Q    Mr. Oliver, do you see something right above the word

1    "date" with a date on it?

2    A    Yeah.  It's --

3              THE COURT:  Don't read it.

4              MR. TONG:  Don't read it.

5              THE COURT:  Don't read it.

6              THE WITNESS:  Yeah.

7    BY MR. TONG:

8    Q    Having just reviewed it, does that refresh your memory on

9    when the bank account was started?

10   A    May of '08.

11   Q    Okay.  And did Hawaiiloa Foundation maintain that account

12   until the foundation ceased to exist?

13   A    Yes.

14   Q    And what money went into that account?

15   A    Money that was made from the proceeds at the office.

16   Yeah.

17   Q    And what generated the proceeds?

18   A    The -- the mortgage process from the -- from the -- the

19   notes and the trusts.

20   Q    Okay.  Did Hawaiiloa Foundation generate money from any

21   source other than the process you've described?

22   A    Not that I'm aware of.

23   Q    Okay.  Now, you started to mention that there were two

24   different offices; is that correct?

25   A    Yes.

1    Q    And who worked where?

2         Or that's a bad question.  What happened in each

3    office?

4    A    When we moved from the first office to the second office,

5    and then there was two offices at the new spot.

6    Q    Okay.

7    A    Yeah.  And on the side Mahealani and Pili were on, they

8    did the process, the mortgage process.  And on the side I was

9    on, it was taxes and basically like research, it's like a

10   research.

11   Q    Okay.  And had you ever heard it referred to as the girls'

12   side and the boys' side?

13   A    Yeah.

14   Q    All right.  And tell us who worked on the girls' side.

15   A    Pilialoha, Lehua, Mahealani, and the other office staff, I

16   couldn't recall all their names.

17   Q    Okay.  And who directed the activities on that side of the

18   office?

19   A    Mahealani and Pili.

20   Q    Do you know what Pilialoha did with regard to that

21   process?

22   A    She was office manager.  Yeah, and so she directed.

23   Q    What were her duties as office manager?

24   A    She would direct the staff on what -- on what to do on

25   their -- their certain areas, their jobs.

1  Q    And you mentioned earlier that you had found bonds online

2  through the patriot movement, correct?

3  A    Yes.

4  Q    And do you know how the items that you found were used in

5  connection with the mortgage process?

6  A    Yeah, they were used to -- as -- as a gift to -- to the

7  package.  That's how it was sold.

8  Q    Well, I -- I guess I'm asking more for how these papers

9  were prepared.  Do you know the mechanics of how the papers

10 were prepared?

11 A    Yeah, I couldn't -- I couldn't -- I know they were being

12 prepared.  I just couldn't tell you who was doing exactly what.

13 Q    Did Hawaiiloa Foundation have computers?

14 A    Yes.

15 Q    What, if any, role did the computers play in the

16 preparation of the papers?

17 A    They were -- they were vital.  They had all the

18 information in them.

19 Q    In other words, they were templates; is that correct?

20 A    Yeah, templates.

21       MR. BARBEE:  Your Honor, I'm going to object to the

22 leading again.

23       THE COURT:  Sustained.

24 BY MR. TONG:

25 Q    I'm just asking about the mechanics of how a piece of

OLIVER - DIRECT

1   paper would be prepared and titled "Bonded Promissory Note."

2   Can you walk me through that?

3   A    Yeah.  There would have -- there was templates and -- and

4   computer programs and they were filled out.

5   Q    All right.  And which side, the boys' side or the girls'

6   side, were those documents filled out on?

7   A    The girls' side.

8   Q    You mentioned Lehua Hoy also worked there; is that

9   correct?

10  A    Yes.

11  Q    What was her job?

12  A    Lehua was, like, third in command.  She was like third in

13  line to help -- helping Pili.

14  Q    Okay.  I'm not sure who first and second were.  Who were

15  they?

16  A    Mahealani, then Pili, and then Lehua.

17  Q    Okay.  And I think you mentioned that a number of people

18  worked on the boys' side, correct?

19  A    Yes.

20  Q    Who worked on the boys' side?

21  A    Me, Uncle Gilbert, Gerry Michaud would come in sometimes,

22  Chase would come in sometimes.  And that's it.

23  Q    You mentioned someone called Uncle Gilbert, correct?

24  A    Yeah.

25  Q    What was his last name?

1    A    Schmitt.

2    Q    And was he of any blood relation to anyone?

3    A    Mahealani's uncle.

4    Q    By blood?

5    A    Yes.

6    Q    What was the nature of the relationship?

7    A    His mom -- her mom's brother.

8    Q    Okay.

9              THE COURT:  Mr. Tong, is this a good time to break?

10             MR. TONG:  Sure.

11             THE COURT:  All right.  So we will break for our

12   afternoon recess, and pick up at 1:15.  Just leave your

13   notepads, of course, on the chair closed up.  And I remind you

14   not to talk about the case with each other or others.  All

15   right?  Thank you.

16             If any of you need your cellphones during the lunch

17   break for some reason, let them know downstairs and we can get

18   your cellphones if you need them.  Because we have these issues

19   about next week if you need to call somebody.

20             (At 11:58 a.m., the jury was excused, and the

21   following proceedings were held:)

22             THE COURT:  All right.  The jury has departed.

23             Mr. Barbee, why don't we take up the Rule 609 issue.

24             MR. BARBEE:  Okay.

25             THE COURT:  Is there any further argument or evidence?

OLIVER - DIRECT

1          MR. BARBEE:  Yes, Your Honor.  I did hear Mr. Nammar's

2     argument.  Our argument basically, Your Honor, is that this

3     witness is trying to identify my client as being the leader who

4     directed certain activities within the Hawaiiloa Foundation.

5     The evidence proffered to impeach him would tend to --

6          THE COURT:  Well, it's under 609, right?  I mean 609

7     is very specific as to when a misdemeanor conviction can come

8     in.  It's not related to how relevant the evidence is or how

9     important the witness is.

10         Rule 609 says that:  "The following rule or rules

11    applied to attacking a witness' character for truthfulness by

12    evidence of a criminal conviction."

13         This is not a felony, we all agree with that.  So you

14    go to (a)(2), and it says:  "For any crime, regardless of the

15    punishment" -- in this case meaning a misdemeanor -- "the

16    evidence must be admitted if the Court can readily determine

17    that establishing the elements of the crime required proving or

18    the witness' admitting a dishonest act or false statement."

19         And there is no 403 analysis if that rule is

20    satisfied.

21         So it seems to me for the conviction to be admissible,

22    you must show to me that the elements of the crime, in this

23    case the abuse of a household member, or Mr. Oliver's

24    admissions show that it's a dishonest act involving a dishonest

25    act or false statement.

 1          MR. BARBEE:  Yes, Your Honor.  Regarding the latter, I
 2    believe that his refusal to comply with police officers'
 3    direction in staying away from a residence for a 24-hour period
 4    of time does impinge his honesty and his law-abidingness.
 5    He -- it indicates he does not abide by the law and he does not
 6    respect authority of --
 7          THE COURT:  So you're saying it's a dishonest act, is
 8    that --
 9          MR. BARBEE:  Yes, Your Honor.
10          THE COURT:  It's not a false statement.  It's a
11    dishonest act.
12          MR. BARBEE:  Yes, Your Honor.
13          THE COURT:  That's your argument?  All right.
14    Anything else then, Mr. Barbee?
15          MR. BARBEE:  No, Your Honor.
16          THE COURT:  All right.  Anything further from the
17    government?
18          MR. NAMMAR:  You know, it's our position that it's not
19    a dishonest act.  The cases I've seen that fall under this sort
20    of thing are like lying to a police officer, showing like a
21    fake I.D. or committing perjury.
22          THE COURT:  All right.  Well, the rule was amended --
23    you may be seated.  Thank you.
24          The rule was amended in 2006.  It is slightly
25    different than what it used to be as far as the -- the

OLIVER - DIRECT

1    language.  So the evidence of the -- of crimes that required

2    proving or the witness' -- in this case Mr. Oliver's --

3    admitting a dishonest act or false statement must be admitted

4    regardless of how the crimes are specifically charged.

5         And if the deceitful nature of the crime is not

6    apparent from the face of the law, that is the elements of the

7    offense or the face of the judgment, it may still come in if --

8    if there is evidence from which it can be readily determined

9    that the conviction required the fact-finder to find or the

10   defendant admitted a dishonest or false statement.

11        Now, I think of particular relevance here is the 2006

12   advisory note to Rule 609.  And let me read this.  I'm not

13   going to read it in full.  But it says:  "The amendment

14   requires that the proponent have ready proof that the

15   conviction required the fact-finder to find or the defendant to

16   admit an act of dishonesty or false statement.  Ordinarily the

17   statutory elements of the crime will indicate whether it is one

18   of dishonesty or false statement.  Where the deceitful nature

19   of the crime is not apparent from the statute, and the face of

20   the judgment, as, for example, where the conviction simply

21   records a finding of guilt for a statutory offense that does

22   not reference deceit expressly, a proponent may offer

23   information such as an indictment, a statement of admitted

24   facts, or jury instructions to show that the fact-finder had to

25   find or the defendant had to admit an act of dishonesty or

1    false statement in order for the witness to have been so

2    convicted."

3          Now, the burden is on Mr. Barbee in this case to show

4    the applicability of the rule.  And here, looking at the

5    statutory element of 709-906, the parties have agreed that what

6    we're talking about here is a refusal to comply with a lawful

7    order of a police officer under Subsection (4).  That's been

8    stipulated to.

9          There is nothing about the elements in and of itself

10   or the statutory language from which the Court can readily

11   determine the dishonest act or you false statement requirement.

12         I understand your argument, Mr. Barbee, that he was

13   told to do something and he didn't do it.  But the laws tell us

14   don't do something, and then people do it and violate the law.

15   That's not a dishonest act.  In other words, whether it's a

16   police officer or a statute, people are violating the law when

17   they commit a crime.  But not every crime is admissible just

18   because you violate the law.  It's a bootstrap argument, in

19   essence.

20         I'm not sure if I'm articulating this well, but my

21   point is you're saying it was the -- because he didn't comply

22   with what the police officer said, it's a dishonest act.  But

23   any conviction involves not doing what you're told to do.  The

24   law tells you don't do X, don't smoke marijuana.  You smoke

25   marijuana, you're disobeying that law.  But it doesn't mean

1    that it's a dishonest statement or dishonest act in doing so.

2         And to the extent I could find cases and looked a

3    little bit over the break at cases involving contempt, it is

4    very fact specific as to whether or not that evidence would

5    establish the foundation under Rule 609.  And I just don't

6    believe here there has been sufficient evidence presented to

7    me, as I laid out under the rule, for the prior conviction to

8    be admissible under Rule 609.

9         All right.  Anything else before we break?

10        MR. TONG:  Your Honor, one other thing.  Mr. Barbee

11   mentioned in passing that he intended to cross-examine

12   Mr. Oliver as to the divorce proceeding filings.  I'm not

13   completely clear on what he intends to ask, so I just want to

14   raise it now.

15        MR. BARBEE:  Mr. Tong brought it up in his direct.  I

16   was just going to follow up, Your Honor, by indicating that

17   he -- he refused to divorce her.  He refused to grant her a

18   divorce.

19        THE COURT:  All right.

20        MR. TONG:  If that's it, I thought he was talking

21   about some violent act.

22        MR. BARBEE:  Meaning the divorce?

23        MR. TONG:  I thought that's what you referenced

24   yesterday.

25        MR. BARBEE:  No.  Maybe what Mr. Tong is referring to

OLIVER - DIRECT

1    is there was a TRO action.  There were two of them actually.

2    One I believe in 2004 and one more recently in 2011 where

3    Mr. Oliver was accused by my client of choking, pushing,

4    striking her, and things of that nature.

5            So, yeah, I -- I was going to ask him questions about

6    the relationship generally, because he's testified here that

7    she was the leader of certain aspects of the relationship, and

8    I wanted to flesh that out, and ask him, Well, isn't it true

9    that you were verbally abusive?  Isn't it true that you were

10   physically abusive as well?

11           MR. NAMMAR:  Your Honor, I think that falls under

12   608(b), specific instance of conduct, and what I recall of the

13   law and the rule is that that has to go to his credibility and

14   his trustworthiness.  I just don't see how that falls --

15           THE COURT:  Well, let's do this:  Let me -- again, I

16   really don't like to rule on these things outside of the

17   context in which you would ask the questions.

18           And, Mr. Barbee, come to sidebar before you ask that

19   question.

20           MR. BARBEE:  Yes, Your Honor.

21           THE COURT:  I can see a circumstance in which

22   potentially, based on the way he's testifying and describing

23   the relationship between the two of them, it could be relevant.

24   On the other hand, sort of in a generic sense, it probably

25   isn't relevant.  And so I really want to see it in the context

 1   of how -- of his testimony and your cross-examination.

 2            MR. BARBEE:  Yes, Your Honor.  And I think it does go

 3   to his credibility insomuch as he's trying to hoist all the

 4   blame onto her and saying that she was leading him.  When it --

 5   I should be able to impeach him and ask, Well, isn't it true

 6   that, you know, you dominated her?

 7            THE COURT:  All right.  Well, let's wait and see how

 8   that cross goes, and then -- and then we'll go from there.  All

 9   right?

10            MR. BARBEE:  Okay.

11            THE COURT:  Anything else?

12            MR. TONG:  No.

13            THE COURT:  Okay.

14        (A recess was taken from 12:09 p.m. to 1:26 p.m.)

15            THE COURT:  We are back after our lunch break with

16   defendants, counsel, case agents, ladies and gentlemen of the

17   jury.  I hope you had a pleasant lunch.

18            Mr. Oliver, I remind you you're still under oath.

19            THE WITNESS:  Okay.

20            THE COURT:  All right?

21            MR. TONG:  Thank you, Your Honor.

22   BY MR. TONG:

23   Q    Mr. Oliver, did Ko Hawaii Pae Aina have a website?

24   A    Yes.

25   Q    What was that website used for?

1   A    For people to come in and do research, a lot of history on

2   there.  Yeah.

3   Q    Did it also -- history about what?

4   A    About land patents and Hawaiian history.

5            THE COURT:  A little closer to the mike, just -- and

6   pull it down just a little bit.

7            THE WITNESS:  Okay.

8            THE COURT:  There we go.

9            THE WITNESS:  Yeah, land patents and a lot of Hawaiian

10  history.

11  BY MR. TONG:

12  Q    And did you have any role in operating or maintaining that

13  website?

14  A    No.

15  Q    Who ran the website?

16  A    Mahealani and Pili.

17  Q    Was that done from the girls' side then?

18  A    Yes.

19  Q    Let me ask you about something called "Zero your account."

20  A    Yeah.

21  Q    I'll put it in quotes.  Does that phrase ring a bell with

22  you?

23  A    Yes.

24  Q    And how did you first learn of that phrase?

25  A    That was on the page we had cited.  I believe it was -- I

OLIVER - DIRECT

100

1   found it on Sam Kennedy's site.

2   Q    And tell us generally what "zero your account" referred

3   to.

4   A    Well, there's the -- the theory was that they would use

5   1099-OIDs, and that any credit that was used -- you used, you

6   could discharge through the 1099 process.

7   Q    Okay.  And what was the 1099 process as promoted by the

8   Kennedy website?

9   A    You would do a couple of forms, you know, a 56, and then

10  you would put in whatever debt you had, like credit cards or

11  mortgage or whatever.  And there's a payer and a recipient, and

12  then it would -- it would actually pay you back.  That was what

13  that was designed for.  Yeah.  To discharge or to pay back the

14  credit, because the theory was that the -- the government was

15  using your credit.

16  Q    And by filing these forms, you would do what?

17  A    You would get a return.  Yeah.

18  Q    How would you obtain the return?

19  A    Well, the IRS would send you a return back.  You put it on

20  a 1040 and then they would return it.

21  Q    1040 is a tax return; is that correct?

22  A    Yes.  Yeah.

23  Q    Now, you mentioned a Form 56; is that correct?

24  A    Yeah.

25  Q    Could you look at Exhibit 18-I, as in India.  Should be in

 1    one of the binders in front of you.

 2              THE COURT:  It's admitted, Mr. Tong.

 3              MR. TONG:  Oh, thank you, Your Honor.  We would ask to

 4    display it, please.

 5              THE COURT:  Yes.

 6              THE WITNESS:  Yeah, I got it.

 7    BY MR. TONG:

 8    Q    Okay.  You have 18-I in front of you, Mr. Oliver?

 9    A    Yes.

10    Q    And give us a second to catch up with you, but we will put

11    it on the screen.

12              You talked about a Form 56 a second ago, correct?

13    A    Yes.

14    Q    Is Exhibit 18-I one such form?

15    A    Yes.

16              MR. TONG:  And if we could see the top half, please,

17    Agent Carter.

18    BY MR. TONG:

19    Q    This is a Form 56-F, and it identifies the person who is

20    affected; is that correct?

21    A    Yes.

22    Q    And whose name appears there?

23    A    Mahealani Oliver.

24    Q    And Box 9 says "Fiduciary's name," correct?

25    A    Right.

OLIVER - DIRECT

102

1   Q    What name appears there?

2   A    Henry Paulson, Jr.

3   Q    And based on your study of the patriot materials, do you

4   have an understanding of what that was intended to convey?

5   A    Yes, that he was a trustee or fiduciary of the account.

6   Q    And was that part of the "zero your account" strategy?

7   A    Yes.

8   Q    And you mentioned that another form that was involved in

9   connection with the "zero your account" was a 1099-OID form; is

10  that correct?

11  A    Yes.

12  Q    And let me ask if you could look at Exhibit 18-A, which is

13  not in evidence yet.

14        Do you have that document in front of you?

15  A    Yes.

16  Q    And do you recognize Exhibit 18-A?

17  A    Yes.

18  Q    What is that?

19  A    That's a 1099-OID.

20  Q    There appears to be some handwriting on those two forms;

21  is that correct?

22  A    Yes.

23  Q    Whose handwriting appears there?

24  A    That's mine.

25        MR. TONG:  We would ask that Exhibit 18-A be received.

1          MR. BARBEE:  Brief voir dire, Your Honor?

2          THE COURT:  Yes.

3                    VOIR DIRE EXAMINATION

4   BY MR. BARBEE:

5   Q    Mr. Oliver, the exhibit that you're looking at right now

6   is 18-A, correct?

7   A    Yes.

8   Q    And these are 2008 1099-OID forms?

9   A    Yes.

10  Q    And these are forms that you researched in looking at the

11  patriot website -- websites?

12  A    Yes.

13  Q    And the websites you looked at were Sam Kennedy's website?

14         MR. TONG:  Objection.  Beyond voir dire.

15         THE COURT:  Sustained.

16  BY MR. BARBEE:

17  Q    And these -- this appears to be two filled-in forms?

18  A    Yes.

19  Q    2008 1099-OID forms bearing your name, correct?

20  A    Yes.

21  Q    And you filled these out, correct?

22  A    Yes.

23  Q    And you submitted these in attempt to zero out your --

24  your debt, right?

25         MR. TONG:  Objection.  Same objection.

1          THE COURT:  Overruled.

2     BY MR. BARBEE:

3     Q    You filled these out to zero out your debts, correct?

4     A    Yes.

5          MR. BARBEE:  Okay.  No further questions at this time.

6     No objection.

7          THE COURT:  Mr. Gronna?

8          MR. GRONNA:  No objection.

9          THE COURT:  18-A is admitted.

10         (Government's Exhibit 18-A was received in evidence.)

11         MR. TONG:  May we show it, Your Honor?

12         THE COURT:  You may.

13                    RESUMED DIRECT EXAMINATION

14    BY MR. TONG:

15    Q    Mr. Oliver -- if you could focus on the top too, please --

16    Mr. Oliver, we have in front of the jury Exhibit 18-A, which

17    consists of the two forms you've just described; is that

18    correct?

19    A    Yes.

20    Q    Just so we're clear, it's a original issue discount, Form

21    1099-OID; is that correct?

22    A    Yes.

23    Q    There's a name that appears in the upper left-hand corner

24    in the box denominated "Payer," correct?

25    A    Yes.

1   Q    Whose name appears there?

2   A    John D. Oliver.  That's me.

3   Q    And below there's a box entitled "Recipient."  Do you see

4   that?

5   A    Yes.

6   Q    And what information on the top form is written in as the

7   recipient?

8   A    The recipient is "MSB, Municipal Service Bureau."

9   Q    What relationship, if any, did you have to the MSB,

10  Municipal Service Bureau?

11  A    That was a traffic ticket, I think, something like that.

12  Q    And Box 1 -- I can't quite read it, but I think it says

13  "Original issue discount."  Do you see that?

14  A    Yes.

15  Q    And there's an amount that appears there, correct?

16  A    Yes.

17  Q    What is that amount?

18  A    $42.42.

19  Q    And what did that number represent?

20  A    That was the amount of the bill.

21  Q    And box number 5 entitled "Description" has some

22  handwriting in it; is that correct?

23  A    Yes.

24  Q    I can't quite read it.  Could you tell us what it says?

25  A    "Paid to the U.S. Treasury.  1040-V attached."

OLIVER - RESUMED DIRECT

106

1   Q    So at the time you filled out this document, what were you

2   intending to convey?

3   A    To try to discharge the debt.  Yeah, get a return.

4   Q    And just to be clear, the bottom half of the same exhibit

5   is another 1099-OID form, correct?

6   A    Yes.

7   Q    And the recipient on this one is Associated Recovery

8   Systems, correct?

9   A    Yes.

10  Q    Who were they relative to you?

11  A    Collection agency.

12  Q    And there's a number that looks like 96 -- $9,643.60 as

13  the original issue discount, correct?

14  A    Yes.

15  Q    And what did that represent?

16  A    That was the amount of the bill.

17  Q    So I'm clear, who was billing whom as reflected in this

18  OID?

19       Is that a bad question?

20  A    Yeah, what do you mean?

21  Q    I'm looking at your face, it's clearly a bad question.

22  Let me try over again.

23       Okay.  You said that Associated Recovery Systems

24  billed you something; is that right?

25  A    Yes.

OLIVER - RESUMED DIRECT

107

1   Q   And the amount was $9,643?

2   A   Yeah.

3   Q   And based on your testimony, the purpose of this was to

4   clear the debt, correct?

5   A   Yeah.  Yes.

6   Q   Where did you learn how to fill out forms in this manner?

7   A   That was on the disk that I had received from -- from Sam

8   Kennedy's people.

9   Q   Now, did there come a time when you discussed this "zero

10   your account" strategy at the Hawaiiloa Foundation meetings?

11   A   Yes.

12   Q   How is it that the topic became part of the meetings?

13   A   It was being incorporated into the office, into --

14        MR. GRONNA:  Well, I'm going to object.  I'm sorry.

15   I'm going to object, lacks foundation.

16        THE COURT:  Sustained.

17   BY MR. TONG:

18   Q   Were you involved in deciding to incorporate the "zero

19   your account" strategy into the Hawaiiloa Foundation meetings?

20   A   Yes.

21   Q   What was your involvement?

22   A   Um --

23   Q   Let me back up.  Let me ask you first, who else -- was

24   anyone else involved in that decision?

25   A   Yes.

OLIVER - RESUMED DIRECT

108

1    Q    Okay.  Who else was involved in that decision?

2    A    Mahealani and Pili.

3    Q    Okay.  Now, what was your involvement in deciding to

4    incorporate this into the Hawaiiloa Foundation program?

5    A    I was going to do the tax part in the office.  The tax.

6    Yeah.

7    Q    Okay.  Help me out here.  Try to recreate -- was there a

8    discussion between the three of you in making this decision?

9    A    Yes.

10   Q    Try to recreate the substance of that discussion, if you

11   would.

12   A    Well, we had --

13         MR. GRONNA:  I'm going to -- I'm going to object,

14   Judge.  This is a general question, and I think the

15   government -- well, foundation, because time as to when this

16   purported meeting took place.

17         THE COURT:  Overruled.  I think it's --

18   BY MR. TONG:

19   Q    Do you remember the question?

20   A    Yeah.

21   Q    I'm basically asking you to tell us what was said.

22   A    Yeah, we had decided to incorporate it into the entire

23   process.

24   Q    Okay.

25   A    And -- and we had discussed it with Pili and Mahea.  The

OLIVER - RESUMED DIRECT

109

1    staff, they had to know.  So we had discussed the process being

2    incorporated into the mortgages.

3    Q    Okay.  Was the process of the "zero your account"

4    discussed at the meeting?

5    A    Yes.

6    Q    Did you tell the others what you had learned about this

7    process?

8    A    Yes.  Yes.

9    Q    And how did Mahealani Ventura-Oliver respond to that?

10   A    She was agreeable.

11   Q    How did Pilialoha Teves respond to that?

12   A    Agreeable.

13   Q    And after this meeting, what happened next with the "zero

14   your account" relative to the Hawaiiloa Foundation process?

15   A    We incorporated it into the office, and then on the boys'

16   side, that's where we set up that section.

17   Q    All right.  And when you say you incorporated it into the

18   boys' side, what do you mean by that?

19   A    Well, the other office.  Yeah.

20   Q    Okay.

21   A    That was our department, my department.

22   Q    Okay.  So your department is the boys' side?

23   A    Yes.  Yeah.

24   Q    And you incorporated it into the boys' side, right?

25   A    Yeah.  Mm-hmm.

OLIVER - RESUMED DIRECT

110

1    Q    What did you do when you incorporated it?

2    A    We had already employed the process in the mortgage, and

3    then we were going to start doing tax returns for people.

4    Yeah.

5    Q    And how did people know that you were available to do

6    these tax documents?

7    A    It was announced at a meeting.  At a seminar.

8    Q    Who announced it at the meeting?

9    A    Mahealani and I.

10   Q    Okay.  So both of you?

11   A    Yeah.

12   Q    And did you tell people at the meeting what you could

13   offer to them?

14   A    Yeah, I think we went over the disk at the meeting and --

15   and explained to everybody how it worked, yes.

16   Q    And just so we're clear, going back to Exhibit 18-A,

17   looking at the bottom half, did Associated Recovery Systems

18   sell you any kind of bond at a discounted price?

19   A    No.

20   Q    And Box 4, "Federal income tax withheld," says that

21   $9,643.60 was withheld on your behalf; is that correct?

22   A    Yes.

23   Q    And did Associated Recovery Systems withhold taxes in that

24   amount on your behalf?

25   A    No.

OLIVER - RESUMED DIRECT

111

1    Q    So was that information true?

2    A    No.

3    Q    Now, you say that this process became discussed at

4    meetings, correct?

5    A    Yeah.

6    Q    And did there come a time when you discussed how OID forms

7    could be used at these meetings?

8    A    Yes.

9    Q    And tell us generally what you told people to do, if

10   anything.

11   A    That if you -- if you had borrowed credit, any kind of

12   money, that you could put it on a 1099-OID and put it on a 1040

13   and it would generate a return.  Yeah.

14   Q    And were -- well, was Mahealani Ventura-Oliver present at

15   those portions of the meetings when you spoke?

16   A    Yes.

17   Q    Was Pilialoha Teves present at those portions of the

18   meetings where you spoke?

19   A    Yes.

20   Q    And how were people interested in the process supposed to

21   contact you?

22   A    Through the -- through the office.

23   Q    Which office?

24   A    The -- it would -- the main office, which is the girls --

25   the girls' side.

OLIVER - RESUMED DIRECT

112

1   Q   So they would call the girls' side and contact you?

2   A   They would call the girls' side and book an appointment.

3   And then -- yeah, and then I would get the appointment.

4   Q   How would you find out that there was an appointment?

5   A   From them.

6   Q   "Them" being?

7   A   Pilialoha.  Yeah.

8   Q   Okay.  Now, let me direct your attention at Exhibit 25.

9           MR. TONG:  In evidence.  If I may, Your Honor?

10          THE COURT:  You may.

11          MR. TONG:  I'm sorry, Your Honor, I'm starting to get

12  hungry now.

13          THE COURT:  Just want to make sure everyone stays

14  awake.

15          MR. TONG:  I'll try not to take that as an insult.

16               (Pause in the proceedings.)

17  BY MR. TONG:

18  Q   Okay.  Mr. Oliver, do you have Exhibit 25 in front of you?

19  A   Yes.

20  Q   All right.  And we have it on the screen.

21          MR. TONG:  If we could see the top half, please, Agent

22  Carter.

23  BY MR. TONG:

24  Q   Do you recognize this as a Form 1040 tax return, sir?

25  A   Yes.

OLIVER - RESUMED DIRECT

113

 1   Q    And who was this return filed on behalf of?

 2   A    Mahealani and I.

 3   Q    As husband and wife?

 4   A    Husband and wife, yes.

 5        MR. BARBEE:  Your Honor, I'm going to object to

 6   leading again.

 7        THE COURT:  Sustained.

 8   BY MR. TONG:

 9   Q    What was your relationship to Mahea Ventura-Oliver at the

10   time Exhibit 25 was prepared?

11   A    We were married.

12   Q    Thank you.

13        And does this tax return reference your filing status?

14   A    Yes.

15   Q    And what does Box 2 say?

16   A    "Married, filing jointly."

17   Q    Now, let's walk through this a little bit.  Down at the

18   bottom of the section there, on Line 21, do you see this

19   reference to "Attached OID"?

20   A    Yes.

21   Q    And what did -- wait a minute.  Let me ask you a basic

22   question.  Who prepared this tax return?

23   A    I did.

24   Q    All right.  And when you prepared this tax return and

25   wrote in "Attached OID," what did you mean by that?

OLIVER - RESUMED DIRECT

114

1   A    That the OIDs were attached to the return itself, the

2   1040.

3   Q    There's a number $20,465.22 that appears to the right of

4   that reference, correct?

5   A    Yes.

6   Q    What did that number represent?

7   A    That was all -- the amount of all the debt.

8   Q    Okay.  And actually 21 is obscured, but what are the

9   two words that appear right after the number?  Or can you read

10  it?

11  A    "Other income."

12  Q    Okay.

13  A    Yeah.

14  Q    It doesn't say "total debts," right?

15  A    No.

16  Q    Okay.  And number 22, Line 22, which is kind of dark, is a

17  total of all the income; is that correct?

18  A    Yes.

19  Q    And you had the same number?

20  A    Yes.

21  Q    All right.

22        MR. TONG:  May we see Page 2?

23        Your Honor, may we display?

24        THE COURT:  Yes, yes.

25        MR. TONG:  Bates 56759, please.

1    BY MR. TONG:

2    Q    All right.  Do you have that in front of you, Mr. Oliver?

3    A    Yes.

4    Q    All right.

5         MR. TONG:  And if we could see the top half.

6    BY MR. TONG:

7    Q    The top of Page 2 basically carries over the number, does

8    it not?

9    A    Yes.

10   Q    And there is a Line 72, which is towards the bottom.  I'm

11   going to point to it because it's kind of obscured, and just

12   ask you if this is the correct line.  There's a section that

13   says "Refund," and there's a line above it.  Is that -- on your

14   copy can you read that line, 72?

15   A    72, yes.

16   Q    And that's "Total income"; is that correct?

17   A    Right.

18   Q    And right below that --

19        THE COURT:  Wait, wait, wait.  Total income?

20        MR. TONG:  I'm sorry.  Total payment.

21        THE WITNESS:  Total -- right.

22        MR. TONG:  My mistake.

23   BY MR. TONG:

24   Q    And Line 64, a little higher next to "Payments," what does

25   that number according to the form represent, Line 64?

1  A    "Federal income tax withheld from" -- I can't read that --

2  "Forms W-2 and 1099."

3  Q    Right.  And was $20,465.22 in fact withheld on your behalf

4  and Mahealani Ventura-Oliver's behalf in that year?

5  A    No.

6  Q    And I believe that Line 74 represents what you want

7  refunded to you; is that correct?

8  A    Yes.

9  Q    And what number appears there?

10  A    That's the same amount, $20,465.22.

11  Q    And there appear to be two signatures at the bottom,

12  correct?

13  A    Yes.

14  Q    Whose signatures appear there?

15  A    Mine and Mahealani's.

16  Q    You mentioned that you got this idea from the "zero your

17  account" research you did, correct?

18  A    Yes.

19  Q    What relationship, if any, was there between the "zero

20  your account" and the Sam Kennedy patriot materials?

21  A    I purchased -- purchased it from someone in their group.

22  Q    Okay.

23  A    Yeah.

24  Q    Were the two related, is what I'm asking, the patriot

25  movement and the "zero your account"?

OLIVER - RESUMED DIRECT

117

1   A    Yeah.

2   Q    So the same thought process?

3   A    Same.

4   Q    I'm going to change subjects on you.  Did there come a

5   time when you bought some coins?

6   A    Yes.

7   Q    And where did you buy the coins?

8   A    I bought 'em online from a coin dealer, a gold dealer.

9   Q    Does the name California Numismatic Investments ring a

10  bell with you?

11  A    Yes.

12  Q    And how does that company's name sound familiar?

13  A    That's where I purchased the gold.

14  Q    And you say you bought it online.  How did you buy it?

15  A    Yeah, I -- I called them.  I went online and found the

16  website, and then I called them.  Yeah.

17  Q    Did they send you materials that you ordered?

18  A    Yes.

19  Q    How were the materials packaged?

20  A    In blue -- in blue cases.

21  Q    Okay.  Did there come a time when you bought some silver

22  coins?

23  A    Yeah -- yes.

24  Q    How were they packaged?

25  A    The same way.

1    Q    Okay.  Let me ask you to look at a couple of pictures.

2    Let's take a look first at Exhibit 30-A in evidence.

3              MR. TONG:  And, Your Honor, may I publish it?

4              THE COURT:  Yes.  May need the lights down a little

5    bit for this.

6              MR. TONG:  If you would, Your Honor.

7              THE COURT:  Yes.  It's a little hard to see.  There we

8    go.

9              THE WITNESS:  Okay.

10   BY MR. TONG:

11   Q    Okay.  Mr. Oliver, your picture may be clearer than the

12   one we're showing to the jury.  So look at either.

13             But there are two white bags in the lower left-hand

14   corner of 30-A; is that correct?

15   A    Yes.

16   Q    And do you recall receiving bags that appeared like that?

17   A    Yes.

18   Q    What was inside?

19   A    Those were silver quarters.

20   Q    Okay.

21   A    Dimes.

22   Q    And is that how the coins which you ordered were delivered

23   to you?

24   A    Yes.

25   Q    Now, you've just testified a moment ago about blue

OLIVER - RESUMED DIRECT

1   containers, right?

2   A    Yes.

3   Q    I'm going to point with this laser to what appears to be a

4   box.  Do you see that?

5   A    Yes.

6   Q    What are those?

7   A    Those are -- those are the coins, those are the gold.

8   Q    Did you upon receiving the gold coins take them out of the

9   containers to look at them?

10  A    Yes.

11  Q    So you're familiar with their appearance?

12  A    Yes.

13  Q    All right.  May I ask you to turn to the next exhibit,

14  which has been marked as Exhibit 30-B for identification.

15           Do you see that picture?

16  A    Yes.

17  Q    And does that picture fairly and accurately depict the

18  appearance of the coins that you removed from the containers?

19  A    Yes.

20           MR. TONG:  We would ask that Exhibit 30-B be received.

21           MR. BARBEE:  No objection.

22           MR. GRONNA:  No objection.

23           THE COURT:  30-B is admitted.

24  (Government's Exhibit 30-B was received in evidence.)

25           MR. TONG:  May we show it, Your Honor?

1          THE COURT:  Yes.

2   BY MR. TONG:

3   Q    And Mr. Oliver, is this the way it appeared when you took

4   the coins out?

5   A    Yes.

6   Q    And they appear to be separately packaged; is that

7   correct?

8   A    Yes.

9   Q    Are these the types of coins that you ordered from

10  California Numismatics?

11  A    Yes.

12  Q    And if I could ask you to turn to the next picture, which

13  is Exhibit 30-C, and ask if you recognize that picture?

14  A    Yes.

15  Q    What is that?

16  A    Those are the quarters, dimes.

17          MR. TONG:  We would ask that Exhibit 30-C be received.

18          MR. BARBEE:  No objection.

19          MR. GRONNA:  No objection.

20          THE COURT:  30-C is admitted.

21      (Government's Exhibit 30-C was received in evidence.)

22          MR. TONG:  May we show it, Your Honor?

23          THE COURT:  Yes.

24  BY MR. TONG:

25  Q    And I gather your picture is a little clearer.

OLIVER - RESUMED DIRECT

121

 1   A    Yes.

 2   Q    All right.  There's some kind of white -- I'm having a --

 3   A    Yeah.

 4   Q    -- brain blackout.  A piece of paper in there, correct?

 5   A    Yes.

 6   Q    And are you able to read what appears on your picture?

 7   A    It says:  "90 percent, $500 pace -- face value.

 8   California Numismatics."

 9   Q    And is that the form in which the coins which you ordered

10   were received?

11   A    Yes.

12   Q    And the bag on the left seems to have the tail end of some

13   phrase, correct?

14   A    Yes.

15   Q    Do you happen to know what that says?

16   A    I -- I can't recall what was written on the bags.

17   Q    Okay.  But these appear to be the items that you ordered

18   from California Numismatics.

19   A    Yes.

20   Q    Is it true that you also ordered some other coins from

21   other dealers?

22   A    Yes.

23   Q    Were they incorporated in the array that we showed you?

24   A    Yes.

25   Q    By the way, where did the money come from to buy these

1   various coins shown in the Exhibit 30 series?

2   A    That came from the foundation.

3   Q    Meaning Hawaiiloa Foundation?

4   A    Hawaiiloa Foundation, yes.

5   Q    I'm going to change subjects on you again.  I want to

6   direct your attention to the November 2008 time frame.  Okay?

7   A    Okay.  Mm-hmm.

8   Q    Did there come a time when you read a newspaper article

9   concerning an FBI investigation?

10  A    Yes.

11  Q    And did you -- or what was your reaction to the article?

12  A    Fear.  Panic.

13  Q    What was the first word?

14  A    Fear.

15  Q    Okay.  Fear and panic?

16  A    Yeah.

17  Q    And what did you do after feeling these emotions?

18  A    I pretty much freaked out and had a fit and decided to

19  move the coins in -- to somewhere else.

20  Q    Okay.  And did you verbalize your feelings of fear or

21  panic?

22  A    Yes.

23  Q    Did you say what you were thinking to anyone else?

24  A    Yes.

25  Q    Who did you tell what you were feeling?

OLIVER - RESUMED DIRECT

123

1    A    Mahealani.  And at the office I made my feelings known to

2    Pilialoha and Lehua.

3    Q    Okay.  And tell us what you said to them.

4    A    I told them that we got to stop.  What do we do?  We need

5    to stop.  And we need to stop.

6    Q    What was the response?

7    A    Really --

8          MR. BARBEE:  Your Honor, I'm going to object.  As to

9    which of these --

10         MR. TONG:  All right.

11         MR. BARBEE:  He was at the office with three --

12         MR. TONG:  Fair enough.

13         MR. BARBEE:  -- people, is this at the home --

14         THE WITNESS:  Yeah.

15         MR. BARBEE:  -- with one person?  Because there may be

16   a privilege that applies here.

17         THE COURT:  All right.  Sustained.

18   BY MR. TONG:

19   Q    All right.  Let's talk about the meeting at the office

20   first.  Did you express your feelings at the office?

21   A    Yes.

22   Q    Who was present when you expressed your feelings?

23         MR. GRONNA:  Well, I'm going to object, Judge.

24   Foundation as to time when the meeting took place.

25         THE COURT:  Overruled.  It was after the newspaper

OLIVER - RESUMED DIRECT

```
 1   article.

 2            THE WITNESS:  Yes.

 3            MR. GRONNA:  We haven't --

 4            THE COURT:  Overruled.

 5            THE WITNESS:  Yes.  I voiced my panic and fear to

 6   Mahealani and Pili.

 7   BY MR. TONG:

 8   Q    Were they together at the time?

 9   A    Yes.

10   Q    All right.  And what did you say?

11   A    I told them that we need to stop.

12   Q    Okay.

13   A    And this is serious.  We need to do something.

14   Q    All right.  What did the defendant Mahealani

15   Ventura-Oliver say in response to your statement?

16   A    Don't worry, it's just an article.  It's BS.

17   Q    Okay.  What did the defendant Pilialoha Teves say in

18   response to your statement?

19   A    Pili didn't say anything, but she was right there

20   listening.

21   Q    Okay.  And I interrupted you as you were starting to say

22   you then got the coins, correct?

23   A    Yes.

24   Q    Tell us how that came about.

25   A    Well, it was like a day after we had discussed that we
```

OLIVER - RESUMED DIRECT

125

1   need to get rid of the coins and hide them.

2   Q    All right.  Let me break that down.  You say, We discussed

3   it, right?

4   A    At the house, Mahealani and I.

5   Q    Okay.

6   A    Yeah.

7   Q    And what was that discussion?

8   A    That we need to hide the coins.

9   Q    And was an agreement reached at that time?

10   A    Yes.

11   Q    What was the agreement?

12   A    That we would send them up to Petro's house.

13   Q    Okay.  Does Petro have a last name?

14   A    Hoy.

15   Q    Is he someone who at times was known as the ambassador?

16   A    Yes.

17   Q    All right.  And after you and the defendant Mahealani

18   Ventura-Oliver decided to do this, who got the coins?

19   A    I grabbed the coins.

20   Q    Okay.

21   A    Yeah.

22   Q    Where were the coins located?

23   A    They were in the safe.

24   Q    Okay.  And --

25            THE COURT:  Where?

```
 1            THE WITNESS:  A gun safe in our house.

 2            THE COURT:  In the house.

 3            THE WITNESS:  Yeah.

 4   BY MR. TONG:

 5   Q    Just to be clear, please flip the page to Exhibit 31.

 6            MR. TONG:  If we could just show it, Your Honor?

 7            THE COURT:  You may publish it.

 8            MR. TONG:  Thanks.

 9   BY MR. TONG:

10   Q    Do you see Exhibit 31?

11   A    Yes.

12   Q    And is that a picture of the safe that you're referring

13   to?

14   A    Yes.

15   Q    And where in your house was this safe located?

16   A    That was in the 584 Haiki house in a closet in our office,

17   our third bedroom.

18   Q    And who got the coins from the safe?

19   A    I did.

20   Q    That looks like a combination safe.

21   A    Yes.

22   Q    Who had the combination to that safe?

23   A    Both of us, Mahealani and I.

24   Q    All right.  What did you do on gathering the coins?

25   A    I got the coins and put them in a bag, big bag, and then
```

OLIVER - RESUMED DIRECT

127

1   there was also cash that went to the Hoys.

2   Q    Okay.  And do you recall how much cash went to the Hoys?

3   A    If I recall, it was around 90,000.

4   Q    That cash -- where had that cash been located?

5   A    That -- that wasn't in the house, that was brought to us.

6   Q    Who brought the cash to you?

7   A    Pili.

8   Q    And how did you transfer -- well, let me ask the first

9   question.  What did you do with the coins and the cash once it

10  was together?

11  A    We brought it down to the office and gave it to the Hoys.

12  Q    Okay.  Was there any conversation with the Hoys about the

13  cash and the coins?

14  A    Yes.

15  Q    What was the nature of the conversation?

16  A    If they could lock it up for us and hold onto it.

17  Q    Who said that?

18  A    I did.

19  Q    Do you recall Mahealani Ventura-Oliver saying anything to

20  the Hoys about the coins or the cash?

21  A    She was right -- standing right there next to me when it

22  went in the trunk.

23  Q    Okay.  So I gather she didn't make a statement?

24  A    No.

25  Q    Okay.

1  A    No.

2  Q    Now, this all occurred after the article that you

3  testified about, correct?

4  A    Yes.  Yes.

5  Q    What happened at the Hawaiiloa Foundation offices after

6  the article appeared?

7  A    There was panic, and then there was document shredding,

8  everyone started shredding documents.

9  Q    Tell me how the document shredding came about.

10  A    It was decided -- it wasn't me -- it came down from

11  Mahealani that -- to start destroying documents, and Pili

12  started instructing everybody to -- what to --

13  Q    Did you personally observe some of the shredding?

14  A    Yes.

15  Q    All right.  Could you turn to Exhibit 1-Q, please.

16        Do you have Exhibit 1-Q in front of you?

17  A    Yes.

18  Q    And do you recognize this item?

19  A    Yes.

20  Q    What is it?

21  A    Pili's carrying a -- a shredder.

22  Q    Is it a photograph?

23  A    It's a photograph, yeah.

24  Q    And does that fairly and accurately depict the appearance

25  of what was happening the day after the article appeared?

1    A    Yes.

2              MR. TONG:  We would ask that Exhibit 1-Q be received.

3              MR. GRONNA:  Judge, I'm going to object to the

4    introduction of this photograph.  It does not have an actual

5    date.  And there's no date as to when this article apparently

6    came in.

7              THE COURT:  Well, we had a month and a year.

8              MR. GRONNA:  Correct.  Day?

9              THE COURT:  You need a specific date?

10             MR. GRONNA:  I think that that would be important.

11             MR. TONG:  Your -- I don't want to do too much talking

12    here, but there actually is a date in the -- in the record.

13             THE COURT:  Well --

14             MR. TONG:  From -- from Agent Carter's first

15    testimony.

16             THE COURT:  If the objection is this shouldn't come in

17    because there's no specific date within the month of November,

18    the objection is overruled.

19             MR. TONG:  May I show it?

20             THE COURT:  Yes.

21             Oh, I'm sorry, Mr. Barbee didn't speak.

22             MR. BARBEE:  I'm just looking at it.  1-Q.

23             THE COURT:  1-Q.  I'm sorry, Mr. Barbee.

24             MR. BARBEE:  No, no, that's fine, Judge.  I'm just a

25    little slow here grabbing these binders.

OLIVER - RESUMED DIRECT

1          Okay, now, just a question on voir dire?

2          THE COURT:  All right.

3                    VOIR DIRE EXAMINATION

4    BY MR. BARBEE:

5    Q    Mr. Oliver, you testified that regarding document

6    shredding and this Exhibit 1-Q that you observed one of the

7    defendants shredding documents, correct?

8    A    Yes.

9    Q    And you said -- you said that word came down from

10   Mahealani to shred the documents.  Did you hear any such words

11   from Mahealani?

12         MR. TONG:  Objection.  That's beyond the scope of voir

13   dire.

14         THE COURT:  Sustained.

15         MR. BARBEE:  No further questions, Your Honor.

16         THE COURT:  All right.  Any objection to 1-Q?

17         MR. BARBEE:  No.

18         THE COURT:  1-Q is admitted.

19    (Government's Exhibit 1-Q was received in evidence.)

20         MR. TONG:  May we show it, Your Honor?

21         THE COURT:  You may.

22                  RESUMED DIRECT EXAMINATION

23   BY MR. TONG:

24   Q    And, Mr. Oliver, you testified that you recognize at least

25   one of the people in this picture; is that correct?

OLIVER - RESUMED DIRECT

131

1   A   Yes.

2   Q   I have a laser dot on the woman on the right.  Do you

3   recognize that person?

4   A   Yes.

5   Q   Who is that?

6   A   That's Pilialoha.

7   Q   Do you recognize the item that she's carrying?

8   A   That's one of our shredders.

9   Q   And did you actually see Pilialoha Teves on the boys' side

10  of the offices on that day?

11  A   Yes.

12  Q   And what was she doing?

13  A   She dropped off the shredder.

14  Q   Okay.  Do you recognize the other individual that appears

15  in this picture?

16  A   No, I don't.

17  Q   And by the way, whose truck is that in the background?

18  A   That's my truck.

19  Q   Was Lehua Hoy there on the day of the shredding?

20  A   Yes.

21  Q   Could you turn to Exhibit 1-R, please, and tell me if you

22  recognize that.

23  A   Mm-hmm, yes.

24  Q   And what is Exhibit 1-R?

25  A   It's a photograph.

OLIVER - RESUMED DIRECT

132

1    Q    And do you recognize the person in it?

2    A    Yeah, that's Lehua.

3    Q    And does that fairly and accurately depict the -- the

4    events that you observed on the day after the newspaper article

5    appeared?

6    A    Yes.

7              MR. TONG:  We would ask that Exhibit 1-R be received.

8              MR. BARBEE:  No objection.

9              THE COURT:  Mr. Gronna?

10             MR. GRONNA:  No objection.  I'm sorry.

11             THE COURT:  No, that's all right.  1-R is admitted.

12        (Government's Exhibit 1-R was received in evidence.)

13             MR. TONG:  May we show 1-R, Your Honor?

14             THE COURT:  Yes.

15             MR. TONG:  All right.  May I have one moment, Your

16   Honor?

17             THE COURT:  Yes.  Let's put the lights back on and

18   take off the exhibit.

19                       (Pause in the proceedings.)

20   BY MR. TONG:

21   Q    Mr. Oliver, I'm going to ask you to look at a couple more

22   pictures just to help us out here.  Take a look at Exhibit 1-N,

23   as in November, please.

24   A    Okay.

25   Q    Okay.  Do you see Exhibit 1-N?

1    A    Yes.

2    Q    And is that a photograph?

3    A    Yes.

4    Q    And does that fairly and accurately depict the appearance

5    of the building in which Hawaiiloa Foundation had its two

6    offices?

7    A    Yes, that's the building.

8            MR. TONG:  We would ask that Exhibit 1-N be received.

9            MR. BARBEE:  No objection.

10           MR. GRONNA:  No objection.

11           THE COURT:  To be clear, that's the second set of

12   offices that has the male and female side?

13           MR. TONG:  Very clear, Your Honor.

14           THE COURT:  Is that right?

15           THE WITNESS:  Yes.

16           THE COURT:  1-N is admitted.

17       (Government's Exhibit 1-N was received in evidence.)

18           MR. TONG:  And may I show it to ask about the boys'

19   and the girls' side.

20           THE COURT:  Yes, you may.

21           All right.  We have to turn the lights down a little

22   bit?

23           MR. TONG:  Yeah.

24   BY MR. TONG:

25   Q    I think your copy is probably better, right?

OLIVER - RESUMED DIRECT

134

1    A    Yeah, it is.

2    Q    All right.

3         MR. TONG:  But let's turn the lights down, if we

4    could.

5    BY MR. TONG:

6    Q    It looks like the building is sort of -- what, in a U

7    starting here (indicating) and working around; is that correct?

8    A    Yes, it's a U shape.

9    Q    And where would your office be, the boys' side?

10   A    My office is the -- where the windows are, straight where

11   the Mack tool truck, the big white truck.

12   Q    Okay.

13   A    Right above the truck.

14   Q    You mean right here (indicating)?

15   A    No, the one in the corner, far corner.  Yeah.

16   Q    Right here (indicating)?

17   A    Above that one.

18   Q    Okay.  Right here (indicating)?

19   A    Yeah.

20   Q    All right.  We can't really see windows up here, but there

21   are windows up here?

22   A    Yeah, there's four windows up there.

23   Q    All right.  And where would the girls' side be located?

24   A    They're right above the white Toyota truck right in the

25   front right --

OLIVER - RESUMED DIRECT

135

1  Q    Right here (indicating)?

2  A    Yeah, they're upstairs right there.

3  Q    Up above the Verizon sign?

4  A    Yeah.

5  Q    And we just saw a couple of pictures of people walking

6  across the parking lot; is that correct?

7  A    Yes.

8  Q    And would that be the lot that separates the boys' and the

9  girls' side?

10 A    Yes.

11 Q    Is there also a dumpster down there somewhere?

12 A    Yeah, that -- the dumpster was just off to the right of

13 the building when you're facing our office.  So the Mack truck,

14 the one in the corner way to the right -- yeah, it's over

15 there -- there's a dumpster.

16 Q    To the right side of the building.

17 A    It's on the corner, yeah.

18 Q    Okay.  And which side of the office was bigger, by the

19 way?

20 A    I believe they were both about the same square feet.

21 Q    Let me ask you about another photograph, which has been

22 marked as Exhibit 1-P, as in papa.

23        Do you recognize that picture?

24 A    Yes.

25 Q    And what is shown in Exhibit 1-P?

1   A    It's the picture of the door to the office.

2   Q    Which office?

3   A    That's the main office.

4   Q    Okay.

5   A    Yeah.

6   Q    In terms of gender, is that --

7   A    Girls.  Girls' side.

8   Q    So one -- does 1-P fairly and accurately depict the

9   entrance to the girls' side?

10  A    Yes.

11         MR. TONG:  We would ask that it be received.

12         MR. BARBEE:  No objection.

13         MR. GRONNA:  I'm going to object on the basis of

14  foundation, Your Honor.  There is a date on the bottom of the

15  picture.

16         THE COURT:  Sustained.  So I think that sign on there,

17  you have to lay a foundation that was present at the time.

18         MR. TONG:  Right.

19         THE COURT:  Of the events that have been covered.

20  BY MR. TONG:

21  Q    We're talking about events -- there was an FBI raid,

22  right?

23  A    Right.

24  Q    And that was when, April 2009?

25  A    Yes.

OLIVER - RESUMED DIRECT

137

1  Q    Okay.  And this picture has a sign on it -- I don't want

2  you to read it to me -- but it has a sign on it, correct?

3  A    Mm-hmm.

4  Q    Did that sign appear on the door prior to the time of the

5  FBI raid?

6  A    No.

7  Q    Oh, okay.

8        MR. TONG:  Well, then I'll withdraw the offer.

9        THE COURT:  All right.  Good objection.

10       MR. TONG:  I need a moment to think now, Your Honor.

11  I'm sorry.

12       THE WITNESS:  Could you -- excuse me, could you say

13  that again?  At the time of the raid -- I don't want to make a

14  mistake here.

15       MR. TONG:  Yeah.  No, no, no.

16       THE WITNESS:  I think I just answered wrong.

17  BY MR. TONG:

18  Q    You testified that you had these two offices, right?

19  A    Mm-hmm.

20  Q    And the program involved the seminars, right?

21  A    Yeah.

22  Q    And what I'm really trying to ask is, that sign that

23  appears in 1-P, was that on the door while Hawaiiloa Foundation

24  was operating its program?

25  A    Yes.

OLIVER - VOIR DIRE (Gronna)

1    Q    It was?

2    A    It was.

3    Q    Oh.

4         MR. TONG:  Well, then I would renew my offer of 1-P.

5         THE WITNESS:  I apologize for that.

6         THE COURT:  All right.  Mr. Gronna?

7         MR. GRONNA:  Brief voir dire?

8         THE COURT:  All right.

9                    VOIR DIRE EXAMINATION

10   BY MR. GRONNA:

11   Q    Mr. Oliver?

12   A    Mm-hmm.

13   Q    Good afternoon.

14   A    Hi.

15   Q    When did you -- I think you eventually moved out of that

16   office that's in part of 1-P; is that right?

17        MR. TONG:  Well, wait, wait, wait.  I object.

18        MR. GRONNA:  Well, I'm just --

19   BY MR. GRONNA:

20   Q    Were you still --

21        MR. TONG:  Doesn't go to the voir dire on the picture.

22        THE COURT:  Are you getting at whether that was the

23   first Hawaiiloa Foundation office or second --

24        MR. GRONNA:  No, no.

25        THE COURT:  -- or are you just talking about --

OLIVER - VOIR DIRE (Gronna)

 1   BY MR. GRONNA:

 2   Q     No, I'm asking when did you move out of those offices?

 3   A     To the boys' side, is that what you mean?

 4   Q     Any side.  When did you move out of those offices?

 5   A     You -- I moved out to the boys' side about halfway through

 6   the whole program.  So it's around 2000 -- middle 2008.

 7   Q     When did the Hawaiiloa Foundation, when did they move out

 8   of the offices that's depicted in this photograph?

 9            THE COURT:  The girls' side.

10   BY MR. GRONNA:

11   Q     The girls' side.

12   A     The girls' side?

13   Q     Yes.

14   A     They -- they moved out of the office after the raid,

15   and -- and then everything fell apart.  That is when we left.

16   Q     All right.  When was the raid?

17   A     The raid was in 2009.

18   Q     When in 2009?

19   A     Oh, July?  I -- June, July?

20   Q     Do you remember when the raid took place?  Does April

21   sound about right?

22   A     April?  Yeah.

23   Q     It was April 2009 when the raid took place, right?

24   A     Yeah.

25   Q     And they moved out of those offices after that happened,

OLIVER - RESUMED DIRECT

140

1   right?

2   A     Yes.

3          MR. GRONNA:  Okay.  I renew my objection, Your Honor.

4          THE COURT:  All right.  1-P is admitted.

5          (Government's Exhibit 1-P was received in evidence.)

6          MR. TONG:  May we show it, Your Honor?

7          THE COURT:  You may.

8          MR. TONG:  After working that hard.

9          THE COURT:  Yeah.

10         MR. TONG:  1-P, please.  All right.

11                    RESUMED DIRECT EXAMINATION

12  BY MR. TONG:

13  Q     So, Mr. Oliver, this is the door to the girls' side; is

14  that correct?

15  A     Yes.

16  Q     And the sign says, what?

17  A     "Seen by appointment only."

18  Q     And that sign was there while Hawaiiloa Foundation was

19  operating, correct?

20  A     Yes.

21  Q     Now, let me pick up on some testimony you gave this

22  morning concerning the credit card.  Okay?

23  A     Yeah.

24  Q     We went through some bonds that you submitted according to

25  the patriot program, correct?

 1   A    Yes.

 2   Q    And I believe you testified that First Hawaiian Bank did

 3   not accept your bonds as payment of the debt, correct?

 4   A    Correct.

 5   Q    And what did you ultimately do about that credit card

 6   debt?

 7   A    After the raids and the panic, we ended up paying for it.

 8   Q    Okay.  And may I direct your attention to Exhibit 17,

 9   please.

10         MR. TONG:  And, Your Honor, if we may show it?  It's

11   in evidence.

12         THE COURT:  Yes.

13         THE CLERK:  17-C?

14         MR. TONG:  17, please.

15         THE WITNESS:  17.  Yeah, that's it.

16         THE COURT:  It's on the overhead.  You can just look

17   up -- just look on the screen, Mr. Oliver.  It's probably

18   easier.

19   BY MR. TONG:

20   Q    All right.  Mr. Oliver, Exhibit 17 appears to be a check

21   dated November 21, 2008, correct?

22   A    Correct.

23   Q    And I believe earlier you testified there was a newspaper

24   article concerning an FBI investigation, correct?

25   A    Yes.

OLIVER - RESUMED DIRECT

142

1    Q    And that was in November, right?

2    A    Yes.

3    Q    And this check is drawn on whose account?

4    A    Hawaiiloa Foundation.

5    Q    And it appears to be made payable to First Hawaiian Bank,

6    correct?

7    A    Correct.

8    Q    In the amount of, what?

9    A    $10,580.59.

10   Q    And who signed this check?

11   A    Mahealani.

12   Q    What was this check for?

13   A    The credit card debt.

14   Q    The same debt that was the subject of the correspondence

15   and bonds you testified about this morning?

16   A    Yes.

17   Q    And tell us the circumstances under which this check was

18   written?

19   A    Well, I didn't have any credit because none of it works.

20   So I needed a credit card so we paid it.

21   Q    All right.  You needed to keep your credit card alive, is

22   that what you're saying?

23   A    Yes, yes.

24   Q    And tell us how the decision was made to pay the -- the

25   debt by this check.

1   A    Yeah, I told Mahealani we needed credit, we got to have

2   credit so we can fly or travel.  So we needed to pay it, and

3   she paid it.

4   Q    And you say this is her signature, correct?

5   A    Yes.

6   Q    Who wrote the amount out?

7   A    I did that.  That's my writing.

8   Q    And the writing here where you wrote the numbers, whose

9   writing is that?

10  A    That's me.

11  Q    And did you have any further discussion with Mahealani

12  Ventura-Oliver concerning the use of a check to pay off your

13  account?

14  A    Just that initial discussion.

15  Q    Okay.

16  A    And she wrote the -- she wrote it out, and then I filled

17  it in and sent it.

18  Q    Why didn't she use another bond to pay it off?

19  A    Well, it didn't work.

20  Q    And did you know that as of November 21, 2008?

21  A    Yes.

22  Q    There's a reference here in the memo section to USPS and

23  then a long series of numbers.  Do you see that?

24  A    Yes.

25  Q    What did that represent?

OLIVER - RESUMED DIRECT

144

1    A    That's a -- the mailing the label, the number on the

2    mailing label.

3    Q    So --

4    A    Yeah.  That's the record that they received it and that

5    was the receipt, the number on the receipt that it was paid.

6    You know, that they received it.

7    Q    And where did you get the idea that it was important to

8    use a mailing label of that sort?

9    A    That was on the patriot information.

10   Q    And I may have asked, I can't recall, but where did the

11   money in Hawaiiloa Foundation's account come from?

12   A    From the participants in the program.

13   Q    Okay.  I want to ask you about a few other documents if

14   you'll bear with me.  You testified about the 1040 form that

15   you prepared.  Remember that?

16   A    Yes.

17   Q    All right.  I'm going to show you a few others and ask if

18   you had a role in preparing them, okay?

19   A    Okay.

20   Q    So let's look at Exhibit 18-G, as in golf.

21   A    Okay.

22   Q    Okay.

23          MR. TONG:  Your Honor, may I show Exhibit 18-G?  I

24   think it's in evidence.

25          THE COURT:  It is in evidence.  You may, yes.

1   BY MR. TONG:

2   Q    And, Mr. Oliver, this is a 1040 tax return on behalf of

3   whom?

4   A    John and Julana Belker.

5   Q    Do you know those people?

6   A    Yes.

7   Q    How do you know them?

8   A    I believe Julana worked in the office, yeah.  And John, he

9   came to meetings.

10  Q    John?

11  A    Yeah, Mr. Belker came to the meetings at the seminars.

12  Q    Okay.  And did you have a role in the preparation of this

13  document, which is Exhibit 18-G?

14  A    Yes.

15  Q    And without going through all of it, does it follow the

16  same format as the one that you and your wife Mahealani

17  Ventura-Oliver prepared?

18  A    Yes.

19  Q    Okay.  And what about Exhibit 18-H, as in hotel?

20       MR. TONG:  May I show 18-H?

21       THE COURT:  Yes.

22  BY MR. TONG:

23  Q    Do you have that in front of you?

24  A    Yes.

25  Q    Am I correct that this is also a tax return?

OLIVER - RESUMED DIRECT

1    A    Yes.

2    Q    And the names of the taxpayers are what?

3    A    Jeremy and Kendra Moniz.

4    Q    Do you know those people?

5    A    Yes.

6    Q    And how do you know them?

7    A    From the seminars, too.

8    Q    Did you have a role in the preparation of Exhibit 18-H?

9    A    Yes.

10   Q    And is it true that it, too, has similar characteristics

11   of the usage of the OID forms?

12   A    Yes.

13   Q    Now, you testified earlier -- well, let me withdraw that

14   question.

15        Let me turn you now to Exhibit 32.

16        MR. TONG:  And I believe it's in evidence, Your Honor,

17   if I may?

18        THE COURT:  32.  You may.

19   BY MR. TONG:

20   Q    Mr. Oliver, Exhibit 32 has a heading "Island Dodge"; is

21   that correct?

22   A    Yes.

23   Q    And there's a box in the upper left-hand corner that I

24   think says "Name of buyer."  Can you read that?

25   A    Yes.  John -- John Oliver.  And --

OLIVER - RESUMED DIRECT

147

1    Q    And whose name -- go ahead.

2    A    Ihilani Catugal.

3    Q    And there's an address below it, correct?

4    A    Yes.

5    Q    And do you recognize that address?

6    A    584 Haiki Place.

7    Q    Were you living there at the time?

8    A    Yeah.

9    Q    Who is Ihilani Catugal?

10   A    That's Mahealani's daughter.

11   Q    And was she living with the two of you at the time?

12   A    Yes.

13   Q    And what does this document represent?

14   A    That was the receipt for the purchase of a truck.

15   Q    And who went to select the truck that was bought with this

16   document?

17   A    Mahealani and I went.

18   Q    How did you end up paying for this truck?

19   A    I believe there was a down payment, there was some cash

20   and then a check.

21   Q    Okay.

22        MR. TONG:  Let's zoom in, if we could, Agent Carter,

23   please, on the credit section.

24   BY MR. TONG:

25   Q    All right.  Mr. Oliver, we've blown it up pretty large

1    here.  There's the credit and it says "Cash down payment,"

2    correct?

3    A    Right.

4    Q    And it has the amount $7,000; is that correct?

5    A    Yes.

6    Q    Where did you obtain the $7,000 in cash?

7    A    That was from the proceeds of the foundation.

8    Q    And did you go to the safe?  How did you get the money?

9    A    No, that was Mahealani.

10   Q    You testified a moment ago that the balance was paid by

11   check; is that correct?

12   A    Yes.

13   Q    And there's a reference here to COD of $6,532.91; is that

14   correct?

15   A    Yes.

16   Q    And did you see the check that was used to pay off the

17   balance of that truck?

18   A    Yes.

19   Q    All right.  Let me ask you to look at Exhibit 32-A in your

20   binder, please.

21            THE COURT:  32-A?

22            MR. TONG:  Yes, Your Honor.

23   BY MR. TONG:

24   Q    Do you have Exhibit 32-A in front of you?

25   A    Yes.

1   Q   And do you recognize that?

2   A   Yes.

3   Q   What is it?

4   A   That's a check.

5   Q   And what was that check used for?

6   A   That was to put the final on the truck so we could take

7   it.

8   Q   Whose signature appears on the check?

9   A   Mahealani.

10        MR. TONG:  We would ask that Exhibit 32-A be received.

11        MR. BARBEE:  No objection.

12        MR. GRONNA:  No objection.

13        THE COURT:  32-A is admitted.

14   (Government's Exhibit 32-A was received in evidence.)

15        THE COURT:  It may be published.

16        MR. TONG:  Thank you, Your Honor.

17   BY MR. TONG:

18   Q   And, Mr. Oliver, this again is a check written on

19   Hawaiiloa Foundation's account, correct?

20   A   Yes.

21   Q   And the date is what?

22   A   7/22/08.

23   Q   And this is for the truck, correct?

24   A   Yes.

25   Q   In fact, there's something in the memo line.  Can you read

OLIVER - RESUMED DIRECT

150

1    that?

2    A    Something "Ihi."

3    Q    Does that look like "truck" to the left of "Ihi"?

4    A    Yeah, yeah, that's what it is, "truck."  Yeah, it's got

5    the stamp over it.

6         MR. BARBEE:  Your Honor, I'm going to object again to

7    the leading nature of the question.

8         THE COURT:  Sustained.

9         MR. TONG:  All right.  The document will speak for

10   itself.

11   BY MR. TONG:

12   Q    So the amount here is the balance of the payment of the

13   truck; is that correct?

14   A    Yes.

15   Q    And who gave you that check or who wrote that check?

16   A    Mahealani.

17   Q    And why did you not use a bond to buy that truck?

18   A    Because it -- they wouldn't accept it, it doesn't work.

19   Q    Did you also have a truck?

20   A    Yes.

21   Q    And was that the truck that was shown in the picture in

22   the parking lot that we saw earlier?

23   A    Yeah, that gold Toyota.  Yeah.

24   Q    How did you pay for that truck?

25   A    That was -- the majority of it was paid from my work.

OLIVER - RESUMED DIRECT

151

1    Yeah.

2    Q    Okay.  And what about the rest?

3    A    There was a portion at the end that was paid for from the

4    proceeds of the foundation.

5    Q    And was that done by check or some other means?

6    A    I believe that was a check.  Yeah.

7    Q    And again, why did you not use a promissory note drawn

8    through Mr. Paulson to pay for your other truck?

9    A    Because I -- I didn't think it would work and I wouldn't

10   have a truck.

11            MR. TONG:  May I have a moment?

12            THE COURT:  You may.

13                 (Pause in the proceedings.)

14   BY MR. TONG:

15   Q    You sort of discussed in the tail end here that you used a

16   couple of checks because you knew the bonds didn't work, right?

17   A    Yeah.  Yes.

18   Q    Now, did you ever discuss in the Hawaiiloa Foundation

19   offices the fact that these bonds weren't working?

20   A    Yes.

21   Q    And was it during the time frame when Hawaiiloa Foundation

22   was operating the seminars?

23   A    Yes.

24   Q    And who was present during those discussions?

25   A    Mahealani, Pili, Lehua, and I did mention it to a couple

OLIVER - CROSS (Barbee)

152

1   of other people in the office.

2   Q    And tell us generally what you told the others about the

3   bonds not working.

4   A    The -- the big thing was there was a bunch of foreclosures

5   that started coming in because they weren't working.  And there

6   was a huge panic in the office, and there was a big rush to try

7   to help people with all their foreclosures now.  So, I kind of

8   flipped out, and that's when it was too much for me to handle.

9   And I -- I told them again they gotta stop.  You gotta stop.

10   Q    And did the program stop after that?

11   A    No.

12           MR. TONG:  Thank you.  I have nothing further.

13           THE COURT:  All right.  Mr. Barbee?

14           MR. BARBEE:  Yes, Your Honor.  It's going to take me a

15   minute here.

16           THE COURT:  Yes.

17                   CROSS-EXAMINATION

18   BY MR. BARBEE:

19   Q    Mr. Oliver, you've entered into a plea agreement in this

20   case, correct?

21   A    Yes.

22   Q    And that's where you and your lawyer negotiated a

23   resolution to your case.  You were named in the indictment,

24   correct?

25   A    Yes.

OLIVER - CROSS (Barbee)

153

1   Q    And you and your lawyer got together with the prosecuting

2   attorneys and negotiated a deal for yourself, correct?

3   A    Yes.

4   Q    And the deal basically is that you have the opportunity to

5   receive a reduced sentence of imprisonment in exchange for your

6   helping the prosecution, correct?

7   A    Yes.

8   Q    So you have an incentive in this case to try to impress

9   the prosecution that you are being helpful to them, correct?

10  A    I agreed to tell the truth.

11  Q    And the truth is, is that you set your wife up to be the

12  fall guy for your scheme; isn't that true?

13  A    That's false.

14  Q    You were the one who went to the patriot websites in 2004

15  and started filing these bonded promissory notes starting in

16  2006, correct?

17  A    I did one, yes.

18  Q    One?

19  A    One or two in the beginning.

20  Q    One or two?

21  A    Yeah.  I did.

22  Q    Okay.  So basically it's up to the government attorneys to

23  decide if they're going to file a motion to ask Judge Seabright

24  to reduce your sentence, correct?

25  A    Yes.

OLIVER - CROSS (Barbee)

154

1    Q    And that depends upon how you behave in court today,

2    correct?

3    A    Yes.

4    Q    You testified that you came to Hawaii in 1990.

5    A    January 1st.

6    Q    You met Mahealani Ventura in 1991.

7    A    Yes.

8    Q    She was working as a waitress and she also was involved

9    with a hula halau on Maui?

10   A    Yes.

11   Q    You married in 1994.

12   A    Yes.

13   Q    She attended paralegal school?

14   A    Yes.

15   Q    She got her paralegal certificate and worked for the Legal

16   Aid Society for a while?

17   A    Yes.

18   Q    And she worked for a title company.

19   A    Yes.

20   Q    She expressed a desire to help Native Hawaiian people?

21   A    Yes.

22   Q    She knew about Hawaiian genealogy and land title issues.

23   A    Yes.

24   Q    She started this Registry, not to do patriot stuff, but to

25   do title research and to try to connect Hawaiian families with

OLIVER - CROSS (Barbee)

155

1    their ancestral lands, correct?

2    A    Yes, she did.

3    Q    And that's pretty much what The Registry was in the middle

4    of 2000 -- in the middle of the decade 2000s?

5    A    Yeah.

6    Q    Okay.  She made presentations about the koe nae?

7    A    Yes.

8    Q    And what is the koe nae?

9    A    Koe nae na kuleana o na kanaka was the reservation of

10   rights for kanaka maoli.

11   Q    And that had to do with the -- her belief based upon her

12   research that one-third of Maui lands had been retained by the

13   people, the Hawaiian people as a gift from King Liholiho?

14   A    I believe one-third of all lands.

15   Q    In the state?

16   A    Yeah.

17   Q    Okay.  But that's what that part of The Registry was based

18   upon, correct?

19   A    Yes.

20   Q    And then in the later part of the decade 2000, starting in

21   2006, you had done a lot of research on this patriot movement,

22   correct?

23   A    Yes.

24   Q    You had gone to websites and spent hours and hours

25   researching these issues having to do with the patriot

OLIVER - CROSS (Barbee)

156

1    movement.

2    A    And law, yes.

3    Q    Okay.  And some of the things you researched included the

4    Redemption Theory?

5    A    Yes.

6    Q    And that is the theory where a person can use their

7    account at the United States Treasury and redeem it to pay off

8    debts?

9    A    Yes.

10   Q    And you studied material on this freedom school website?

11   A    Yes.

12   Q    And you -- your studies included the use of these bonds

13   that were also obtained from the websites?

14   A    Yes.

15   Q    Your research included studies including tax forms, the

16   OID 1099s to pay off debts?

17   A    Yes.

18   Q    You shared your research as you went along with your --

19   your wife Mahealani, did you not?

20   A    Yes.

21   Q    And you persuaded her, so to speak, that this was

22   something that could be -- is possibly legitimate, correct?

23   A    I never persuaded her.  She could make up her own mind.

24   Q    You did not communicate the hours of studying of these

25   patriot documents to your wife at that time when she was

1   involved in educating people about Hawaiian rights in her

2   Registry program?

3   A    She was studying legal, all legal theories too, all the

4   legal stuff also.

5   Q    And you were the one that started to study it, correct?

6   A    Yeah, I found it on --

7   Q    You drew her attention to it, correct?

8            THE COURT:  Let him finish his answer, Mr. Barbee.

9            MR. BARBEE:  Yes, Your Honor.

10           THE COURT:  He wasn't done.

11           THE WITNESS:  Yeah, I found it on the Internet and

12   started looking at it, yes.

13   BY MR. BARBEE:

14   Q    And you drew her attention to it, correct?

15   A    I suppose so, yes.

16   Q    You were the first one to look at this stuff, weren't you?

17   A    Yeah, I looked at it, yeah.

18   Q    And you're the one that directed your wife's attention to

19   this stuff and discussed it with her at length, correct?

20   A    She was very, very intensely studying law already, legal

21   things, this type of stuff.

22   Q    She wasn't studying the patriot stuff, was she?

23   A    She was.

24   Q    You were studying the patriot stuff.

25   A    I started, but she fell right in with me.  She would find

OLIVER - CROSS (Barbee)

158

1   just as much things, just as many things as I did.

2   Q    Correct.  But you were the one who directed her to these

3   websites, correct?

4   A    I suppose.

5   Q    Thank you.

6        Regarding the freedom school website, on that website

7   they have information about these bonds to offset debt?

8   A    Yup.

9   Q    They have -- and you studied those, correct?

10   A    Yeah.

11   Q    They have information about admiralty law, correct?

12   A    Yes.

13   Q    And you studied that, correct?

14   A    I read documents on the -- on the Internet, yes.

15   Q    In fact, you downloaded forms to try to discharge debts

16   having to do with claims in admiralty, correct?

17   A    Yes.

18   Q    You studied the zero out your account program from the

19   Kennedy website?

20   A    Yes.

21   Q    You downloaded or obtained a CD or DVD that walked a

22   person through this program?

23   A    Yes.

24   Q    And this is a program that starts with the premise or

25   theory that a person when they're born, you know, are loaning

```
 1    money or credit to the United States Treasury because the

 2    Treasury went bankrupt in the 1930s?

 3    A    Yes.

 4    Q    That's the theory.

 5    A    Yeah.

 6    Q    And you believed that theory, correct?

 7    A    At the time, yes.

 8    Q    Okay.  And in directing your wife to these issues, you

 9    persuaded her to believe it too, didn't you?

10    A    No, I never persuaded her to do anything.

11    Q    Well, let me ask you about that in a minute.

12              You studied on these patriot websites acceptance for

13    value?

14    A    Yes.

15    Q    What is acceptance for value?

16    A    It's a banking term, a UCC term.  Uniform Commercial Code.

17    Q    And you studied the commercial code quite a bit, didn't

18    you?

19    A    A little bit.

20    Q    A little bit or quite a bit?

21    A    A little bit.  Yeah.  I read -- I read documents that

22    other people wrote.

23    Q    And you maintained folders in your residence in binders

24    regarding the UCC and commercial law, did you not?

25    A    Folders and binders?
```

OLIVER - CROSS (Barbee)

160

1   Q    Binders such as these three-ring binders containing

2   articles having to do with the commercial code and the UCC?

3   A    Yeah, info -- yes, information.

4   Q    So you had --

5   A    Yeah.

6   Q    -- a voluminous collection and library concerning these

7   issues, did you not?

8   A    Yes.

9   Q    And that was part of the material that you studied for

10  hours and hours and hours and hours, correct?

11  A    For hours.  Yes.

12  Q    And that's what persuaded you that these programs might be

13  legit -- legitimate, correct?

14  A    Yes.

15  Q    And you studied trusts, correct?

16  A    A little bit of trusts.

17  Q    And that's on the freedom school website true -- also,

18  too?  Isn't that true, that that's also on the freedom school

19  website?

20  A    Yeah.

21  Q    And you studied this straw man theory, correct?

22  A    Yes.

23  Q    And can you tell us what is the straw man theory as you

24  understand it.

25  A    It's a -- it's a corporation basically created by the

OLIVER - CROSS (Barbee)

1    government.  Separate from us.

2    Q    And is it used to -- supposed to be used to avoid

3    liability?

4    A    No.

5    Q    It's used to avoid debts?

6    A    The straw man, no.

7         THE COURT:  Mr. Barbee, why don't we go ahead and take

8    our afternoon recess.

9         MR. BARBEE:  Yes, Your Honor.

10        THE COURT:  All right?  All right.  So we'll take a

11   recess, ladies and gentlemen.  Leave your pads behind as

12   always, and of course, do not discuss the case.  Thank you.

13        (A recess was taken from 2:43 p.m. to 3:06 p.m.)

14        (The following proceedings were held in open court in

15   the presence of the jury:)

16        THE COURT:  All right.  Please be seated.  We are back

17   on the record with the defendants, counsel, case agents, the

18   jury.

19        And, sir, I remind you you are still under oath.

20        All right, Mr. Barbee.

21   BY MR. BARBEE:

22   Q    Mr. Oliver, after you made your deal with the government,

23   your plea agreement, you met with the -- Special Agent Malia

24   Dougan here and Special Agent Steve Carter, correct?

25   A    Yes.

OLIVER - CROSS (Barbee)

162

1   Q    And you told them at that time that you met with them that

2   you did not understand the debt relief process.

3             MR. TONG:  Objection, Your Honor.

4   BY MR. BARBEE:

5   Q    Is that correct?

6             MR. TONG:  I'm sorry.  Objection.

7             THE COURT:  Hold on.  There's an objection.

8             MR. TONG:  That's improper impeachment reading from a

9   document.

10            MR. BARBEE:  Well, I won't read from it then.

11  BY MR. BARBEE:

12  Q    Did you tell Special Agent Malia Dougan and Special Agent

13  Carter that you did not really understand the debt relief

14  process?

15  A    Yes.

16  Q    And that's a lie, isn't it?

17  A    No.

18  Q    You're the one that studied all these patriot websites and

19  downloaded forms, correct?

20  A    Yes.

21  Q    You're the one that grafted in this patriot redemption

22  stuff into your wife Mahealani's Registry program?

23  A    No.  No.

24  Q    Let me direct your attention to Government's Exhibit 1-B,

25  1 bravo, in front of you.

OLIVER - CROSS (Barbee)

163

1        THE COURT:  You want it on the overhead, Mr. Barbee?

2        MR. BARBEE:  Yes.  Yes, please.

3        THE COURT:  So we can put 1-B up.

4        MR. BARBEE:  Can we see the top portion, please?

5        SPECIAL AGENT CARTER:  Is that good?

6        MR. BARBEE:  Yeah.

7   BY MR. BARBEE:

8   Q    Do you have the document in front of you?

9   A    Yeah.

10   Q    And this is a form that you downloaded from a patriot

11   website, is it not?

12   A    Probably a basic, basic form.

13   Q    And this is a form that you downloaded from a patriot

14   website, is it not?

15        MR. TONG:  Objection, Your Honor.

16        THE WITNESS:  No.

17        MR. TONG:  Asked and answered.  Same question.

18        THE COURT:  Sustained.

19        THE WITNESS:  No, this is a created form.

20   BY MR. BARBEE:

21   Q    This is a form that you filed, correct?

22   A    Yes, we filed this one.

23   Q    And where did you get this form from?

24   A    The basic outline, without all the wording, was from a

25   patriot site.

OLIVER - CROSS (Barbee)

1   Q    Okay.  And this is a form that you then adapted from a

2   form that you downloaded from the patriot website?

3   A    Yes.

4   Q    Okay.  Will you look at 1-D, 1 David.

5   A    Yes.

6         MR. BARBEE:  And can you put it on the overhead,

7   please?  Yes.

8         SPECIAL AGENT CARTER:  First page?

9         MR. BARBEE:  Yes.  And the top portion?

10  BY MR. BARBEE:

11  Q    This is entitled "Private Offset Discharge and Indemnity

12  Bond," correct?

13  A    Yes.

14  Q    And this is a form that you downloaded from a patriot

15  website, is it not?  And then adapted?

16  A    This form was -- this actual one was given to me by

17  somebody.

18  Q    Okay.  And this is a form that you then adapted to file to

19  try to discharge debt?

20  A    Yes.

21  Q    Okay.

22        MR. BARBEE:  1-E, please.  1 Edward.

23        THE COURT:  Wait a minute.  Is 1-E in evidence?

24        THE CLERK:  Not according to my records.

25        THE COURT:  Yeah, I don't have it in evidence either,

1    Mr. Barbee.

2              MR. BARBEE:  Okay.  I'll move on.

3              THE COURT:  I mean you can try to get it in evidence.

4              MR. BARBEE:  No, no, no, no.

5              THE COURT:  I'm just saying it's not in evidence right

6    now.

7              MR. BARBEE:  No, no, no, no.

8              THE COURT:  Okay.

9              MR. BARBEE:  Can we look at Exhibit 2.

10   BY MR. BARBEE:

11   Q    Do you have Exhibit 2 in front of you?

12             MR. BARBEE:  And can we have that on the overhead.

13             That's in evidence, correct?

14             THE COURT:  Yes.

15             THE WITNESS:  2-A?

16   BY MR. BARBEE:

17   Q    Front page.  2.  Just 2.

18             THE COURT:  Just 2.  Right before 2-A should be just

19   2.

20             MR. BARBEE:  Just the number 2.

21             THE WITNESS:  Here we go.  Okay.

22             MR. BARBEE:  And could we see the top portion.

23   BY MR. BARBEE:

24   Q    And this one is entitled "Private Offset Discharging and

25   Indemnity Bond," and it's for a Jerry Agbannaoag.  And this

OLIVER - CROSS (Barbee)

166

1   form, the basic form itself, is one of those forms that you had

2   downloaded from a website, correct?

3   A     Yes, this is one of the ones that was given to me, yes.

4   Q     Okay.

5   A     This one.

6   Q     And 2-F, like Frank.

7          THE COURT:  You can put it on the overhead.

8          MR. BARBEE:  And, again, just the top portion.

9   BY MR. BARBEE:

10  Q     Mr. Oliver, this reads a "Bonded Promissory Note" in the

11  amount of $1 million, correct?

12  A     Yes.

13  Q     And this is a form that you obtained from one of these

14  patriot websites, correct?

15  A     Yeah.  Standard.

16  Q     Standard form?

17  A     Yeah.

18  Q     And these were the documents that were then, after you

19  downloaded them, put onto the templates in the computers on the

20  girls' side in their office, correct?

21  A     No.

22  Q     These are the forms when you indicated in your direct

23  testimony that the girls would complete the forms, they would

24  just fill in the basic information like the person's name,

25  correct?

1   A    These forms were real early on.  I didn't -- I didn't put

2   them on any of the office computers.  Only my computer.

3   Q    June?

4   A    Yeah.

5   Q    2008?

6   A    Yeah, but the layout of this form, it's -- it's early.

7   They -- they changed later on.  But, no, I did not put them on

8   any computers but my own.

9   Q    And the forms changed later on because you changed the

10  forms, correct?

11  A    No, I didn't.  No.

12  Q    Okay.  Well, let's look at 2-G, like George.

13          MR. BARBEE:  And just the top portion, please.

14  BY MR. BARBEE:

15  Q    This, again, reads "Bonded Promissory Note" in the amount

16  of $1 million to Henry Paulson, directing that a million

17  dollars be paid on the account of Jerry Agbannaoag.  This,

18  again, is like the previous exhibit, a form that you had

19  download from a patriot website, correct?

20  A    Yes.

21  Q    Okay.  Can we look at 2-J, 2 Joseph.

22          You previously testified that you studied -- as part

23  of your studies of the patriot movement, you studied the

24  Uniform Commercial Code, correct?

25  A    Very little.

OLIVER - CROSS (Barbee)

168

1    Q    And the filing of documents to prevent or to erase debts

2    by filing UCC statements, correct?

3    A    I knew a little bit about it.

4    Q    Okay.  If you could look at 2-J, do you have that in front

5    of you?

6    A    Mm-hmm.

7    Q    And that appears to be a Form UCC-1 --

8    A    Yes.

9    Q    -- filed in the Agbannaoag case.  You familiar with that

10   form?

11   A    Yes, the UCC-1.

12   Q    And that's one of the forms you did study in your research

13   on the documents for the patriot movement?

14   A    UCC-1, yes.

15   Q    Yeah.  And you downloaded this UCC-1 form?

16   A    Yes, anybody can.

17   Q    And you downloaded this UCC form, correct?

18   A    This one?

19   Q    Well, without the Agbannaoags' name in it, you downloaded

20   the form, didn't you?

21   A    No, I didn't.

22   Q    How do you know you didn't?

23   A    I know, I know I didn't.  I never downloaded the UCC form.

24   Q    Okay.  Did you direct the downloading of this UCC-1 form?

25   A    No.

OLIVER - CROSS (Barbee)

169

1   Q     Look at 2-K, 2 Kevin.

2             MR. BARBEE:  The top portion, please.

3   BY MR. BARBEE:

4   Q     Now, this document is entitled "Notice of Acceptance and

5   Taking for Value," is it not?  Are you familiar with this form?

6   A     Yes.

7   Q     It's one of the forms that you downloaded from the patriot

8   websites?

9   A     No, I never downloaded this form.

10  Q     Let me ask you about the boys' side.

11  A     Mm-hmm.

12  Q     Boys' side had yourself, correct?

13  A     Yup.

14  Q     Gerry Michaud?

15  A     Yeah.

16  Q     Who's Gerry Michaud?

17  A     Gerry is a friend.  I've known him for years.

18  Q     And he was also involved in tax filing, the tax protester

19  stuff, correct?

20  A     No, Gerry more studies legal -- he studies law, codes and

21  statutes, that's Gerry.

22  Q     So he's an attorney?

23  A     No.

24  Q     But he professes to have legal knowledge about some of

25  this patriot redemption issues?

OLIVER - CROSS (Barbee)

170

1  A    He never professed it, but he's knowledgeable in things.

2  Q    And he has some knowledge and shared his knowledge with

3  you about the admiralty issues, correct?

4  A    No.

5  Q    Okay.  So besides doing the tax -- the tax claims --

6  A    Mm-hmm.

7  Q    -- the 1099-OID forms and the 1040 individual tax returns

8  back in your area with the boys --

9  A    Mm-hmm.

10  Q    -- what else were you involved with back there?

11  A    What do I do?  I did the tax stuff.  Gilbert would do

12  mailing.  Mailing and -- mailing and filing mail.  And Gerry

13  would just do research.

14  Q    Research on what?

15  A    He did his own stuff.  I don't know.  Gerry just did his

16  own stuff.

17  Q    He just did research?

18  A    Yeah, he didn't work for us.  He sat in there and he

19  researched and worked on his own things.

20  Q    And talked to you?

21  A    Sometimes.

22  Q    And the women would fill out these templates, correct?

23  A    Yes.

24  Q    And many of these templates that they filled out were

25  forms, bonded promissory notes, UCC statements, et cetera, that

OLIVER - CROSS (Barbee)

171

1    you had downloaded from patriot websites.

2    A    The initial one, yes.  Yes.

3    Q    The initial one?

4    A    The initial bond promissory note from Kennedy, yes.  But I

5    didn't write anything in them and I didn't change any of it.

6    Q    In meeting with the FBI and Special Agent Dougan of the --

7    the IRS, you indicated and described yourself only as a partner

8    in the program who would watch Mahealani run the program.  Did

9    you tell them that?

10   A    Yes.

11   Q    And that's a lie, isn't it?

12   A    No.

13   Q    Isn't it true that you directed Mahealani on these

14   promissory notes to redeem monies from the U.S. Treasury to pay

15   off debt?

16   A    I did not direct Mahealani to do anything in that office.

17   Q    Isn't it true -- well, let's ask about home then.  Isn't

18   it true that you were not a very good husband?

19   A    Sure, I'll accept that.

20   Q    That you were verbally abusive to her?

21   A    At the point when all this fell apart and she ran off with

22   somebody else, yes.

23   Q    2004 time frame to 2009 time frame.

24   A    And that was the same thing.  She ran off with somebody

25   else.

1   Q    You were verbally abusive to her at work and at home,

2   correct?

3             MR. TONG:  Objection, Your Honor.  Relevance.

4             THE COURT:  Overruled.

5   BY MR. BARBEE:

6   Q    Isn't that correct?

7   A    Yes, there was an incident.

8   Q    One incident?

9   A    Yes.

10  Q    There was more than one incident, wasn't there?

11  A    There was one incident.

12  Q    And was that the 2004 or the 2011 incident you're

13  referring to?

14  A    The 2011 one that got discharged?

15  Q    Which one are you referring to as one incident?

16  A    2004.  2004.

17  Q    The 2004?

18  A    Yes.

19  Q    And that's where you threatened to burn down the house?

20  A    No.

21  Q    You shoved her?

22  A    Yes.

23  Q    You kicked her?

24  A    No.

25  Q    You pushed her?

1  A    That's -- I pushed her.

2  Q    You shoved her?

3  A    No, I pushed her.

4  Q    You grabbed her?

5  A    No.

6  Q    You restrained her?

7  A    No.

8  Q    You choked her?

9  A    No.

10  Q    You called her "stupid"?

11         MR. TONG:  Your Honor, I object at this point.

12         THE COURT:  Sustained.

13  BY MR. BARBEE:

14  Q    You were very controlling in the marriage, were you not,

15  and in the relationship?

16  A    Very early on.  Very early on.

17  Q    Very controlling, correct?  You got jealous if she wore a

18  swimsuit, things like that?

19  A    Very early on.

20  Q    You drove her pretty much everywhere, she didn't have her

21  own vehicle, correct?

22  A    She always had her own vehicle.

23  Q    And you on occasion would disable her car so she couldn't

24  go anywhere?

25  A    No.

OLIVER - CROSS (Barbee)

1          MR. BARBEE:  Your Honor, I might be getting into an

2     area that we previous -- previously talked about.

3          THE COURT:  Sidebar?

4          MR. BARBEE:  Yes.

5                    (Sidebar on the record:)

6          MR. BARBEE:  This is -- Mr. Gronna -- I was going to

7     ask him about drug usage and alcohol usage as I related to the

8     Court earlier today.

9          THE COURT:  All right.  So, and that is you had

10    proffered to me based on the presentence report was 2005 and

11    prior?

12         MR. BARBEE:  Correct.

13         THE COURT:  Okay.  So if I apply the framework that I

14    set forth that we discussed earlier, you would have to be able

15    to proffer to me some events he's testified to in that time

16    frame in which his memory might be impaired in some way.  I

17    don't think I've heard that, but you can tell me if I'm missing

18    something.

19         MR. BARBEE:  Okay.  He's just testified about the 2004

20    incident that certain things didn't happen.  If he's under the

21    influence of cocaine and other drugs and alcohol at the time,

22    that could account for his answer that he did not -- his denial

23    there.

24         THE COURT:  Okay.

25         MR. NAMMAR:  Your Honor, that's not even central to

OLIVER - CROSS (Barbee)

1    his direct testimony.  His direct testimony was focused on 2008
2    and 2009.
3            THE COURT:  Well, that doesn't matter.  I mean he's on
4    cross-examination and asked him about 2004 and the event.  So
5    the question is whether or not the truthful answer regarding
6    the drug use would tend to show maybe he wasn't recalling
7    events correctly.
8            MR. NAMMAR:  I don't think he said he couldn't recall
9    anything.  He gave a definitive yes or no as to each one of
10   those.
11           THE COURT:  All right.  Here's my view on this, which
12   is it's too far afield essentially.  He admitted that he
13   essentially assaulted her.  He didn't agree with every --
14           MR. TONG:  Detail.
15           THE COURT:  -- detail, thank you, as to the manner in
16   which it occurred, but he admitted that he assaulted her.  And
17   so I don't think that the impeachment has much value, if any,
18   as far as challenging his memory.  And I think under 403
19   analysis at that point in time it's just way too far afield and
20   prejudicial.
21           MR. BARBEE:  Yes, Your Honor.
22           THE COURT:  Okay.  All right.  But you made your
23   record.
24                         (End of sidebar.)
25   BY MR. BARBEE:

OLIVER - CROSS (Barbee)

176

1   Q    The 2000 and -- in 2004 incident that we were discussing,

2   you actually had a TRO filed on you, correct?

3   A    Yes.

4   Q    And likewise, in 2011?

5   A    Yes.

6   Q    And also in 2011, Mahealani Ventura filed for divorce from

7   you, correct?

8   A    Yes.

9   Q    And you refused her request for divorce, did you not?

10  A    Because of the lies.

11  Q    You refused to divorce her, didn't you?

12  A    At that moment until things were settled correctly.

13  Q    You refused to divorce her, didn't you?

14  A    Yeah.

15  Q    So as a result, you're still married today, right?

16  A    Yes.

17  Q    Even though she doesn't want to be married to you.

18  A    I don't either.  I just want it settled properly.

19  Q    Now, your direct testimony earlier this afternoon or this

20  morning, with regard to Exhibit 17, if we could -- if you could

21  look at that.

22        MR. BARBEE:  And if we could load it up.  I believe

23  this is a -- yeah, just the top half.

24  BY MR. BARBEE:

25  Q    This is a check to pay off your credit card debt, correct?

1   A    Yes.

2   Q    And I think you said this morning that you told Mahealani

3   that, We need to pay this, correct?  You told her, right?

4   A    Yes.

5   Q    So you're directing her to pay this credit card debt.

6   A    Or else we wouldn't have credit, yes.

7   Q    Okay.  Now, you indicated this morning in your direct

8   testimony that you used to work in tile.

9   A    Yes.

10  Q    And I believe you said that you stopped working at --

11  well, I guess you said that you continued to work throughout.

12  But you also testified that all of the 2008 income and money

13  that went into the bank account of the Hawaiiloa Foundation

14  bank account was all from participants, correct?

15  A    Yes.

16  Q    So none of that money was from any of your tile work

17  business, was it?

18  A    No.

19  Q    You didn't do any work in 2008 other than do these

20  promissory notes and tax forms, correct?

21  A    Yeah, I -- I didn't do much work.  I didn't do -- I might

22  have done some work to help out friends.

23  Q    So all the income that you were spending was all from the

24  Hawaiiloa Foundation.

25  A    Yes.

OLIVER - CROSS (Barbee)

178

1   Q    Including partially your truck.

2   A    Yes, the tail end.

3   Q    The second truck.

4   A    Yes.

5   Q    The coins.

6   A    Yes.

7   Q    Speaking of the coins, I think we've received evidence

8   that in 2008, you purchased $36,860 of coins, silver, gold from

9   the California Numismatics Company, correct?

10  A    We purchased.

11  Q    You purchased?

12  A    We did.

13  Q    You went on the Internet, isn't that what you said, and

14  you called?

15  A    But nothing -- nothing --

16  Q    Isn't that what you said this morning?

17  A    Nothing happened without her consent.  I didn't have the

18  money.

19  Q    Nothing happened without her consent.

20  A    I had no money.  And the truck record shows that, I had to

21  ask, and the bank.

22  Q    You testified earlier that you looked up on the Internet

23  the coins that you wanted to purchase from this website and

24  that you made a phone call to the California Numismatics and

25  ordered $36,860 worth of coins, correct?

OLIVER - CROSS (Barbee)

179

1  A    After discussing it with her, yes.

2  Q    You didn't have to choke her to get permission?

3        MR. TONG:  Objection, Your Honor.

4        THE COURT:  Sustained.  Mr. Barbee, you know better.

5  BY MR. BARBEE:

6  Q    In May of 2008, you purchased $14,926 worth of coins,

7  correct, from the Swiss American Trading Company?

8  A    Yes.

9  Q    You didn't need her permission to purchase those coins,

10 did you?

11 A    Of course I did.

12 Q    October 15th, 2008, you purchased an additional $851 worth

13 of coins, correct?

14 A    Yes.

15 Q    Did you do this all by yourself or did you have to ask

16 permission from your wife?

17 A    I had to ask permission.

18 Q    Do you recall advising participants to keep cash at their

19 houses so it wouldn't be seized?

20 A    Keep cash.

21 Q    Kaneshiros.

22 A    No, I don't recall.

23 Q    And in fact, you testified earlier today that you had

24 $90,000 worth of cash that you gave to the Hoys for

25 safekeeping, correct?

OLIVER - CROSS (Barbee)

180

1    A    Yeah, that wasn't me.  That wasn't my money.

2    Q    It wasn't your money?

3    A    No.  None of the --

4    Q    Whose money was it?

5    A    -- Hawaiiloa Foundation money was my money.

6    Q    It wasn't your money.

7    A    No.

8    Q    Do you recall looking at the divorce complaint filed by

9    your wife?

10   A    I remember some of it.

11   Q    Do you recall that in response to her request to divorce

12   you that you complained because she wasn't giving a 50/50 split

13   and that you were entitled to half of all the assets?

14   A    Which is my tools, the kitchen stuff, the TVs, all the

15   little stuff.

16   Q    Oh, that's yours, but not the cash?

17   A    No.

18   Q    Do you recall responding to the divorce complaint against

19   you filed by your wife that Mahealani is not dividing it 50/50

20   percent in accordance with Hawaii statutes?

21   A    Every -- if you read it, it says everything in her

22   possession is hers.  I left the house with the shirt on my

23   back.  I had tools in there, which are gone now.  The dogs are

24   gone.  Everything is gone.

25   Q    Mahealani's trying to claim all property and not dividing

OLIVER - CROSS (Barbee)

181

1   it 50/50, all property.

2   A    All everything in her possession is hers.  That's what it

3   said.  And I thought that wasn't fair, that wasn't 50/50,

4   because everything that I had worked for for the past 20 years

5   was in that house.

6   Q    And you worked for Hawaiiloa Foundation too, didn't you?

7   A    Yes.

8   Q    50 percent of that was yours too, wasn't it, according to

9   your logic?

10   A    Yes, but I -- I was not the manager.

11   Q    Okay.  So, so far we got you spending on coins, two

12   trucks.  In addition, did you buy a backhoe, a heavy equipment

13   machine, with the proceeds from Hawaiiloa Foundation?

14   A    Yes.

15   Q    $16,000, right?

16   A    Yup.

17   Q    Did you get permission from your wife to buy this backhoe?

18   A    If we had pulled the phone records, you would see that the

19   day that check was written there was a phone call.

20   Q    And you bought this $16,000 backhoe from Joseph Keomaka,

21   correct?

22   A    Yes.

23   Q    And where did you keep it?

24   A    It was up on -- on her land.

25   Q    Did she know how to drive a backhoe?

1  A    Nope.

2          THE COURT:  When you said "her land," who were you

3  referring to?  You said "her land."

4          THE WITNESS:  Well, the family land.  Her family --

5          THE COURT:  "Her," though, is who?  I don't know who

6  "her" means.

7          THE WITNESS:  Mahealani.

8          THE COURT:  Oh.

9          THE WITNESS:  Yeah.

10  BY MR. BARBEE:

11  Q    Did there come a time in 2008 where you arranged for a

12  person named Winston Shrout to come down from the Mainland to

13  give lessons to you and other people about the bonds in

14  question that we're talking about?

15  A    Yes, Winston came down.

16  Q    And you are the one that extended the invitation to him,

17  correct?

18  A    I -- I got ahold of Winston, yes.

19  Q    And he came down and his purpose was to put on a seminar

20  to educate some of the staff about these bonded promissory

21  notes?

22  A    I don't recall the promissory notes.  I remember the tax

23  part.

24  Q    Did he also talk about admiralty?

25  A    He might have mentioned it.  I can't recall the entire --

OLIVER - CROSS (Barbee)

183

1    I believe it was two days, I couldn't recall everything.

2    Q    Were you aware that some of the documents filed on behalf

3    of participants in this case have to do with admiralty?

4    A    Yes.

5    Q    And you're familiar with those type of documents, those

6    bonds, denying jurisdiction of the courts?

7    A    Yes.

8    Q    And Winston talked about some of that too, didn't he?

9    A    Yeah.  I don't think jurisdiction -- denying the

10   jurisdiction of the courts was ever an issue, but I'm familiar

11   with the -- the language in the literature.

12   Q    Mahealani didn't call him and ask them to come down; you

13   did, correct?

14   A    She was in agreement.

15   Q    At the time that you, I guess, were raided in 2009, you

16   then recognized Special Agent Steve Carter, correct?

17   A    Yes.

18   Q    And he was the guy that came undercover back in November

19   to the Cameron Center.

20   A    Yes.

21   Q    And you had talked to him for quite a bit of time when he

22   was at the Cameron Center posing undercover as a Steve Koch?

23   A    Yes.

24   Q    And you made statements to him regarding your extensive

25   study of the bond issue?

OLIVER - CROSS (Barbee)

184

1   A    I -- I can't recollect if I -- that's what I said.

2   Q    Okay.  Well, the excerpt will speak for itself.

3        You discussed with him the filing of 1099-OID forms at

4   length.  Correct?

5   A    Like I said, I don't remember the exact conversation.

6   Q    Well, you recall talking to him for quite a while, don't

7   you?

8   A    I remember talking to him.

9   Q    Do you remember what you talked about?

10  A    I believe he asked about the mortgage process, and I -- I

11  just can't recall exactly everything I said.  I just can't.  I

12  talked to people all day.

13  Q    Well, you told him that he could get bonds, but it was

14  only for paid people.  Do you remember telling him that?

15  A    No, but if he wrote it, I'm sure I said it.

16  Q    Well, it's on a -- it's on a video recording.

17  A    Okay.  Then I said it.

18  Q    Did you tell him that regarding the bonds that this

19  process takes years to learn?

20  A    Yeah.  That was --

21  Q    And you had spent --

22  A    That's true.

23  Q    You had spent years learning it, correct?

24  A    Yeah.

25  Q    Remember telling him that Obama wasn't born in Hawaii?

1   A    Yeah.

2   Q    Remember telling him that the bonds were a remedy to get

3   rid of your debt?

4   A    I -- like I said, I can't remember everything.

5   Q    Do you remember telling him that if he signed up, he would

6   get a package, the everyday UCC, positive bond, indemnity bond.

7   It's something we don't give everybody.  We give it to the

8   person that pays.  You remember telling him that?

9   A    No, I don't.

10  Q    Does that sound like something you would say?

11  A    If -- if he said I said it, then I did, yes.

12  Q    Does it sound like something you would say?

13  A    Yes.

14  Q    You'll get the UCC whole package bonds, but once you see

15  that, it's not over, correct?  Told him that?

16          THE COURT:  Do you recall?

17          THE WITNESS:  I -- I can't recall.

18          THE COURT:  You don't recall.  All right.

19          THE WITNESS:  Yeah.  As you can see, it was a long

20  conversation, and it was a long time ago.

21  BY MR. BARBEE:

22  Q    You recall telling him that he could just pay in a

23  promissory note and to ask, Will you let me pay in a

24  nonnegotiable note?  Do you recall that?

25  A    I don't recall that.

OLIVER - CROSS (Barbee)

186

1   Q    Do you recall telling him that -- strike that one.

2        You recall referring him to the freedomschool.com

3   website?

4   A    I used to do that.  I used to do that often.

5   Q    Recalling -- telling him that, At Treasury you'll show

6   them that you served it to Henry Paulson, making him the

7   fiduciary?

8   A    I'm sure I said that.  That was part of the process.

9   Q    And the process, as you describe it, is what you grafted

10  on to your wife's Registry Hawaiian rights program.

11  A    No.

12  Q    You incorporated it into her Registry program.

13  A    I could not incorporate anything into her program.

14  Q    Didn't you say earlier today you incorporated the tax

15  relief program into her program?

16  A    That's because that was my own little spot in the office.

17  So I worked my -- myself into a spot in the office with the tax

18  things.

19  Q    Mr. Oliver, regarding the tax returns that you filed, you

20  pled guilty to the -- to the tax charges in the indictment,

21  correct?

22  A    Yes.

23  Q    With regard to those, at the time that you filed those tax

24  returns, did you willfully file them knowing they were false or

25  did you have a good faith belief that they were a legitimate

1   claim?

2   A   I thought they would be -- I thought they were false.

3   Q   But you went ahead and filed them?

4   A   Yeah.

5   Q   And you're the self-proclaimed tax expert?

6       MR. TONG:  Well, I object.  That's argumentative.

7       THE COURT:  Sustained.

8   BY MR. BARBEE:

9   Q   You were the one, as you testified, found a little niche

10  for yourself doing the tax issues and were advising people

11  about taxes?

12  A   Yes.

13  Q   And you were filing these documents for them, correct?

14  A   I did --

15  Q   You were filing 1099-OID forms and 1040 forms for

16  participants?

17  A   I did two -- two participants, and then I stopped.

18  Q   Your testimony is you only did two participants?

19  A   I believe there is two, yes.

20  Q   And we're talking about Count 18 of the indictment,

21  Count 17 of the indictment?

22  A   Yeah, I'm not sure which count.

23  Q   This is Count 18, Overt Act 9 that alleges that you

24  prepared individual tax income return, tax year 2007 for JM and

25  KM seeking a refund of $61,000?

OLIVER - CROSS (Barbee)

188

1   A    Yes.

2   Q    At the time that you filed that, you took payment to do

3   that for them?

4   A    I believe I did.

5   Q    And you're saying that all the while you knew it was a

6   false document, or are you saying you had a good faith belief

7   that it could be legitimate?

8   A    Well, ours didn't work, so it was false.

9   Q    I'm talking about at the time.

10  A    Yes, at the time.

11  Q    At the time you believed it was false?

12  A    Yes, I already had done our process.

13  Q    In 2007?

14       MR. TONG:  I object, Your Honor.  That misstates the

15  evidence on the filing date.

16  BY MR. BARBEE:

17  Q    Calendar year 2007 filed in 2008?

18  A    I honestly can't remember all the dates.  But by the time

19  when I did those tax returns, I had already filed ours.

20  Q    If you didn't believe that this program was legitimate,

21  why would you promote it to your wife and other members of the

22  community --

23       MR. TONG:  Objection.

24  BY MR. BARBEE:

25  Q    -- if you didn't believe it was legitimate?

OLIVER - CROSS (Barbee)

189

1          MR. TONG:  Argumentative, misstates the testimony.

2          THE COURT:  Rephrase.

3    BY MR. BARBEE:

4    Q    Why would you promote the tax redemption program and do

5    these filings for people for a fee in 2006 to 2008, early '09,

6    if you didn't have a belief that they -- a good faith belief

7    that they would work?

8          MR. TONG:  Objection.  Argumentative and misstates the

9    evidence as to the "promote" part.

10         THE COURT:  Overruled.

11         THE WITNESS:  Because at the time I loved Mahealani

12   and I -- I wanted to work in the office.  And it was a big

13   misjudgment on my part, but I wanted to be a part of it.  I got

14   caught up in the hype.

15   BY MR. BARBEE:

16   Q    Okay.  So let me see if I can understand what you're

17   saying.  You're the one that researched all this patriot stuff

18   about the bonded promissory notes and about the redemption

19   program and about the OID 1099 forms, filing for debt relief.

20   You shared that with her, and you wanted her to get into

21   trouble.  Is that what you're saying?

22   A    Absolutely not.  As a matter of fact, in the beginning

23   before all -- before the first person got -- got taken in and

24   the process done, we got in a huge argument because I told her

25   families will get hurt.  And I was adamantly against it.

OLIVER - CROSS (Barbee)

190

1    Adamantly.

2    Q    But you bought a backhoe, you bought two trucks, you

3    bought --

4              MR. TONG:  Your Honor, I object.

5    BY MR. BARBEE:

6    Q    -- gold coins --

7              THE COURT:  Sustained.  Sustained.  Mr. Barbee,

8    sustained.

9    BY MR. BARBEE:

10   Q    Was Mahealani present when you were talking to Special

11   Agent Steve Carter outside and inside the Cameron Center on

12   November 16th, 2008?

13   A    Of?

14   Q    When you were promoting these programs.

15   A    I talked to -- remember talking to Steve outside and she

16   wasn't there.  I don't recall if we talked inside.

17   Q    So everything you said to him at that time, you felt free

18   to express your mind without your wife interfering with your

19   thoughts that you were expressing to Special Agent Carter,

20   correct?

21   A    Yes.  And I believe I expressed that it shouldn't be done,

22   but --

23   Q    Well, I guess the jury will decide that.

24             MR. BARBEE:  No further questions.

25             THE COURT:  All right.  Mr. Gronna?

```
 1                     (Pause in the proceedings.)

 2             THE COURT:  At your convenience, Mr. Gronna.

 3             MR. GRONNA:  I'm sorry, Judge.  I'm trying -- there's

 4    a lot here.

 5             THE COURT:  Well, you're just flipping pages as far as

 6    I can see.  You weren't trying to move.  You were just flipping

 7    pages.

 8             MR. GRONNA:  That's what I mean, I'm just trying to

 9    get through it.

10                      CROSS-EXAMINATION

11    BY MR. GRONNA:

12    Q    Good afternoon, Mr. Oliver.

13    A    Hi.

14    Q    I'm Richard Gronna.  I represent Pilialoha Teves.

15    A    Yeah.

16    Q    And I'll have some questions for you.

17             Now, I guess I'll start back, so you moved -- you grew

18    up in San Diego?

19    A    Yes.

20    Q    Okay.  And you moved to Hawaii in 1990?

21    A    Yeah.

22    Q    And how old were you?

23    A    26, 27.

24    Q    Okay.  And how old are you now?

25    A    48.
```

OLIVER - CROSS (Gronna)

1   Q    Okay.  And at the time you moved here, you came here, you

2   know, you wanted to get out of San Diego, surf --

3   A    Yeah.

4   Q    -- get a job, hang out and live on Maui, right?

5   A    Yeah.

6        THE COURT:  Mr. Gronna, just move the mike.

7        MR. GRONNA:  Oh, I'm sorry, Judge.

8   BY MR. GRONNA:

9   Q    So essentially you kind of wanted to live the Maui

10  lifestyle, right?

11  A    Yeah.

12  Q    Okay.  And you brought your trade with you?

13  A    Yes.

14  Q    And your trade was being a tile setter.

15  A    Yes.

16  Q    You formed a company Kama'aina --

17  A    Kaimana Tile Company.

18  Q    Yes.

19  A    Yeah.

20  Q    And when you first started, you had your own crew?  Or was

21  it just you?

22  A    Yeah, I had a helper, yeah, with me.

23  Q    And how many people did you have working with you?

24  A    Usually just one.  One or two.  Yeah.  Small.

25  Q    Okay.  And you were actually very successful at your job,

1    weren't you?

2    A    Yes, I was.

3    Q    You're a very skilled tile setter.

4    A    Yes.

5    Q    And you made a very good living doing that, didn't you?

6    A    Yes, I did.

7    Q    You made a lot of money doing that, didn't you?

8    A    Yeah.

9    Q    And one of the -- and every year, of course, you would

10   have to pay taxes, right?

11   A    Yes.

12   Q    And you didn't like having to pay taxes, did you?

13   A    No.

14   Q    I mean who amongst us does, right?

15   A    Mm-hmm.

16   Q    And so in the course of having to pay taxes, I'm taking

17   you probably complained to other workers and so forth, right?

18   A    Once in a while, yeah.

19   Q    And, you know, some owners maybe that you worked for?

20   A    Yeah, I didn't complain too much, but...

21   Q    Complained about the fact that the government is, you

22   know, in your pocket, right?

23   A    Oh, yeah.  Yeah.

24   Q    And then, of course, you met Mahealani?

25   A    Yes.

1    Q    And you fell in love and got married.

2    A    Yeah.

3    Q    And Mahealani had friends.

4    A    Yeah.

5    Q    And one of her friends back -- that you knew of was

6    Pilialoha Teves, right?

7    A    Yes.

8    Q    And they were -- they were close friends, right?  They did

9    things together?

10   A    Halau sisters.

11   Q    Right, they were halau sisters.

12   A    Yeah.

13   Q    And so they danced hula together --

14   A    Yeah.

15   Q    -- in the halau?

16   A    Mm-hmm.

17   Q    And one of the things that attracted you to Ms. Teves --

18   well, Ms. Oliver, your wife, Ms. Ventura, was the fact that she

19   was interested in Hawaiian sovereignty rights.

20   A    Well, I was attracted by her beauty first.

21   Q    Sure.

22   A    Yeah.

23   Q    But I mean but there's also parts that interest you, her

24   intelligence, right?

25   A    Yeah, when she started doing land research, it was

OLIVER - CROSS (Gronna)

195

1   interesting.

2   Q    Yeah.

3   A    Yeah.

4   Q    And so when she started doing land research, she brought

5   up the issues pertaining to the overthrow of the monarch,

6   right?

7   A    Yeah, learned about that.

8   Q    And you learned about that?

9   A    Yeah.

10  Q    And you formed an opinion about that.

11  A    Yeah, at some point.

12  Q    Okay.

13  A    Yeah.

14  Q    And your opinion was that it was illegal and it shouldn't

15  have happened, right?

16  A    Yes, it was.

17  Q    And that the Hawaiian people were usurped from their --

18  from their lands, right?

19  A    Yes.

20  Q    And that bothered you?

21  A    Yeah, it did.

22  Q    Okay.  And not only did that part bother you, it's the

23  fact that, you know, you also got the government digging into

24  your pocket taking your hard-earned income, right?

25  A    Yeah.  Yeah, but it wasn't my life struggle.

OLIVER - CROSS (Gronna)

1  Q    And so what happened then as you began to do that, you

2  began to get interested into the sovereignty movement.

3  A    Yeah, I -- I never really got too interested in the

4  sovereignty movement.

5  Q    Well, I mean the Mainland, the patriot movement, it's also

6  known as the --

7  A    Well, yeah.  Yeah.

8  Q    -- sovereignty movement, right?

9  A    The America -- yeah.  Yeah.

10  Q    So this was sort of happening at the same time you're

11  learning about Hawaiian sovereignty, right?

12  A    Yeah.

13  Q    And so as you're learning about Hawaiian sovereignty

14  rights, you're now getting into the -- into the websites with

15  Mr. Kennedy, the freedom movement, right?

16  A    Yeah.

17  Q    And, you know, Winston Shrout was another part of that

18  movement, right?

19  A    Mm-hmm.

20  Q    And they had their opinions about how everything was -- I

21  guess the basic premise is that the United States government is

22  bankrupt.

23  A    Yeah, three times now.

24  Q    Yeah, three times the U.S. Government's bankrupt.  It was

25  bankrupt in 1933?

OLIVER - CROSS (Gronna)

1    A    Second bankruptcy.

2    Q    That was the second bankruptcy.  I see.  When was the

3    first one?

4    A    1863.

5    Q    I'm sorry?

6    A    1863.

7         THE COURT:  Would you get a little closer or pull that

8    mike up a little closer.

9         THE WITNESS:  1863.

10        THE COURT:  Thank you.

11   BY MR. GRONNA:

12   Q    So the American government, first of all, went bankrupt in

13   1863?

14   A    According to --

15   Q    And how did they --

16   A    According to my studies what I was reading, yes.

17   Q    According to these groups that you began to get affiliated

18   with, right?

19   A    Yes.

20   Q    You took up their belief system, right?

21   A    Yes.

22   Q    Okay.  And 1863, that would have been right around the

23   American Civil War, right?

24   A    Yes.

25   Q    And how did the American government go bankrupt in 1863?

OLIVER - CROSS (Gronna)

198

1   A    It had to borrow money for the war.

2   Q    I see.  And so that was the first bankruptcy, but they

3   came out of bankruptcy, I guess, is that safe to say?

4   A    Well, not really.  1933 they came out but went right back

5   in.

6   Q    I see.  And what happened in 1933?

7   A    The Big Deal, Roosevelt's Big Deal.  The Social Security

8   Act.

9   Q    Social Security Act?

10  A    Yeah.

11  Q    I see.  And then the third time the U.S. Government went

12  bankrupt?

13  A    2003.

14  Q    2003?

15  A    Yeah.

16  Q    I see.  And what happened in 2003 that caused the American

17  government to go bankrupt?

18  A    It -- its debts were due.

19  Q    Its debts were due?

20  A    Yeah.

21  Q    And how did it go bankrupt?

22  A    From what I was -- been reading, that every 70 years is a

23  term of bankruptcy.

24  Q    Every?

25  A    70 years.

1   Q     Every 70 years --

2   A     From what -- what I used to read -- what I would read in

3   the patriot groups, every 70 years.

4   Q     And you believed that?

5   A     At the time, yeah.

6   Q     And actually you believed that and you still believe that.

7   A     Right now I don't know what to believe.  I know that it

8   got me in a lot of trouble.

9   Q     Okay.  And actually it wasn't until you got indicted in

10  this case that you began to question that belief; isn't that

11  right?

12          MR. TONG:  Well, objection as to ambiguous about "that

13  belief."

14          THE COURT:  Regarding bankruptcy every 70 years?

15          MR. GRONNA:  Oh, well, how about just the patriot

16  movement that includes the bankruptcy every 70 years.

17          MR. TONG:  Well, I think that's overly broad now.

18          THE COURT:  Sustained.

19          MR. GRONNA:  All right, that's fine.

20  BY MR. GRONNA:

21  Q     As far as all the things we've been discussing about, you

22  know, United States government going bankrupt, you still

23  believe that?

24  A     Yeah, I don't -- I don't believe any -- anything right now

25  because I don't even know anymore.

OLIVER - CROSS (Gronna)

200

1    Q    All right.  That's fine.  But as of the time that you --

2    the government indicted you in this case, you believed that,

3    didn't you?

4              MR. TONG:  Objection.  What is the "that"?

5              THE COURT:  Bankruptcy every 70 years.

6              MR. GRONNA:  There you go.  Thank you, Judge.

7              THE WITNESS:  Yes.

8    BY MR. GRONNA:

9    Q    Okay.  And you also at the time you were indicted, you

10   also -- you also believed that all this other movement

11   material -- information that you had also read about, right?

12             MR. TONG:  Objection.  Overly broad.

13             THE COURT:  Sustained.

14             MR. GRONNA:  All right, that's fine.

15   BY MR. GRONNA:

16   Q    Now, when you first came here and you began to set tile,

17   you didn't believe that, did you?  That was not part of your

18   belief system that the government went bankrupt every 70 years.

19   A    No.

20   Q    And when did you start formulating this thought or when

21   did you start looking into all this patriot movement

22   information?

23   A    I can't remember a year, but like the mid-2000s.

24   Q    Okay.

25   A    Yeah.

1    Q    And again, that coincided with your wife's looking into

2    sovereignty -- Native Hawaiian sovereignty issues, right?

3    A    Yeah.

4    Q    Okay.  Now, at the time you had a -- I guess it's safe to

5    say you had sort of a disdain for the federal government?

6    A    I don't want to say disdain, but I had questions from what

7    I was reading about it.

8    Q    Okay.  And you believed that, didn't you?  You believed

9    what you were reading?

10   A    Some of the stuff.

11   Q    I mean you took up their -- their cause, so to speak,

12   didn't you?

13   A    Yeah, it was very -- very well written, and yeah, very

14   persuasive.

15   Q    It was very well written and very persuasive.

16        And all of the documents that you have been shown here

17   today, you understood what all those documents meant at the

18   time that they were being generated; isn't that right?

19   A    Not fully.

20   Q    Okay.

21   A    I couldn't -- yeah.

22   Q    Were they a part of what Mr. Kennedy and the freedom.com

23   were displaying on their websites, right?

24   A    Yeah.

25   Q    It's part of their CD -- you bought a CD from Mr. Kennedy,

1  didn't you?

2  A    Yes, I did.

3  Q    And that CD is what contained some of the very forms that

4  are part of this case that have been shown to you, right?

5  A    Yeah, some of it.

6  Q    Okay.

7  A    With disclaimers.

8  Q    All right.  And there's disclaimers?

9  A    On everything they gave, yes.

10  Q    Okay.  But you -- when you prepared these documents, you

11  apparently omitted those disclaimers, didn't you?

12  A    Yeah.

13  Q    And now, at the time that you got involved with this, you

14  said that you had -- the Hawaiiloa Foundation was formed?

15  A    Yeah.

16  Q    And do you recall who the members of the Hawaiiloa

17  Foundation were?

18  A    I believe it was me, Mahealani, and Ihilani.

19        THE COURT:  I'm sorry, who was the third?

20        THE WITNESS:  Ihilani.

21  BY MR. GRONNA:

22  Q    And who is Ihi --

23  A    Her daughter.

24  Q    Ihilani Catugal?

25  A    Yeah.

OLIVER - CROSS (Gronna)

203

1  Q    And who is that?

2  A    That's Mahealani's daughter.

3  Q    So essentially you were the board of directors for the

4  Hawaiiloa Foundation; is that right?

5  A    Yeah, the -- the members, yeah.

6  Q    Right.  So basically the Hawaiiloa Foundation was an

7  organization of the -- of the Olivers, right?

8  A    Yeah.

9  Q    Of the Oliver family?

10  A    Mm-hmm.

11  Q    And no one else was a part of that organization, right?

12  A    No.

13  Q    And other people you had at that organization, they worked

14  for that organization, right?

15  A    Yes.

16  Q    They were workers.

17  A    Mm-hmm.

18        THE COURT:  Sir, you're saying "mm-hmm."  You need to

19  say "yes" or "no."

20        THE WITNESS:  Yes.  Yes.  Yes.

21  BY MR. GRONNA:

22  Q    Okay.  All right.  So essentially you looked at those

23  individuals as your employees, right?

24  A    No, I didn't look at them as my employees.

25  Q    Or how about employees of the foundation?

OLIVER - CROSS (Gronna)

204

1   A    They worked, yes.

2   Q    And that same very foundation that you were a vice chair

3   of, right?

4   A    Yes.

5   Q    And essentially those people that worked for the

6   foundation followed the direction of the -- of the chair, the

7   vice chair of the foundation, right?

8         MR. TONG:  Objection.  Overly broad and state of mind,

9   speculation.

10        THE COURT:  I don't think it's calling for state of

11  mind, but it is overly broad.  So if you can break it down,

12  Mr. Gronna.

13        MR. GRONNA:  All right.  Thank you.

14  BY MR. GRONNA:

15  Q    People that you had working for you, or for the

16  foundation, of which you were the vice chair of, right?

17  A    Mm-hmm.

18  Q    Those people followed the directions of those directors,

19  right?

20  A    Mahealani.

21  Q    And you were a member of that, you were a director,

22  weren't you?

23  A    Yes, but I didn't direct anybody.

24  Q    Okay.  But you were a director.

25  A    I was -- but I didn't direct anybody.

OLIVER - CROSS (Gronna)

1  Q    Okay.  But as a director, you would either agree or

2  disagree with the -- whatever the Hawaiiloa Foundation would

3  do, right?

4  A    No, the management, the foundation itself, the body, we

5  might have had a meeting or two, but I didn't direct the

6  foundation, the office.

7  Q    Okay.

8  A    Yeah, I was -- yeah.

9  Q    You were a director?

10 A    Vice chair.

11 Q    Vice chair.  Okay.  And you had a vote in the Hawaiiloa

12 Foundation, right?

13 A    Yes.

14 Q    And whenever the foundation decided to do something, you

15 had to voice and make a vote yes or no, right?

16 A    And -- and I did voice my opinion quite often.

17 Q    Okay.  And then those meetings were closed to other

18 people, right?

19 A    Yes.

20 Q    In other words, you didn't have your workers or employees

21 of the Hawaiiloa Foundation present at those meetings, did you?

22 A    No.

23 Q    Now, do you recall when you decided that -- well, let me

24 back up a little bit.

25       Prior to the incorporation of the Hawaiiloa

 1   Foundation, do you remember when that was?

 2   A    Prior?

 3   Q    Well, do you -- just in general, when was the Hawaiiloa

 4   Foundation formed?  Do you remember when that was?

 5   A    2005 or '06.  2005 or '06.  I can't remember the exact

 6   year.

 7   Q    Okay.  So Hawaiiloa Foundation was in existence from 2005

 8   or 2006.

 9   A    Yeah.

10   Q    All right.  And essentially from 2005 or 2006, it pretty

11   much sat idle, didn't it?

12   A    Yeah.

13   Q    And actually what happened was, is that your wife was

14   running The Registry, right?

15   A    She had -- yes.

16   Q    And one of the helpers of The Registry was Ms. Teves,

17   right?

18   A    Yes.

19   Q    And Ms. Teves was there because she was interested in

20   promoting and -- promoting of the knowledge of how the Hawaiian

21   people were wronged by the taking of their Kingdom by the

22   United States government, right?

23        MR. TONG:  Objection.  Speculation.

24        THE COURT:  Sustained.  You asked why.  His view as to

25   why Ms. Teves was there.

OLIVER - CROSS (Gronna)

1          MR. GRONNA:  Okay.

2          THE COURT:  That's why I sustained the objection.

3          MR. GRONNA:  That's fine, Judge.  I understand.

4          THE COURT:  Okay.

5    BY MR. GRONNA:

6    Q    Do you know the reason why -- well, Ms. Teves was helping

7    Mahealani with the running the -- well, with running of The

8    Registry, right?

9    A    Yes.

10   Q    And that was to -- for the purpose of restoring the

11   Hawaiian people back to their native lands, right?

12   A    Yes.

13   Q    And that to your -- what you observed, that was something

14   she was involved in doing, right?

15   A    Yes.

16   Q    And that was her primary concern, right, her primary

17   working at The Registry?

18          MR. TONG:  Objection.  Speculation, state of mind.

19          THE COURT:  Well, that was primarily what you saw her,

20   observed her do; is that right?

21          THE WITNESS:  Yes.

22   BY MR. GRONNA:

23   Q    And now, up until 2006, The Registry was not involved with

24   filing bonded promissory notes, was it?

25   A    No.

1   Q    That was actually your -- your doing, wasn't it?

2   A    Our doing.  I did not incorporate or make a decision to

3   incorporate any of that into --

4   Q    That's not my question.

5   A    -- anything but our home.

6   Q    That's not my question.  She did not have anything to do

7   with your using the bonded promissory note in 2006, right?

8   A    No.

9   Q    Okay.  And as a matter of fact, was your home actually

10  foreclosed on?

11  A    Yes.

12  Q    And when was it actually foreclosed on?

13  A    Oh, I couldn't remember the dates.  I can't remember the

14  year.

15  Q    Well, isn't it -- isn't it true that you were actually

16  just served with the Notice of Foreclosure proceedings in the

17  last six months for that property?

18  A    I -- I haven't been.

19  Q    Do you remember having been served with any kind of

20  document to foreclose the property?

21  A    Yes, previously.

22  Q    And who lives in that property now, do you know?

23  A    As far as I know, Mahealani.

24  Q    Mahealani still in that property?

25  A    As far as I know.  I don't know.  I've been in jail.  I

OLIVER - CROSS (Gronna)

```
 1   don't know.

 2   Q    Okay.  Well, as of -- as of the time you went into

 3   custody, she was still living there?

 4   A    Yes.

 5   Q    And I think that you actually went into custody -- well,

 6   when you first were indicted in this case, you were given bail,

 7   weren't you?

 8   A    Yes.

 9   Q    And --

10         MR. GRONNA:  One moment, Judge.

11         MR. TONG:  Sidebar, Your Honor?

12         THE COURT:  All right.

13         Well, let's -- can you move on, and we'll discuss this

14   after the jury goes home?

15         MR. GRONNA:  Yes.

16         THE COURT:  Because you're going to continue until

17   tomorrow, Mr. Gronna.

18         MR. GRONNA:  Sure.

19         THE COURT:  Why don't we move on and we'll not waste

20   the jury's time now.

21         MR. GRONNA:  That's fine.

22         THE COURT:  We'll take that up this afternoon.  We'll

23   just go another 10 minutes or so, then we'll break.

24         MR. GRONNA:  That's fine.

25   BY MR. GRONNA:
```

OLIVER - CROSS (Gronna)

210

1    Q    Let me just ask you this:  As of April of 2012, it was

2    your knowledge that Ms. Oliver was still in that house, right?

3    A    Yes, as far as I -- yes.

4    Q    And that's the same house that you initiated your bonded

5    promissory note on in 2006, right?

6    A    Yes.  We initiated.

7    Q    Now, when the decision -- so, okay.

8          Ms. Teves was working in, I guess, the office, the

9    first office that you talked about, right?  And that was due to

10   her working with Mahealani and The Registry issues, right?

11   A    Yes.

12   Q    Okay.  And essentially you were the one -- I guess you and

13   Mahealani discussed the bonded note, right?

14   A    Yes.

15   Q    And to her knowledge, she wasn't researching that

16   information, was she?

17   A    No.

18   Q    And that was your doing, wasn't it?

19   A    Yes, I had the information.

20   Q    Okay.  And essentially in May of 2008, I think that you

21   learned she was going to acquire a home, right?

22          MR. TONG:  Objection.  Who is "she"?

23          THE COURT:  Sustained.

24   BY MR. GRONNA:

25   Q    Ms. Teves.

OLIVER - CROSS (Gronna)

1   A    Yeah, that she was going to buy a home.

2   Q    Okay.  And when you learned that she was going to buy a

3   home, that's when you approached her and you actually said,

4   I've got a way for you to pay off your home mortgage, didn't

5   you?

6   A    No.  No way.  No, she was familiar with the whole system

7   already.

8   Q    And that's because you had informed her of that, right?

9   A    No, the process was already in play when everybody was

10  coming into the office.

11  Q    Okay.  In May of 2008?

12  A    Yeah.

13  Q    Okay.  And because you had actually in -- I think it was

14  February of 2008, you had actually sent off another bonded

15  promissory note to pay for your home, right?

16  A    Yeah.

17  Q    And you asked her to do the notary for that, didn't you?

18  A    Yeah.

19  Q    And so you essentially had told her, you know, We're doing

20  it for our house, it's going to work, you should do it for

21  yours?

22  A    I never coached her or coerced her, no.

23  Q    You never made that suggestion to her?

24  A    No.

25  Q    Okay.  And she got the forms from you?

1    A    They were in the office, yes.

2    Q    And they came from you, though, right?

3    A    Well, they can say it came from me, but they were -- it

4    was in the computers in the office.

5    Q    It was in your computer, right?

6    A    It was -- at the time she did hers, it was in all their

7    computers.

8    Q    And you downloaded all those forms into the computers,

9    right?

10   A    I downloaded the initial ones, but they kept morphing into

11   different forms.

12   Q    And you assisted in the morphing of those different forms.

13   A    Absolutely not.

14   Q    You didn't have anything to do with that?

15   A    No.

16   Q    You never reviewed that?

17   A    No.

18   Q    You never gave them input to that?

19   A    No.

20   Q    I see.  So all you did was the 1099-OIDs?

21   A    Yes.

22   Q    And you prepared those forms?

23   A    Yeah.

24   Q    And you actually -- you did your own tax returns?

25   A    Yeah.

OLIVER - CROSS (Gronna)

1   Q    I think we looked at a couple of them?

2   A    Yes.

3   Q    And when you signed those returns, you know, you signed

4   those, you knew that those were false.  I think that's what you

5   testified to?

6   A    Yes.

7   Q    You signed those knowing that they were false?

8   A    Yes.

9   Q    And you knew that signing the false document, a false 1040

10   return is subject to being -- subject to penalty of perjury?

11   A    Yes.  But I didn't think that it was a big deal to -- that

12   they would come after me.

13   Q    So it was not a big deal to lie to the government, right?

14   A    Well, at the time that's -- obviously I was wrong.

15   Q    No, my question is, it's not a big deal to you to lie to

16   the government; is that right?

17          MR. TONG:  Objection.  Asked and answered.

18          THE COURT:  Sustained.  He said "at the time" too.

19          MR. GRONNA:  I see.

20   BY MR. GRONNA:

21   Q    And is it safe to say you still feel the same way now?

22   A    No.

23   Q    And when was the epiphany?

24   A    The epiphany was when nothing worked.

25   Q    Okay.  And when nothing worked was when?

OLIVER - CROSS (Gronna)

214

1    A    Nothing -- when they started doing the mortgage process,

2    and when I did the mortgage process and nothing worked.

3    Q    Well, it must have worked because, as you said, Mahealani

4    is still in that same house that you did the mortgage process

5    for, right?

6    A    Yeah.  But it didn't work still.  They still foreclosed.

7    Q    Okay.  So in 2008, it didn't bother you to fill out a

8    false tax return and file it.

9         MR. TONG:  Objection.  Argumentative.

10        THE COURT:  Sustained.

11   BY MR. GRONNA:

12   Q    Now, when Ms. Teves had done her bonded promissory note

13   like you had done, did you tell -- you never told her, Hey, you

14   shouldn't do that, it's not going to work?

15   A    I figured she already knew because people were getting

16   foreclosed on.

17   Q    You never told her that, It's not going to work, you

18   shouldn't do it?

19   A    I probably did.  I told --

20        THE COURT:  No, do you have a recollection of telling

21   her that?

22        THE WITNESS:  I don't have a recollection, no.  The

23   exact instance.

24   BY MR. GRONNA:

25   Q    And at the time that this happened, later on did she

OLIVER - CROSS (Gronna)

215

1    confide in you that, Hey, you know what, John, I'm getting

2    these letters from -- from lawyers about recognizing this

3    bonded promissory note?

4    A    I think she showed -- she said that she was getting

5    letters.  Yeah.

6    Q    Okay.  And she asked you for some advice, How should I

7    deal with this?

8    A    And -- yes, she did.

9    Q    And you gave her advice on how to deal with it, didn't

10   you?

11   A    I don't recall what I said.  I thought that they already

12   had their process down.

13   Q    Well, you assisted in creating that process, didn't you?

14   A    No.

15   Q    I mean that was all part of the patriot movement.

16   A    No, I downloaded the original documents.  And I might have

17   known a little bit --

18   Q    And you studied all --

19   A    I studied it, but I didn't morph anything.

20   Q    You studied all those documents.

21   A    She studied them too.  I did not --

22   Q    She studied them with you?

23   A    She studied them on her own.  She had --

24   Q    Do you know?  Were you there?

25              THE COURT:  Don't interrupt him.  Don't interrupt the

 1   witness.

 2   BY MR. GRONNA:

 3   Q    Were you there?

 4   A    She had all the information.

 5   Q    Were you there with her when she studied this?

 6   A    I know she was studying.  I wasn't -- I couldn't be with

 7   her all day.

 8   Q    Okay.  How do you know she studied it?

 9   A    Because she wrote all of it.

10   Q    She wrote all these documents?

11   A    Yeah.

12   Q    Okay.  She wrote -- Pilialoha Teves wrote --

13   A    No, no.

14   Q    -- all the documents that we've been exhibiting?

15   A    No, I was talking about Mahealani.

16   Q    Oh, I'm talking about Ms. Teves.

17   A    Okay.  No, no, Ms. Teves --

18        THE COURT:  With that confusion, let's break for the

19   evening.

20        THE WITNESS:  Yeah.

21        THE COURT:  He was, I think, clearly talking about

22   Ms. Ventura-Oliver when you were talking about who was

23   studying.

24        Is that right?

25        THE WITNESS:  Yeah.

OLIVER - CROSS (Gronna)

1           THE COURT:  Okay.  You were not talking about

2    Ms. Teves.

3           THE WITNESS:  No.

4           THE COURT:  Okay.  So why don't -- with that, let's

5    let an evening pass and pick up the cross-examination tomorrow

6    morning, all right?

7           So, ladies and gentlemen, tomorrow morning either

8    first thing or at the break, we'll have some discussion about

9    next week and scheduling next week and so forth.  We'll take

10   that up at that point in time.  All right?

11          So I hope you all have a pleasant evening.  Leave the

12   notebooks behind, of course, and just remember you still are

13   not permitted to talk about the case with each other or others

14   or do any research.

15          (At 4:14 p.m., the jury was excused, and the following

16   proceedings were held:)

17          THE COURT:  All right.  You may step down.  You may

18   step down, sir, and -- so we'll need Mr. Oliver back 9 o'clock

19   tomorrow, okay?

20          Be seated, please.

21          All right.  So let's discuss the matter that was going

22   to be taken up at sidebar now then.

23          Mr. Gronna, you were going to get into -- sounded like

24   you were going to get into the bail revocation.

25          MR. GRONNA:  Yes, Your Honor.  The only thing I was

1   going to get into the bail revocation for was just the time

2   period of when the bail revocation took place, not in that --

3   essentially was just for time, a time sequence of when he gave

4   up on his belief of -- of this patriot movement.

5          You know, he seems to tell two things:  Number one,

6   that I didn't believe it after I saw it didn't work, and that

7   could have been as early as June of 2008, but yet here he is

8   coming into April of 2012 still maintaining that belief system,

9   because I believe that, as I recall, that there had been a

10  number of filings that seemed to come right out of the pages of

11  the patriot movement pertaining to this Court's jurisdiction

12  over him.  Which I think may -- I'm not quite sure, but that

13  might have been one of the issues that the Court had with him

14  because he didn't recognize or appreciate this Court's

15  jurisdiction on him.

16         THE COURT:  I have to say I have a shocking lack of

17  memory as to exactly what happened at that bail hearing.

18         MR. GRONNA:  Well, no, no, but I think generally

19  speaking -- the point being is this:  That I think that --

20         THE COURT:  Did I revoke his bail?  Was it me or a

21  magistrate?

22         MR. BARBEE:  I think it was the magistrate.

23         MR. GRONNA:  It might have been -- yeah, well, I have

24  a -- I have a government's Motion to Revoke Pretrial Release.

25  It was April 20th.  This was filed on Number 429 in the ECF

1   filing and --

2                    (Court and clerk conferring.)

3            THE COURT:  Okay.  And then who ultimately -- we had a

4   hearing then?

5            THE CLERK:  Mm-hmm.

6            THE COURT:  Apparently it was before me.  I just do

7   so --

8            MR. GRONNA:  Yeah.  No, no, I --

9            THE COURT:  -- many of these, I just honestly don't --

10           MR. GRONNA:  No, I know.

11           THE COURT:  -- remember this one.  I have to say.

12           MR. GRONNA:  Right.  And you know, Judge, I don't -- I

13   don't have the actual -- I don't know who actually did it.

14           THE COURT:  Well, if he filed -- if he filed documents

15   that he signed, whether it be before or after the bail was

16   revoked --

17           MR. GRONNA:  I'm just getting a rough date that the

18   inquiry was more of just the date that he was, you know, when

19   he had this epiphany that, you know, the sovereign -- the

20   patriot movement is bogus, and I don't believe in it anymore.

21           THE COURT:  Right.

22           MR. GRONNA:  But I --

23           THE COURT:  But if you have documents you want to

24   impeach him with, I think you can do that.  I mean we'll hear

25   if there are any objections to that.

1          MR. GRONNA:  Oh, no, no, the only thing I was just

2     doing was just trying to establish a date to when he no longer

3     believed in this --

4          THE COURT:  Well, are we past that now?  I mean are

5     you going --

6          MR. GRONNA:  Yes.

7          THE COURT:  We are past that.  So this is kind of moot

8     at this point then.

9          MR. GRONNA:  Yes.

10          THE COURT:  Okay.  Well, let's leave it at that.

11     Okay.

12          Anything else we need to take up then?

13          MR. GRONNA:  I was going to ask him, you know, whether

14     or not he was still filing, you know, but you don't have

15     jurisdiction -- the Court does not have jurisdiction, and

16     that's all part of the patriot movement, you know, because

17     essentially what I'm hearing him say is, I don't believe in

18     this patriot stuff, and I don't believe -- it's from, what,

19     June of 2008 when it didn't work for me, and I started writing

20     checks to pay for my -- for my property that I had wanted

21     bonded promissory notes for.  I mean here he is still --

22          THE COURT:  If you can impeach him, then impeach him.

23     Okay?

24          MR. GRONNA:  Okay.  Thank you.

25          THE COURT:  Now, Mr. Barbee, I wanted to clarify, that

```
 1    amended witness list you provided, are those the witnesses you
 2    intend to call?  Do I have that right?
 3              MR. BARBEE:  I think it's getting refined more and
 4    more as we get closer.  We have Mrs. Schmitt, who is on the
 5    amended list.  We have Keaaumoku Kapu, who is on the original
 6    list.  We have two of the Armitages, Wayne and Denise, who are
 7    on the amended list.
 8              THE COURT:  Okay.
 9              MR. BARBEE:  We have Mr. Logan, who I think is on the
10    amended list.  We have -- I put it down as a Brady Bintliff,
11    it's actually Grady, with a G, Grady Bintliff.
12              THE COURT:  All right.
13              MR. BARBEE:  And that's who we have so far.
14              THE COURT:  All right.  So give me the name -- I'm
15    sorry, spell the name on the initial list, because I don't have
16    that before me and I didn't hear you.
17              MR. BARBEE:  Last name Kapu, and it would be witness
18    number --
19              THE COURT:  No, what's the first name?  I just --
20              MR. BARBEE:  Keeaumoku.
21              THE COURT:  Keeaumoku?
22              MR. BARBEE:  Yeah, 30 -- he's in the 30s, I think.
23              THE COURT:  Number 11.
24              MR. BARBEE.  11.  Okay.  So that's what we have so
25    far, Judge.
```

```
 1              THE COURT:  Two, three, four, five -- so that's about
 2   six or so.
 3              MR. BARBEE:  Yeah.
 4              THE COURT:  Okay.  All right.
 5              MR. BARBEE:  So that should be hopefully less than a
 6   half a day.
 7              THE COURT:  Okay.  All right.
 8              All right.  Anything else?
 9              MR. TONG:  No, Your Honor.
10              THE COURT:  All right.  So you're going to finish up
11   with him tomorrow morning, maybe an hour or so we'll be done
12   with him, and then you're going to turn to Agent Carter.
13              MR. TONG:  Yes, Your Honor.
14              THE COURT:  How long will that be?
15              MR. TONG:  I need to work with him tonight, but I
16   think couple hours.
17              THE COURT:  Couple hours?
18              MR. TONG:  Yeah, because we got to go through the
19   financial.  Maybe less.  Maybe less.
20              THE COURT:  All right.  And then you're going to rest.
21              MR. TONG:  And then we're going to rest.  Well,
22   subject to making sure our records correspond with Ms. Greaney.
23              THE COURT:  Yes, of course.  Of course, right.
24              All right.  So then the defense better be prepared to
25   go forward.
```

```
 1              MR. BARBEE:  By lunchtime, I guess.

 2              THE COURT:  Right.  Right.  Right.

 3              MR. GRONNA:  Maybe we could settle instructions

 4    tomorrow afternoon.

 5              THE COURT:  We may be able to settle instructions or

 6    get on it.  I have a draft I'm looking through now in my

 7    office, and I -- I can finish that up hopefully tomorrow

 8    morning.  Might be able to get a copy to you by noon or so

 9    tomorrow.  But I don't think we're going to obviously get to

10    the jury on Friday.  It just doesn't seem like that's going to

11    happen.

12              Now, if, if we only have half a day tomorrow and

13    that's all, nobody else testifies, then maybe we will get to

14    the jury on Friday.  So you folks have to be ready to make

15    those decisions tomorrow.  That's my point.

16              MR. BARBEE:  Yes, Your Honor.

17              MR. GRONNA:  Thank you, Judge.

18              THE COURT:  All right.  We're in recess.

19              (The proceedings concluded at 4:22 p.m.,

20    October 16, 2013.)

21

22

23

24

25
```

1                      COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing pages numbered 1 through 223

6    is a true, complete and correct transcript of the proceedings

7    had in connection with the above-entitled matter.

8          DATED at Honolulu, Hawaii, January 15, 2014.

9

10

11                      _____/s/ Cynthia Fazio_____
                        CYNTHIA FAZIO, CSR, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25