1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,    ) CRIMINAL NO. 11-00503JMS
4                             )
            Plaintiff,        ) Honolulu, Hawaii
5                             ) October 18, 2013
        vs.                   ) 9:05 a.m.
6                             )
 (01) MAHEALANI VENTURA-OLIVER ) FURTHER JURY TRIAL - DAY 11
7  (03) PILIALOHA K. TEVES,   )
                              )
8            Defendants.      )
    _____ )
9

10                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
11                UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:      LAWRENCE L. TONG, ESQ.
                            MICHAEL DAVID NAMMAR, ESQ.
14                          Office of the U.S. Attorney
                            PJKK Federal Building
15                          300 Ala Moana Blvd., Suite 6100
                            Honolulu, Hawaii  96850
16

17  For Defendant           RUSTAM A. BARBEE, ESQ.
    Ventura-Oliver:         Attorney at Law
18                          1188 Bishop Street, Ste. 2606
                            Honolulu, Hawaii  96813
19

20  For Defendant Teves:    RICHARD D. GRONNA, ESQ.
                            Attorney at Law
21                          841 Bishop Street, Suite 2201
                            Honolulu, Hawaii 96813
22

23  Official Court          Cynthia Fazio, CSR, RMR, CRR
    Reporter:               United States District Court
24                          P.O. Box 50131
                            Honolulu, Hawaii  96850
25  Proceedings recorded by machine shorthand, transcript produced
    with computer-aided transcription (CAT).

1                          I N D E X

2

3    EXAMINATIONS                                      PAGE

4    DENISE ARMITAGE.......................................
         DIRECT EXAMINATION BY MR. BARBEE..................  15
5        CROSS-EXAMINATION BY MR. NAMMAR..................  28
         CROSS-EXAMINATION BY MR. GRONNA..................  37
6        REDIRECT EXAMINATION BY MR. BARBEE...............  43

7    JONAH KEEAUMOKU KAPU..................................
         DIRECT EXAMINATION BY MR. BARBEE.................  47
8        CROSS-EXAMINATION BY MR. TONG....................  50
         CROSS-EXAMINATION BY MR. GRONNA..................  54
9

                                                         100
     Closing argument by Mr. Tong.........................
11   Closing argument by Mr. Barbee...................... 132

12   Closing argument by Mr. Gronna...................... 142

13   Rebuttal closing argument by Mr. Tong............... 160

14

15

16

17                        E X H I B I T S

18

19   DEFENDANT'S:                                        PAGE

20   26.1, 26-A.1 through A.3, B.1, C.1, D.1 through
     D.11 and E.1 were received in evidence..............  56
21
     A was received in evidence..........................  64
22

23

24

25

1   FRIDAY, OCTOBER 18, 2013                          9:05 A.M.

2            (The following proceedings were held in open court out

3   of the presence of the jury:)

4            THE COURT:  All right.  We are back on the record with

5   both defendants present, counsel, and case agents.  I did

6   receive the theory of defense instructions proposed by

7   Mr. Barbee and Mr. Gronna.

8            Any comments from the United States?

9            MR. NAMMAR:  Your Honor, we reviewed them.  I think

10  generally when I've seen them, there's very -- they're a lot

11  shorter and they don't repeat the elements like -- like this

12  one did.  They just simply say "lack of intent" or "no

13  knowledge" on the part of the defendant.

14           THE COURT:  Well, I mean actually I give them credit

15  in some ways because they actually -- I looked at it and they

16  actually track the language from the instruction.  So it is

17  very clear in that -- to that degree.

18           MR. NAMMAR:  And then -- well, my only other comment

19  is I think there's a misspelling on the last one of

20  Mr. Barbee's "misunderstanding."

21           MR. BARBEE:  Oh.

22           MR. NAMMAR:  Should be I-N-G, I think.

23           THE COURT:  Well, I had retyped these myself.

24           MR. NAMMAR:  Okay.

25           THE COURT:  Here's my view on this:  First of all,

1   they start off by saying that the defendants pled guilty on the

2   grounds that...  I don't know why they pled guilty.  They

3   haven't testified that's why they pled guilty.  I understand

4   what the theory of the defense is, but that may be different

5   than why they pled guilty.

6          So I think a better way to word it is, for instance,

7   as to Count 1, to say:  "As to Count 1, Defendants

8   Ventura-Oliver and Teves' theory of the defense is that," and

9   then go forward from there to make it neutral in that regard.

10         MR. BARBEE:  That's fine, Judge.

11         MR. GRONNA:  That's fine.

12         THE COURT:  And I do not give, You must find the

13  defendant not guilty on that count.  If I were to say that, I

14  would have to give an instruction, seems to me, to say, But if

15  you do find it and the elements, you must find them guilty.

16  And so I think that's evidence because it's an element of the

17  offense for each that you are giving.

18         So I'm going to give to you what I propose.

19         MR. NAMMAR:  Yes, Your Honor.

20         THE COURT:  Ms. Greaney, if you can hand those out.

21         And then if there's any objection, you can make that

22  on the record.  Or I'll hear from you as well if you can

23  convince me otherwise.  And I had to retype this because it

24  came in PDF, so please look for typos too as you read it, okay?

25         MR. BARBEE:  Looks good, Judge.

1          MR. NAMMAR:  No objection, Your Honor.

2          MR. GRONNA:  No objection.

3          THE COURT:  All right.  So we'll give that instruction

4     in that form.

5          Mr. Barbee, the issue on forfeiture, where does that

6     stand?

7          MR. BARBEE:  We can -- I can inform the Court and

8     counsel that I have talked to my client at some length about

9     that issue.  And it's her knowing and intelligent decision to,

10    in the event she's convicted, to submit it to the discretion of

11    the Court.

12         THE COURT:  All right.  So, Ms. Ventura-Oliver, that

13    is your decision?  In other words, if you're convicted, and the

14    rule requires me to ask this beforehand, so, again, I have no

15    view as to whether you will be convicted or not.  But in the

16    case of conviction, this forfeiture issue you agree would be

17    submitted to me as opposed to having the jury make that

18    determination?

19         DEFENDANT VENTURA-OLIVER:  Yes.

20         MR. GRONNA:  And likewise, Your Honor, I have gone

21    over this with Ms. Teves, and she would defer to have the Court

22    make the ruling on the forfeiture.

23         THE COURT:  All right.  Is that right, Ms. Teves?

24         DEFENDANT TEVES:  Yes.

25         THE COURT:  All right.  So then those jury

1    instructions you provided and the work put into that is moot at

2    this point in time.  I suppose in the case of conviction what

3    we'd do is just get some post-trial briefing on it and a

4    proposed order from -- from you folks as to how to proceed.

5            MR. TONG:  Whatever the Court would want.  I mean we'd

6    be prepared to trace the assets, if necessary, to direct the

7    Court to the exhibits that we think --

8            THE COURT:  Right, that would be helpful probably.

9            MR. TONG:  Yeah.  Yeah.

10           THE COURT:  Right.  And then the defense could respond

11   to that if they --

12           MR. BARBEE:  Yes, Your Honor.

13           THE COURT:  -- believe there was an appropriate

14   response.  Okay?  I'd rather do it in writing rather than

15   argument is what I'm saying, I think, and we can take that up

16   at our leisure essentially.  I mean the briefing schedule.

17           All right.  Are we ready to bring the jury in then?

18           THE CLERK:  Yes, Your Honor.

19           MR. BARBEE:  Your Honor, before they come in, I just

20   report to the Court and parties that I have for sure one

21   witness, who was already here this morning.  The other flew in

22   from the Big Island or --

23           DEFENDANT VENTURA-OLIVER:  From Maui.

24           MR. BARBEE:  From Maui.  And he's not at the

25   courthouse yet, so I'll probably need a few minutes with him

1    before I put him on.  And then --

2            THE COURT:  Well, let me be clear about something.  If

3    he's not here and we're ready to proceed, whether it be with

4    Ms. Ventura-Oliver's testimony or closing, that's what we're

5    going to do.  You've known when your case was for a long time

6    now.  And if this witness doesn't show up for some reason, it's

7    not going to delay us any further.

8            MR. BARBEE:  This is the witness I reported to the

9    Court that was working and couldn't get away from work until --

10   and fly out until this morning.

11           THE COURT:  Well, there's something called a subpoena,

12   which actually does work pretty well in getting people out of

13   work into court.  Even friendly witnesses who need to show a

14   boss that they're under subpoena.

15           MR. BARBEE:  Yes, Your Honor.  The last thing I would

16   indicate to the Court is that I did have numerous discussions,

17   long and detailed, with my client about her right to testify or

18   not testify.  And she asked intelligent questions, I gave her

19   answers and my advice, and it's her knowing and intelligent

20   decision, based upon advice of counsel and her own decision,

21   not to testify at trial in this matter.

22           THE COURT:  All right.  And do you wish me to inquire

23   of her, Mr. Barbee?

24           MR. BARBEE:  Yes, I do.

25           THE COURT:  All right.  So, Ms. Ventura-Oliver, you

1   heard what I said to Ms. Teves earlier, right?

2            DEFENDANT VENTURA-OLIVER:  Yes.

3            THE COURT:  About the right to testify.  Pull the mike

4   up a little bit, ma'am, just so I can hear you.

5            Whether you testify or not is no concern of mine

6   whatsoever.  I just want to make sure you understand your

7   rights and that that is on the record is all I want to do.

8            So, first of all, you understand you have an absolute

9   right to testify on your own behalf if that's what you chose to

10  do.

11           DEFENDANT VENTURA-OLIVER:  Yes.

12           THE COURT:  Okay.  You also understand you have a

13  constitutional right not to testify.

14           DEFENDANT VENTURA-OLIVER:  Yes.

15           THE COURT:  And you understand -- I think we went

16  through the jury instructions yesterday and you probably

17  already have seen the jury instruction that if you don't

18  testify, I would instruct the jury that they could not hold

19  that against you in any way.  You understand that?

20           DEFENDANT VENTURA-OLIVER:  That's right.

21           THE COURT:  All right.  And finally, you understand,

22  although certainly it's appropriate and wise to consult with

23  Mr. Barbee, an experienced attorney, regarding his views on

24  this, the ultimate decision whether to testify or not testify

25  rests with you.  Do you understand that?

1            DEFENDANT VENTURA-OLIVER:  Yes, we did discuss that.

2            THE COURT:  Okay.  And it's your decision not to

3    testify.

4            DEFENDANT VENTURA-OLIVER:  That's correct.

5            THE COURT:  All right.  Thank you very much.

6            MR. GRONNA:  One other matter, Your Honor.  I want

7    to -- when it comes to Ms. Teves' case in chief, there were

8    three exhibits that I was going to attempt to introduce, and

9    that was essentially going to be it.  It was the -- the

10   inclusion of those documents, I think that we stipulated to on

11   the 26 -- Exhibit 26 series.  I think they're marked, they're

12   on that top binder there on the desk as 21-A.1, A.2, et cetera.

13   So I was going to ask to introduce those into evidence.

14           The other document I was going to be asking to

15   introduce into evidence was the Affidavit of Truth of John D.

16   Oliver.  You know, we discussed that at length with him in his

17   cross-examination.

18           And finally, there was the discussion of his

19   continuing to file pleadings that essentially tracked the

20   patriot movement.  Those were the documents that he filed or

21   caused to have filed on April 12th, 2012, and those are part of

22   the court record as they stand now.

23           THE COURT:  Can I see those?  I just don't --

24           MR. GRONNA:  Yes, Your Honor.  May I approach?

25           THE COURT:  Yes.

```
 1              MR. GRONNA:  (Handing document.)
 2              THE COURT:  All right.  Well, we'll take this up at
 3    the time.
 4              MR. GRONNA:  Very good.  I just wanted to just alert
 5    the Court ahead of time.
 6              THE COURT:  Thank you.  I appreciate that.
 7              All right.  So, Ms. Greaney can go get the jury.
 8              Your witness will be who, Mr. Barbee?
 9              MR. BARBEE:  This is going to be Denise Armitage.
10              THE COURT:  Someone can get her and just have her sit
11    in the courtroom so she will be ready to take the stand.
12              MR. BARBEE:  Yes, Your Honor.
13                   (Pause in the proceedings.)
14              THE COURT:  Mr. Nammar?
15              MR. NAMMAR:  Yes.
16              THE COURT:  No criminal history issues with this
17    witness?
18              MR. NAMMAR:  No, Your Honor.  Not for 609.
19              THE COURT:  Okay.  Well, if there's something else,
20    you might want to take it up at sidebar first if there's
21    something.
22              MR. NAMMAR:  Definitely, Your Honor.
23              THE COURT:  All right.  All right.
24              MR. GRONNA:  And, Your Honor, since you're here, I
25    want to know if the Court would entertain renewal of my
```

1    objection to the introduction of photographs of Ms. Teves

2    carrying the shredder.  I don't know what number that was, but

3    I know Mr. Oliver made the statement about that, but I don't

4    know that the foundation was made as to who made the -- who

5    took the photograph on the date that it was taken.  Because I

6    don't think he took that photograph.

7         THE COURT:  Well, I think Agent Carter testified that

8    he had taken those photographs that were admitted into

9    evidence, didn't he?

10        MR. GRONNA:  What he testified, I believe, was Ms. Hoy

11   dumping the bags in the dumpster.

12        THE COURT:  Well, I think Mr. Tong asked a question

13   before that.

14        MR. GRONNA:  Okay.  I just -- I wasn't sure that

15   that's in fact -- I don't recall that part.

16        THE COURT:  But I -- you know, if that's not in the

17   record, I would give the government an option to put him back

18   on to lay that foundation because this objection, of course, is

19   coming after the testimony.

20        MR. GRONNA:  Sure.  No, I understand that.

21        THE COURT:  Right.

22        MR. GRONNA:  But I had made the objection originally.

23        MR. TONG:  I -- I did ask the question.  And I don't

24   believe that it's required for foundational purposes that we

25   have someone say, I took the photograph.  But I think I did ask

1    that, but I certainly asked him were you on surveillance or did

2    you see things that these photographs --

3              THE COURT:  Would he testify he took those

4    photographs?

5              MR. TONG:  Yes.

6              THE COURT:  Yes?

7              MR. GRONNA:  Okay.  I mean --

8              THE COURT:  So -- so, do you want to talk to Mr. Tong

9    and see if you really want to continue that objection or if

10   you're satisfied at this point?

11             MR. GRONNA:  Well, for the record, I would just

12   continue it and let the Court to say the foundation has been

13   made, if that's in fact --

14             THE COURT:  Well, I'm going to allow you to recall

15   Agent Carter, because I think it was a little bit -- it was a

16   little vague, I think, on that, and I think it's a good idea

17   just to put him on the stand and say, I took that photograph,

18   for the record, if that's what his testimony would be,

19   Mr. Tong.

20             MR. TONG:  Which photograph are you objecting to?

21             MR. GRONNA:  The one where she was carrying the

22   shredder.

23             MR. TONG:  Okay.  Shall I do that first or --

24             THE COURT:  We'll wait since Mr. Barbee has his

25   witness in the courtroom.

1          MR. TONG:  Your Honor, may I inquire whether they

2     object to any of the other photographs taken on that day?  I

3     don't want to get into this little tit-for-tat thing.

4          THE COURT:  Yeah, they're talking about something else

5     right now.  We'll have a sidebar at a minimum before he

6     testifies.

7          MR. GRONNA:  And, Your Honor, in discussing this

8     matter with the photograph, we're going to waive -- we'll

9     submit it that it was introduced properly.

10         THE COURT:  All right.

11         MR. GRONNA:  So we don't need to recall --

12         MR. TONG:  You're submitting -- you're withdrawing

13    your objection?

14         MR. GRONNA:  Yes.

15         MR. TONG:  Okay.

16         THE COURT:  Okay.

17         MR. GRONNA:  I'm withdrawing the renewal of my

18    objection.  Okay?

19         MR. TONG:  Say that again?

20         MR. GRONNA:  Withdrawal of the renewal of my

21    objection.

22         THE COURT:  Mr. Tong, do you believe there will be any

23    rebuttal case?

24         MR. TONG:  I'm so sorry?

25         THE COURT:  Do you believe at this point there will be

1    any rebuttal?

2              MR. TONG:  I do not.

3              (The following proceedings were held in open court in

4    the presence of the jury:)

5              THE CLERK:  Criminal Number 11-00503, United States of

6    America versus defendant number 1, Mahealani Ventura-Oliver;

7    defendant number 3, Pilialoha K. Teves.

8              This hearing has been called for further jury trial,

9    day 11.

10             Your appearances for the record, please.

11             MR. TONG:  Good morning, Your Honor.  Ladies and

12   gentlemen.  Larry Tong and Michael Nammar for the United

13   States.  With us are Special Agent Steven Carter and Special

14   Agent Malia Dougan.

15             THE COURT:  Yes, good morning.

16             MR. BARBEE:  Good morning, everybody.  Rustam Barbee

17   appearing with Mahealani Ventura-Oliver, present in court.

18             THE COURT:  Yes, good morning.

19             MR. GRONNA:  Good morning, everyone.  Richard Gronna

20   appearing on behalf of Pilialoha Teves, and we're back.

21             THE COURT:  Yes, good morning.

22             And good morning, ladies and gentlemen.

23             Mr. Hearn.

24             JUROR NUMBER 2:  Yes, sir.

25             THE COURT:  You are now one of the jurors that will be

 1  deliberating.

 2         JUROR NUMBER 2:  Thank you, sir.

 3         THE COURT:  All right.  Mr. Okada had some issues that

 4  came up that required his immediate attention.  And given the

 5  fact we still had three alternates left, the parties and the

 6  Court agreed it would be in the best interest to allow

 7  Mr. Okada to take care of those matters and to focus on those

 8  matters.  And as a result, Mr. Hearn is moved up from an

 9  alternate to one of the deliberating jurors.  All right?

10         Mr. Barbee?

11         MR. BARBEE:  Yes, Your Honor.  Thank you.

12         The defense would call witness Denise Armitage to the

13  stand.

14                     DENISE ARMITAGE,

15  called as a witness by Defendant Ventura-Oliver, having been

16  first duly sworn, was examined and testified as follows:

17         THE CLERK:  Thank you.  Please have a seat.

18         Please state your name for the Court and spell your

19  last name.

20         THE WITNESS:  My name is Denise Armitage.  My last

21  name is A-R-M-I-T-A-G-E.

22                   DIRECT EXAMINATION

23  BY MR. BARBEE:

24  Q    Good morning, Mrs. Armitage.

25  A    Good morning.

DENISE ARMITAGE - DIRECT

16

1   Q    I'd like to ask you -- well, first of all, where do you

2   live?

3   A    I live on Maui.

4   Q    Okay.  And how long have you lived on Maui?

5   A    Since '75, 1975.

6   Q    Okay.  And are you married?

7   A    Yes, I am.  I've been married for 40 years.

8   Q    And who are you married to?

9   A    I'm married to Wayne Armitage.

10  Q    And do you know Mahealani Ventura-Oliver?

11  A    Yes, I do.

12  Q    And is she present here in court?

13  A    Yes, she is.

14  Q    Okay.  Can you describe her and point her out?

15  A    She's in a teal-colored shirt -- I mean, dress, with a

16  flower in her hair.

17  Q    Okay.  How long have you known Mahealani Ventura-Oliver?

18  A    I've known Mahealani almost a lifetime.  She's family.

19  Q    Okay.  And by "family," you mean that she's related to

20  your husband, correct?

21  A    Yes, she's related to my husband, who's second cousin.

22  Q    Okay.  Directing your attention to the time frame of, I

23  guess, early 2000 to the ending period of 2000, did you have an

24  opportunity to know John Oliver?

25  A    Yes.

1   Q    And who is John Oliver?

2   A    It's her husband.

3   Q    Okay.  And were you present in their company often?

4   A    Many times, yes.

5   Q    Okay.  Did you have the opportunity when you were present

6   in their company to observe their interaction with each other?

7   A    Yes.

8   Q    And based upon your personal observations, can you say

9   whether or not -- or can you say who appeared to be the

10  dominant person in that relationship?

11  A    It would be John.

12  Q    Why do you say that?

13  A    Because Mahealani couldn't go anywhere without him, do

14  anything or even talk to family without him.

15  Q    Did he seem to be a controlling type person?

16  A    Yes.

17  Q    Did you ever witness him get physical with her?

18  A    Yes, I did.  It was at a family meeting that we had on our

19  property, and he didn't like what we were talking about, so he

20  just grabbed her arm and said, We need to leave right now, and

21  he just dragged her to the -- to the Jeep and they left.

22  Q    Okay.  Did you personally witness John be verbally abusive

23  or emotionally abusive to Mahealani?

24  A    She tried not to show it, but, yeah, he would -- he would

25  tell her things what to say to us and to friends that's around.

1    He wouldn't let her be herself, in other words.  He wouldn't --

2    he would coach her on what to say.

3    Q    Do you have any personal knowledge from your personal

4    observation of John Oliver whether or not he seemed to have a

5    high concern for money?

6    A    A very high concern.

7    Q    Why you say -- why do you say that?

8    A    Everything he talked about was making money.  It was

9    nothing about life, it was about money.

10   Q    Did there come a time where John Oliver personally told

11   you and your husband Wayne that he wanted to start charging you

12   folks rent for living on family land?

13   A    Yes, he did.

14        MR. NAMMAR:  Objection.  Calls for hearsay.

15        THE COURT:  Wait, wait, ma'am.  Sustained.

16        MR. NAMMAR:  Move to strike.

17        THE COURT:  Yeah, I don't know if there was an answer

18   or not, I didn't hear, but strike the question and answer.

19   BY MR. BARBEE:

20   Q    Without repeating the words that were said, without

21   repeating the words that were told to you, did there come a

22   time where Mr. -- Mr. Oliver tried to collect rent from -- from

23   you folks for living on family land?

24   A    Yes, he did.

25        MR. NAMMAR:  Objection.  Based on hearsay.

DENISE ARMITAGE - DIRECT

1          THE COURT:  Well, it's -- on second thought, it's not

2    being offered for the truth of the matter asserted.  Is that

3    right, Mr. Barbee?

4          MR. BARBEE:  Yes, Your Honor.

5          THE COURT:  All right.  So I will admit it.

6    BY MR. BARBEE:

7    Q    You can answer.

8    A    Yes, he did.  He --

9    Q    And don't use the words that he said, but...

10   A    Okay.  It was -- it was said that we should be charged

11   rent for family property that we live on.

12   Q    And how did you feel about that?

13         THE COURT:  Well, what's the relevance of how she

14   felt?

15         MR. BARBEE:  Okay.  Okay, Your Honor.

16   BY MR. BARBEE:

17   Q    Was this land John Oliver's land that he wanted rent from?

18   A    No, it wasn't.  It was my husband's family land that we

19   were -- we had the honor and still have the honor to live on

20   it.

21   Q    And was Mahealani helpful in getting you and your husband

22   to live on that land?

23   A    Yes, she was.  She was also helpful --

24         THE COURT:  Ma'am, ma'am, just -- he only asked that

25   one question.

1          THE WITNESS:  Yes.

2          THE COURT:  He didn't ask anything else.

3          THE WITNESS:  Yes.

4    BY MR. BARBEE:

5    Q    Directing your attention to early 2008, did there come a

6    time when you volunteered to work at the Hawaiiloa Foundation?

7    A    Oh, yes.

8    Q    And how often did you volunteer?

9    A    I'd go there at least three times a week, maybe four hours

10   each day.

11   Q    Okay.  And what did you do there at the Hawaiiloa

12   Foundation?

13   A    I would do genealogy research for the kanaka people that

14   came in for -- for help.

15   Q    And is it your recollection that Mahealani had been doing

16   that for several years?

17   A    Yes, she has.

18   Q    And you were volunteering to help her with that?

19   A    To help, yes.

20   Q    And what types of things did you do?

21   A    I actually would get on the computer and start searching

22   family land for the families that came in for help to find

23   their family land.  So we would go in and -- I would go in and

24   search the genealogy.

25   Q    And did you -- at the time that you were doing the

1   volunteer work, was there a single office or were there two

2   offices?

3   A      There were two offices.

4   Q      Okay.  And can you describe where the offices were and who

5   worked --

6   A      They were --

7   Q      -- in what office?

8   A      They were upstairs units, and it was about maybe 50 yards

9   apart of each other.  It was two-story building.

10  Q      Okay.  And who worked in which office of the two?

11  A      Well, one of them mostly was Mahealani in one and

12  Pilialoha would be working in another.  And we would actually

13  try to help both of them.

14  Q      Okay.  Let me go back.  If you described the two offices

15  as maybe suites --

16  A      Mm-hmm.

17  Q      -- one suite and the other suite?

18  A      Mm-hmm.

19  Q      Are you saying that Pilialoha and Mahealani worked in one

20  suite and somebody else worked in the other suite?

21  A      Pretty much they -- they would work in each suite, and

22  then they would get together to see what needed to be done more

23  per families as far as putting them on the properties.  The

24  ohana property.

25  Q      Okay.

DENISE ARMITAGE - DIRECT

22

1   A    Yeah.

2   Q    Now, did you see John Oliver present at these offices?

3   A    Every time I went there, yes.

4   Q    And would he only stay in one of the offices or would he

5   come and be present in both offices?

6   A    He would at times be at both offices, because where he sat

7   there's a window.  And at this window he could see the other

8   office.  So if somebody would come and go either office, he

9   would go over and find out who it was.

10  Q    That was coming?

11  A    And then he would return back, you know, he would go like

12  back and forth.

13  Q    So are you saying that if he, observing from the window at

14  one of the suites, observed somebody come into the suite where

15  Mahealani and Pilialoha were --

16  A    Mm-hmm.

17  Q    -- that he would leave his suite and come over to see who

18  came?

19  A    Yes.  Yes.

20  Q    Okay.  And you saw this on more than one occasion?

21  A    More than, yes.

22  Q    Okay.  And did -- did Mr. Oliver seem to exercise some

23  control and authority over any of the offices?

24       THE COURT:  Based on your own personal observation.

25  BY MR. BARBEE:

DENISE ARMITAGE - DIRECT

1    Q    Your personal --

2    A    On my own personal?  Yes, he did.  He -- when I would come

3    into the office and get on a computer, he would come and check

4    to see what I'd be doing.  And sometimes he'd tell me that

5    don't use the computer, it's not -- you know, particular days,

6    but not to -- there was no work to be done.

7    Q    And at the time you were using the computer, would you be

8    in the office where primarily Mahealani and --

9    A    Yes.

10    Q    -- Pilialoha was?

11    A    Yes.

12    Q    And he'd be present in the office and telling you not to

13    use the computer?

14    A    Yeah, he would say that it -- for me not to use it because

15    it's going to be used by someone else.  And although that there

16    were, like, three or four computers, he would say that it's

17    going to be used.  And so I couldn't use it, for me to just

18    answer the phones.

19    Q    And what would you be using the computer for?  In this

20    example you gave, what were you using the computer for?

21    A    To get into the genealogy history of the families at hand

22    that we were researching.

23    Q    Let me go backwards to pre-2008.  Did you ever attend

24    meetings where Mahealani would speak about genealogy and

25    Hawaiian history issues?

1   A    Yes, that was at the Cameron Center.

2   Q    Okay.  And this is before 2008, correct?

3   A    Yes.

4   Q    And would there be people present listening to her?

5   A    Yes, there were.

6   Q    And what types of topics would she talk to the people

7   about?

8   A    She would talk to them about family lands, genealogy, how

9   to search it, and how to -- and how to continue to help

10  themselves to search it.

11  Q    And was John -- did you ever see John Oliver present at

12  these meetings before 2008?

13  A    Yeah, at all the meetings.

14  Q    He was present at all the meetings?

15  A    He was present at all times.

16  Q    And did he ever participate or interject his two cents'

17  worth when Mahealani was talking about genealogy issues?

18  A    Yes.  Yeah.  He would be standing on the side and coaching

19  her on what to say on some issues.

20  Q    And how -- so he would just interject and interrupt her?

21  A    Yeah, he would just say, No, Mahealani, it's like this.

22  Q    And did you --

23  A    Or, you know, No, Mahealani, it's this way.

24  Q    Did you observe that on more than one occasion?

25  A    Almost at every meeting.

1   Q    Did it appear to you that John sought dominance over her

2   when she was making these present -- presentations?

3   A    Yes.  Yes.

4   Q    Did he know what he was talking about on the -- on the

5   Hawaiian rights issues?

6   A    He talked a little about the Hawaiian rights, but he

7   wanted her to make more of a point on other issues.

8   Q    Did there come occasion in 2008 -- going back to 2008, did

9   there come an occasion when you were volunteering when somebody

10  kicked you out of the offices?

11  A    Oh, yeah.

12  Q    And --

13  A    John kicked me out.

14  Q    And was this on his suite office or the one where

15  Mahealani and Pilialoha worked?

16  A    It was in the office that Mahealani and Pilialoha worked

17  in.

18  Q    What happened?

19  A    Well, I went in there one day, and I was going to get on

20  the computer, and he looked at me and he said -- first, I

21  walked in and he was on the computer, and I walked behind him.

22  And he quickly escaped out of that, whatever he was working,

23  and I asked him, What should I do today?  And he said, Well, I

24  think maybe you should go home today because we don't have any

25  work to be done.  And I said, Well, you know -- I said, Well,

1    we have this family that we need to research on.  And he says,

2    Oh, we're not doing that today, so you need to leave.  So I

3    questioned, Why do you want me to leave?  And he says, Well,

4    because there's things around here that we don't want you to

5    see because you're going to tell Tutu about it.

6    Q    And who's Tutu?

7    A    Tutu is my Aunty Juanita.

8    Q    Okay.  And what happened after that?

9    A    And so he kind of like pushed me out of the office, and he

10   said, We're going to go to lunch anyway, and he shut the door

11   and he locked it.

12   Q    Were you ever present and personally observed John Oliver

13   interact with Pilialoha Teves and Mahealani in that office

14   suite?

15   A    Yeah, yeah, I did, and he was -- he was --

16            THE COURT:  He just asked if you observed that.

17            THE WITNESS:  Yeah.

18            THE COURT:  That's all he asked so far.

19   BY MR. BARBEE:

20   Q    And based upon your personal observations, did it -- did

21   it appear or not appear that he was telling them what to do?

22   A    It appeared to me that he was telling them what to do.

23   Q    Okay.  Regarding money again, directing your attention to

24   the early and middle part of 2008 -- and let me clarify, your

25   volunteer work at the offices was starting in early 2008?

1   A    Yes.

2   Q    And when did it end approximately?

3   A    Approximately towards the end of 2008.

4   Q    Okay.

5   A    Like October, beginning of November.

6   Q    October, beginning of November.  And did you ever

7   personally observe Mahealani interact with John regarding the

8   checkbook?

9   A    Yes, I did.

10  Q    And what did you observe personally?

11  A    Well, I -- I observed --

12        MR. NAMMAR:  Objection.  Calls for hearsay, Your

13  Honor.

14        THE COURT:  It's not being offered for the truth.

15  Overruled.

16  BY MR. BARBEE:

17  Q    What did you observe personally regarding the checkbook?

18  A    I observed her talking with a family, and I'd see him --

19  seen him on many occasions push a checkbook in front of her and

20  asking her to sign some checks, and several times she says,

21  Well, I'm busy right now, John.  And he says, Oh, all you got

22  to do is sign these checks and I can leave.

23        So she would just sign it.  And then he would go by

24  his computer and finish it up.  Didn't know exactly what he was

25  finishing on these checks.  But -- and then he tore it out and

1    he would leave the office.

2    BY MR. BARBEE:

3    Q    Okay.  Prior to 2008 when Mahealani would be holding

4    meetings at the Cameron Center and educating people about

5    genealogy and Hawaiian land rights, was there any discussion

6    about helping people with their mortgages?

7    A    It -- I don't know when it got to that point, but when we

8    first began this, it was about getting the kanaka maoli people

9    rightfully on the properties.  Family properties.  And as we

10   were -- as it was going along and more people were getting

11   interested, somehow a few, I would say maybe a little more than

12   a handful of people, would come in and ask about their

13   mortgage, that they're foreclosing and they need help for their

14   mortgage.  And I cannot see when -- when did that really start.

15   It just kind of flowed right into what Mahealani was teaching.

16   Q    And before 2008 when Mahealani was doing her Registry

17   program and talking on the radio and TV --

18   A    Mm-hmm.

19   Q    -- was there any discussion about mortgage?

20   A    No.

21   Q    Okay.

22          MR. BARBEE:  No further questions.

23          THE COURT:  All right.  Cross?

24          MR. NAMMAR:  Yes, Your Honor.

25                        CROSS-EXAMINATION

```
 1   BY MR. NAMMAR:

 2   Q    Good morning.

 3   A    Good morning.

 4   Q    You said you worked at -- at the offices.  Was that the

 5   offices by the Nextel store?

 6   A    I don't know what a Nextel store is.

 7   Q    Okay.

 8             MR. NAMMAR:  Your Honor, may we publish --

 9             THE WITNESS:  Hookahi Street?  Yes.

10             MR. NAMMAR:  May we publish 1-N?

11             THE COURT:  N, as in Nancy?

12             MR. NAMMAR:  Yes.

13             THE COURT:  Yes.

14             Is the cap on?

15             SPECIAL AGENT CARTER:  No, it has to warm up.

16             THE COURT:  I've had that happen before where we're

17   sitting waiting and there was the cap on.  It's like taking a

18   picture with the cap on.  There we go.

19             MR. NAMMAR:  A little dim.  I guess it's warming up.

20   And maybe we could be quicker if -- may I approach, Your Honor?

21             THE CLERK:  I got it.

22             THE WITNESS:  I can see that picture.

23   BY MR. NAMMAR:

24   Q    Okay, you can see it?

25   A    Yeah.
```

DENISE ARMITAGE - CROSS (Nammar)

30

1   Q   Is that the offices where you worked?

2   A   That was one of the offices.

3   Q   Okay.

4   A   That wasn't the one in particular that I worked at.

5   Q   You didn't work there.

6   A   Most of the time.

7   Q   You didn't work there most of the time.

8   A   Not that one.  It was the first one.

9   Q   Okay.  So most of your work was done at the first office,

10  right?

11  A   Yes.  Yes.

12  Q   And that was in early 2008, right?

13  A   Early 2008, yes.  Till almost the mid of 2008.

14  Q   Okay.

15  A   Not quite on the --

16  Q   But most of what you did as far as your volunteer work was

17  at that other office, right?

18  A   Yes, sir.

19  Q   Okay.  And when you volunteered, you told us about how you

20  helped out with genealogy, right?

21  A   Yes.

22  Q   And about how you'd research that on the computer, right?

23  A   Yes, sir.

24  Q   And you also told us about how you knew Mahealani really

25  well, right?

```
 1   A     Yes.

 2   Q     She's family to your husband --

 3   A     Yes.

 4   Q     -- Wayne, right?

 5         And you volunteered with her because you wanted to

 6   help her, right?

 7   A     Wanted to help her, and I believed in the process that she

 8   was helping many other Hawaiian people.

 9   Q     And when you volunteered with her, she would ask for your

10   help on certain things, correct?

11   A     When I'm there, yes.

12   Q     And so she would ask for your help on doing genealogy

13   research, right?

14   A     Genealogy, running for supplies and stuff, yes.

15   Q     And so you took your orders from her, right, when you were

16   working there?

17   A     Only on the part of searching, because I -- I wasn't very

18   knowledgeable about computers.  So I would go to her or Pili

19   on, you know, how to search.

20   Q     And when you had questions about those things, you asked

21   either her or Pili, right?

22   A     Yes.

23   Q     Okay.  Now, when you were volunteering, were a number of

24   people coming into the office when you were working there that

25   weren't -- that weren't either volunteering or employed with --
```

1    A     There were some families that would come in and bring some

2    of their palapala to us on their genealogy, yes.

3    Q     And you also talked about some people that were coming in

4    for help on their mortgages, right?

5    A     No.

6    Q     Oh, so there were no people that came to the office --

7    A     There were a few, but I did not know anything about

8    mortgages.

9    Q     Okay.  But were there not people, many coming into the

10   offices that were asking for help on their mortgages?

11   A     They were.  There were more people at the meetings.

12   Q     Okay.

13   A     At the classes that Mahealani held that asked about

14   mortgages, and I said, Well, I don't know anything about

15   helping you with your mortgage, but the class was about getting

16   people on their family land.

17   Q     And the people who came into the office for help with the

18   mortgages, they met with Mahealani, didn't they?

19   A     Not that I know of.

20   Q     Well, who did they meet with?

21   A     I don't know.

22   Q     You don't know who they met with?

23   A     I don't -- I'm not there all day, so some of them may come

24   in the afternoon when I'm not there.  Like I said, the ones

25   that I encountered was families that needed help on getting

DENISE ARMITAGE - CROSS (Nammar)

33

```
 1   genealogy, not --
 2   Q    When you were working at the office, Mahealani would give
 3   people a lot of paperwork, right?
 4   A    Yes.
 5   Q    And that paperwork, part of it at least, was about
 6   eliminating their mortgages, wasn't it?
 7   A    No.
 8   Q    So you in all your time that you were working there in
 9   2008, you never saw Mahealani give any paperwork to help people
10   out with their mortgages?
11   A    No.
12   Q    You also know from your time volunteering at the office
13   that Mahealani took in money from certain people, right?
14   A    No.
15   Q    So in all your time you were working there, you never saw
16   people pay any money?
17   A    They were paying money, but it wasn't to Mahealani.
18   Q    Who was the money being paid to that you --
19   A    John.
20   Q    And who did you see paying money to John?
21   A    Well, I don't know their names right offhand.  But it was
22   maybe two families that I've seen.
23   Q    And how did they pay John?
24   A    With cash.
25   Q    And you saw them give the cash to John?
```

1   A   Yes.

2   Q   And what --

3   A   And he would leave and say he's going to the bank.  I

4   didn't question it because my job there was just doing

5   genealogy.

6   Q   And you got some paperwork from Mahealani, didn't you?

7   A   Yes, on our family -- my husband's family land, yes.

8   Q   And did she charge you for that paperwork?

9   A   No.

10   Q   What was that paperwork for?

11   A   To put us on family land.

12   Q   And how was that going to happen?

13   A   I beg your pardon?

14   Q   How was the paperwork going to put you on the family land?

15   A   By genealogy, by family.

16   Q   And --

17   A   By family blood, yes.

18   Q   How was it going to do it with your genealogy, your family

19   blood?

20   A   How is it going to do it?  It's been doing it for

21   eight years.  I've been there eight years now.

22   Q   Did you pay for that land when you got on it?

23   A   Oh, no, because it's family land.

24   Q   Okay.  So the paperwork put you on the land?

25   A   Yes, sir.

1   Q      How did the paperwork that Mahealani --

2   A      Proof of my -- proof of my husband's genealogy to put us

3   there.

4   Q      And so that's how you got on the land?

5   A      Yes, sir.  We also had to research our -- my husband's

6   family to -- to verify that we belong there.

7   Q      John didn't give you that paperwork, did he?

8   A      No, he didn't.

9   Q      Okay.  And your husband is Wayne, right?

10  A      Yes, sir.

11  Q      And you know that yesterday he testified, right?

12  A      Yes, sir.

13  Q      And he told you about his testimony, right?

14  A      No, he didn't.  He was on his way to Maui as I was on my

15  way here.

16  Q      So you didn't see him this morning?

17  A      No.

18  Q      Okay.  And you talked a little bit about those seminars

19  that were held at the Cameron Center, right?

20  A      Yes, sir.

21  Q      And at those seminars Mahealani spoke, right?

22  A      Yes.

23  Q      And at those seminars she was doing most of the talking,

24  wasn't she?

25  A      Yes.

```
 1   Q    And she talked about land titles, right?

 2   A    Land titles, yes.

 3   Q    She talked -- she talked about reclaiming properties,

 4   right?

 5   A    Right.

 6   Q    And she also talked about eliminating debt too, didn't

 7   she?

 8   A    No.

 9   Q    How many of those meetings did you go to in 2000 --

10   A    Oh, I probably went to several of them, a lot of them.

11   Q    Okay.

12   A    And I know that she never talked about mortgage.

13   Q    So in all --

14   A    I know she talked about putting people on the land.

15   That's what our focus was.

16   Q    And how many of those meetings did you go to in 2008?

17   A    Oh, probably about eight of them.

18   Q    And in those eight meetings, you never heard her say

19   anything about mortgages?

20   A    No, I've heard John say something about it on the side,

21   and I didn't quite understand it.

22   Q    And in those eight meetings, you never heard her say

23   anything about eliminating debt?

24   A    No.

25   Q    Now, Mahealani knew a lot about Native Hawaiian rights,
```

1  correct?

2  A    Oh, yes.  Yes.

3  Q    And you thought of her as an expert in that area, didn't

4  you?

5  A    Yes, I did, and I still do.

6  Q    And John Oliver, he wasn't an expert in that area, was he?

7  A    No, he wasn't.

8  Q    He didn't know much about Hawaiian rights, did he?

9  A    No, he didn't.  He learned from Mahealani the Hawaiian

10  rights.

11          MR. NAMMAR:  No further questions.

12          MR. GRONNA:  I just had a couple questions, Judge.

13          THE COURT:  All right.

14          MR. GRONNA:  Actually I do have some cross, but is it

15  okay --

16          MR. BARBEE:  Oh, go ahead.

17          THE COURT:  You know, you -- let him -- let Mr. Gronna

18  go first, and then you can follow up on everything you wish,

19  Mr. Barbee.

20          MR. BARBEE:  Thank you.

21          THE COURT:  Okay.  It's your witness, so you can go

22  last as far as the --

23          MR. BARBEE:  Thank you, Judge.

24          THE COURT:  -- the re- -- the redirect.  Okay.

25                    CROSS-EXAMINATION

1    BY MR. GRONNA:

2    Q    Good morning.

3    A    Good morning.

4    Q    Do you know Pilialoha Teves?

5    A    Yes, I do.

6    Q    And do you see her here this morning?

7    A    Yes, I do.

8    Q    And where is she seated?

9    A    She's seated right on that table there.

10   Q    And she's wearing?

11   A    She's wearing a purple blouse.

12   Q    Very good.  Thank you.

13        MR. GRONNA:  She identified Ms. Teves.

14   BY MR. GRONNA:

15   Q    How long have you known Ms. Teves for?

16   A    I've known Pilialoha for at least, going over 10 years,

17   maybe 15.

18   Q    Okay.  And in the 15 years you knew her, she had known

19   Mahealani.

20   A    Yes, that's how I met Pili.

21   Q    Okay.  And your observation is they were close friends?

22   A    Yes.

23   Q    And would you say that Pili was protective of Mahealani

24   with John?

25        MR. NAMMAR:  Objection.  Calls for lay opinion.

DENISE ARMITAGE - CROSS (Gronna)

1          THE COURT:  Calls for?  Lay opinion?

2          MR. NAMMAR:  And speculation.

3          THE COURT:  You're going to have to lay a foundation.

4          MR. GRONNA:  All right.  That's fine.  I'll back up.

5    BY MR. GRONNA:

6    Q    You had mentioned that John was verbally abusive with

7    Mahealani.

8    A    Yes.

9    Q    And you were there in times, and Ms. Teves was there at

10   those times, at some of those occasions?

11   A    She was there maybe on two occasions that he verbally

12   would tell her stuff, but she wasn't there when I seen him grab

13   her 'cause they were on our property at that time, and Pili

14   wasn't there.

15   Q    The times that you were there and John was verbally

16   abusive, how did it make you feel from what you observed?

17          MR. NAMMAR:  Objection.  Relevance.

18          THE COURT:  Sustained.

19   BY MR. GRONNA:

20   Q    Were you embarrassed by the manner in which Mr. Oliver --

21          THE COURT:  It's the same question.  Sustained.

22          THE WITNESS:  No.

23   BY MR. GRONNA:

24   Q    All right.  In your -- well, let me ask you this then:

25   You began working with Ms. Oliver to do the genealogy?

```
 1   A    Yes.

 2   Q    And that was in 2007, would you say?

 3   A    I would say early 2008, late 2007 is when I first got

 4   knowledge of what these ladies knew.

 5   Q    Okay.  And -- and Ms. Oliver was conducting seminars or,

 6   you know, discussions at the Cameron Center about those

 7   rights -- Native Hawaiian rights and genealogy?

 8   A    Yes.

 9   Q    All right.  Ms. Teves, from your understanding, was there

10   helping Ms. Oliver?

11   A    Oh, yes.  Yes.

12   Q    And she was helping Ms. Oliver in the office with the

13   genealogy; is that right?

14   A    Yes, yes.

15   Q    And this is before -- before Mr. Oliver had come in and

16   set himself up in the office?

17   A    Yes.

18   Q    And then at some point in time, Mr. Oliver came in and set

19   himself up in the office; is that right?

20   A    Yes.

21   Q    Okay.  And then is that when you began to see -- did you

22   notice a change when Mr. Oliver came in and started working in

23   the office?

24   A    Yeah, I did.  He was wanting to know what every -- what

25   everybody was doing.  He needed to know what we all were doing.
```

1   At some point in time, yeah.

2   Q    Okay.  Would you say that he was interested in the same

3   process that you were interested in and the other women working

4   in the -- in the office?  In other words, doing the genealogy

5   and -- and the Hawaiian rights?

6   A    At the very beginning he was very interested.  And as it

7   was starting to move along, he was not getting interested.  He

8   was -- he was somewhere else.

9   Q    Was he --

10  A    He was like concentrating more like money?

11  Q    Okay.

12  A    Yeah, he -- at the beginning, yeah, he was interested.

13  And like I said, you know, as it gradually got long and we got

14  more people interested in the classes of the genealogy and

15  stuff is where he started to change.

16  Q    And would you say that the change was a result of his

17  influence?

18  A    Yes.

19          THE COURT:  I'm sorry, I thought there was an

20  objection.

21          MR. NAMMAR:  I object.  Speculation.

22          THE COURT:  I'm sorry?

23          MR. NAMMAR:  Speculation.

24          THE COURT:  Sustained.  Strike the question and

25  answer.

1   BY MR. GRONNA:

2   Q    In other words, from what you observed, you said that you

3   had noticed a change in the way that the office was operating;

4   is that right?

5   A    Yes.  Yeah.

6   Q    And when you noticed the change in that, that was -- would

7   you say that was based on Mr. Oliver's influence within the

8   office?

9   A    Yes.

10            THE COURT:  Wait.

11            MR. NAMMAR:  Objection.

12            THE COURT:  Again, there's an objection.

13            MR. NAMMAR:  Same objection.

14            THE COURT:  A little quicker to get up, Mr. Nammar.

15            Sustained.  Strike the question and answer.

16            MR. GRONNA:  All right.

17   BY MR. GRONNA:

18   Q    Did Mr. Oliver begin to interject his own theories within

19   the office?  Did you notice him doing any of that?

20   A    Can you repeat that?

21   Q    Sure.  Did you notice Mr. Oliver setting forth his

22   opinions and influence within the office -- well, that's

23   actually compound.

24            Did you notice him putting forth his influence within

25   the office and how it was run?

1    A    Yes.  Yeah.

2    Q    Okay.  And would you say that Mr. Oliver had made -- was

3    demanding that things be changed within the office and how it

4    runs?

5    A    Well, he wasn't really demanding, but he had made sure

6    that we would do things in his order.  His way.

7    Q    I see.

8    A    Yeah.

9    Q    Okay.

10             MR. GRONNA:  No other questions.  Thank you.

11             THE COURT:  All right.  Mr. Barbee?

12             MR. BARBEE:  Yes, Your Honor.  Try to be very brief.

13             THE COURT:  All right.

14                        REDIRECT EXAMINATION

15   BY MR. BARBEE:

16   Q    Mrs. Armitage, you talked about the -- the meetings at the

17   Cameron Center.

18   A    Yeah.

19   Q    Did you see at the Cameron Center, in addition to John

20   Oliver and Pilialoha and Mahealani, did you also see anybody

21   known to you as a Petro Hoy?

22   A    Yeah.

23             MR. NAMMAR:  Objection.  Beyond the scope.

24             THE COURT:  Sustained.

25   BY MR. BARBEE:

44

1    Q    When you described on cross-examination to Mr. Nammar the

2    office suite that you were working in where Pilialoha and

3    Mahealani were, you said that John Oliver would come over to

4    that office.

5    A    Mm-hmm.

6    Q    And would he come over -- where was he coming over from?

7    A    From the other office.

8    Q    And in the other office, were you aware that he had a

9    Petro Hoy that frequented -- frequented his office?

10   A    I -- at first I -- I noticed that Petro Hoy was becoming

11   more frequently to the office.  As when I first started seeing

12   him there, he'd be there like maybe once, twice a week, maybe

13   an hour.  And then gradually he was there much more often.

14   Q    And this is on John's side?

15   A    Yes.

16   Q    And did you notice a Gerald Michaud also on John's side?

17   A    Yes.

18        MR. BARBEE:  Okay.  No further questions.

19        MR. NAMMAR:  Nothing further, Your Honor.

20        THE COURT:  All right, ma'am, you may step down.

21   Thank you.

22        THE WITNESS:  Oh.  Okay.

23                                  (Witness excused)

24        THE COURT:  All right, sidebar.

25        MR. BARBEE:  Yes.

```
 1                    (Sidebar on the record:)
 2           MR. BARBEE:  Almost there, Judge.
 3           THE COURT:  Well, that's the question, where is your
 4  witness?
 5           MR. BARBEE:  He's out -- I was signaled by one of the
 6  people out there that he's arrived.  I haven't had a chance to
 7  talk to him.
 8           THE COURT:  All right.  All right.  So we will take a
 9  break then.  I will let you talk to him.
10           MR. BARBEE:  I appreciate it.  And after talking to
11  him, I'm not sure if I'm even going to call him, but we'll see.
12           THE COURT:  All right.
13           MR. TONG:  Who is this again?
14           MR. BARBEE:  This is the Keeaumoku Kapu.
15           MR. TONG:  Okay.
16           THE COURT:  So we'll take about 15 minutes.
17           MR. BARBEE:  Thank you, Judge.
18           THE COURT:  That's all you're going to get, though.
19           MR. BARBEE:  Yeah, that's fine.
20           THE COURT:  All right.
21                       (End of sidebar.)
22           THE COURT:  All right.  Ladies and gentlemen, we are
23  getting very close to the end.  And, therefore, that requires a
24  little flexibility.  So we're going to take a little bit early
25  break because there's a little business that has to be taken
```

 1  care of before we start back up.  I do think we'll get to

 2  instructions and closing arguments today, though.  I do expect

 3  that will happen.  Exactly when we start is a little uncertain,

 4  but -- but I'm hoping we get -- we get to that today.

 5         One question I have for you folks.  If we do finish up

 6  today, do you want to come back on Monday?  Or do you want to

 7  just start on Tuesday?  Tuesday.  Everyone is shaking their

 8  heads Tuesday.  Good.  That's your decision.  So we'll do that.

 9  Hopefully we will finish up today.

10         Leave your notepads, do not discuss the case, and

11  we'll pick up in about 15 minutes.  Okay?

12         (A recess was taken from 10:00 a.m. to 10:26 a.m.)

13         (The following proceedings were held in open court in

14  the presence of the jury:)

15         THE COURT:  We are back with the defendants, counsel,

16  case agents, and ladies and gentlemen of the jury.

17         Mr. Barbee.

18         MR. BARBEE:  Thank you, Your Honor.  We would at this

19  time call our witness, Keeaumoku Kapu.

20                         JONAH KEEAUMOKU KAPU,

21  called as a witness by Defendant Ventura-Oliver, having been

22  first duly sworn, was examined and testified as follows:

23         THE CLERK:  Thank you.  Please have a seat.

24         Please state your name for thor record, and spell your

25  last name.

 1          THE WITNESS:  My name is Jonah Keeaumoku Kapu,

 2    K-A-P-U.

 3                    DIRECT EXAMINATION

 4    BY MR. BARBEE:

 5    Q    Good morning, Mr. Kapu.

 6    A    Good morning.

 7    Q    Where do you live?

 8    A    I live in Lahaina, Maui.

 9    Q    And how long have you lived on Maui?

10    A    I lived on Maui approximately about 19 years.

11    Q    And what do you do for a living, occupation, vocation?

12    A    First of all, I'm a taro farmer.  Kind of took the

13    responsibilities that was generation passed down by my family.

14    And throughout the years living on Maui, I've served on the

15    Maui County Culture Resources Commission.  I also served on

16    the -- an eight-year term, four years as the chair, of the

17    Maui/Lanai Islands Burial Council.  And still today I serve as

18    an advisor to the Office of Hawaiian Affairs on the Native

19    Hawaiian Historic Preservation Council.

20          I run a 501(c)(3) nonprofit organization called Na

21    'Aikane o Maui, which is a cultural center.  And there's a

22    couple of the other Native Hawaiian organizations that we do

23    run for educational purposes for like youths, like in the

24    Department of Education, to kind of give the children some

25    knowledge about Hawaiian traditions and customs.

1    Q     And do you know a person named Mahealani Ventura?

2    A     Yes, I do.

3    Q     Do you see her in the courtroom today?

4    A     Yes, I do.

5    Q     Where is she?

6    A     She's sitting over here (indicating).

7    Q     Okay.  How long have you known Mahealani?

8    A     I've known her for probably from 2004, so about maybe

9    nine years.

10   Q     Okay.  And in what capacity is it that you got to know

11   her?

12   A     I got to know her because, you know, her affiliation as

13   well as mine in the cultural realm was very similar on having

14   the understanding as to where to go, where to turn to based

15   upon the character and identity of our people.  The things that

16   she offered and the places that we needed to go to do research

17   to find a little bit more about our culture root.  So those

18   kinds of things are really beneficial for myself as well as my

19   family, and that's where we kind of clicked.

20   Q     Okay.  What types of things did she offer to the

21   community?

22   A     Knowing who you are basically.  About genealogy.  About

23   being not only culturally tied but genealogically tied to

24   properties that were awarded from the Crown and where those

25   properties basically are today to kind of give people an

KAPU - DIRECT

1    understanding as to where -- places to go to search and, like,

2    say the Bureau of Conveyance, the archives and information of

3    the archives that would help families basically find out who

4    they were, what their responsibilities was back then, and how,

5    you know, families today tie in the same responsibilities

6    today.

7    Q    Did Mahealani Ventura seem to be passionate about what she

8    was doing?

9    A    Very much.  Very much passionate in getting with the

10   communities.  One thing about Lahaina I need to stress is a lot

11   of families in Lahaina really don't -- their genealogy, a lot

12   of them don't even know past five generations.  So, that

13   passion of understanding who we are, the root of where we came

14   from.  Today, you know, now there's a lot of people that have

15   clear understanding because we have these places that we can go

16   to.

17   Q    Did Mahealani -- does she seem to care for the people that

18   she helps?

19   A    Yes.  Very much.

20   Q    And has she been successful, to your personal knowledge,

21   in assisting families go to their ancestral homes and live on

22   their --

23   A    Yes.

24   Q    -- family's properties?

25   A    Yes.

```
 1              MR. BARBEE:  Okay.  No further questions.
 2              THE COURT:  All right.  Mr. Tong?
 3              MR. TONG:  Yes, Your Honor.
 4                       CROSS-EXAMINATION
 5   BY MR. TONG:
 6   Q    Mr. Kapu, good morning.
 7   A    Good morning.
 8   Q    My name is Larry Tong.  I'm one of the prosecutors.
 9        Just so I'm clear, what is genealogy?
10   A    Genealogy is knowing -- going back for generations knowing
11   your -- your family ties, your family tree, how far you can go
12   back.  Like for me, I know 19 generations on my mother's side
13   going back.  So with that allows me an opportunity to share
14   that knowledge with my children because it's important that we
15   know where we came from.
16   Q    Okay.  And part of the equation, I think you said, is
17   where we came from and where we are today, right?
18   A    Yeah.
19   Q    So you kind of trace the two together, right?
20   A    Mm.
21   Q    And this sort of relates to lands here in Hawaii also?
22   A    Yes.  Very much.
23   Q    Very much in the sense that you're tracing a family to a
24   particular land from the beginning to now --
25   A    Yeah.
```

KAPU - CROSS (Tong)

1   Q      -- is that correct?

2   A      Yeah.

3   Q      And I assume -- well, you used the phrase that part of it

4   is to "understand your responsibilities," right?

5   A      Yes.

6   Q      Now, I assume part of those responsibilities is to take

7   possession or ownership of lands that are in your genealogy?

8   A      No, not necessarily.  I think, you know, provides an

9   opportunity to understand the native testimonies, the probates,

10  because the probates kind of help families understand, you

11  know, back in that time who was the neighbors living around

12  them, what was the family's responsibilities within the area;

13  some was in taro cultivation, others was fisherman.  So that

14  kind of information was really important to know the families

15  had a generational knowledge that was passed on and whether or

16  not they still following that same tradition and knowledge

17  today.

18  Q      So part of it is the relationship between the different

19  families?

20  A      The relationship between the different families and their

21  responsibilities of who they -- a lot of people like to see

22  whether or not they were part of the government structure back

23  then, part of the nobility status back then.  Some of them --

24  you know, all we remember today is a lot of the wonderful

25  stories that we talk -- that our grandparents pass down, but

```
 1   there's more deep-rooted things that is really important too,
 2   not just besides that family --
 3   Q    Does part of this study have to do with the effect of the
 4   overthrow of the monarchy?
 5   A    Um --
 6   Q    I mean if you go back 19 generations, I assume you're
 7   pre-1893, right?
 8   A    Yeah, I think, like, for the -- my interest alone was when
 9   the properties was transferred over from the time of the
10   Mahele, yeah.
11   Q    Mm-hmm.
12   A    There were titles that basically were -- were signed from
13   the King and passed down.  So when you looking at things in
14   that way, in the political status that we're at today, whether
15   or not that political status is, you know, identifying as
16   pertaining to, well, who were we yesterday?  How high in that
17   nobility status were we yesterday?
18          So, knowing that we had the ability to be very
19   well-educated in the Native Hawaiian community because of that
20   nobility status, people are trying to understand, okay, what
21   happened to us today?  How come all of a sudden from such a
22   high realm we -- we -- from the time of the '20s or '30s, we
23   fell into the poverty realm.  So what was it that actually took
24   our character and identity back, took it away from us, and a
25   lot of families are searching for that --
```

1    Q    Trying to find the identity back?

2    A    -- just as to who we are.

3    Q    And a part of it is to try to regain your identity, is

4    that what it is?

5    A    Yes.

6    Q    Okay.  And you said that part of this involved research at

7    the Bureau of Conveyances?

8    A    Mm-hmm.

9    Q    That's here in Honolulu, right?

10    A    Yeah.

11    Q    That's basically the place where the government maintains

12    records of lands, right?

13    A    Yes.

14    Q    It's like notice to the world saying, Here's the transfer

15    of land from party A to party B, right?

16    A    Yes.

17    Q    And you did a lot of that research?

18    A    My family did a lot of research for the past, I would say,

19    maybe some about 25, 27 years.  And it's just helping other

20    families knowing who we are.  And it was all based on, like,

21    family reunions, being prepared for family reunions, missing

22    links, where the families went.  You know, a lot of families

23    left Lahaina, where did they go?  So it's searching for your

24    root basically.

25    Q    Right.  And these are the topics that you and Mahealani

1    Ventura-Oliver had a shared interest in; is that correct?

2    A    Yeah, yeah.

3    Q    Okay.

4            MR. TONG:  Thank you.  That's all I have.

5            THE COURT:  Thank you.

6            All right.  Nothing?

7            MR. BARBEE:  No --

8            MR. GRONNA:  I just have one question -- two questions

9    actually.  Sorry.  I give all this --

10                        CROSS-EXAMINATION

11   BY MR. GRONNA:

12   Q    I'm sorry, you know Ms. Pilialoha Teves?

13   A    Yes, I do.

14   Q    And she shares a lot of the same sentiment that you've

15   just expressed from your -- what you know of her?

16   A    Yeah.

17   Q    Thank you.

18            MR. GRONNA:  That's all I have.  Thank you.

19            THE COURT:  All right.  You may step down, sir.  Thank

20   you.

21            THE WITNESS:  Thank you.

22                                    (Witness excused)

23            THE COURT:  Mr. Barbee?

24            MR. BARBEE:  Your Honor, the defense at this time will

25   rest, and at the appropriate time renew our motion previously

1    made under Rule 29.

2              THE COURT:  All right.  Yes.  We'll take that up in a

3    little bit.

4              MR. GRONNA:  And, Your Honor, I do have defense, and

5    as I previously mentioned, essentially would be the admission

6    of certain documents.

7              THE COURT:  Okay.  Well, go ahead and let's start with

8    the one involving the stipulation as far as the exhibits.

9              MR. GRONNA:  Yes.  Those would be defense -- we'll be

10   submitting would be Defense Exhibit, in addition to

11   prosecution's, Exhibits 26 -- you want me to go through

12   those --

13             THE COURT:  Well, what are the numbers?  Just tell me

14   the numbers.

15             MR. GRONNA:  Oh, okay.  It would be 26.1, 26-A.1, and

16   that sequence.  They're in the binder.

17             THE COURT:  Well, you have to tell me so the record is

18   clear what you're moving in.

19             MR. GRONNA:  All right.  I'll be moving in what's been

20   marked as 26.1, 26-A.1, 26-A.2, 26-A.3, 26-B.1, 26-C.1, 26-D.1,

21   26-D.2, 26-D.3, 26-D.4, 26-D.5, 26-D.6, 26-D.7, 26-D.8, 26-D.9,

22   26-D.10, 26-D.11, and 26-E.1.

23             THE COURT:  All right.  And there's a stipulation to

24   the admission of those, I understand.

25             MR. NAMMAR:  Yes, Your Honor.

1          THE COURT:  All right.  So those Exhibits 26.1, 26-A.1

2     through .3, B.1, C.1, D.1 through D.11 and E.1 are admitted.

3        (Defendant's Exhibits 26.1, 26-A.1 through A.3, B.1, C.1,

4         D.1 through D.11 and E.1 were received in evidence.)

5          MR. GRONNA:  Thank you, Your Honor.

6          THE COURT:  By stipulation.

7          MR. TONG:  Your Honor, may I have one moment with

8     Mr. Gronna?

9          THE COURT:  Yes, yes.

10                  (Counsel conferring.)

11          MR. TONG:  Your Honor, I believe just to be complete,

12     the government is stipulating with Mr. Gronna that these

13     records were part of the Pilialoha Teves mortgage file

14     maintained by Central Pacific Bank.

15          THE COURT:  All right.  So -- and the exhibit -- the

16     Government Exhibit 26 --

17          MR. TONG:  That series relates to the same file of

18     Central Pacific Bank.

19          THE COURT:  Right.  So essentially what happened,

20     ladies and gentlemen, the government introduced some of those

21     records and now some more have been introduced.  It all relates

22     to those Central Pacific Bank records.  Okay?

23          So it all comes from that same file; is that correct?

24          MR. GRONNA:  That's correct.

25          MR. TONG:  Yes, Your Honor.

1          THE COURT:  The Central -- Central Pacific Bank file
2    testified to by --
3          MR. TONG:  Gary Yamashiro.
4          THE COURT:  -- Gary Yamashiro.  Okay.
5          MR. GRONNA:  That's correct.
6          THE COURT:  All right.  There's a stipulation to that
7    effect.  All right.
8          MR. GRONNA:  Secondly, Your Honor, I haven't marked it
9    yet, but I will be marking as Defense Exhibit -- I guess it
10   would be 1 --
11         MR. BARBEE:  No, A.
12         MR. GRONNA:  Or A.  Excuse me, I got the wrong
13   letters.  This will be Defense Exhibit A.  This would be the --
14         MR. TONG:  Well, I prefer that he not read the title
15   into the record for this document.
16         THE COURT:  All right.  We're going to have some --
17   let me see counsel at sidebar real quickly.
18         MR. GRONNA:  Yes.
19         THE COURT:  And then we can see if we can -- privately
20   do this without having the jury sit through this for too long.
21                    (Sidebar on the record:)
22         MR. GRONNA:  I did want to alert the Court ahead of
23   time.  So this is the Affidavit of Truth that Mr. Oliver
24   testified to that I crossed him on.
25         THE COURT:  Yes.  Yes, I'm aware of it.

1          MR. GRONNA:  Okay.  And I wanted to move that into

2     evidence.  It's been identified.

3          MR. TONG:  I don't object.

4          THE COURT:  All right.  So that's going to be A?

5          MR. GRONNA:  Yeah, we'll just -- I'll mark that as A.

6          THE COURT:  Okay.  So let's put that on the top, so

7     we have a blank spot for it and we'll mark that as Defense

8     Exhibit A.  All right?  And that's admitted.

9          MR. GRONNA:  And I'll mark this pleading Defense

10    Exhibit B, because my questioning of him of his filing

11    additional documents in protest, and he identified this court

12    document.

13         THE COURT:  Right.  And for the record, it's

14    Document 102 from this case.

15         MR. GRONNA:  Yes.

16         THE COURT:  Okay.

17         MR. TONG:  I object to Document 102 -- oh, I object to

18    this particular exhibit marked as B.

19         THE COURT:  That's B just for the record.

20         MR. TONG:  Exhibit B on -- and just so we're clear,

21    we're talking about something entitled "Dismissal of

22    Court-Appointed Public Defender For Cause," et cetera --

23         THE COURT:  Right.  Right.

24         MR. TONG:  -- on 403 grounds.  First off, whatever

25    relevance it has, Mr. Oliver has already testified to.

1    Secondly, it has many different things in here that are

2    inappropriate, irrelevant, not appropriate to go to the jury.

3    References to a plea agreement offered between the United

4    States and Mr. Oliver.  His rejection of the same.  And various

5    comments on the validity of the indictment in this case.

6        And in addition, the Court may recall that this

7    document, I think, was admitted by Mr. Oliver at some bail

8    hearing to have been prepared by a third party named Aran

9    Ardaiz, the self-styled Attorney General of Ko Hawaii Pae Aina.

10   It wasn't even necessarily his document, so...

11       MR. GRONNA:  It was his -- he adopted this document as

12   his own, he filed it and caused to have it filed.  This is his

13   sentiment and his belief at the time.  When we have this

14   witness getting up there and saying that I didn't believe in

15   any of this and I relinquished all -- essentially all of my

16   sentiment towards the so-called patriot movement, yet at the

17   same time he still continued to persist in filing similar types

18   of documents.  And especially given the fact that it makes it

19   even more relevant because of the fact that he was so highly

20   resistant to any type of plea agreement or anything else with

21   the government, and then all of a sudden, it's, you know,

22   completely changed, and now is up here on a plea agreement

23   trying to get a reduction in his sentence.

24       THE COURT:  But he admitted to the facts.  That's the

25   problem I have.  He's admitted to it.  So you already have that

1    in there, that he submitted a document where he claimed the

2    court lacked jurisdiction over him in April of 2012.  That's in

3    the record already, so you have that.

4          So I don't see this adding much of anything.  He

5    testified somebody else did prepare it.  He did testify to

6    that.  Sort of, you know, minimized his role.  I mean you

7    certainly can argue that if you want, regardless of whether

8    this comes in or not.

9          MR. GRONNA:  But I think --

10         THE COURT:  And as a general matter, you know, a

11   document that's just purely impeachment doesn't come into

12   evidence.  And that's what it seems to me to be is a document

13   that just is impeachment.

14         MR. GRONNA:  Well --

15         THE COURT:  It's not being offered for the truth

16   obviously.  I mean the Court lacks jurisdiction --

17         MR. GRONNA:  Well, no, but that was his belief and

18   that was what he had adhered to, and this was part of the

19   basis, the reason why he, you know, changed from being such an

20   adamant, anti-government individual to now being, you know, on

21   the same team with the government and testifying against these

22   two defendants.

23         THE COURT:  But if you have a prior document, prior

24   statement, let's say, of a witness and you impeach him with it,

25   do you move that document into evidence?  I don't think so.

1    You impeach him with it.

2              MR. TONG:  Which he did.

3              THE COURT:  Which you did.  So it's my view it's not

4    admissible.  I want to think about this a little more --

5              MR. GRONNA:  Right.

6              THE COURT:  -- so if it's all right with everybody --

7              MR. GRONNA:  No, no, that's fine.

8              THE COURT:  -- I'll reserve this until --

9              MR. TONG:  That's fine.

10             THE COURT:  -- a little bit later.

11             MR. GRONNA:  That's fine.

12             THE COURT:  Okay?

13             MR. TONG:  That's fine.  The only thing I would add is

14   he did on cross-examination say that his beliefs were expressed

15   from time to time up until the time he was incarcerated.  So I

16   think that's already in the record that Mr. Gronna can use.

17             THE COURT:  There's no question in my mind that you

18   have plenty of ammunition to use as to Mr. Oliver in your

19   closing argument.  Including, including, and I don't want to

20   suggest that, you know, you have enough and I'm not going to

21   give you more, I don't want to suggest -- let the record --

22   including that in April 2012 he filed this sort of nonsensical

23   claim that the court lacked jurisdiction.

24             MR. GRONNA:  And I think -- and my feeling, Your

25   Honor, is it's important for the jury to actually see where

1    this individual is coming from, because the fact of the matter

2    is, you know, he's making claims that, you know, he was being

3    controlled by Ms. Oliver, and he wasn't the person behind doing

4    all these claims and these sorts of documents and --

5              THE COURT:  But I don't see --

6              MR. GRONNA:  -- here it is, he's filing this exact

7    same type of thing.

8              THE COURT:  But the jury knows that, and it's

9    impeachment.  You know, it's impeachment is what it is.  So my

10   inclination is not to let it in, but I want to think about it

11   for a little bit.

12             MR. GRONNA:  All right.  That's fine, Judge.

13             THE COURT:  So A is admitted.  Do you want to renew

14   your motions now?  Are you going to rest?  You will do it in

15   front of the jury.

16             MR. GRONNA:  Yes, and then if you wanted to go ahead

17   and do that, I'd renew the motion.

18             MR. BARBEE:  Yeah, I'd like to -- with the Court's

19   permission, I would like to renew my motion now at the end of

20   the -- Mr. Gronna's case and at the end of the case, so I don't

21   have to constantly -- I know there's like four times you got to

22   renew this motion.  I'd like to just go on the record and with

23   the Court's permission just have my rule -- my motion for

24   acquittal follow through until the end of the case and to the

25   end of the verdict.

1           THE COURT:  Right.

2           MR. GRONNA:  And, likewise, I would join.

3           THE COURT:  All right.  I assume there's no objection

4   that even though Mr. Gronna hasn't rest in front of the jury --

5           MR. TONG:  No objection.

6           THE COURT:  -- to consider Rule 29 now and preserve

7   both defendants' rights under Rule 29.

8           MR. TONG:  No objection.

9           THE COURT:  Okay.  Any argument on it at all?

10          MR. BARBEE:  No, Your Honor.

11          MR. GRONNA:  No, Your Honor.  Submit.

12          MR. BARBEE:  Submit.

13          THE COURT:  Okay.  For the same reasons stated

14   earlier, I am going to deny both Motions --

15          MR. GRONNA:  Very good.

16          THE COURT:  -- for Judgment of Acquittal.  All right?

17          And I don't believe there's anything in addition to

18   the defense case that would raise any -- any concerns in that

19   regard.  Okay.

20          So you'll move in A.

21          MR. GRONNA:  And B.  Or, I'm sorry, A.  I'm sorry.  B

22   we're reserving.

23          THE COURT:  Yeah, let me just think about B.

24          MR. GRONNA:  All right.

25          THE COURT:  You can -- if you want, you can move it

1   in, and I'll say I'm going to reserve determination on that

2   now.

3          MR. GRONNA:  All right.  Okay.  Thank you.

4          THE COURT:  And then you'll rest?

5          MR. GRONNA:  Then I'll rest.

6          THE COURT:  And then you will say there's no rebuttal?

7          MR. TONG:  I will.

8          MR. GRONNA:  Okay.  Thank you.

9                         (End of sidebar.)

10         THE COURT:  All right.  Mr. Gronna, so based on our

11  conversation.

12         MR. GRONNA:  Yes, thank you, Your Honor.  At this time

13  we'd also be moving to admit into evidence what would be marked

14  as Defense Exhibit B.

15         THE COURT:  Okay.  A -- start with A.

16         MR. GRONNA:  A.  I'm sorry, yes, would be A.

17         THE COURT:  And A?

18         MR. TONG:  No objection, Your Honor.

19         THE COURT:  All right.  A -- Defense Exhibit A is

20  admitted.

21        (Defendant's Exhibit A was received in evidence.)

22         MR. GRONNA:  And we'd also be moving in at this time

23  Defense Exhibit B.

24         THE COURT:  All right.  And B, I'm going to reserve a

25  determination on.  I wanted to think about B for a little bit.

1          MR. GRONNA:  That's fine.

2          THE COURT:  You want to tell what A is to the jury

3    just so they know what that is, Mr. Gronna?

4          MR. GRONNA:  Yes.  Exhibit A is the Affidavit of Truth

5    of John D. Oliver that he executed on May 1st, 2009.

6          THE COURT:  All right.  And there was testimony

7    regarding that.

8          MR. GRONNA:  Testimony regarding that.  He was shown

9    the document, and this will go to the jury.

10         THE COURT:  All right.  Okay.

11         All right.  Anything further then, Mr. Gronna?

12         MR. GRONNA:  No, Your Honor.  At this point defense

13   rests.

14         THE COURT:  All right.  Mr. Tong?

15         MR. TONG:  We have no further evidence, Your Honor.

16         THE COURT:  All right.  Ladies and gentlemen, what

17   that means is we are done with the evidence at this point in

18   time.

19         So let me tell you what we are going to do now.

20   First, you're going to close your notepads because we're done

21   with the evidence, and so we'll collect up those notepads.  You

22   will get them in the jury deliberation room.

23         And what I'm going to do now is have the jury

24   instructions handed out to you.  These are long.  You will have

25   the jury instructions to take with you.  The jury instructions,

1    physically copies, to take with you into the jury room.  Okay?

2    So don't be concerned thinking you have to memorize what the

3    judge said.  It's 51 pages or something.  I don't expect you to

4    memorize it.  But I'm going to read them to you.  I want you to

5    pay close attention, but understand you will have copies with

6    you in the deliberation room.  Okay?

7            Do we have the verdict forms?

8            I was wrong, 53 pages.

9            We're going to wait and see how long this takes.

10           MR. TONG:  You're a mind-reader, Your Honor.

11           THE COURT:  No, I see you two talking.  I know exactly

12   what you're talking about.

13           MR. TONG:  And, Your Honor, may I give Ms. Greaney the

14   redacted indictment?

15           THE COURT:  Oh, yes.  Yes.

16           So I'll explain later, ladies and gentlemen, the

17   verdict form and the indictment.  In these instructions I will

18   be referring on occasion to "indictment."  You'll have a copy

19   of it.  Not -- only the counts that apply to these two

20   defendants are in there.  There were other things that have

21   been taken out that don't apply to them.  But everything is in

22   there as far as the counts I will be talking about in the

23   instructions.

24           One thing I want to point out, it's called superseding

25   indictment, you'll see that.  I'm just going to refer to

1    indictment.  It's the same thing.  I'm talking about the same

2    thing, all right?  It's just different terminology.  All right?

3            All right.  So with that, you can read along, if you

4    wish or not.  It's up to you.  All right?

5            You do each have a copy of the instructions, and you

6    have now heard all of the evidence in the case and will soon

7    hear the final arguments of the lawyers for the parties.

8            It becomes my duty, therefore, to instruct you on the

9    rules of law that you must follow and apply in arriving at your

10   decision in the case.

11           In the jury -- in a jury trial -- any jury trial there

12   are, in effect, two judges.  I am one of the judges; the other

13   is the jury.  It has been my duty to preside over the trial and

14   to determine what testimony and evidence is relevant under the

15   law for your consideration.  It is now my duty to instruct you

16   on the law applicable to the case.

17           You, as jurors, are judges of the facts.  But in

18   determining what happened in this case -- that is, in reaching

19   your decision as to the facts -- it is your sworn duty to

20   follow the law I am now defining for you.  Unless otherwise

21   stated, you should consider each instruction to apply

22   separately and individually to each defendant on trial.

23           You must follow all of my instructions as a whole.

24   You have no right to disregard or give special attention to any

25   one instruction, or to question the wisdom or correctness of

1    any rule I state to you.  That is, you must not substitute or

2    follow your own notion or opinion as to what the law is or

3    ought to be.  It is your duty to apply the law as I give it to

4    you, regardless of the consequences.

5            It is also your duty to base your verdict, in this

6    case -- verdicts -- solely upon the testimony and evidence in

7    the case, without prejudice or sympathy.  That was the promise

8    you made and the oath you took before being accepted by the

9    parties as jurors in this case, and they have the right to

10   expect nothing less.

11           The indictment or formal charge against a defendant is

12   not evidence.  Each defendant is presumed to be innocent and

13   does not have to present any evidence to prove innocence.  The

14   government has the burden of proving every element of the

15   charge beyond a reasonable doubt.  And that applies to each

16   charge.  If it fails to do so, you must return a not guilty

17   verdict.

18           While the government's burden of proof is a strict or

19   heavy burden, it is not necessary that a defendant's guilt be

20   proved beyond all possible doubt.  It is only required that the

21   government's proof exclude any "reasonable doubt" concerning a

22   defendant's guilt.

23           A reasonable doubt is a doubt based upon reason and

24   common sense, and may arise from a careful and impartial

25   consideration of all of the evidence, or from lack of evidence.

1   Proof beyond a reasonable doubt is proof that leaves you firmly

2   convinced that a defendant is guilty.

3         If after a careful and impartial consideration with

4   your fellow jurors of all of the evidence, you are not

5   convinced beyond a reasonable doubt that a defendant is guilty,

6   it is your duty to find that defendant not guilty.  On the

7   other hand, if after a careful and impartial consideration with

8   your fellow jurors of all of the evidence, you are convinced

9   beyond a reasonable doubt that a defendant is guilty, it is

10  your duty to find that defendant guilty.

11        A defendant in a criminal case has a constitutional

12  right not to testify.  You may not draw any inference of any

13  kind from the fact that the defendants did not testify.  In

14  other words, you can draw no suggestion of guilt of any sort

15  and may not consider that fact against them in any way.

16        Now, as stated earlier, it is your duty to determine

17  the facts, and in doing so, you must consider only the evidence

18  I have admitted in the case.  The term "evidence" includes the

19  sworn testimony of the witnesses and the exhibits admitted in

20  the record.

21        Remember that any statements, objections, or arguments

22  made by the lawyers are not evidence in the case.  The function

23  of the lawyers is to point out those things that are most

24  significant or most helpful to their side of the case, and in

25  doing so, to call your attention to certain facts or inferences

1    that might otherwise escape your notice.

2          In the final analysis, however, it is your own

3    recollection and interpretation of the evidence that controls

4    in the case.  What the lawyers say is not binding on you.

5          Rules of evidence control what can be received into

6    evidence.  During the course of the trial, when a lawyer asked

7    a question or offered an exhibit into evidence and a lawyer on

8    the other side thought that it was not permitted by the rules

9    of evidence, that lawyer may have objected.  If I overruled an

10   objection, the question was answered or the exhibit received.

11   If I sustained an objection, the question was not answered and

12   the exhibit was not received.

13         Whenever I sustained an objection to a question, you

14   must not speculate as to what the answer might have been or as

15   to the reason for the objection.  You must not consider for any

16   purpose any offer of evidence that was rejected, or any

17   evidence that was stricken from the record; such matter is to

18   be treated as though you had never known of it.

19         Now, during the course of the trial I may have

20   occasionally made comments to the lawyers, or asked a

21   question -- or asked questions of a witness, or admonished a

22   witness concerning the manner in which he or she should respond

23   to the questions of counsel.  Do not assume from anything I

24   said that I have any opinion concerning any of the issues in

25   this case.  Except for my instructions to you -- to you on the

1  law, you should disregard anything I said during the trial in

2  arriving at your own findings as to the facts.

3         In this case, the parties have agreed, or stipulated,

4  as to certain facts.  This means that they agree that these

5  facts are true.  You should therefore treat these facts as

6  having been conclusively proved.

7         Evidence may be direct or circumstantial.  Direct

8  evidence is direct proof of a fact, such as the testimony of an

9  eyewitness.  Circumstantial evidence is indirect evidence, that

10 is, proof of a chain of facts from which you can find that

11 another fact exists, even though it has not been proved

12 directly.

13        So, while you should consider only the evidence in the

14 case, you are permitted to draw such reasonable inferences from

15 the testimony and exhibits as you feel are justified in the

16 light of common experience.  In other words, you may make

17 deductions and reach conclusions which reason and common sense

18 lead you to draw from the testimony and evidence in the case.

19        You are to consider both direct and circumstantial

20 evidence.  The law permits you to give equal weight to both,

21 but it is for you to decide how much weight to give to any

22 evidence.

23        Now, I have said that you must consider all of the

24 evidence.  This does not mean, however, that you must accept

25 all of the evidence as true or accurate.

1          You, as the jury, are the sole judges of the

2     credibility or "believability" of each witness and the weight

3     to be given to his or her testimony.  In evaluating the

4     testimony of a witness, you may consider:  (1) the opportunity

5     and ability of the witness to see or hear or know the things

6     testified to; (2) the witness' memory; (3) the witness' manner

7     while testifying; (4) the witness' interest in the outcome of

8     the case, if any; (5) the witness' bias or prejudice, if any;

9     (6) whether other evidence contradicted the witness' testimony;

10    (7) the reasonableness of the witness' testimony in light of

11    all the evidence; and (8) any other factor or factors that bear

12    on believability.  You may accept or reject the testimony of

13    any witness in whole or in part.  That is, you may believe

14    everything a witness says, or part of it, or none of it.

15         And the weight of the evidence is not necessarily

16    determined by the number of witnesses testifying as to the

17    existence or nonexistence of any fact.  You may find that the

18    testimony of a smaller number of witnesses as to any fact is

19    more credible than the testimony of a larger number of

20    witnesses to the contrary.

21         You have heard recordings that have been received in

22    evidence.  A transcript of the recordings was provided to help

23    you identify speakers and to help you decide what the speakers

24    say.  Remember that the recordings are not the evidence, not

25    the transcript.

1          So you will not have those transcripts.  Sometimes

2     jurors send a note, Can we get the transcripts?  Don't send

3     that note because the answer is no.  Okay?  Because the

4     transcripts are not evidence.

5          So remember that the recordings are the evidence, not

6     the transcript.  If you heard something different from what

7     appears in the transcript, what you heard is controlling.

8          The rules of evidence provide that if scientific,

9     technical, or other specialized knowledge might assist the jury

10    in understanding the evidence or in determining a fact in

11    issue, a witness qualified as an expert by knowledge, skill,

12    experience, training, or education may testify and state his or

13    her opinion concerning such matters.

14         You should consider each expert opinion received in

15    evidence in this case and give it such weight as you may think

16    it deserves.  If you decide that the opinion of an expert

17    witness is not based upon sufficient education and or

18    experience, or if you conclude that the reasons given in

19    support of the opinion are not sound, or if you conclude that

20    the opinion is outweighed by other evidence, then you may

21    disregard the opinion entirely.

22         A witness may be discredited or impeached by

23    contradictory evidence by a showing that:  (1) the witness

24    testified falsely concerning a material matter; or (2) at some

25    other time, the witness said or did something that is

1    inconsistent with the witness' present testimony; or (3) at

2    some other time, the witness failed to say or do something that

3    would be consistent with the present testimony had it been said

4    or done.

5           If you believe that any witness has been so impeached,

6    then it is for you alone to decide how much credibility or

7    weight, if any, to give the testimony of that witness.

8           You have heard the testimony from John D. Oliver and

9    Leatrice Lehua Hoy.  Each of these witnesses has pleaded guilty

10   pursuant to plea agreements to crimes arising out of the same

11   events for which the defendants are on trial.  These guilty

12   pleas and plea agreements are not evidence against the

13   defendants, but you may consider the pleas -- but you may

14   consider the pleas and plea agreements only in determining

15   these two witnesses' believability.

16          For these reasons, in evaluating the testimony of John

17   Oliver and Lehua Hoy, you should consider the extent to which

18   or whether each such person's testimony may have been

19   influenced by his or her guilty plea or plea agreement.  In

20   addition, you should examine such witnesses' testimony with

21   greater caution than that of other witnesses.

22          And we're on Instruction Number 15.

23          The testimony of a law enforcement officer should be

24   weighed and considered, and credibility determined, in the same

25   way as that of any other witness.  A law enforcement officer's

1  testimony is not entitled to any greater weight, nor should you

2  consider it more credible, than any other witness' testimony

3  simply because it is given by a law enforcement officer.

4       You have heard testimony from FBI Special Agent Steven

5  Carter, who acted as an undercover agent during the

6  government's investigation in this case.  Law enforcement

7  officials may engage in stealth and deception, such as the use

8  of informants and undercover agents, in order to investigate

9  criminal activities.  Undercover agents and informants may use

10 false names and appearances and assume the roles of members in

11 criminal organizations.

12      You have heard testimony that the defendants made

13 certain statements.  It is for you to decide (1) whether the

14 defendants made the statement, and (2) if so, how much weight

15 to give to it.  In making those decisions, you should consider

16 all of the evidence about the statements, including the

17 circumstances under which the defendants may have made such

18 statements.

19      You have heard evidence that the defendants committed

20 other acts not charged here.  You may consider this evidence

21 only for its bearing, if any, on the question of the

22 defendants' intent, motive, opportunity, preparation, plan,

23 knowledge or absence of mistake, and for no other purpose.  You

24 may not consider this evidence as evidence of guilt of the

25 crimes for which the defendants are now on trial.

1            Now, when you get a copy of the indictment, you will

2    note that the indictment charges that the offenses were

3    committed "on or about" certain dates.  The evidence need not

4    establish with certainty the exact date of an alleged offense.

5    It is sufficient if the evidence in the case establishes beyond

6    a reasonable doubt that an offense was committed on a date

7    reasonably near the date alleged.

8            Defendants Ventura-Oliver and Teves are charged in

9    Count 1 of the indictment with conspiring to commit the

10   following two offenses against the United States:  (1) mail

11   fraud; and (2) making, selling and using false and fictitious

12   instruments.  In order for a defendant to be found guilty of

13   that charge, that is the conspiracy charge in Count 1, the

14   government must prove each of the following elements beyond a

15   reasonable doubt:

16           First, beginning in or about February 2008, and ending

17   in or about February 2011, there was an agreement between two

18   or more persons to commit at least one of the offenses as

19   charged in the indictment;

20           Second, the defendant became a member of the

21   conspiracy knowing of at least one of its objects and intending

22   to help accomplish it;

23           Third, one of the members of the conspiracy performed

24   at least one overt act for the purpose of carrying out the

25   conspiracy, with all of you agreeing on a particular overt act

1    that you find was committed.

2         Now, a conspiracy is a kind of criminal partnership --

3    an agreement of two or more persons to commit one or more

4    crimes.  The crime of conspiracy is the agreement to do

5    something unlawful; it does not matter whether the crime agreed

6    upon was committed.

7         For a conspiracy to have existed, it is not necessary

8    that the conspirators made a formal agreement or that they

9    agreed on every detail of the conspiracy.  It is not enough,

10   however, that they simply met, discussed matters of common

11   interest, acted in similar ways, or perhaps helped one another.

12   You must find that there was a plan to commit at least one of

13   the crimes alleged in the indictment as an object of the

14   conspiracy with all of you agreeing as to a particular crime

15   which the conspirators agreed to commit.

16        One becomes a member of a conspiracy by willfully

17   participating in the unlawful plan with the intent to advance

18   or further some object or purpose of the conspiracy, even

19   though the person does not have full knowledge of all the

20   details of the conspiracy.  Furthermore, one who willfully

21   joins an existing conspiracy is as responsible for it as the

22   originators.  On the other hand, one who has no knowledge of a

23   conspiracy, but happens to act in a way which furthers some

24   object or purpose of the conspiracy, does not thereby become a

25   conspirator.  Similarly, a person does not become a conspirator

1    merely by associating with one or more persons who are

2    conspirators, nor merely by knowing that a conspiracy exists.

3         An overt act does not itself have to be unlawful.  A

4    lawful act may be an element of a conspiracy if it was done for

5    the purpose of carrying out the conspiracy.  The government is

6    not required to prove that the defendant personally did one of

7    the overt acts.

8         A conspiracy may continue for a long period of time

9    and may include the performance of many transactions.  It is

10   not necessary that all members of the conspiracy join it at the

11   same time, and one may become a member of a conspiracy without

12   full knowledge of all of the details of the unlawful scheme or

13   the names, identities, or locations of all of the other

14   members.

15        Even though a defendant did not directly conspire with

16   all of the other defendants or other conspirators in the

17   overall scheme, the defendant has, in effect, agreed to

18   participate in the conspiracy if it is proved beyond a

19   reasonable doubt that:

20        (1) the defendant directly conspired with one or more

21   conspirators to carry out at least one of the objects of the

22   conspiracy;

23        (2) the defendant knew or had reason to know that the

24   other conspirators were involved with those with whom the

25   defendant directly conspired; and

1              (3) the defendant had reason to believe that whatever

2      benefits the defendant might get from the conspiracy were

3      probably dependent upon the success of the entire venture.

4              It is no defense that a person's participation in a

5      conspiracy was minor or for a short period of time.

6              Now, you have heard testimony about various events

7      that took place over a number of years.  Some of the people who

8      may have been involved in these events are not on trial.  The

9      government is not required to prosecute all members of an

10     alleged conspiracy in one proceeding or trial.  Nor is the

11     government required to prove the identity of all of the

12     participants in an alleged conspiracy.  An indictment may

13     charge a defendant with a conspiracy involving people whose

14     names are not known, as long as the government can prove that

15     the defendant conspired with one or more persons who are

16     identified.

17             As to Count 1, you must decide whether the conspiracy

18     charged in the indictment existed, and, if it did, who at least

19     some of its members were.  If you find that the conspiracy

20     charged did not exist, then you must return a not guilty

21     verdict, even though you may find that some other conspiracy

22     existed.  Similarly, if you find that either defendant was not

23     a member of the charged conspiracy, then you must find that

24     defendant not guilty, even though that defendant may have been

25     a member of some other conspiracy.

1          The conspiracy offense charged in Count 1 of the

2    indictment alleges that the defendants agreed to commit two

3    types of offenses against the United States.  As I said

4    earlier, the first type is mail fraud, which is defined later

5    in Instruction Number 26.  The second offense involves the

6    usage of fictitious obligations.  In order to find a defendant

7    guilty of the second offense, the government must prove the

8    following elements beyond a reasonable doubt:

9          First, that the defendant passed, uttered, sold,

10   produced, published or otherwise made, a false or fictitious

11   instrument or document within the United States;

12         Second, the fictitious instrument or document

13   appeared, represented, purported, or contrived through scheme

14   and artifice to be an actual security or other financial

15   instrument issued under the authority of the United States or

16   the State of Hawaii; and

17         Third, the defendant acted with the intent to defraud,

18   that is, the intent to deceive or cheat.

19         A fictitious instrument is a document or item, whether

20   negotiable or nonnegotiable, made to appear to be "actual" in

21   the sense that it bears a resemblance to genuine financial

22   instruments.  The document must, in other words, include enough

23   of the various hallmarks and indicia of financial obligations

24   so as to appear to be within the family of genuine financial

25   obligations.  The test is not whether the document is similar

1   to any financial obligation in particular, but whether taken as

2   a whole it includes enough of the various hallmarks and indicia

3   of financial obligations so that it appears to resemble a

4   genuine financial instrument.

5        A fictitious instrument may all -- I'm sorry -- may

6   include a document that a prudent person would not likely

7   accept as genuine, so long as the fictitious obligation bears a

8   family likeness to genuine financial instruments.

9        In determining whether a document or item is a

10  fictitious instrument, you may consider, by way of example,

11  whether it bears relevant attributes of actual financial

12  obligations, such as official seals, serial numbers, portraits

13  of government buildings, officials or state persons, symbols or

14  mottos of the issuing nation or entity, official signatures,

15  dates of issue or statements to the effect that the document

16  shall serve as legal tender or shall be redeemable for

17  something of value.

18       Now, both defendants, that is Ms. Ventura-Oliver and

19  Ms. Teves, are charged in Counts 2 through 16 of the indictment

20  with committing mail fraud.  In order for the defendant -- for

21  a defendant, either one, to be found guilty of a mail fraud

22  charge, the government must prove each of the following

23  elements beyond a reasonable doubt:

24       First, the defendant knowingly participated in,

25  devised, or intended to devise a scheme or plan for obtaining

1    money or property by means of false or fraudulent pretenses,

2    representations or promises;

3            Second, the statements made or facts omitted as part

4    of the scheme were material; that is, they had a natural

5    tendency to influence, or were capable of influencing, a person

6    to part with money or property;

7            Third, the defendant acted with the intent to defraud;

8    that is, the intent to deceive or cheat; and

9            Fourth, the defendant used, or caused to be used, the

10   mails to carry out, or attempt to carry out, an essential part

11   of the scheme.

12           In determining whether a scheme to defraud exists, you

13   may consider not only the defendant's words and statements, but

14   also the circumstances in which they are used as a whole.

15           A mailing is caused when one knows the mails will be

16   used in the ordinary course of business or when one reasonably

17   foresees such use.  It does not matter whether the material

18   mailed was itself false or deceptive so long as the mail was

19   used as part of the scheme, nor does it matter whether the

20   scheme or plan was successful or that the money or property was

21   obtained.

22           As to Counts 2 through 16, which are the mail fraud

23   counts, if you decide that a defendant was a member of a scheme

24   to defraud, and that defendant had the intent to defraud, the

25   defendant may be responsible for other co-schemers' actions

1    during the course of and in furtherance of the scheme, even if
2    the defendant did not know what they said or did.
3           For the defendant to be guilty of an offense committed
4    by a co-schemer in furtherance of the scheme, the offense must
5    be one that the defendant could reasonably foresee as a
6    necessary and natural consequence of the scheme to defraud.
7           Now, we've covered counts -- I'm going off script for
8    a minute.  We've covered Counts 1 through 16.  Both defendants
9    are charged in Counts 1 through 16.  The remaining counts are
10   only against Ms. Ventura-Oliver.  Okay?  So the remaining
11   substantive instructions that is covering these counts that I'm
12   going to cover now only apply to Ms. Ventura-Oliver and not to
13   Ms. Teves.  Okay?
14          So Count 17 of the indictment charges defendant
15   Mahealani Ventura-Oliver with money laundering.  In order for
16   defendant Ventura-Oliver to be found guilty of that charge, the
17   government must prove each of the following elements beyond a
18   reasonable doubt:
19          First, defendant Ventura-Oliver knowingly engaged or
20   attempted to engage in a monetary transaction, as charged in
21   the indictment;
22          Second, defendant Ventura-Oliver knew the transaction
23   involved criminally derived property;
24          Third, the property had value greater than $10,000;
25          Fourth, the property was, in fact, derived from the

1   conspiracy or mail fraud scheme as alleged in Counts 1 through
2   16 of the indictment; and
3        Fifth, the transaction occurred in the United States.
4        The term "monetary transaction" means the deposit, in
5   or affecting interstate commerce, of funds or a monetary
6   instrument by, through, or to a financial institution.
7        And the term "financial institution" means an
8   institution whose deposits are insured by the Federal Deposit
9   Insurance Corporation, or any credit union.
10       The term "criminally derived property" means any
11  property constituting or derived from, the proceeds of a
12  criminal offense.  The government must prove that the defendant
13  knew that the property involved in the monetary transaction
14  constituted, or was derived from, proceeds obtained by some
15  criminal offense.  The government does not have to prove that
16  the defendant knew the precise nature of that criminal offense,
17  or knew that the property involved in the transaction
18  represented the proceeds of the conspiracy or mail fraud scheme
19  alleged in Counts 1 through 16 of the indictment.
20       Although the government must prove that, of the
21  property at issue more than $10,000 was criminally derived, the
22  government does not have to prove that all of the property at
23  issue was criminally derived.
24       If you find that a financial transaction involved a
25  financial institution insured by the Federal Deposit Insurance

1    Corporation, you may infer an effect on interstate commerce.

2           Defendant Mahealani Ventura-Oliver may be found guilty

3    of money laundering as charged in Count 17 of the indictment,

4    even if she did not -- even if she personally did not commit

5    the act or acts constituting the crime but aided and abetted in

6    its commission.  To prove defendant Ventura-Oliver guilty of

7    aiding and abetting, as to Count 17, the government must prove

8    the following beyond a reasonable doubt:

9           First, money laundering was committed by someone;

10          Second, defendant Ventura-Oliver knowingly and

11   intentionally aided, counseled, commanded, induced or procured

12   that person to commit each element of money laundering; and

13          Third, defendant Ventura-Oliver acted before the crime

14   was completed.

15          It is not enough that defendant Ventura-Oliver merely

16   associated with the person committing the crime, or unknowingly

17   or unintentionally did things that were helpful to that person,

18   or was present at the scene of the crime.  The evidence must

19   show beyond a reasonable doubt that defendant Ventura-Oliver

20   acted with the knowledge and intention of helping that person

21   commit money laundering.

22          And the government is not required to prove precisely

23   which person actually committed the crime, and which person

24   aided and abetted.

25          Defendant Mahealani Ventura-Oliver is charged in

1    Count 18 of the indictment with conspiring with John D. Oliver
2    to submit false, fictitious, and fraudulent claims upon the
3    United States.  In order to find defendant Ventura-Oliver
4    guilty of that offense, the government must prove each of the
5    following elements beyond a reasonable doubt:
6          First, at some point in or about May 2008 and
7    continuing through in or about May 2009, there was an agreement
8    between two or more persons to submit false, fictitious, or
9    fraudulent claims to any agency of the United States;
10         Second, defendant Ventura-Oliver became a member of
11    the conspiracy knowing of at least one of its objects and
12    intending to help accomplish it;
13         Third, one of the members of the conspiracy performed
14    at least one overt act for the purpose of carrying out the
15    conspiracy, with all of you agreeing on a particular overt act
16    that you find was committed.
17         A conspiracy is a kind of criminal partnership -- an
18    agreement of two or more persons to commit one or more crimes.
19    The crime of conspiracy is the agreement to do something
20    unlawful; it does not matter whether the crime agreed upon was
21    committed.
22         For a conspiracy to have existed, it is not necessary
23    that the conspirators made a formal agreement or that they
24    agreed on every detail of the conspiracy.  It is not enough,
25    however, that they -- that they simply met, discussed matters

1    of common interest, acted in similar ways, or perhaps helped

2    one another.  You must find that there was a plan to commit at

3    least one of the crimes alleged in the indictment as an object

4    of the conspiracy with all of you agreeing as to a particular

5    crime with which conspirators agreed to commit.

6              In this case there is only one, though.  Correct?

7              MR. NAMMAR:  Yes, your Honor.

8              THE COURT:  Which is the submitting false, fictitious

9    and fraudulent claims upon the United States.

10             One becomes a member of a conspiracy by willfully

11   participating in the unlawful plan with the intent to advance

12   or further some object or purpose of the conspiracy, even

13   though the person does not have full knowledge of all the

14   details of the conspiracy.  Furthermore, one who willfully

15   joins an existing conspiracy is as responsible for it as the

16   originators.  On the other hand, one who has no knowledge of a

17   conspiracy, but happens to act in a way which furthers some

18   object or purpose of the conspiracy, does not thereby become a

19   member of the conspiracy or a conspirator.  Similarly, a person

20   does not become a conspirator merely by associating with one or

21   more persons who are conspirators, nor merely by knowing that a

22   conspiracy exists.

23             An overt act does not itself have to be unlawful.  A

24   lawful act may be an element of the conspiracy if it was done

25   for the purpose of carrying out the conspiracy.  The government

1   is not required to prove that the defendant, in this case

2   Ventura-Oliver, personally did one of the overt acts.

3           Now, Ms. Oliver -- Ventura-Oliver is charged in

4   Count 25 of the indictment with making and presenting a false,

5   fictitious, or fraudulent claim to an agency of the United

6   States.  In order to find her guilty of that charge, the

7   government must prove the following elements beyond a

8   reasonable doubt:

9           First, defendant Ventura-Oliver presented a claim, or

10  knowingly and deliberately caused someone else to present a

11  claim, against the United States, or an agency thereof; and

12          Second, defendant Ventura-Oliver knew that such claim

13  was false, fictitious or fraudulent.

14          A "false" or "fictitious" claim is a claim which is

15  untrue when made and which is known by the person making it, or

16  causing it to be made, to be untrue.  A "fraudulent" claim is a

17  claim which is known to be untrue and which is made or used

18  with the intent to deceive.

19          As to the second element, defendant Ventura-Oliver

20  must have known that the claim was false, fictitious, or

21  fraudulent.  A defendant who acts on a good faith

22  misunderstanding as to the requirements of the law does not act

23  knowingly and intentionally even if her understanding of the

24  law is wrong or unreasonable.  Nevertheless, merely disagreeing

25  with the law does not constitute a good faith misunderstanding

1     of the law because all persons have a duty to obey the law
2     whether they agree with it or not.
3           You are instructed as a matter of law that the
4     Internal Revenue Service is an agency of the United States.
5           A "claim," as that word is used in these instructions,
6     is a command for money, property, credit or reimbursement.
7           The government need not prove that the agency of the
8     United States, in this case the IRS, was deceived or misled by
9     the claim.
10          Now, Ms. Ventura-Oliver may be found guilty of
11    submitting a false, fraudulent, or fictitious claim to the
12    United States as charged in Count 25, even if she did not
13    personally commit the act -- or the act or acts constituting
14    the crime but aided and abetted in its commission.  To prove
15    Ms. Ventura-Oliver guilty of aiding and abetting, the
16    government must prove the following beyond a reasonable doubt:
17          First, someone committed the offense of submitting a
18    false, fraudulent or fictitious claim to the United States;
19          Second, defendant Ventura-Oliver knowingly and
20    intentionally aided, counseled, commanded, induced or procured
21    that person to commit each element of the offense; and
22          Third, defendant Ventura-Oliver acted before the crime
23    was completed.
24          It is not enough that defendant Ventura-Oliver merely
25    associated with the person committing the crime, or unknowingly

1    or unintentionally did things that were helpful to that person,

2    or was present at the scene of the crime.  The evidence must

3    show beyond a reasonable doubt that defendant Ventura-Oliver

4    acted with the knowledge and intention of helping that -- that

5    person commit the offense.

6         The govern -- government is not required to prove

7    precisely which person actually committed the crime and which

8    person aided and abetted.

9         As to Count 1 of the indictment, defendants Mahealani

10   Ventura-Oliver and Pilialoha Teves' theory of defense is that

11   they did not willfully participate in an unlawful plan with

12   intent to advance or further some object or purpose of the

13   conspiracy; and, that they did not act with the intent to

14   defraud, deceive or cheat.

15        As to Counts 2 through 16, the mail fraud counts, both

16   defendants' theory of defense is that they did not act with the

17   intent to defraud, deceive or cheat.

18        As to Count 17, defendant Ventura-Oliver's theory of

19   the defense is that she did not know the transaction involved

20   criminally derived property -- this is the money laundering

21   count now -- and did not knowingly and intentionally aid,

22   counsel, command, induce or procure another person to commit

23   money laundering.

24        As to Count 18, Ms. Ventura-Oliver's theory of defense

25   is that she did not willfully participate in any unlawful plan

1   with intent to advance or further some object or purpose of the

2   conspiracy; and, that she did not act with the intent to

3   defraud, deceive or cheat.

4          And finally, as to Act 25, defendant Ventura-Oliver's

5   theory of the defense is that she did not knowingly and

6   intentionally present a false, fictitious or fraudulent claim;

7   and, acted in a good faith misunderstanding as to the

8   requirements of the law.

9          The word "knowingly," as that term has been used in

10   these instructions, means that the act was done voluntarily and

11   intentionally and not because of mistake or accident.

12          Now, a separate crime or offense is charged against

13   one or more of the defendants in each count of the indictment.

14   Each offense, and the evidence pertaining to it, should be

15   considered by you separately.  Also, the case -- the case of

16   each defendant should be considered by you separately and

17   individually.  The fact that you may find one of the defendants

18   guilty or not guilty of any of the offenses charged should not

19   control your verdict as to any other offense or any other

20   defendant.

21          I caution you, members of the jury, that you are here

22   to determine whether each of the defendants is guilty or not

23   guilty from evidence in the case.  The defendants are not on

24   trial for any act or conduct or offense not alleged in the

25   indictment, and you are here only to determine whether the

1    defendants are guilty or not guilty of the charges in the

2    indictment.  Nor are you called upon to return a verdict as to

3    the guilt of any other person or persons not on trial as a

4    defendant in the case.  You should consider evidence about the

5    acts, statements, and intentions of others, or evidence about

6    other acts of the defendants, only as they relate to the

7    charges against the two defendants.

8            Also, the punishment provided by law for the offenses

9    charged in the indictment is a matter exclusively within the

10   province of the judge -- that's me -- and should never be

11   considered by the jury in any way at arriving in -- in arriving

12   at an impartial verdict.

13           Now, some of you took notes during the trial.  I think

14   maybe all of you took notes during the trial.  Whether or not

15   you took notes, you should rely on your own memory of what was

16   said.  Notes are only to assist your memory.  You should not be

17   overly influenced by your notes or those of other jurors.

18           Now, remember, even during your deliberations, my

19   mandate to you still applies that you not read any news stories

20   or articles, listen to any radio, or watch any television

21   reports about the case or about anyone who has anything to do

22   with it.  Do not do any research, such as consulting

23   dictionaries, searching the Internet, or using other reference

24   materials, and do not make any investigation about the case on

25   your own.  And do not discuss the case in any manner with

93

 1   others, directly or through social media.  You may only discuss
 2   the case with your fellow jurors during your deliberations,
 3   with all 12 of you present.
 4          So, again, I'm going to go off script again.  What I'm
 5   telling you is that same rule I told you earlier about the
 6   evidence that you are to consider has to be, is what is
 7   presented to you in this courtroom still applies.  Okay?  So
 8   you can't be discussing matters and say, Gee, you know, we
 9   should look that up and see what it says.  You can't do that.
10   It's a natural inclination, I understand that.  That's how we
11   all work today.  Around the dinner table you have a discussion
12   and someone pulls out an iPad and starts looking up something.
13   Right?  That's how people sort of learn in today's environment.
14          This is a little different.  You have to put all that
15   aside.  So I don't allow things like cellphones and iPads and
16   so forth in the jury room.  You can only base your verdict on
17   the evidence you hear.  When you go home at night, you can't go
18   do research.  Just like before, you can't talk to others still.
19   All of those rules still apply.
20          All right.  So I'm on Page 52, Instruction 40:  Your
21   verdict must represent the considered judgment of each juror.
22   In order to return a verdict, it is necessary that each juror
23   agree thereto.  In other words, your verdict must be unanimous.
24          It is your duty as jurors to consult with one another,
25   and to deliberate in an effort to reach agreement if you can do

1    so without violence to individual judgment.  Each of you must

2    decide the case for yourself, but only after an impartial

3    consideration of the evidence in the case with your fellow

4    jurors.  In the course of your deliberations, do not hesitate

5    to reexamine your own views and change your opinion if

6    convinced it is erroneous.  But do not surrender your honest

7    conviction as to the weight or effect of the evidence solely

8    because of the opinion of your fellow jurors, or for the mere

9    purpose of returning a verdict.

10        Remember at all times, you are not partisans.  You are

11   judges -- judges of the facts.  Your sole interest is to seek

12   the truth from the evidence in the case.

13        Now, upon retiring to the jury room you should first

14   select one juror to act as your foreperson.  And that

15   foreperson will preside over your deliberations and will be

16   your spokesperson here in court.

17        Now, there are two verdict forms.  Remember I told you

18   you consider each defendant separately, right?  So you have two

19   separate verdict forms:  One for Ms. Ventura-Oliver, one for

20   Ms. Teves.  And they're very straightforward.  For example, as

21   to Count 1, simply says:  "As to the offense of conspiracy as

22   charged in Count 1 of the superseding indictment, we the jury

23   find defendant," and then it will have -- one will have one

24   defendant's name, the other will have the other.  And then

25   there's a box "not guilty" or "guilty," or a line, you just

1    check it "guilty" or "not guilty."  Okay?  And you go through

2    all of the counts.  Of course, there are more for

3    Ms. Ventura-Oliver.

4            The back of the verdict form, okay, whoever the

5    foreperson is now, the back is where you date and sign it.  So

6    make sure you turn it over to the very back whoever that

7    foreperson is, okay?

8            You will also have a copy of the indictment with you.

9    Okay?  And you can follow along -- as to the counts, you can

10   look and see what is in the indictment as to those counts as

11   you go.

12           One thing I do want to explain is Counts 2 through 16,

13   the mail fraud counts, use initials of the people who --

14   regarding the item mailed.  And that's because that's required

15   in indictments.  So you don't use full names in the indictments

16   of other individuals, so it just uses initials.  Okay?  So you

17   might have to tie those initials into the particular count.

18           All right.  So you will take the verdict forms to the

19   jury room and when you have reached unanimous agreement as to

20   your verdicts, you will have your foreperson fill them in, date

21   and sign them, and then return to the courtroom.

22           If, during your deliberations, you desire to

23   communicate with the Court -- me -- please put your message or

24   question in a note, have the foreperson sign the note, and pass

25   the note to the marshal who will bring it to my attention.  I

1   will then respond as promptly as possible, either in writing or

2   by returning to the courtroom to address you orally.  I caution

3   you, however, that you should never state or specify your

4   numerical division at any time.  For example, you should never

5   state that X number of jurors are leaning one way and X number

6   jurors are leaning another way.  All right?

7           All right.  Can I see counsel at sidebar?

8               (Sidebar on the record:)

9           THE COURT:  All right.  Other than the objections

10  already on the record which are preserved, are there any

11  objections to the instructions as read?

12          MR. BARBEE:  No, Your Honor.

13          MR. GRONNA:  No.

14          MR. TONG:  No, Your Honor.

15          THE COURT:  So obviously we're not going to go now.  I

16  think we'll just come back at 12:45 and start up then.

17          MR. TONG:  That's fine, Your Honor.

18          THE COURT:  Okay?

19          MR. BARBEE:  That sounds good.

20          THE COURT:  Okay.  All right.  Anything else?

21          MR. BARBEE:  No.

22          MR. GRONNA:  No.

23          MR. TONG:  No.  Thank you, Your Honor.

24               (End of sidebar.)

25          THE COURT:  All right.  Ladies and gentlemen, we're

1    going to go ahead and break for lunch.  All right?  So the way

2    the process works is this:  That Mr. Tong is going to give

3    what's called his opening closing argument first.  Both

4    Mr. Barbee and Mr. Gronna will give their closing.  Then the

5    government has a right to do a rebuttal closing.  In our system

6    of law whoever has the burden of proof, and in this case the

7    government does, goes last.  Okay.  So Mr. -- the government

8    will have the right to do a rebuttal argument.

9          Lawyers never like to split up arguments, and it's

10    getting close to lunch, and so what we're going to do is break

11    early for lunch and come back at 12:45.  Okay?  And get started

12    then.  So we're just going to break early for lunch.

13          So I remind you you're still not deliberating.

14    Alternates, you're still part of us here, still part of the

15    group.  Please have a pleasant lunch.  Remember do not talk

16    about the case.

17          The instructions you can just leave, Ms. Greaney will

18    get those.  And they will be in the deliberation rooms when you

19    start deliberating.  Okay?  All right.  Thank you.

20          (At 11:36 a.m., the jury was excused, and the

21    following proceedings were held:)

22          THE COURT:  All right.  So the jury has departed.

23          I want to start promptly at 12:45.  So be here on time

24    because we need to move through I think from that time forward

25    to make sure we get -- get through today.

1            Right when we come back we'll have a sidebar.

2            Mr. Gronna, remind me if I forget, and I'll rule on

3   Exhibit B.

4            MR. GRONNA:  Oh, very good.  Thank you.

5            THE COURT:  Okay?

6            MR. GRONNA:  All right.  Thank you.

7            THE COURT:  Anything else?

8            MR. TONG:  No, Your Honor.  Thank you.

9            MR. GRONNA:  No.  Thank you.

10           THE COURT:  All right.  Thank you.

11       (A recess was taken from 11:37 a.m. to 12:55 p.m.)

12           (The following proceedings were held in open court in

13   the presence of the jury:)

14           THE COURT:  All right.  Please be seated.  We're back

15   with counsel, defendants, case agents and the ladies and

16   gentlemen of the jury.

17           We have one matter to finish up at sidebar and then

18   we'll go right into closing.

19                    (Sidebar on the record:)

20           THE COURT:  All right.  So on Mr. Gronna's motion

21   regarding Exhibit B, there's actually, interestingly, a split

22   in the circuits on whether or not a prior inconsistent

23   statement, when somebody admits to it, the statement itself is

24   admissible or not.  The majority view seems to be it's not

25   because it adds nothing.  There is an unpublished Ninth Circuit

1    case saying the court should have let it in, but no other
2    guidance from the Ninth Circuit.
3         Regarding -- regardless of that, however, I have
4    reviewed this document carefully, and agree with Mr. Tong under
5    Rule 403 it should not be admitted.  The probative value is
6    very minimal here given Mr. Oliver's admission.  And there is
7    in my view, given the content of the document, a danger of
8    unfair prejudice.  And Mr. Oliver testified he did not prepare
9    the document.  Someone else prepared it.  And I sort of think
10   in fairness to, you know, you now want to reach into certain
11   parts of that, and he never had an explanation explaining he
12   never read it, he never -- anything of that sort.  So there's a
13   bit of unfairness as well.
14        Finally, and it is cumulative, he did admit to it.  So
15   you certainly can use that in your argument.  Okay?
16        MR. GRONNA:  Okay.
17        MR. TONG:  Your Honor, just to get the Court's
18   permission --
19        THE COURT:  That's not on, is it?
20        MR. TONG:  Not -- not yet.
21        THE COURT:  Good.
22        MR. TONG:  Not yet.  I wasn't sure what he was
23   pointing at.
24        So I have two chart boards here that counsel have
25   seen, and I have an easel right here.

1          THE COURT:  All right.

2          MR. TONG:  And I just want to make sure if I use it,

3    I'm not going to obscure your view.

4          THE COURT:  I can move around.  I can move around.

5          MR. TONG:  Okay.  Thank you.

6          THE COURT:  Not a problem.  Okay.

7                    (End of sidebar.)

8          THE COURT:  All right.  So we are going to start with

9    Mr. Tong and the government's opening closing argument.

10          MR. TONG:  May it please the Court.

11          Sound check.  I'm sorry, I have this mike on.

12          THE COURT:  If you're going to use the mike, you

13    probably can't use the other standing one.

14          There's a lot of feedback.

15          MR. TONG:  This is an equipment malfunction.

16          Thank you.

17          All right.  Beg your pardon.  May it please the Court,

18    counsel, ladies and gentlemen.

19          Let's start with what is not in dispute.  These two

20    defendants, Mahealani Ventura-Oliver and Pilialoha Teves, were

21    part of a group.  The group was initially known as Ko Hawaii

22    Pae Aina, later The Registry, and then Hawaiiloa Foundation.

23    The group marketed a process by which you could eliminate your

24    debts.  The process included the use of pieces of paper that

25    they called "bonds."

 1          The bonds had no legal effect.  They were pieces of
 2    paper put together using word processing templates with fancy
 3    borders, fancy colors, and all kinds of legal words that strung
 4    together meant absolutely nothing.  They weren't the equivalent
 5    of money.  They couldn't be used to pay off mortgages.  They
 6    couldn't be used to pay off any debts.  None of those facts are
 7    disputed.  You do not have to decide whether any of those facts
 8    happened.  All of that is undisputed.
 9          What you do have to decide in this case is why these
10    two defendants were part of that process.  Was it because they
11    themselves were victims duped into thinking that the process
12    that they were marketing, however bizarre it was, was real?
13    Or, as we contend, was it because there was a plan, an
14    agreement, a conspiracy between the two of them to use these
15    documents that they knew were not real to commit a mail fraud
16    scheme by which they could get money by lying to others.
17          Innocent victims or criminal participants?  That's
18    ultimately the question you have to decide in this case.
19          Now, you heard Judge Seabright tell you that Count 1
20    of the indictment, the lead charge, is conspiracy.  Conspiracy
21    may sound like a fancy legal term, but it's really very simple.
22    A conspiracy is just an agreement between two or more people to
23    commit a crime, or in this case, to use, to sell, to make these
24    fictitious documents and use them as if they were real, and to
25    get money from other people by lying about how this process

1    supposedly could work.

2          An agreement to be a conspiracy does not have to be in

3    writing.  We don't have to show you a formal contract.  We

4    don't have to show you that the two of them took out an oath in

5    blood, even though we have some documents where their

6    fingerprints appear in red, the color of blood.  We just have

7    to show that there was an agreement to commit a crime.

8          We don't have to show who came up with the idea.  We

9    don't have to show who did what.  We just have to show that

10   there was an agreement.  We don't have to show that a

11   particular defendant knew all the details of the agreement or

12   even who all the participants were.  All we have to show is

13   that each defendant joined in the agreement, knowing of its

14   purpose and intending to help accomplish it.

15         Once you find that there is an agreement, as Judge

16   Seabright already told you, we have to prove that one of the

17   defendants committed something called an "overt act."  An overt

18   act itself does not have to be illegal.  It's just an act to

19   show that the agreement is working.

20         Let me give you a real simple example.  Let 's talk

21   about a bank robbery for a minute.  Certainly the defendants

22   are not charged with bank robbery, but let's talk about a bank

23   robbery.  One person says, Let's go rob a bank.  He goes to a

24   second person and says, Let's go rob a bank, but we need a

25   getaway car.  The second person then goes to a third person and

1    says, We need a driver.  And then one of them, having agreed to

2    commit the crime of bank robbery, makes a phone call, calls

3    Hertz or Avis or your favorite rental car company, and says, I

4    want to rent a car.

5            That is a conspiracy.  Each person has their own role.

6    One person planned it, another person agreed to get the car, a

7    third person was the wheel man.  And the phone call, although

8    not illegal, is an overt act because it is committed to help

9    accomplish the goals of the conspiracy.  That's what a

10   conspiracy is about.

11           Now, in this case, of course, we have a little bit of

12   a different conspiracy.  And how do you decide whether it was a

13   conspiracy?  Well, one thing you can do in this case is look at

14   the pattern of conduct.  Look at the pattern of documents and

15   see that the same documents were repeated over and over and

16   over again.  The same types of statements were made over and

17   over and over again.  And when you get in the jury room, you

18   can look at the binders of documents that will be presented to

19   you.

20           In a case involving fake documents, I guess it's

21   probably not surprising that we had to put a lot of documents

22   together.  I want to thank you for your patience over the last

23   three weeks.  My friend, Mr. Nammar, told you in opening

24   statement that some of it would be pretty tedious, and he was

25   right about that.  And we really appreciate your patience

1   there.

2          But it was very important for us to go through each

3   document and put them together for you that way.  Because just

4   like a mason builds a wall, brick by brick, in this case we

5   built our case exhibit by exhibit.  And you will have that wall

6   of exhibits in the jury room to look at.  And I will ask you to

7   ask yourself, What does the wall of evidence show you?

8          There is absolutely no doubt that these defendants had

9   a plan.  The activity was repetitive, it followed the same

10  pattern, it happened over and over and over again.  Each person

11  involved in the process knew, had actual knowledge that the

12  documents that were supposed to pay off the debts did not work.

13         Before I get into the documents, let me just tell you,

14  Judge Seabright told you you'll have the indictment and there

15  are various counts listed with numbers.  We have grouped the

16  indict -- exhibits in numbers that correspond to the charge.

17  So if you are considering Count 2 of the indictment, go to

18  Exhibit 2 in the binder and look at the series of exhibits, and

19  they should all be lined up for you in a way that helps you

20  understand what happened with regard to that particular count.

21         Now, how did all of this start?  When did it start?

22         In 2006 and 2007, you heard that John Oliver, the

23  husband of Mahealani Ventura-Oliver, started using something

24  called "admiralty claims."  You know that the two of them lived

25  together in a house.  They had a mortgage with Chase.  They

1    started using the admiralty claims in 2006 and '07, and what

2    happened?

3              Let's take a look at Exhibit 1-V.  This is a letter

4    from Chase dated November 22, 2006, addressed to Mahealani

5    Ventura-Oliver and John Oliver.  And you can see in the first

6    paragraph that it talks about the usage of a "Notice of

7    International Commercial Claim in Admiralty Administrative

8    Remedy."

9              If you look to the next line, it says:  "Please be

10   advised that your 'claim' document is invalid and is not

11   recognized."

12             If you look to the last paragraph, you'll notice that

13   Chase even goes further.  It says:  "You should know that other

14   borrowers have fallen victim to unlawful scams that include

15   documents similar to the claim you've sent.

16             "The solicitation claim that the filing of these

17   claims will extinguish valid and legal debt obligations, these

18   efforts are invalid, do not eliminate debt, and may be illegal.

19   We advise that you consult an attorney or law enforcement

20   officer."

21             Look at the date of that letter, November 22, 2006.

22             This has to do with their home mortgage.  You heard

23   John Oliver testify that after getting that first letter,

24   another admiralty claim was used.  Chase predictably responded

25   in the same fashion.  Let's look at Government's Exhibit 1.

1    This document is dated January 2, 2007, a couple of months

2    after the one you just looked at.  The language is pretty much

3    the same.

4            If we can zoom in on the first paragraph.

5            "Please be advised the claim document is invalid and

6    not recognized."  And the last paragraph, again:  "These

7    efforts do not eliminate debt and may be illegal.  Consult an

8    attorney or a law enforcement officer."

9            Was there any evidence that that's what was done?

10   Absolutely not.  What did John Oliver and Mahea Ventura-Oliver

11   do after receiving two notices from their lender that these

12   attempts could be illegal and did not extinguish debt?  They

13   started the private bond order process.

14           Let's take a look at Exhibit 1-B.

15           If we could see the top half, please?

16           This is February 9, 2008, to Chase Home Finance, a

17   document entitled "Private Bond Order in the Amount of

18   $300,000."  You've seen many like it.  This is the first one

19   that was used by John and Mahealani Ventura-Oliver.  You'll see

20   that their signature appears at the bottom.

21           If we could see that, Agent Carter, please.  Right

22   there.

23           And if we could go to the first paragraph, you'll see

24   that essentially this bond supposedly claims that Chase should

25   get repayment of the loan from the Comptroller of Currency of

1    the Hawaiian Treasury, Russ Saito.

2           You already know that this is a fictitious financial

3    instrument.  Russ Saito came in and explained to you the State

4    does not pay private mortgages with state funds.  He explained

5    to you that the State does issue bonds, but it's through a

6    process with the legislature.  He explained to you there are no

7    passthrough accounts, I should put that in quotes, by which a

8    private citizen can tap into a fund and say, I want my debt

9    paid off.  This document was fictitious.  And it's dated

10   February 9, 2008, signed by Mahealani Ventura-Oliver, along

11   with her estranged husband, in supposed payment of their

12   mortgage.

13          How does Chase respond?  Your common sense tells you

14   that that bond was not real.  Chase wrote a letter saying the

15   same thing.  That letter appears as Exhibit 1-C.

16             If we may see that, please.

17          I should point out, actually I saw it on the screen,

18   the last page of that bond coincidentally in February of '08

19   was notarized by Pilialoha Teves, the other defendant in this

20   case.

21          Now, Chase responds May the 2nd, 2008:  "You are in

22   default."  And this is an acceleration warning.  I won't go

23   into all of the content of that, but it basically says, You

24   haven't made any payment, we're now accelerating the loan.  And

25   it says, We are now going to take whatever recourse we have.

1  May 2008.

2          You saw evidence that John Oliver and Mahealani

3  Ventura-Oliver also tried to use the same process to pay off

4  their credit card debt.

5          Take a look at Exhibit 17-B.  This is a document with

6  a different legal title, but, again, as you know from Matthew

7  Johnson's testimony, the words in isolation may be legal words

8  that have meaning, but strung together in the fashion in which

9  they are here, they are meaningless.  This document isn't worth

10  the paper that it's written on.

11          But it's called a "Bonded Promissory Note" in the

12  amount of the $250,000.  Paid to the order of First Hawaiian

13  Bank, routed through Russ Saito, the Comptroller of the

14  Currency, who told you there is no such instrument of the sort

15  that appears on the screen.

16          If we can look at the bottom of this document, please,

17  Agent Carter, with the date.

18          You'll see that it's signed by John Oliver, and the

19  date is April 19 of 2008.  A little bit before that last letter

20  from their mortgage company telling them that the bonds didn't

21  work.

22          What happened when he submitted that April the 19th,

23  2008?  Well, he submitted another document on the same day.

24          If we could see Exhibit 17-D, Page 301, please.

25          This document notarized in front of Pilialoha Teves,

1  says:  "Please find enclosed a bonded promissory note as a

2  gift.  I will expect a reply.  If there is no confirmation, I

3  shall assume your acceptance of the offer."

4          Did they accept the offer?  Of course not.  They

5  recognized, as you do, as your common sense tells you, that

6  that bond was not worth a thing.  But the letter that says that

7  is Exhibit 17-C, dated May 2, 2008.

8          If we could see that, please?

9          May 2, 2008.  First Hawaiian Bank.  "We are in receipt

10  of your" -- and it really belongs in quotes -- "bonded

11  promissory note order dated April 19, 2008.  Please be advised

12  that none of the enclosures have any legal effect.

13          And if we can go down just a line.

14          "The enclosures are being offered as repayment.

15  However, they do not represent repayment" -- or "payment,"

16  rather, "and are hereby rejected."

17          Okay.  So we have basically attempts prior to May of

18  2008 to use the process on a mortgage and then on a credit

19  card.  Both are met with letters from the lenders or the credit

20  card issuer saying it's no good.

21          What happens?  Does John Oliver or Mahealani

22  Ventura-Oliver stop using the process?  No, we have shown you

23  that not only did they continue with the process, but they went

24  into business.  If we can look at Exhibit 1-X, Page 3, you will

25  see a corporate resolution for Hawaiiloa Foundation.

1          If you could go to the first -- through the two items.

2          This is a resolution dated May the 9th of 2008.  It's

3  the "minutes of meeting."  You see who was present.  Mahealani

4  Ventura-Oliver, the defendant, who's identified as the chair of

5  the foundation as well as the treasurer; you see John Oliver,

6  the vice chair; and Ihilani Catugal, the defendant Mahealani

7  Ventura-Oliver's daughter.

8          And this resolution basically says, We resolve to open

9  a bank account at the Maui County Federal Credit Union and that

10  all monies received by the foundation will be deposited in that

11  account.  It also says that the authorized signatory will be

12  Mahealani Ventura-Oliver, and that John Oliver be a delegate as

13  necessary to cosign checks.

14          If we could see the signature, it is that of Mahealani

15  Ventura-Oliver.  Notarized by Pilialoha Teves.  May 2008.

16  After the bonds didn't work on the mortgage, after the bonds

17  didn't work on the payment of the credit card debt.

18          You heard that that credit -- excuse me, you heard

19  that that Maui Federal Credit Union account was opened.  Agent

20  Carter did a summary of that account.  Over the next 15 or

21  so -- so months through the early part of 2009, almost $468,000

22  was deposited into the Hawaiiloa Foundation account.  You have

23  those summaries, you can look at them.  The business grew.  It

24  didn't stop.

25          As the business continued, the Hawaiiloa Foundation

1    business, one of the participants was Pilialoha Teves.  What
2    did she know and when did she know it?  Well, you've heard
3    evidence that she also tried the same process on her personal
4    debt.  We showed you that Pilialoha Teves got a mortgage loan
5    in May of 2008 from Central Pacific Bank.  Before the first
6    payment even came due, Pilialoha Teves sent in her own bond.
7              Let's take a look at Exhibit 26.
8              You can see the --
9              Well, before you go there, Agent Carter.
10             You can see Pilialoha Teves' name appears here.  The
11   date is June the 18th of 2008.  It's notarized by Mahealani
12   Ventura-Oliver, one month after she got the notices from the
13   credit card company and her own lender.
14             If we can see the top, please, Agent Carter.
15             Another one of these fancy documents with the fancy
16   borders printed off of the computer template form with the
17   words "Bonded Promissory Note" that, as Mr. Johnson told you,
18   means absolutely nothing.  Yet, she claims that this is payable
19   to Henry Paulson, the Secretary of the Treasury, one of the
20   cabinet level officials of the United States government, in the
21   amount of $2 million to be applied to Pilialoha Teves' loan
22   account.
23             And we don't need to see more, but the operative
24   language is:  "Payee shall, upon receipt of this instrument,
25   charge Central Pacific Home Loans via a passthrough account,"

1    which you know from Matthew Johnson's testimony does not exist.

2              How did Ms. Teves' lender respond to that?  We know

3    that they said it was no good.

4              Take a look at Exhibit 26-B.

5              This is a letter from the lawyers for Central Pacific

6    Bank, and it's dated July 9, 2008.  And it is addressed to

7    Ms. Teves.  And it talks about the loan that she said would be

8    paid off with that worthless bonded promissory note.  And it

9    says:  "Please be advised that these documents do not

10   constitute legal tender or negotiable instruments.  In order to

11   pay off your loan, you must deliver either a certified or

12   cashier's check or wire transfer.

13             That's the backdrop for the beginning of the Hawaiiloa

14   Foundation process.  Each of the two defendants had tried the

15   very process that they ended up marketing.  Each of the two

16   defendants had been told it was no good.  You don't have to

17   rely on your common sense in figuring out what they knew and

18   when they knew it.  You have actual evidence of what they were

19   told.

20             Well, what happens?  You heard that they both

21   participated in the process.  The process by now is well known

22   to you.  You heard participant after participant come in and

23   describe to you what would happen.  There would be weekly

24   meetings on Sundays at the Cameron Center on Maui.  The primary

25   speaker at those meetings was Mahealani Ventura-Oliver.  She

1    talked about Hawaiian rights and issues, history, things that
2    are interesting to almost everyone.  Things that tugged at the
3    hearts of others who were looking for some form of redress in
4    times that were difficult when the economy was not good, when
5    the Clinton apology had come out.  This appeal to people who
6    wanted to think that as Hawaiians they might have some rights
7    or redress or recourse as a means of solving their problems.
8    And in the context of drawing them in, through her words,
9    through her personality, Mahea Ventura-Oliver began to talk
10   about mortgages and how mortgages could be paid off.
11        You heard the description of the process, the straw
12   man account, the usage of government officials telling them to
13   pay off the bonds.  It may sound crazy, but she made it seem
14   real.  She called up Petro Hoy, who basically said, I am an
15   ambassador.  I know things about the international community.
16   In the international community this is how things are done.
17        All of this seems nonsense, flies straight over your
18   head, but it gave it more credence, made it more believable,
19   made it seem almost real to these people who were desperate to
20   find some kind of help.
21        Mahealani Ventura-Oliver then told them, The bonds we
22   give you pay off mortgages.  You heard Aileen Helekahi from
23   Maui come in and tell you, Mahealani Ventura-Oliver told us the
24   process worked.  You heard Tanya Andaya come in and tell you,
25   Mahealani Ventura-Oliver told me that the process works.  You

1    heard Tanya Andaya say Pilialoha Teves told her the bond is

2    real.  You heard Francisca Lono, the videotaped deposition,

3    tell you they circulated a sheet showing that Pilialoha Teves'

4    mortgage had been paid off.  Although, as you know from the

5    evidence we've shown and presented in court, it wasn't paid

6    off.  She was foreclosed upon.

7         You saw that some of the same statements were even

8    made to Special Agent Carter, who went in not as a special

9    agent of the FBI, but a young man with a big smile, and they

10   basically went up to him and described the process very openly

11   to him.  During the November 9, 2008 undercover meeting --

12        MR. BARBEE:  Hate to interrupt, Your Honor, but I

13   think that misstates the testimony.  It was John Oliver that

14   went up to him.

15        THE COURT:  I think he was getting into the evidence.

16   Overruled.

17        MR. TONG:  Mr. Barbee will give you his interpretation

18   later, but I am going to show you a tape of a part of the

19   meeting that occurred on November the 9th, 2008, attended by

20   Special Agent Carter, which features the words of Mahealani

21   Ventura-Oliver.

22        May we play file 2, 1031.

23                        (Video played.)

24        MR. TONG:  "Your mortgage has been zeroed out."  Those

25   are the words of the defendant Mahealani Ventura-Oliver, not

1    her estranged husband John Oliver.

2            How did the process work?  Well, on the following week

3    when Agent Carter went in, he struck up a conversation with

4    Gilbert Schmitt.  Gilbert Schmitt worked in the office.

5    Gilbert Schmitt is a blood relative of Mahealani

6    Ventura-Oliver.  She calls him Uncle Gilly.  Uncle Gilly

7    describes to Agent Carter, who is in this undercover role,

8    saying I've got a problem with my mortgage, and he tells him

9    how it will work.

10           If we could play that excerpt, please.

11                         (Video played.)

12           MR. TONG:  You heard Gil Schmitt say the mortgage gets

13   paid through the U.S. Treasury, through the process that you

14   have seen is nonexistent.  The catch was, in order to get these

15   bonds, even though they were worthless, you had to set up an

16   appointment.  You had to go from these public meetings, what

17   Gil Schmitt called the "beginners meeting" to Agent Carter,

18   into these private meetings of those who had made a commitment.

19           Sure, the defendants called it a kokua, as if it were

20   voluntary.  But you heard that in order to get anything done,

21   you had to come up with money, with a fee.  Witness after

22   witness told you, I understood that I would not get any

23   documents unless I paid the fee.  The fee was about $1500 to

24   $2500 a property.  You saw checks, receipts, and testimony

25   about how that process worked.  People would come in and

1   basically say, Here is my mortgage information, fill out the

2   documents, they would pay their fee, they would then be given a

3   stack of documents, including bonds that ultimately did not

4   work.

5          They would also be given UCC documents that supposedly

6   created liens on property, and they would also be given trusts

7   that put a property into a trust supposedly to protect it, and

8   in fact they even conveyed 1 percent of those properties into

9   this entity, which caused people a lot of problems, they

10  couldn't refinance, they couldn't sell.

11         Bonds, liens and trusts.  BLT is what Lehua Hoy called

12  it.

13         You heard from a number of witnesses what happened

14  when they got into that room that had the little sign "By

15  appointment only."  They basically were given a stack of

16  documents and told to sign.  They signed the documents.  And

17  whether it be Mahealani Ventura-Oliver or Pilialoha Teves or

18  Lehua Hoy, they were told not to pay their mortgages.  In fact,

19  Francisca Lono on the videotape basically testified that

20  Pilialoha Teves told her, Go out and celebrate.  Your mortgage

21  is now paid for.

22         It didn't work.  These people paid good money trying

23  to find relief, and it didn't work.  And down the line they

24  began to complain.  They got foreclosure notices from their

25  banks.  They told people at Hawaiiloa Foundation.  The response

1  was, Ignore them.  Don't answer the phone.  Don't respond,

2  because if you do that, it will be as if you renewed the debt.

3           These defendants convinced people that this process

4  worked.  They were able to do that, as I said, because people

5  were desperate, because they tugged at the heart rather than

6  the mind of those who wanted to believe.  Mahealani

7  Ventura-Oliver took advantage of their vulnerability.  She used

8  her abilities as a speaker.  She used the studies that she has

9  made, that you heard about from a couple of her witnesses, to

10 sound educated, informed, more knowledgeable than most of the

11 people who participated.  Most of the participants are

12 hardworking people with no advanced degrees and not a lot of

13 money, and they bought into her program.  Not only with their

14 minds, but with their money.

15          Some of it also may be unique to Hawaii.  Because you

16 heard a number of people come forward and say that word of what

17 Mahealani Ventura-Oliver, Pilialoha Teves and the group were

18 doing spread like wildfire.  It was out on the coconut

19 wireless.  Half of the people said, I heard about the program

20 first from aunty or uncle or some relative who was going

21 through this process.  They then thought it would work because

22 they heard about it from someone who they knew.

23          You heard one of the witnesses, I believe it was

24 Aileen Helekahi, say, They were the talk of Hana.  People were

25 flocking to the meetings.  When they got there the crowds were

1   overflowing.  You saw when Agent Carter went, it looked like a

2   packed room with people milling about.  And ultimately people

3   trusted, as Irene Peelua -- or Peelua said, she said over here

4   in Hawaii everything is about trust and reputation.  And they

5   trusted.  And they got burned.

6           Some people were even current in their mortgage and

7   got convinced to buy into the program.  Jerry Agbannaoag.  You

8   remember him?  He and his wife worked at two of the major

9   hotels in Wailea.  He's in facilities management; she's in

10  accounting.  They worked hard and had three properties.  One

11  home, two investment properties.

12          Jerry Agbannaoag had no interest in Hawaiian

13  sovereignty rights, but he heard of her program, he attended,

14  and he became convinced that even if he took his hard-earned

15  dollars and paid his mortgages off, when the mortgages were

16  gone, he still wouldn't own the land because of things that

17  Mahealani Ventura-Oliver told him.

18          They bought in.  They paid money.

19          Exhibit 2-B, if we could see it, please.

20          Mr. Agbannaoag through his wife paid $14,000.  June of

21  '08.

22          Now, again, let's put this in context.  This is after

23  both of these defendants had been told by their own lenders

24  that the process didn't work.  Jerry Agbannaoag paid $10,000,

25  and then there's another check for 4,000 to follow for three

1    BLTs.

2           Can we see Exhibit 2-C, please.

3           There's the 4,000.  You can see the memo line

4    references the houses.

5           $14,000 for assistance when he was already current

6    with his mortgage.  All based on the educational information

7    provided by Mahealani Ventura-Oliver.  You heard what happened.

8    He was told to stop paying his mortgages, like the other people

9    that drew foreclosure notices, just like the ones they got

10   before they even got in the process.  He lost two of his

11   properties.  He got pretty emotional about it.  $14,000 down

12   the toilet, two properties gone, all based on the misstatements

13   of these individuals.

14          Noreen Lane, similar story.  Noreen Lane is with Lynne

15   Sakagawa.  She works at the auto supply store, NAPA.  She came

16   forward and told you that they were current, but they heard

17   about this process.  It tugged at their thoughts as a Native

18   Hawaiian.  She ended up buying into the program.  Using a bond,

19   stopping her payments, and then getting foreclosure notices.

20   She tried to refinance, but the trust that they created with

21   the 1 percent interest prevents her from doing so.  Yet another

22   person who misplaced their trust in this program.

23          You also heard that a number of people complained and

24   even asked for a refund.  Lorelei Torino, her name was Mannoia

25   at the time, basically contacted the group.  Wanted to know,

1   How come I'm getting a foreclosure notice after I followed your

2   process to the T?  She didn't hear anything back.  There was no

3   talk.

4          Ask yourself why she didn't hear anything back.  If

5   these people really believed that the process was working,

6   what's the first thing they would have done when they got

7   complaints?  They would have called the person and said, Hey,

8   you know what, I want to know all about it.  Because something

9   went wrong.  I can help you.  The document wasn't done right.

10  Maybe it wasn't mailed quite the way it was supposed to be.

11  But nothing.  Lorelei Torino hears nothing.  Why does she hear

12  nothing?  Because they knew it didn't work.  They knew before

13  they even started this it didn't work.

14         Finally, what happens is Lorelei Torino gets a bill.

15         Let's take a look at Exhibit 8-L.

16         "Aloha."  It always starts nice.  "We received your

17  phone call requesting a refund.  Our records show that you gave

18  an unconditional gift of $3,000 to the foundation."

19         You know, it's not an unconditional gift; it was a

20  fee.

21         It then provides an accounting.  Accounting of money

22  received.  And it lists all the services.  And it totals the

23  services as being worth $6,350, which doesn't count the

24  educational stuff, which is priceless.  And then the bill says:

25  "Your request for a return is in arrears $3350.  You may honor

1   this arrearage in a cashier's check or money order to the

2   foundation."

3          What does that tell you?  If these bonds worked, and

4   the defendants thought they were entitled to money, why didn't

5   they write up a new bond and just draw on it.  If they wanted

6   their $3350, why not just tap into that secret account that

7   they said was maintained at the Treasury or in the state

8   comptroller's office and draw the money.  Why would you say,

9   Pay us by cashier's check or money order?  Use your common

10  sense.  When somebody tells you, Pay by cashier's check or

11  money order, that's usually because they want to make sure they

12  get money, cash on the barrel head.  They knew what real money

13  is, and they knew that bonds were not real money.

14         Speaking of that, the evidence shows you that the

15  defendants themselves knew how to pay their bills, and the way

16  to do it wasn't through the usage of these bonds.

17         Let's take a look at Exhibit 31.  It's a picture of a

18  safe.  This was in the residence of John and Mahealani Oliver.

19  What was inside that safe?

20         Exhibit 31-A.  You heard that in April of 2009, when

21  the federal agencies conducted a search, they found that that

22  safe contained cash.  I believe there was $43,300 in that

23  particular safe.

24         Why would you keep cash in the safe but not bonds if

25  the bonds were worth millions of dollars?  If the bonds were

1    valuable financial instruments, as they were telling other

2    people, why wouldn't they keep them in a safe place, like you

3    would keep a birth certificate somewhere, or something very

4    valuable in a safe deposit box?  Why keep cash?  Because they

5    knew what cash was, they knew that was real money, they knew

6    that's how they would pay their debts.  They knew the bonds

7    were no good.

8            Mahealani Ventura-Oliver used Hawaiiloa Foundation's

9    account to buy her daughter a truck.  You saw that there was

10   evidence that there was a truck bought, that Mahealani

11   Ventura-Oliver went down to the dealership with her estranged

12   husband John, they picked out a truck for Ihilani, they paid a

13   certain portion in cash, which Mahealani gave to John to pay,

14   and then the balance was paid by check.

15           Let's look at Exhibit 32-A.

16           Here we are, July 22, 2008, the beginning of their

17   marketing of the plan after they've already heard that the

18   bonds don't work, and they're buying a truck for Ihi paying

19   Island Dodge $6,532 signed by Mahealani Ventura-Oliver.

20           Why did she write a check if the bonds were real?  If

21   she thought the bonds could pay off debts, why didn't she use

22   one to buy the truck?  Why use cash if a bond could be used

23   instead?  Why use a check like this?  Because she knew the

24   bonds were fake.

25           Pilialoha Teves, also knew how to use money to pay her

1    bills.

2            Let's take a look at Exhibit 27, please.

3            Exhibit 27 is a loan document from the Maui Federal

4    Credit Union to Marla Teves, who you heard is the name she

5    formerly used, for a truck.  A Chevy Blazer.  And the monthly

6    payments were $369.

7            Now, as she was marketing the plan, if she believed

8    that the bonds would work, wouldn't you expect her to use the

9    bonds to make those payments?

10           But let's take a look at how she paid.  Let's look at

11   Exhibit 27-C.

12           This is a check, Pilialoha Teves, dated October 22,

13   2008, in payment of that $369 a month debt.

14           Let's look at Exhibit 27-G.

15           This is another check from Pilialoha Teves in payment

16   of that debt, with the loan number here.  Ask yourself why

17   she's writing checks.  Because she knows the bonds don't work.

18   Because, as Gary Yamashiro told you, lenders can repossess

19   cars.  Because she knows that in order to have her car, she has

20   to pay it with legitimate money.

21           Ladies and gentlemen, we have shown that the two

22   defendants knew as they were marketing these bonds that the

23   bonds did not work.  And in spite of that, they told people

24   that they did work.  They told people that their mortgages were

25   paid.  They told them to stop making payments.  They did not

1    tell them that the bonds had not worked for them.  They did not

2    tell them that the Olivers had tried on their mortgage and it

3    didn't work.  They did not tell them that Pilialoha Teves had

4    basically tried with her company and that it had not worked.

5    They passed around a sheet that falsely said that Pilialoha

6    Teves had no debt because the bonds had worked.  We have shown

7    that they agreed to sell these bonds knowing that they were

8    worthless.  We have shown that they are guilty of the

9    conspiracy charged in Count 1.

10          Counts 2 through 16, mail fraud, the evidence is

11   really the same.  We have to show that the two of them devised,

12   came up or participated with a plan, a scheme to deceive people

13   by telling them things that weren't true in order to get money.

14   It's the same evidence.  Week after week they told people it

15   worked.  They knew it didn't work.  They didn't disclose that

16   fact, and they collected money.  You saw $468,000 go into the

17   account.

18          The one thing we have to show as part of the mail

19   fraud scheme is that they used the mails.  I'm not going to

20   belabor the point, but you heard time and time again that the

21   mails were an integral part of this plan.  Because person after

22   person was told that what made the bond effective was the

23   receipt of the bond as evidenced by the green card.

24          And when you go into the jury room, you can see that

25   Counts 2 through 16 are lined up.  The document reference in

1   the indictment is the same number as the count, Count 2 will be

2   Exhibit 2, and the A behind it is going to be some evidence of

3   the mailing.

4        Mails were part of the scheme, they were important,

5   people knew it.  Exhibit 1-G shows you that they were told in

6   writing:  "Green card instructions.  Make copies of the front

7   and back of the green card from the 12th Reserve Bank."  That

8   was an important part of the scheme.  It gave it the veneer of

9   legitimacy, meaning it gave it an appearance that it was real

10  when it wasn't.

11       You heard people scramble to get their green cards.

12  Chris Westen called in sick once just to go toss his house

13  upside down to find the green card.  He couldn't find it.  He

14  went down to the post office.  It was part of the scheme.

15       We have showed that as part of this scheme, they

16  deceived people, they obtained money, and they used the mails.

17  I submit to you that as to Counts 2 through 16, we have proved

18  both defendants guilty of mail fraud.

19       The rest of the charges that I'll move forward through

20  as quickly as I can relate to the defendant Mahealani

21  Ventura-Oliver alone.

22       Count 17 is money laundering.  Judge Seabright told

23  you that money laundering is basically when someone conducts a

24  financial transaction involving more than $10,000 in funds that

25  are derived or obtained through criminal activity.  In this

1    case the criminal activity is the conspiracy and the mail

2    fraud.  The funds that we are talking about are the payment of

3    the credit card debt and the check that shows the transaction

4    is Exhibit 17.

5         Exhibit 17 is a check written on November 21, '08, in

6    the amount of $10,580, more than the $10,000, and John Oliver

7    told you that this was in payment of the credit card debt.

8    This was after they tried to use the bond several times, got

9    the letters from First Hawaiian saying it's no good.  John

10   Oliver told you, We had to have a credit card, so we paid with

11   this credit -- with this check.

12        Mahealani Ventura-Oliver signed the check.  It's

13   signed -- it's sent out with this USPS, showing again the

14   mailings are still part of this thought process.  And it's

15   drawn on the account of Hawaiiloa Foundation, which as John

16   Oliver told you and as Agent Carter's analysis demonstrates,

17   had money only coming from the participants with the exception

18   of the small amounts for hula and flag sales.

19        We have proved that the defendant Mahealani

20   Ventura-Oliver is guilty of money laundering based on the

21   events leading to this check.  The money came from the scheme,

22   this was used, it is basically participants' funds, and they

23   used real money to pay off a debt because they knew as of that

24   date and sooner that they couldn't use the bonds.

25        Mahealani Ventura-Oliver is also charged with two tax

1   charges.  Count 18 is a conspiracy, and Count 25 relates to a

2   1040 form.  Conspiracy in this case, the law is the same, but

3   the purpose of the agreement is different.  Count 18 charges

4   that the defendant Mahealani Ventura-Oliver conspired with her

5   estranged husband John to make false claims to the IRS seeking

6   refunds.  And if you read the indictment, it will lay out the

7   process.  The process involved the usage of a series of

8   documents.  You heard Chris Morgan talk about them.

9           Can you folks see that?

10          The documents are listed here, and basically the first

11  one is a 1099-OID form.  I'm not going to show you all of

12  those, but you'll remember that's a form that is rarely used.

13  It's basically called an "original issue discount."  It is

14  intended by the IRS to be used when you buy something at a

15  discount.  So if you buy a savings bond for $50, and it is

16  worth $100 face value, when you cash it in for the hundred, the

17  $50 income gets reported on the OID.  It has nothing to do with

18  debts.  It has to do with bonds sold at a discount.

19          And the scheme here involved John Oliver standing up

20  at the same group meetings with the encouragement of Mahealani

21  Ventura-Oliver who says, Hey, we marry that process up with

22  ours, and saying, We can eliminate your debts, and we put your

23  debts on the 1099-OID forms and send them in to the IRS in a

24  way that results in a tax refund.  You'll recall that

25  testimony.

 1              The 1096 form is the form that transmits it.  And
 2     you've seen evidence -- Marnel Soares, for example -- where
 3     there's a series of 1099 forms, and if you look at them when
 4     you get into the jury room, you'll recall that her testimony
 5     was that this is a list of all my debts, my credit cards, my
 6     mortgage, anything that I owed with the account number and how
 7     much I owed.  And, no, the federal income tax was not withheld
 8     by that particular entity, et cetera.
 9              Part of the scheme also included the usage of this
10     Form 56, which is a Notice of Fiduciary Relationship.  Chris
11     Morgan explained to you that that's usually used by an estate.
12     In other words, when somebody dies.  And it's supposed to
13     identify for the IRS a person who can act on your behalf with
14     regard to the IRS.  In this case as you go through the
15     documents, you will see that the Form 56s identify Henry
16     Paulson again, the Secretary of the Treasury, as the particular
17     individual handling the accounts.
18              1040-V is a payment voucher, and you'll recall that
19     that's supposed to be attached to a payment, a check that is
20     sent to the IRS, yet in this case it was sent as a freestanding
21     document claiming money back from the IRS saying in some
22     bizarre way of thought that I have been paid all this money,
23     and now I need to recoup it from you.
24              The final document is a 1040, Federal Income Tax
25     Return.  You're familiar with that.  What makes the particular

1    forms here unusual is the same number appears three times.  You

2    add up your debt, you put it on OID forms, you put that number

3    down as your income rather than your debt, you then put the

4    same number down as taxes withheld.  Remember that makes no

5    sense.  Chris Morgan says who earns money, pays everything to

6    the IRS, how do you buy groceries?  You can't.  Makes no sense.

7    And then you repeat the same number and say, Zero taxes, give

8    me a refund in the full amount of my debt.  Bizarre.  Makes no

9    sense whatsoever.

10           But as part of this process, you heard that they

11   encouraged people to see John Oliver to basically use these tax

12   forms in order to "zero your account" to adjust your debt as

13   part of the whole process by which mortgages and debt are

14   supposedly paid.

15           What happened in the tax returns?  Here's the summary

16   of the different tax returns that you will see.  Maybe a little

17   harder to see from there.

18           Exhibit 25 is a personal tax return for John Oliver

19   and Mahealani Ventura-Oliver seeking a refund of $20,465.  The

20   other exhibits are John Oliver personally.  The Bowkers.  The

21   Monizes and Marnel Soares.  They all fit the same pattern where

22   the debt is used, added up on the OID forms, and then the same

23   amount is claimed as a tax refund.  Total claimed refunds,

24   $1,504,952.

25           Count 18 charges the defendant Mahealani

1    Ventura-Oliver conspired or agreed with John Oliver to

2    participate in this process.   Count 25 charges that she herself

3    participated in making the false return with her estranged

4    husband John.

5            May we see Exhibit 25, please?

6            In the jury room you'll see that this is a little more

7    legible, but this is a tax return.   It's the basis of Count 25,

8    the false claim.   Husband and wife, joint return, John Oliver,

9    Mahealani Ventura-Oliver.

10           And if we could go down and show the OIDs, please.

11           THE COURT:   Are these charts in anyone's way?   Not

12   everyone can see?   You can see.   Okay.   Good.

13           MR. TONG:   If you look at the original, you'll see

14   this is the income line, I think it's 21, and it says:

15   "$20,465.   See attached OIDs."   That's the total income.

16           Page 2 of that return, please?   If we could see the

17   top portion, please?

18           This says that the same amount has been held as taxes,

19   which John Oliver told you was not true.   And then the bottom

20   of the return, I believe this is the line that says that was

21   the amount paid, $20,465.   And then it seeks a refund in the

22   same amount.   Signed by John Oliver, Mahealani Ventura-Oliver.

23           You heard that the theory of defense on this tax

24   charge, these two tax charges, is that she had a good faith

25   misunderstanding of the law.   Ask yourself where would you get

1    that good faith misunderstanding of the law?

2         John Oliver told you that this OID scheme was based on

3    the same materials from Sam Kennedy that was the basis for the

4    mortgage fraud.  They knew that the mortgage elimination scheme

5    didn't work.  It made no sense.  Your common sense tells you it

6    makes no sense.  There is no straw man.  There is no boogeyman

7    that you can basically go through and tap into an account.  You

8    can't use it to eliminate debt.  You can't use it to ask for a

9    tax refund.  There's no misunderstanding of the law.  It's

10   ridiculous, it's false, it's fraudulent.

11        The question is, was it part of the program?  And I

12   want to wrap up by playing a couple of excerpts that show that

13   Mahealani Ventura-Oliver knew it was part of the program and

14   encouraged it.

15        Let's play the first excerpt, please.

16                       (Video played.)

17        MR. TONG:  Does that show that she knew that the taxes

18   were part of the process?  Of course it does.  As she put it,

19   It brings our monetary interest and marries that with our legal

20   interest.  And I found out that you can file this tax return,

21   and I said, Okay.  And plus we can file and get a tax return.

22        And if I may, let me play one last clip of Mahealani

23   Ventura-Oliver talking describing how the mortgages, the debts

24   and the taxes are all related.

25                       (Video played.)

1            MR. TONG:  Ladies and gentlemen, in her own words,

2    Mahealani Ventura-Oliver has just showed you that the mortgage

3    debt program was related to the taxes.  And in fact, in her

4    mind that's what brings closure.

5            The time has come for you to bring closure to this

6    case.  I ask that you find both defendants guilty of all counts

7    as charged.  Thank you.

8            THE COURT:  Mr. Barbee?

9            MR. BARBEE:  Yes, Your Honor.  May it please the

10   Court --

11           THE COURT:  Yeah, let's hold on one second.  Let's get

12   these down, Mr. Barbee, so -- there we go.  All right.

13           MR. BARBEE:  -- counsel, members of the jury.

14           Boy, you got a lot of stuff to digest in this case,

15   three works -- three weeks' worth of testimony and evidence.

16   It's quite a bit.

17           This will be my last chance to speak to you about the

18   reasonable doubts that exist in this case.  I'm going to try my

19   very best to point out what I feel are the reasonable doubts

20   that exist.  But if I forget something, please forgive me.  I

21   submit that there is abundant reasonable doubt in this case.

22           Three weeks ago you swore an oath when you were sworn

23   in as jurors.  You promised to give the defendants the benefit

24   of the doubt.  You promised to presume them to be innocent.

25   And I'm going to ask you to keep your promise in this case.

1          About 10 years ago, my mother-in-law from Molokai gave

2    me something, and I thought I'd bring it in to help try to

3    demonstrate one of the concepts in this case.

4          This is an old antique, and I hope I don't break it

5    here today.  But the concept is really pretty simple.  And the

6    scales help to demonstrate it.  When a case like a criminal

7    case starts, as opposed to a civil case, you can imagine the

8    scales of justice.  In a civil case it starts even-steven,

9    everything's in the middle, both sides are equal.  In a

10   criminal case, however, it's quite different.  In a criminal

11   case you start with the scales weighed entirely to one side.

12   And that's the presumption of innocence.  That's where you

13   start and that's where we started.

14         If and only if the prosecution can tilt that scale all

15   the way this way with proof beyond a reasonable doubt, and

16   erase your reasonable doubts, may you find a defendant guilty.

17         And in this case I submit that the government has

18   failed to do that.

19         Now, I'd like to start by commending law enforcement

20   for their efforts in enforcing the law and protecting those in

21   our community that are predators that will prey upon the

22   unwitting, the unknowing, the naive and the trusting.

23         But once a case comes to court, like this case, it's

24   not up to law enforcement to decide the case.  It's not up to

25   the lawyers to decide the case.  It's up to you folks to decide

1  the case.  It's you folks that count in deciding what is

2  important and what is persuasive, and whether or not the

3  government has erased the presumption of innocence and gone all

4  the way to the other side to prove the case beyond a reasonable

5  doubt.

6          Now, the evidence in this case, I submit, will show

7  without any doubt that Mahealani Ventura-Oliver meant well.

8  She meant to do right for her neighbors in the community.  She

9  meant well.  And we know that from some of the testimony.  You

10 will recall, I believe, that Mrs. Kaneshiro came to court and

11 testified from the witness box and from the stand, and she said

12 in her own words that it appeared to her that Mahealani seemed

13 that she meant well.

14         At her Registry meetings where she would speak to the

15 attendees at the seminar about history, ancestral land issues

16 and ancestral rights, she -- she meant well.  Her agenda at

17 both The Registry meetings, pre-Hawaiiloa Foundation and at the

18 meetings at the Cameron Center in 2008, her agenda, her passion

19 and her focus were on these issues.

20         Mrs. Kaneshiro testified that the discussion about

21 history, the aina, and genealogy went on and on.  At the

22 private meetings Mrs. Kaneshiro testified that Mahealani

23 Ventura-Oliver tried to give instructions about the bond

24 redemption program to those people that were attending and

25 present during this instructional time.  They were to learn

1    about the process and the documents, and Mahealani

2    Ventura-Oliver was trying to instruct them.  According to

3    Mrs. Kaneshiro, it was not detailed.  And when people in the

4    group had questions, she could not answer the questions.  She

5    could not answer them.

6          Later when the Kaneshiros and a group of other

7    families were experiencing problems and weren't having the

8    process work for them, they came to a meeting, and I think it

9    was January 11th of 2009.  They came to a meeting at the

10   office, and they asked for their money back.  Mrs. Kaneshiro

11   testified that Mahealani Ventura-Oliver was at a loss for

12   words.  She stuttered and she didn't know.  But there was

13   somebody present that did know.  Somebody else was nearby, and

14   the person that knew was John D. Oliver.  He yelled out:  "Give

15   them their money back."  And it was made so.  It happened.

16         This is an important illustration, and it's just one

17   illustration and example of John Oliver exercising his

18   authority over a program that he initiated, he brought from the

19   Mainland to Maui, and he controlled.

20         It bears just worth repeating real quickly, Mahealani

21   Ventura-Oliver did not know what to do.  John Oliver knew.  He

22   came out of the shadows, and everybody in the room witnessed

23   him exercise his authority.

24         As I said, that's one example of the basic truth in

25   this case.  And it's an important example.  It shows that John

1    Oliver was not a bystander watching things happen.  The

2    aw-shucks kind of guy that he tried to present himself when he

3    got on the stand.  Make no mistake, ladies and gentlemen, about

4    who was really pulling the strings, who was the initiator, who

5    was the controller in 1988 -- or, excuse me, 2008/2009, the

6    time frame that we're concerned with.

7         A little bit more about John D. Oliver.  John D.

8    Oliver is a liar.  He's a disagreeable, abusive coward of a

9    man.  In the mid-2000s, he studied up on these patriot --

10   radical patriot ideas from websites in the Mainland.  And he

11   became radicalized himself.  He shared this information with

12   his wife Mahealani.  He filed the initial bonds on their

13   behalf.  He saw an opportunity to use his wife's platform and

14   her audience with her community to experiment with these

15   radical patriot ideas.  And he took this opportunity.

16        First, he persuaded Mahealani that it was legitimate

17   and that it would work.  Next, he quit his job doing tile work

18   and shut down his tile business, and he created a new job for

19   himself.  His new job was to use his unwitting wife to promote

20   his Mainland patriot scheme to screw with the government, to

21   screw with the bankers.  And on the side make a little money

22   for himself.

23        In simple terms, what John Oliver did is if he could

24   use -- or vision the example of somebody who's running a

25   manapua truck.  They go out, and John went out and he collected

1    goodies to put on his truck.  Some of the goodies he collected

2    were these freedom school templates and forms, the Sam Kennedy

3    templates and forms, and he grabbed these goodies, like bonded

4    promissory note, acceptance for value, redemption and

5    admiralty, blah, blah, blah, blah, on and on and on, and he put

6    these goodies in his manapua truck.

7            He next got a Mainland patriot speaker to come to

8    Maui -- this is Winston Shrout -- to give out new forms and to

9    give a seminar regarding this bond issue.  And to give a

10   seminar regarding the tax issues.  The 1099 filings in this

11   case.

12           Those are more goodies he put on his truck.

13           In the mid-2000s, he then incorporated the 1099 tax

14   claim, he grafted that onto the Hawaiiloa Foundation.  He put

15   all these goodies in his truck, and poor Mahealani was used by

16   John Oliver like the bell ringing, like the music coming from

17   the speakers on the side of the truck to bring in customers for

18   the manapua man.

19           Liar John testified under oath here before us that he

20   never understood how the bond redemption process worked.  He

21   didn't understand it in May, he didn't understand it in June,

22   he didn't understand it in July, and he didn't understand it

23   all the way until the end.

24           Well, we know that he knew.  And we know that because

25   on November 16th, 2008, he explained in detail how it worked to

1    Special Agent Steven Carter.  Steven Carter recorded it all,

2    and it's on Exhibit 1-W, I believe.  And we played it for you.

3    Not just one or two minutes in greeting when he came in, but as

4    soon as Special Agent Carter got in the door, John Oliver was

5    chirping in his ear and explaining everything to him.  And one

6    of the things he explained, in response to Mr. Tong's argument,

7    is that you got to be strong.  It's going to get hairy.  Ignore

8    these letters.  Ignore all this and that.

9         So that's not proof that Mahealani Ventura and

10   Pilialoha Teves knew that the program wasn't working.

11   According to John Oliver, part of the process was that you

12   would get this harassment from your creditors, and you were to

13   ignore it, and it's going to get hairy.  And that's what he

14   told Special Agent Carter.

15        So just like the cockroach that gets caught in the

16   kitchen when the lights come on and scuttles away, so too did

17   John Oliver get caught lying right on the stand.

18        He knew exactly how it worked, he brought it to Maui,

19   he brought it to Mahealani, he brought it to Pilialoha, he

20   brought it to the Hawaiiloa Foundation.

21        He was the only one in that room at the Cameron Center

22   on November 16th that day who knew, with the possible

23   exceptions of his good friend legal-eagle Gerry Michaud, and

24   ambassador, doctor, swindler Petrovich Hoy.  Two guys from the

25   boys' office.

1          You know, it makes me angry that he came in this

2     courtroom and sat there and told bold --

3          THE COURT:  Mr. -- Mr. Barbee, your view is

4     irrelevant.  It doesn't make you angry because that's

5     irrelevant.

6          MR. BARBEE:  Okay.  I was just going to tell you what

7     made me sad.

8          THE COURT:  Doesn't matter.  Your anger, your sadness

9     is irrelevant to us.

10         MR. BARBEE:  Okay.  It makes -- it is worrisome, it is

11    worrisome and should be of great concern that Mahealani

12    Ventura-Oliver and Pilialoha Teves could be convicted based

13    upon the word of John Oliver and that you would convict them

14    based on his word.  When they were only naive and trusting.

15         The law Judge Seabright told you and read to you

16    earlier today, defendants are presumed to be innocent.  They're

17    not guilty unless they intended to defraud, unless they

18    knowingly passed fictitious documents, and unless, in the case

19    of Mahealani Ventura-Oliver, willfully filed false tax claims.

20         Now, I humbly submit that the government just doesn't

21    have that proof, and they certainly don't have it beyond a

22    reasonable doubt.  Because they did not know, they did not

23    intend, and they did not act willfully to defraud their

24    neighbors in their own community.  Instead, they too were

25    victims of John David Oliver's overbearing personality and

1   reckless experiment with this radical patriot program that he
2   imported to Maui.

3          John Oliver initiated and controlled this process
4   until the bitter end when his goodies on his manapua truck got
5   stale.  And when that happened, he threw these wonderful,
6   caring, generous and brave women under his truck.  In an effort
7   to get a lighter sentence.

8          So I ask you, please do not vote for the conviction.

9          After I'm done Attorney Gronna and Attorney Tong or
10   Attorney Nammar will get the last word.  I know I didn't cover
11   everything, there's just one or maybe two more things that
12   Attorney Tong raised in his argument I want to respond to.

13          On the excerpt or one of the excerpts he played on the
14   screen, according to Mr. Tong's argument, it's evidence of --
15   bad evidence against my client that she announced somebody in
16   the audience had zero on their mortgage or their credit report.
17   Right before that statement is made, Mahealani Ventura-Oliver
18   says, Oh, I've got a note.  That's a note handed to her from
19   the crowd.  Now, I don't have real sharp eyes and I can't see
20   who handed her that note, but it wouldn't surprise me if it's
21   John.

22          He -- Mr. Tong gave the example of the bank robbery
23   and how conspiracy can go on between many people, and he talked
24   about, well, one guy talks to another, Let's rob a bank, and
25   the third guy is going to be the getaway driver, and a call is

1    made to rent a car for the getaway vehicle.

2            Well, if it happens that those first three people know

3    that they're going to rob a bank and they conspired to rob a

4    bank, and one of them asks his wife to call Hertz or Avis or

5    National or Alamo to rent the car, and she doesn't know about

6    the bank robbery, she's not guilty.

7            So after the lawyers are done talking, and you retire

8    for deliberations and elect a foreperson, the judge is going to

9    give you your verdict form for each of the defendants.  And

10   kind of explained it.  It has a spot for -- for each of the

11   counts.  In the case of Mahealani Ventura, there's going to be

12   19 spots.  Count 1, it has a line for "not guilty" or "guilty."

13   And I ask you to check the box "not guilty" for Count 1.  "Not

14   guilty" for Count 2.  Not guilty for all those mail fraud or

15   alleged mail fraud charges all the way up to Count 16.

16           For Count 17, the allegation of money laundering, that

17   she knew the proceeds were from criminal activity, I ask you to

18   check the box "not guilty."  And for Counts 18 and 25, the tax

19   charges, I ask you again to vote "not guilty" and to acquit

20   Mahealani Ventura.

21           Thank you very much for your attention.  And thank you

22   for your consideration.

23           THE COURT:  All right, Mr. Barbee.  We will take a

24   relatively brief bathroom break.  Okay?

25           Can we use the jury lounge in the judge's conference

1    room?  Yes?

2           So send you over there.

3           Is there only one bathroom in there in that?  There's

4    two?  Okay.  There's also actually a judge's conference room

5    right through the door.  If there's no one in there, you can go

6    use the judge's bathroom there too, if you want.  Okay?

7           But we'll break for about 10 minutes and be back for

8    Mr. Gronna's closing.  Okay?  Remember you are not

9    deliberating, so don't talk about the case.

10          (A recess was taken from 2:23 p.m. to 2:43 p.m.)

11          (The following proceedings were held in open court in

12    the presence of the jury:)

13          THE COURT:  All right.  Please be seated.

14          We're back with defendants, counsel, case agents and

15    the jury.

16          All right, Mr. Gronna.

17          MR. GRONNA:  Thank you, Your Honor.

18          Wow, it's been a long three weeks, hasn't it?  And now

19    we're nearing the end of that three weeks, I'd like to say

20    thank you to everyone, to -- to these people over here at this

21    desk, of course to my desk, my client, and to the Court for

22    giving us the opportunity to present our side and a different

23    side, a different view of what the government has presented to

24    you.

25          When you look back in 2008, started out it was a

1   pretty good year.  Country was still in prosperity.  And if we

2   turn back the clock to the years before, the country was really

3   very prosperous.  People that were -- had -- could be

4   waitresses, could be daycare givers, husbands that could be

5   cement pourers, could go and acquire property, and they were

6   living the American dream.  They could go and get unlimited

7   amounts of credit beyond our wildest imaginations.  It was a

8   time of prosperity, and we were all living the American dream.

9            And then in 2008, the lights went on and reality hit.

10  It was just that, it was a dream.  They had us in a dream.  And

11  in the course of time of 2005, 2006, there were two women that

12  are sitting over at that table that were engaged in trying to

13  restore a dream.  They were trying to restore a dream of a land

14  that was lost, a country and a nation that was lost from a

15  hundred-and-some-odd years ago.

16           And they worked tirelessly and diligently to going

17  back and looking at what had happened and working to restore

18  the dignity and rights of a people whose country had been taken

19  away from them.  And that's what they had believed.  And that's

20  what they were working to do.  They worked and they formed The

21  Registry, going back charting the people's families and their

22  lives, where they came from, to help them to restore them back

23  to a place where they could have some hope and some dignity

24  restored back to them.

25           Now, in 2008 we know that -- well, let me back up a

1    little bit.  We know that Mahealani and Pilialoha were friends.

2    They had been friends for many years.  They had known each

3    other through the hula.  They had been engaged, as I said, in

4    the restoration and finding of the Native rights of the

5    Hawaiian people.

6        Mahea had joined -- had married John Oliver, and we

7    know from -- who John Oliver is.  He was a tile setter, had

8    come from San Diego, had married Ms. Ventura -- Ms. Ventura,

9    who's now Ventura-Oliver.  And essentially had his own

10   business, and as he said, he was actually very successful at

11   his business in the early 2000s.  Because that's when things

12   were prosperous.  We were building, houses were being

13   constructed, shopping centers were being built, mortgages were

14   being lent out to people that could afford them, or in some

15   cases could not afford them, and things were going well.

16        At some point in time, however, Mr. Oliver decided

17   that, and as he told you, you know, the government is dipping

18   into his pocket.  He didn't like it.  Mr. Oliver went off and

19   joined and began in -- say he couldn't really tell us when, but

20   sometime around 2005, 2006, he began going into online and

21   discovered the patriot or the -- or the sovereignty movement

22   that derived itself out of the Mainland.  This had nothing to

23   do with anything Ms. Teves was involved in, but it had

24   something to do with what Mr. Oliver was involved in.

25        And what did we learn about Mr. Oliver?  Mr. Oliver

 1    joined up a radical group.  It was headed by a guy by the name

 2    of Sam Kennedy, a Texas talk show host.  And they had come up

 3    with their Restore America Plan, of which Mr. Oliver decided

 4    that he wanted to become a part of.  And this Restore America

 5    Plan is the plan that came to tell us that America is bankrupt,

 6    and that he was there to restore this bankrupt America into

 7    this model country that he thought it should be.  And part of

 8    the Restore America program was this notion of bonded

 9    promissory notes and all of the other things that we began to

10    see, and that we did actually see in the course of this case.

11         Mr. Oliver came up with this novel idea that, you

12    know, you got your straw man and that we have -- the straw man

13    has got another man, and that the straw man and the real man,

14    once you divided, you can't go in and tap into a secret account

15    that the government holds for every one of us.  And that

16    account has anywhere from $600,000 up to $200 million,

17    depending on how much you want to draw from your secret

18    account.

19         This plan was not devised by Pilialoha Teves.  She

20    never advocated this plan.  She didn't devise this plan.  She

21    didn't go out and get the templates for this plan.  She didn't

22    download the templates into the computers for this plan.  She

23    had nothing to do with doing this plan and devising it and

24    implementing it.  She was working for The Registry as a notary,

25    and that was her job.  And also helping people in their gene --

1    restoring and finding their genealogy.

2         Now, you know, you think about what Mr. Oliver had to

3    say in his testimony, and he wouldn't be very specific, but I

4    would imagine that if you think about it, I think it was

5    around, he says, June of 2008, he didn't believe in this stuff

6    anymore, and he warned these two.  He warned

7    Ms. Ventura-Oliver, not so sure about Ms. Teves, that, Hey,

8    this is really no good, it's not going to work.

9         But you know what, think about -- let's fast-forward

10   this now to November 16th of 2008, and I highlighted a few of

11   what I thought to be were some pretty -- some highlights of his

12   true mentality and beliefs.

13        Let's see.  You know that Mr. Carter had been there

14   the week before, and John says:  "You know, you look at the

15   history of America, we've never been fed the truth.  Say

16   something about you're not Hawaiian, go through this program.

17   It's tied to you, we're saying U.S. Treasury.  It's still tied

18   to the U.S. Treasury, and the Hawaiian Treasury is pretty much

19   gone, but the whole thing -- but the whole -- but it's a whole

20   'nother thing over -- over there.

21        "But as far as your Social Security number and how

22   they attach it, how they attach it to the U.S. Treasury, yeah,

23   and it's all by contract, and basically they force you into the

24   contract.  You know, Social Security and all that.  Yeah, now

25   they -- now you have to sign up, your parents have to sign up

1    for it when babies are born.  And so they keep -- they keep
2    forcing.  It's socialism.  It's pretty much a socialist country
3    now, because they put a different twist on it.  They give us
4    things to make us feel free, but we're not.  And you know, we
5    all need rules and laws.  I mean government can be good, it
6    keeps everything in order, but when they start stealing from --
7    but from when they start stealing from you."
8            This is not Ms. Teves.  This is John Oliver.
9            So what does he say?  He tells him, Go to the website.
10   It's called freedomschool.com.  Go to freedomschool.com, and it
11   has all of this information, information about how -- you know,
12   did you know paying taxes is voluntary?
13           Yeah, according to Mr. Oliver.
14           Let's see.  What else?  "You can check the website,
15   and, man, there's thousands and thousands of pages of law and
16   history, and stuff that'll just blow your mind.  And stuff that
17   we should all know.  And you can make an educated decision, you
18   know what I mean, either way, because some of the stuff we
19   learned in school, I read it in the paper, and if you really
20   read between the lines, you start to see the propaganda.
21           "There's also Republic Broadcasting, it's on an
22   Internet radio site, and one of the geniuses in all this type
23   of laws, commerce law is a look at "Take No Prisoners."  It's a
24   radio show on that website."
25           This is the sovereigntist movement that Mr. Oliver was

1   enrolled in.  He was engaged in it.  He had a library in it.

2   And he had templates to download and create bonded promissory

3   notes.  And it was a promise to the people that if you engage

4   in these bonded promissory notes, we would -- you could get

5   your mortgages and your debts eliminated.  That was Mr. Oliver.

6           And so he sold that plan to Mrs. Oliver, but more so

7   down the line to Ms. Teves.  And when you look at Ms. Teves,

8   and you think about what the evidence was about the interaction

9   that people had with Ms. Teves, well, she was at the meetings.

10   Did she speak at the meetings?  If she spoke at all, it was

11   very, very short, and I think the testimony had been that it

12   was about her basic knowledge of Hawaiian rights.  She didn't

13   speak at all about bonded promissory notes and stuff, because

14   she didn't understand it because the only guy that maybe could

15   have understood it was John Oliver.

16           And did she set the fees?  No.  There was no evidence.

17   The fees had already been established by somebody else in the

18   program, but it wasn't her.  What she did was, she provided

19   notarial services for the documents that had been downloaded

20   and provided by John Oliver, and the templates, essentially he

21   had to teach them where to fill in the blanks, which is what

22   they did.  It was John Oliver that put this together and sold

23   it to the people.

24           And who were the people?  They were people that were

25   so far behind in their debts, as they said, and it was

1    unfortunate and sad for some of these people that we had to

2    listen to.  It was.  But they were desperate and they needed

3    some help.  And so, you know, you can think of that from the

4    standpoint over here, Well, they're taking advantage of these

5    poor people because they knew they were in distress and needed

6    a way out, or you can take it from the standpoint of them

7    saying, These people are hurt, they need help.  We're told by

8    the sovereigntist, by Mr. Oliver, that this plan can bail them

9    out, give them some help from their distress.

10          And you know, when you think about Ms. Teves, what did

11   she do?  I mean, you know, is her name on the Hawaiiloa

12   Foundation documents?  That's in evidence, it was just shown to

13   you earlier this afternoon.  She's not on the board.  She

14   notarized, but what does a notary do?  All a notary does is

15   used to verify the signatures that are contained on the

16   document.  They're not there to verify the documents.  Now, she

17   notarized the Hawaiiloa Foundation form, it tells us who that

18   was, and as they said, that was a family organization.

19          And let's think about, what about the money part?  You

20   know, we got to see what was paid to her.  She essentially was

21   paid a salary every month for sitting and assisting and helping

22   people fill out the forms to submit them.  She was being paid

23   approximately five to $6,000 a month.

24          Now, we have in there, you know, the charts from

25   the -- that had been the summary of the account information,

1    and I think that that account information was approximately

2    $450,000, but then, of course, when you add the additional

3    money that was found in the safe along with the coins, it's

4    probably much more than that.  And so how much did Ms. Teves --

5    how much did she make?  Less than 10 percent of what they'd

6    earned.  But she went to the office, like all of us do here, to

7    perform her job and her task.  And she was paid a salary for

8    doing that.

9         Now, the -- the law that the Court has given you, and

10   I wanted to just go over a couple of points with you, the --

11   the basic thing we're really dealing here with is, you know,

12   there's no question that these documents were generated.  They

13   were, you've seen them.  But really what you have to determine

14   is, What did they know?  What was their intent?  And has the

15   government been able to prove to you beyond a reasonable doubt?

16        And you saw the scale here.  Have they been able to

17   tip that scale to such a degree that they've been able to prove

18   to you that they actually knew that this was not going to work,

19   and that they obtained these funds knowing that it was no good

20   and it wasn't going to work.  Or were they just there, like all

21   the rest of the people that came into this program, thinking

22   that something was going to be paid and taken care of.

23        And that it was actually, according to the way that

24   the sovereigntists or the -- I should say the patriots believe

25   it to be, that in fact they were going to be able to pay off

1    their debts by the way of these bonded promissory notes.

2           Now, Ms. Teves is not involved in the -- in the IRS

3    scam, had nothing to do with that.  But certainly, you know, we

4    had Mr. Shrout come over and, you know, give his presentation

5    on how to go about doing that, along with how to also perfect

6    the bonded promissory notes.

7           Because you'll see -- if you go through the exhibits,

8    you'll see how the bonded notes morphed over the course of the

9    six months and how they changed.  And when you think about

10   this, and, again, remember Mr. Oliver says, I had nothing to do

11   with this.  You know, I told them it was all bad, and, you

12   know, the FBI came out with their notice that this is a scam,

13   and I told them, See, I told you so and I don't want anything

14   more to do with this.

15          But you remember the Kane- -- Mrs. Kaneshiro coming

16   and telling you about visiting on January 11th of 2009, when

17   she and her husband went and they came to Mrs. Oliver, who sat

18   and not really -- believing that they were going to come for

19   further discussion on how to -- on the program and demanding --

20   and they, of course, demanding their money back.  Mr. Oliver,

21   of course, saying, Well, give them back their money.  But also

22   remember Mrs. Kaneshiro also saying how she was appalled at the

23   fact that John Oliver came to them to say, Oh, by the way, I

24   think you may --

25          MR. TONG:  Objection, Your Honor.  This goes beyond

1    her testimony.

2              THE COURT:  Sustained.

3              MR. GRONNA:  Well, it went to the point where

4    Mrs. Kaneshiro, as I remember her testimony, was that John

5    Oliver approached her with a new plan --

6              MR. TONG:  Objection.  Misstates the evidence.

7              THE COURT:  The -- the jury's recollection will

8    control.  I sustained the other one because of the "appalled"

9    language seemed a bit of hyperbole.  But the jury's

10   recollection will control.  Go ahead.

11             MR. GRONNA:  Thank you.

12             But it was Mrs. Kaneshiro who said that John Oliver

13   had approached them, and that Mr. Oliver had a new way of

14   sending out a new bonded promissory note.  And this was in

15   January of 2009.  And this bonded promissory note was based in

16   admiralty.

17             And if you look at the exhibits, I think that it's

18   Exhibit 16, and I think that what you will see in that exhibit

19   is the morphing of the actual bonded promissory notes that were

20   submitted.  And the bonded promissory note that was submitted,

21   and I think it was for Mr. Peelua, was a bonded promissory note

22   based in admiralty right around the same line of that of which

23   Mr. Oliver was advocating.  He was right in it up through the

24   very end, and everything he told to you essentially was his own

25   self-serving lie.

1          You know, as I pointed out when I had him up on the
2    stand and talked to him about the fact that he had no problem
3    lying either -- I mean think about this.  If he didn't believe
4    in this in June of 2008, and yet for the next five, six months
5    sat at meetings and stood up and advocated for this program,
6    and then sat and made this comment to Mr. Carter about how well
7    this program is, he's either the greatest pathological liar or
8    he truly believed it.  In which case he still doesn't have any
9    problem sitting up and lying to you about what this program
10   did.  And he didn't believe it.  It's just totally incredible.
11          And we also have Defense Exhibit A, and you're going
12   to see that.  This is the Affidavit of Truth that I was asking
13   him questions about and how he said, I didn't want any of the
14   money back, I wanted nothing to do with it anymore.  And this
15   was in November of -- I'm sorry, May of 2009.  I want nothing
16   more to do with any of the money.  It was all just -- it was
17   all no good.
18          Here we have, and I think this was -- he said he --
19   because he had the money up at the Hoys'.  And he said, I don't
20   want anything more to do with it, and yet here he is having an
21   Affidavit of Truth saying that the Hoys stole $400,000 of their
22   money, and that he wanted it back.  Really, John?  Really?
23          Okay.  Now, I want to just say something about when
24   Ms. Teves was given the bonded promissory notes that she
25   attempted to use on her own home.  And we had the Exhibits 26

1   series, which is in the large binders that you'll get back

2   there.

3          But also what you're going to get is a smaller binder,

4   like this (indicating), this will be it, and contained in that

5   is a lot of documents that Ms. Teves had filed in response to

6   the -- the bank.  And essentially a lot of this when you look

7   at this -- now, remember, Pilialoha Teves is -- essentially

8   she's a masseuse, a therapeutic masseuse.  That is her skill.

9   And aside from doing genealogy, that's basically the education

10  she has.  And yet here you have such documents of Rescission of

11  Mortgage Contract Within Three-Day Rescission Period.

12         Pilialoha Teves drafted that?  Really, John?

13         How about the bonded promissory note?  She did that?

14         Or how about -- how about her preparing a Declaration

15  of Trust?  You think she could do that?

16         Or how about sending letters off, Confirming and

17  Verification of Payoff and Satisfaction of Loan?  She can do

18  that?

19         She had the -- the aptitude, the library, the forms?

20  Did anybody ever testify that she had the forms?  For this kind

21  of stuff?  The only forms that we know of that was available at

22  the Hawaiiloa Foundation were the bonded promissory notes and

23  other documents associated with that that was created by John

24  Oliver, because he's the guy that got them from his pal

25  Mr. Kennedy.

1            Or how about this one, how about the Second Judicial

2    and Administrative Notice to All of Respondents Standing?

3    Notice of Property and Irrevocable Trust in Original

4    Jurisdiction.  Notice of Withdrawal.  Proof of Service.  She

5    could draft that?  She had the wherewithal to know how to put

6    together that kind of language to file those kinds of

7    documents?

8            And so as John Oliver says, Yeah, you file it, but

9    it's going to get hairy.  Well, it did get hairy, and she

10   followed along and, you know, for better or worse, she tried

11   the process.  And eventually, yes, she did find out that they

12   eventually did take the house.

13           And look at when they took the house.  It was not

14   until January of 2009, I believe.  Excuse me.  It was -- some

15   of the last filings, and it's really unknown at this point in

16   time when the actual foreclosure took place.  But when you look

17   and see in the evidence when is the last notary that she

18   signed, and the last notary she signed was in November of 2008.

19           And there was one other document that came into

20   evidence of her signature where apparently she was a witness

21   to, and that was -- and I believe the person that she witnessed

22   that to stated that she wasn't even there.  So we didn't even

23   know when that document -- when she actually executed that

24   document.  But certainly any evidence the government had put up

25   of her actually executing any documents after 2008, except for

1   that one witness, there isn't any.

2           We have the fact that she was getting -- still getting

3   some income from her work at the foundation, but we don't have

4   any evidence to know exactly what she was doing there or who

5   she was advising or counseling or what she was doing.

6   Essentially she is ministerial in her position.

7           And so what the government is asking you to do is to

8   say, Well, she's -- was working there, she was collecting a

9   salary.  She's an employee, so she must have known that it was

10  no good, so you got to find her guilty.

11          I submit to you just the opposite.  It's usually the

12  employees are left in the dark about what the employers, the

13  management is up to.  And I submit to you that that was the

14  case.  That being a line person working, that she would not

15  have known what the overall scheme and -- of what Mr. Oliver

16  had submitted and put out there.  She was Ms. Ventura-Oliver's

17  friend, and on that she worked and supported.

18          And she believed, she believed that it worked.  She

19  believed it worked.  There's -- there's nothing to suggest by

20  what her prior actions were and what she was doing with herself

21  would suggest that she would be someone that would go out and

22  intentionally dupe somebody.  Especially given the fact of what

23  she had been doing just before all this started happening.  She

24  was involved in helping people to restore them of their rights,

25  to find their background of who they were and where they came

1    from.

2           But people came, they were in distress, there was no

3    way out.  She acted as the notary.  She provided a notarial

4    service for people, and essentially her role was ministerial

5    compared to the overall scheme of things and how it worked.

6           Now, what I wanted to do is to suggest -- is to remind

7    you that when you go back and deliberate to think about what

8    the theory of our defense is.  And the theory of the defense is

9    that they did not have the intent to defraud.  And there is no

10   evidence to suggest that Ms. Teves did in fact have the intent

11   to defraud.  Anything that she had said to the people was what

12   had been told to her by somebody that she thought was being

13   truthful.

14          The other thing is this, is that when you read the

15   instructions, there's an instruction that will also tell you

16   that each individual is to be judged separately.  So when you

17   go back and deliberate, you'll think independently of Ms. Teves

18   and what her role was, and the fact that essentially she was

19   not a leader, organizer, or necessarily the promoter of this

20   program.  Essentially you have to have knowledge that you're

21   engaged in a conspiracy.  And is there evidence that she had

22   knowledge that this was in fact a -- not going to work?  Well,

23   no.

24          I'm not as eloquent as those that have come before me.

25   But I'd just like to say that -- I mean you think of all of

1    what the evidence is that you've heard in this case, people

2    that spent hours going and listening to the presentations, and

3    spending hours and the time that they spent with Ms. Teves,

4    like 5, 10, 15 minutes, total, when they came in to -- when

5    they came in and she notarized their signatures, when she acted

6    as a notary.  I submit that's not enough.  It's not enough

7    evidence for proof that she knew that she was actually duping

8    these people into this program, that she was actually knowingly

9    taking money from them.  It's not there.  And it's not proof

10   beyond a reasonable doubt.

11        And so when you think about what proof beyond a

12   reasonable doubt, and what that high, heavy burden that the

13   government has and that standard, it has not been raised, and I

14   submit to you that there is reasonable doubt.

15        Now, the government is going to come up, and you know,

16   they're going to tell you how wrong Mr. Gronna is.  That, you

17   know -- I think one of the favorite comments is, you know, I

18   don't know if he was in the same trial that I was in.  But I

19   was, and I submit to you that this is -- that there's a

20   reasonable doubt.  And, you know, they'll provide you with

21   other instances, but I'd like you to think about how -- when

22   given that, how we would respond to those follow-up statements

23   that you're going to be given.

24        You heard a lot of evidence in this case.  But even in

25   spite of the constant parade of people that came up here that

1   all had the same story, essentially all said the same thing,

2   they spent very little time with her.  She notarized their

3   documents, she sat in at the meetings, she didn't say anything

4   at the meetings.  When they had questions about it, she would

5   say, Yeah, your mortgage is going to be taken care of, because

6   that's what she was told was going to happen.  She didn't do

7   anything more than what was told to her about how it was going

8   to work.  Essentially she was there working on their behalf.

9        And I submit to you that there is insufficient

10  evidence for you to return a guilty verdict.  And I implore you

11  that you should return a guilty -- a not guilty verdict because

12  that is the only true and fair verdict that you can actually

13  return when it comes to Ms. Teves.

14       She was dedicated to helping people.  She was not out

15  to take their money.  She didn't know that this was in fact

16  going to turn out the way that it did.  And that she's not

17  guilty.  She's not guilty.  She believed in what she was doing,

18  and she had absolutely no intent to take these people, and I

19  implore you to find that she's not guilty and to return that

20  verdict of not guilty.  Thank you.

21       THE COURT:  All right.  Mr. Tong.

22       MR. GRONNA:  Oh, and actually, I do have one more

23  thing before I do walk away.  I wanted to say that in

24  closing -- one second -- you remember when we started this

25  trial out and we gave opening statements.  And do you remember

160

1    what I said was going to happen in the course of this trial and

2    the evidence that would come out, and I submit to you

3    everything that I told you that was going to happen in this

4    opening statement did in fact come through in the course of

5    this trial.  And that now we are here and the things I told you

6    are -- are true, they did happen, and because of that, I submit

7    to you that she is not guilty, and we have been able to

8    demonstrate the fact that she's not guilty and to return that

9    verdict.  Thank you.

10            THE COURT:  All right.  Mr. Tong?

11            MR. TONG:  Just a notary.  Pilialoha Teves.  Take a

12   look at the records between April of 2008 and March of 2009,

13   she got $56,329 from Hawaiiloa Foundation.  Take a look at

14   Agent Carter's summary.  A lot of that money was in the form of

15   checks that went into her account from individual participants

16   that said "BLT."  56,000 bucks.  That's pretty good money for

17   being just a notary.

18            Isn't it more likely that she's not an employee?

19   Doesn't the evidence show you, as Lehua Hoy told you, that she

20   was the number two in command.  She reported to Mahealani

21   Ventura-Oliver, and she was above Lehua Hoy, who explained the

22   organization to you.

23            She didn't understand the program?  She knew it well

24   enough to tell others how to deal with the bonds.  She knew it

25   well enough to tell others how the bonds would be used.  And at

1   the time she told that to people, she knew that it had not

2   worked for her.

3          Mr. Gronna says, Well, she didn't know at the time.

4   The evidence that he brought forward for you, Exhibit 26-D.1

5   shows that the bank initiated foreclosure in August of 2008.

6   Shortly after she tried to use the bond, failed, joined

7   Hawaiiloa Foundation and started to earn her $56,000 and

8   change.

9          I submit to you she's not a notary; she's a

10  co-conspirator.  Someone who joined the agreement knowing of

11  its purpose and helping to accomplish it.

12         Now, Mr. Barbee made a number of points.  I want to

13  commend him on the scale.  I -- I can't voice my opinion, but

14  the scale was very illustrative and interesting, I suggest to

15  you.

16         But the one thing that I think -- I submit that you

17  should consider is that you, as jurors, are sworn to decide

18  this case on the basis of the evidence.  That's why Lady

19  Justice is blind, and there's two pans to weigh the evidence.

20  One thing that you cannot base your verdict on is emotion.  I

21  will read to you an instruction that Judge Seabright gave to

22  you earlier.

23         "It is also your duty to base your verdict solely upon

24  the testimony and evidence in this case, without prejudice or

25  sympathy.  That was the promise you made and the oath you took

1    before being accepted by the parties as jurors in this case.

2    And they have the right to expect nothing less."

3           I ask you to honor that oath and decide this case on

4    the basis of the evidence, not emotion.  Because I submit to

5    you the evidence has shown that they are guilty.

6           Mr. Barbee got up and launched on a long attack on

7    John Oliver.  But you know already from the instructions given

8    to you that we do not have to show who came up with the plan.

9    We do not have to show who the ringleader was.  We just have to

10   show that the defendants joined in, knowing of the purpose and

11   helping to accomplish it.

12          You can find both defendants guilty even if you don't

13   like John Oliver.  You can also find them guilty even if you

14   find that John Oliver is a bad person.  Because you must decide

15   the case on the basis of the evidence, not on any belief on

16   whether they had a good marriage or a bad marriage, or whether

17   he's a good or a bad person, or whether he's overbearing.

18          And while we're talking about that, in a sense I ask

19   you to consider the relationships that you've heard about here

20   in a different way.  Mahealani Ventura-Oliver for years was

21   into this Hawaiian sovereignty movement.  You saw the passion

22   with which that movement is promoted to others in the form of

23   Mr. Armitage the other day.  I asked him questions that were

24   designed just to bring out what is this about, and he got

25   pretty pointed with me saying, It's not our belief.  This is

1    the law, this is the rights.  We're trying to redress them.

2    Part of it is we basically stand up for our rights, we take our

3    property, we do what is necessary.

4         That was the mindset that she had before this program

5    began.  John Oliver came in with a similar mindset.  Government

6    is strange, government is bankrupt.  He put his thumb in the

7    eye of government.  The two of them not only married each other

8    but they married up their programs.

9         The bonds became part of this Hawaiian sovereignty

10   thing.  People were told the bonds worked, they pay off your

11   mortgage.  It became a way of vindicating their feelings

12   towards government.  But for purposes of this case, the

13   evidence is very clear that every participant was told the

14   bonds worked, and they knew that it didn't.

15        The relationship may have been volatile, but in a

16   sense their minds, the way they melded it together, was a

17   marriage made in heaven.

18        Now, Mr. Barbee also brought out the question of,

19   Didn't they just mean well.  Well, if they meant well, why

20   didn't they tell people that each of them had tried the process

21   and it didn't work?  Why would they take money from people?

22        Mr. Barbee says they didn't mean to victimize their

23   neighbors.  Remember Charlotte Kanaele?  Retired from Miyako

24   Sushi.  Worked there until she had a leg circulation problem

25   and could no longer stand to make sushi.  She heard about the

1    program, she heard the bond would pay off the mortgage.  She

2    heard about it in May 2008, after Mahealani Ventura-Oliver had

3    tried the bond unsuccessfully.  Mahea Ventura-Oliver met with

4    Charlotte Kanaele, took her $2,000 in money, money she didn't

5    have, and told her, This bond will pay off your mortgage.  The

6    bond was notarized in July of 2008, after she knew the bond

7    didn't work.  Is that being nice to your neighbors or is that

8    deceiving people for your personal gain?

9             One other point I just want to make quickly.  They

10   seem to -- both defense lawyers seem to suggest that the

11   defendants were motivated by goodwill to help people.  How does

12   that explain why they did this process for those who weren't in

13   any financial trouble?  What about Jerry Agbannaoag?  What

14   about Noreen Lane?  What about those who weren't behind in

15   their payments?  What about Tanya Andaya?  They took money from

16   those people to give them a product they knew that didn't work.

17   They weren't helping them.  They were hurting them.  These

18   people weren't in distress when they started, but they surely

19   were in distress when it ended.

20            Ladies and gentlemen, I ask that you carefully

21   consider the evidence and ask yourself, If they didn't know

22   what they were doing was wrong, why did they shred things when

23   they saw that they were being investigated?  If they didn't

24   know that they were the group that was selling bonds illegally,

25   why did they put out the ad in the paper saying, We are not

1    that group?

2           Ladies and gentlemen, I suggest to you that when you

3    go back in the jury room, when you look at the exhibits, you

4    will conclude that they engaged in a plan that was well

5    orchestrated, that they knew didn't work, that was part of an

6    agreement, a conspiracy to commit mail fraud.  And that they

7    are guilty of all charges.  Thank you very much.

8           THE COURT:  All right, ladies and gentlemen, that

9    concludes the trial.  At this point in time I am going to

10   excuse our two remaining alternates, Ms. Hirakawa and

11   Ms. Contreras.  I certainly want to thank both of you for your

12   service.

13          I think I explained a little bit previously what may

14   happen in reference to you going forward, so I want to make

15   sure you understand that.  Every now and then -- it's very,

16   very rare, but every now and then there's an emergency one of

17   the deliberating jurors may have, whether it be with him or

18   herself or a family member, where they simply cannot serve.

19   And in our federal rules, there is a provision that if that

20   happens, we can call in an alternate juror.  And then

21   deliberations would begin anew with that alternate juror

22   replacing the juror who had to step aside.

23          But should that happen, I have to be ensured before I

24   will be able to seat you that you haven't discussed the case or

25   done any research or otherwise been influenced in any way

1    regarding the case.

2           So my same admonition to you still applies.  My same

3    order and instruction to you still applies.  That is, you can't

4    talk to others about the case, you can't talk to each other,

5    and you can't talk to your fellow jurors.  Okay?  The parties

6    know they can't talk to you, so no one will try to talk to you,

7    the lawyers or parties.  They understand that.  All right?

8           When a verdict is reached, you will be notified.  At

9    that point in time, you are released from my order and you can

10   go home and talk all you want.  All right?

11          So I will excuse you at this time to go back to the

12   jury lounge and to check out.  And again, on behalf of the

13   parties and the Court, we thank you very much for your service.

14   We know it's a long trial, and we very much appreciate your

15   service.  Thank you.

16          Just the two alternates, just the two alternates are

17   coming out.

18                    (Pause in the proceedings.)

19          THE COURT:  Okay.  Will the marshal step forward for

20   swearing, please.

21          You may be seated.  You may all be seated.  Thank you.

22          (The jury marshal was sworn to take charge of the jury

23   during deliberations.)

24          THE COURT:  All right.  So, ladies and gentlemen, you

25   are going to begin your deliberations now.  I'll leave it up to

1    you if you want to do something beyond just elect your

2    foreperson.  If you want to just do that and go home, that's

3    fine.  If you want to do that and begin your deliberations,

4    that's fine.  You're sort of in control when you deliberate.

5    That doesn't mean to say I'm going to let you deliberate till

6    midnight, okay?  Let's just be clear on that.  I mean people do

7    have family and children to get back to, court staff and so

8    forth.  So this won't go on real long tonight, but if you want

9    to stay and deliberate, you're welcome to.

10            When you are ready to leave, just make sure the

11   marshal knows you're leaving, and -- and I'll be notified and

12   the parties will be notified then that you have left.  All

13   right?

14            I am going to put what's called ELMO -- is it there

15   yet?

16            THE CLERK:  No, because it's still here.

17            THE COURT:  No.  Okay.  It may not be this afternoon,

18   but Tuesday morning what's called an ELMO in the jury

19   deliberation room.  It's simply a machine that you can place on

20   a piece of paper, you can do anything, put a pair of glasses, a

21   wedding band, whatever you want, you can place on it and it

22   magnifies it on an overhead.  That way should you want to look

23   at any documents, you can look at them together as opposed to

24   having -- because you are only going to have one set of

25   exhibits, instead of passing it around, you can put it on that

1    ELMO machine and everyone can take a look.  It's up to you
2    whether you want to use it or not.  It's a tool only for you if
3    you want to take advantage of that.  All right?
4           Tuesday, yes.  So remember you're not coming back
5    Monday.  Tuesday morning deliberations will begin at 9 o'clock.
6    All right?  So at this point in time I will excuse you to begin
7    the deliberations.
8           And we'll get your notepads to you in deliberations
9    room.
10          THE CLERK:  They're there.
11          THE COURT:  They're there already.  Okay.
12          (At 3:29 p.m., the jury retired to commence its
13   deliberations.)
14          THE COURT:  All right.  So, Mr. Barbee and Mr. Gronna,
15   you'll both be on ten-minute call?
16          MR. GRONNA:  Sure.
17          MR. BARBEE:  I might need 15, Your Honor, because I'm
18   way up on the top of Bishop Street.
19          THE COURT:  You're a fast walker, Mr. Barbee.
20          And obviously, Ms. Ventura-Oliver and Ms. Teves, you
21   too, likewise, need to be on ten-minute call.  You folks have
22   cellphones that you can get from your attorneys or you'll be in
23   their offices.  I'm not sure what you're going to do,
24   but sometimes the jury will have questions and we need to get
25   back together, and I don't like keeping the jury waiting.  And

1   then when there is a verdict, of course, I don't want to keep

2   them waiting as well.

3          So be on about 10- or 15-minute call at the most.

4   Ms. Greaney will let everyone know when the jury goes home, so

5   you will know when the jurors have been excused for the

6   evening.

7          All right.  Thank you all very much.

8          MR. BARBEE:  Thank you, Judge.

9          MR. GRONNA:  Thank you, Your Honor.

10         (The proceedings concluded at 3:30 p.m., October 18,

11  2013.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3         I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing pages numbered 1 through 169

6    is a true, complete and correct transcript of the proceedings

7    had in connection with the above-entitled matter.

8              DATED at Honolulu, Hawaii, January 16, 2014.

9

10

11                          /s/ Cynthia Fazio
                    CYNTHIA FAZIO, CSR, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25